**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIM AMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-4884 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CHICAGO BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kim Ammons ("Plaintiff") brings this action against Defendant Chicago Board of Education ("Defendant" or "Board") for alleged violations of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and Title VII of the Civil Rights Act of 1964 ("Title VII") arising at of her employment as a Security Officer at Curie Metropolitan High School ("Curie"). This matter is before the Court on Defendant's motion for summary judgment [55]. For the reasons stated below, the Court denies Defendant's motion [55]. This matter is set for status hearing on October 9, 2018 at 9:00 a.m.

## I.      Background

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [57], [64], and [75], and the exhibits attached thereto. The following facts are undisputed except where a dispute is noted.

The Court has subject matter jurisdiction over Plaintiff's ADA, FMLA, and Title VII claims pursuant to 28 U.S.C. § 1331. Venue is proper in this district because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred here. This action arises out of Plaintiff's employment by Defendant in Chicago, Illinois, which is located in this district.

Plaintiff was first employed by Defendant as a custodian from February 1994 until June 1997, when the Board privatized the custodial staff. Plaintiff was rehired by Defendant in 2000 in a security position. She was laid off in 2003 and rehired in 2004. Beginning in April 2004, Plaintiff worked as a security officer at Curie. Curie is divided into two buildings: the A Building and the B Building. The A Building is a three-story structure that contains the general education classrooms. The B Building is a two-story structure that contains the auditorium, music rooms, gym facilities, pool, and locker rooms. The boys' and girls' locker rooms are located on the second floor of the B Building.

Plaintiff testified that her job duties remained consistent from 2004 to 2012. When she began at Curie in 2004, she was posted at the information desk in the B Building. There were several chairs at this desk, including one that Plaintiff used. Plaintiff also rotated from the information desk and walked the perimeter of the B Building, including the hallway by the girls' locker room. Plaintiff put a chair in this hallway. At her deposition, she explained that the "custodial staff might move it," and "[i]t was on us to go into either the dean's office or a classroom nearby to pull the chair out." [58-1] at 47. Plaintiff testified that, despite having a chair at her post, she could become active at any time when students were in the hallway and could disperse or move students around when needed. Plaintiff also testified that she did not sit when there were individuals in the hallway. According to Plaintiff, because of her experience she knew when moving was needed and when it was not. Michel Haynes, a CPS custodian who years earlier worked as a security officer at another CPS school, testified at his deposition that he was allowed to sit while on the job and was able to perform his job duties in an effective way. [58-2] at 80.

At some point, Plaintiff was moved to a post on the second floor, east end of Curie's A Building, outside the special education classrooms. She had a chair and desk at that post. Although

security officers were not guaranteed a specific post at Curie, Plaintiff had this post for over ten years.

Since 2012, Defendant has maintained a job description for the security officer position within CPS. According to Plaintiff, there were several versions of the job description over the course of her employment at Curie. The 2012 job description for school security officers states that "Security Officers are responsible for the overall safety and security of the school," are "actively involved in the progressive discipline system," and provide "the first line of defense to defuse and de-escalate student misconduct and/or serious incidents." [58-41] at 2. The position's "Principal Accountabilities & General Responsibilities" include, among other things (1) "actively respond[ing] to fights or other issues in the school that threaten the safety of students, staff, and/or guests"; (2) "maintain[ing] an orderly post and remain[ing] at the post at all times unless otherwise directed by a supervisor"; (3) fulfilling "duties assigned related to Hall Sweeps"; (4) reporting "unusual activity or suspicions of safety issues" to the security supervisor or administration; and (5) monitoring school grounds and school entrances. The job description does not list constant walking as a job requirement. Plaintiff testified that she has seen a copy of this job description. Plaintiff also testified that it would be difficult to respond to fights while sitting in a chair, but that, as an experienced security officer with more than twenty years of work history, she knew that security officers were not to be seated when students were in the halls.

Starting in 2012, Defendant, through the Office of Safety and Security ("Office"), began reviewing and reforming its security practices across the entire district. The Office spoke to principals and students as a part of this review and found that they felt safer when security officers had greater presence in the building by roving the hallways. Principals and students indicated that

seated security officers appeared less vigilant and alert.[1]  Around April 2012, the Office made the decision that security officers were no longer allowed to be seated while on duty.  This policy applied district-wide to all security officers.  (However, as discussed below, the policy apparently was never implemented at Curie until the 2015-2016 school year.  Also, the record in this case does not contain any written copy of the alleged policy, and Plaintiff testified that she never received any communication from Defendant requiring that chairs be removed.)  The basis for the policy change was that seated security officers have a reduced capacity to provide security services to the school.  Security officers are responsible for ensuring to the safety of students, staff, and visitors and must be able to respond promptly to emergency situations.  A standing security officer has fewer blind spots and a faster response time.  According to Defendant, being mobile improves security officers' job performance and effectiveness.

In June 2013, Plaintiff received an "excellent" evaluation.  In 2014, Plaintiff was posted to the third floor, west end of the A Building.  This post was known as "three west."  Her responsibilities included monitoring the halls, checking the washrooms, answering the radio if the attendance office called to get a student out of class, and going in and out of the lunch room.  Plaintiff had a chair at this post, which the administration allowed.

On March 27, 2014, Ammons filed Charge Number 2014CA2496 against then-Assistant Principal Cottrell (no first name provided) with the Illinois Department of Human Rights

---

[1] Plaintiff disputes this fact (and several others) on the basis that she has insufficient knowledge to admit or deny it, but Plaintiff's lack of knowledge does not create a material factual dispute.  See *Bledsoe v. Potter*, 2005 WL 2230188, at *3 (N.D. Ill. Sept. 7, 2005) ("A response that the non-movant does not have sufficient information cannot create a dispute, and thus the Court deems these statements of fact admitted."); *Lockhart v. Village of Riverdale*, 2003 WL 21212589, at *1 n.1 (N.D. Ill. May 22, 2003) ("for purposes of the Motion for Summary Judgment, all facts to which plaintiffs responded that the lacked sufficient knowledge will be deemed admitted").

("IDHR") alleging age discrimination and retaliation. Plaintiff testified that she could not recall if anyone besides Cottrell knew about this Charge. [58-1] at 245.

Around March or April 2014, Plaintiff was moved to the first floor to monitor the doors on the southwest side of the A Building. Plaintiff did not know "why [she] was moved," but recalled that "she had filed some charges for retaliation around that time." [58-1] at 60. More generally, Plaintiff testified that her job duties changed after she "filed charges," noting that "[t]hey started moving me around to different areas of the building." [58-1] at 278. While posted by the southwest doors, Plaintiff would arrive at the doors around 7:15 a.m., stay at the post in the morning, and then go to the third floor. When Plaintiff began at this post, a desk and several chairs were located by the first-floor doors. At some point—Plaintiff does not recall the month—the desk was removed. The desk contained Plaintiff's blood pressure medication. Plaintiff testified that custodian Haynes told her that assistant principal Cottrell had moved the desk because she did not want Plaintiff to sit down. Plaintiff testified that she sent a text message to Cottrell, who responded that she was not in the building but would arrive soon. Later that morning, Cottrell called Plaintiff to the office and told Plaintiff that Plaintiff had accused Cottrell of stealing her medicine and that Plaintiff could be written up for her actions. Haynes testified that around the same time period, all of the security desks were removed but some of the security officers still had chairs. [58-2] at 22-23. In particular, Haynes testified that "some of the security staff in the A building where [Plaintiff] was assigned to, a lot of them had chairs which were supposed to have been removed too; but, you know, nothing was said about that." *Id*. at 23.

On May 1, 2014, Plaintiff received a "good" evaluation, which was lower than the "excellent" evaluation she received the year before. Plaintiff refused to sign the evaluation. On June 18, 2014, Plaintiff filed Charge Number 2014CF3295 with the IDHR alleging that she was

denied overtime due to her age. Plaintiff testified that none of her peers at Curie knew about her filing this charge, but that she assumed the administrators knew because they "were maybe served [with] papers." [58-1] at 250.

On September 9, 2014, the IDHR granted Plaintiff's request to withdraw Charge Numbers 2014CA2496 and 2014CF3295 and closed both claims. On September 25, 2014, Plaintiff filed Charge Number 2015CA0758 with the IDHR. She alleged that the Board failed to promote and harassed her due to her age and sexual orientation and for filing previous IDHR charges. Plaintiff could not recall if she spoke to her peers about this Charge and she never spoke with the administration about this Charge. She testified, however, that Cottrell and security supervisor Mike Morris knew about the charge. Further, Cottrell and dean Joseph Vargus are listed as Board witnesses on the witness list found in the IDHR's Investigation Report for the charge.

Sometime around September 2014, Plaintiff's personal lock was cut off her school locker. A number of Plaintiff's personal items, including a cell phone and iPod, were taken and not returned. Plaintiff did not file a police report. Plaintiff testified at her deposition that she assumed that then-principal Phillip Perry ordered the lock to be cut because Plaintiff is a lesbian and because she had filed charges with the IDHR. However, Plaintiff also testified that "Perry never knew anything about [her] lifestyle." [58-1] at 233.

From October 15, 2014 through December 7, 2014, Plaintiff was on approved short-term disability leave. From September 30, 2014 to December 7, 2014, she was on approved leave under the Family and Medical Leave Act ("FMLA"). Plaintiff returned from leave on December 3, 2014.

In April 2015, Plaintiff was again posted to "three west" in the A Building. Plaintiff had a chair. Plaintiff testified that every security officer had a chair at this time. According to Plaintiff, the administration did not have a policy regarding chair use and allowed a chair at all times. The

same month that Plaintiff began the post at "three west," her chair was removed. Plaintiff testified that assistant principal Rochelle Bryant told her that "it was [Bryant's] job to continue with the removal of [Plaintiff's] chair." [58-1] at 111. According to Plaintiff, Bryant did not explain why Plaintiff's chair was being taken, but Plaintiff "had an idea" that it was because she had filed previous harassment and retaliation charges against Cottrell. *Id*.

During the 2014-2015 school year, Curie had 105 student arrests, 113 on-campus physical fights, 28 mob action fights, and 27 requests for expulsion. Plaintiff described the school environment during this time as "[w]ild," with "more fights" than when she started at Curie in 2004. [58-1] at 67.

On April 29, 2015, Plaintiff submitted a request to the Board's Equal Opportunity Compliance Office ("EOCO") for an ADA reasonable accommodation. Plaintiff reported that she had plantar fasciitis and was "impaired having to walk for 6 ½ hours per day without a break." [58-20] at 3. She requested the ability to "sit for a short time" to "take some pressure off [her] feet, back, and r[ight] knee." *Id*.

On May 4, 2015, Ammons filed Charge Number 2015CF2939 with the IDHR. She alleged harassment on account of her disabilities, as well as retaliation/harassment for filing a previous discrimination charge.

On June 4, 2015, the EOCO sent Plaintiff a letter acknowledging receipt of her request for a reasonable accommodation. On July 13, 2015, the EOCO sent Plaintiff a Notice of Preliminary Determination requesting additional information from her health care provider. Plaintiff provided the requested information. On August 13, 2015, the EOCO sent Plaintiff a response and offered an accommodation. The EOCO noted that Plaintiff had requested a chair as a reasonable

accommodation. The EOCO stated that it was denying the request for a chair for the following reasons:

> First, based upon the job description of your position, and after consulting with Jadine Chou, Chief, Security, Department of Safety and Security, Brian Bond and former Assistant Principal Rochelle Bryant, it was determined that your job requires almost constant walking. Also, your assignment requires perimeter checks of exit areas to adequately perform the essential functions of your job.

> Further, it is the understanding of the EOCO that the job training you received from Safety and Security emphasizes the need to properly stand and walk while on duty to assist in maintaining a calm, structured, and positive school learning environment. According to Mr. Bond, being seated for any length of time while on duty adversely impacts a security officer's ability to respond to situations that are disruptive to the school environment or to convey the appearance of authority in the school.

> Allowing you additional time to sit while on duty would in effect remove some of the essential functions of your job. The ADA does not require an employer to remove essential functions to accommodate an employee. Therefore, your request to have a chair at your assignment post is denied.

The EOCO instead offered Plaintiff a schedule modification as a reasonable accommodation. Rather than take a one-hour lunch break, she could choose to take a thirty-minute lunch break and two fifteen-minute breaks (the "30-15-15 break accommodation").

While Plaintiff's request for an accommodation was being considered, the administration at Curie changed. On June 29, 2015, Allison Tingwall became the interim principal of Curie and the assistant principals were replaced with a new team. In October 2015, assistant principal Christopher Graves became the head of Curie's security team. The new administration made improving the school's safety a priority. Graves and Tingwall have both submitted declarations stating that the new administration determined at the start of the 2015-2016 school year that security officers' continued sitting on the job was ineffective in ensuring that Curie remained safe for students, faculty and guests because the buildings contain multiple stairwells and hallways that are not readily visible from a fixed vantage point and sitting officers would not be actively

circulating, checking all areas of their assigned region for security issues and risks, such as students loitering, or preventing fights from happening. Graves and Tingwall state that, at the start of the 2015-2016 school year, Tingwall made the decision to remove all chairs that were in use by security guards in the A Building and only the CPD officers stationed at the Park Doors in the B Building continued to have chairs and a desk due to their location as the school's main entrance for guests. All other security officers were expected to remain standing while on duty and actively monitor the hallways by roving, walking between locker banks, conducting bathroom sweeps, and monitoring blind spots like stairwells and secluded hallways. This policy applied to both the A and B Buildings, including the locker room stations in the B Building. The B Building locker rooms contain a number of stairwell access points, as well as hallways and alcoves which are not readily visible from one particular vantage point.

Plaintiff disputes a portion of Graves' and Tingwall's declarations. She testified that in August 2015, the principal allowed security officers to have chairs. According to Plaintiff, a chair was located at her post and all the security officers had chairs when the 2015-2016 school year began and no chairs were removed until November 2015—three months after school started. By contrast, custodian Haynes testified that he did not remember any chairs in the A building when school started in September 2015. See [58-2] at 49. The only place he recalled seeing a chair was at the desk that CPD used. See *id*. at 55. However, Haynes also testified that in the last year he worked at Curie (2015-2016) there was a chair on the second floor of the A building, although he did not know who was sitting there. [66-1] at 74. Also between 2015 and 2016 there was a chair on the first floor of the A building by the northwest door. Haynes explained: "I tell you why, the teachers' lunchroom is right there, where the chairs was stored. And they would get the chair. And I mean, they might not have been authorized to even sit down; but they would get a chair and

pull it out there and sit down. *** And nobody would say anything to them. *** The chair wasn't took through the night." *Id.* at 75-76.

Plaintiff also submits photographs that she allegedly "received *** via text messages regarding all other security staff being allowed to sit while she was out of the building." [63] at 22. However, Plaintiff does not offer any declarations or other evidence from witnesses with knowledge of when, where, and how the photos were taken—questions "that could be answered only by the [person] who produced" the photographs. *Griffin v. Bell*, 694 F.3d 817, 827 (7th Cir. 2012). In other words, the photos have not been authenticated under Federal Rule of Evidence 901(b)(1), and therefore cannot be used to avoid summary judgment. *Id.* (plaintiff was not "witness with knowledge," and thus could not authenticate video made of his arrest, where plaintiff could not say how video had been made or whether it had ever been altered); see also *Szymankiewicz v. Doying*, 187 Fed. Appx. 618, 622 (7th Cir. 2006) ("In evaluating a summary judgment motion, the court may consider as evidence properly authenticated and admissible documents or exhibits. To be admissible, documents must be authenticated by an affiant through whom the exhibits could be admitted into evidence.").

On August 6, 2015, the IDHR determined that Plaintiff's claims in Charge Number 2015CA0758 (which was filed in September 2014) lacked substantial evidence. Ammons was absent from Curie on September 11, 14, 15, 16, 17, 24 (half day), and 30, 2015; October 19 and 28, 2015; and November 4, 2015. On November 6, 2015, Plaintiff left Curie during her work shift. The parties dispute whether Plaintiff followed the proper channels of communication before leaving. On November 10, 2015, Tingwall issued Plaintiff a Notice of Pre-Disciplinary Hearing. The hearing date fell on a holiday, Veterans' Day. Plaintiff refused to sign the notice. On November 12, 2015, Plaintiff's union, the Service Employee's International Union ("SEIU"), filed

a grievance on her behalf. The SEIU alleged that Defendant violated the collective bargaining agreement when Tingwall directed Plaintiff to attend a pre-disciplinary hearing on Veterans' Day.

Plaintiff was absent from Curie on November 9, 13 and 19, 2015. On November 23, 2015, Plaintiff e-mailed EOCO Administrator Dalila Bentley and inquired about appealing an ADA accommodation. Bentley provided Plaintiff with information about the appeal process, as well as forms to submit a new request for a reasonable accommodation request. Plaintiff was absent from Curie on November 24 and 25 and December 1 and 2, 2015. From December 3, 2015 to January 3, 2016, Plaintiff was out on approved short-term disability leave. From December 1, 2015 through January 3, 2016, she was also on approved FMLA leave.

On December 10, 2015—while Plaintiff was on leave—Tingwall issued Plaintiff a written reprimand concerning Plaintiff allegedly leaving work on November 6, 2015 without following the proper channels of communication. The reprimand was placed in Plaintiff's personnel file.

On December 11, 2015, Plaintiff submitted another request for a reasonable accommodation under the ADA. She requested one of two accommodations: first, being assigned to the Park Door Entrance, where security "sits and log[s] in [the] public"; or second, being assigned to the locker room as an attendant. [58-25] at 2. Plaintiff stated that she "was unable to walk or stand continuously for 6+ hours" and that she "need[s] to sit 10 mins each hour." *Id*. On December 14, 2015, the EOCO acknowledged receipt of Plaintiff's request for a reasonable accommodation.

On December 30, 2015, Plaintiff filed Charge Number 440-2016-00903 with the IDHR. She brought three charges: (1) denial of a reasonable accommodation; (2) ADA discrimination and retaliation; and (3) retaliation under Title VII. Plaintiff alleged a continuing action.

On January 4, 2016, the EOCO sent Plaintiff a response to her request for a reasonable accommodation and offered her an accommodation. It denied her request for the same reasons that it denied her April 29, 2015 request for an accommodation. The EOCO further explained that Plaintiff would not be assigned to the Park Door Entrance because "the school utilizes security with [the] Chicago Police Department to fill that post, and that post is not available to School Security Officers or to you." [58-27] at 3. Instead, the EOCO stated that "Principal Tingwall will, on a temporary basis of thirty (30) days, reassign your post to the Locker Room Attendant post." *Id*. The letter advised Plaintiff that "this is not a sitting position" and that "the Locker Room Attendant monitors the Locker Room for the first 10 minutes and the last 10 minutes of each hour, and then must monitor the hallway near the Locker Room." *Id*. The letter also advised Plaintiff that, as an alternative, Plaintiff could still choose to take a thirty-minute lunch break with two fifteen-minute breaks to address her limitations related to constant standing and walking. *Id*.

Plaintiff returned to work on January 4, 2016. Plaintiff testified that when she came back to work, she met with Morris and Graves and spoke to them about accommodations. (It is not clear from the record if this occurred on January 4 or shortly after.) During the evening of January 4, 2016, Plaintiff emailed Tingwall and told her that she was not coming to work on January 5, 2016 and was "going back on disability." [58-31] at 3. From January 5, 2016 through January 10, 2016, Plaintiff was out on approved short-term disability leave. From January 5, 2016 through January 10, 2016, she was on approved FMLA leave. *Id*. at ¶ 10. On January 6, 2016—while Plaintiff was out on leave—the Board conducted a hearing on Plaintiff's November 12, 2015 grievance.

Plaintiff returned to work on January 11, 2016. She testified that, upon her return to work, the administration never offered her the post in the girls' locker room. Instead, Graves again

assigned her to the third floor and allowed her to use a chair. Plaintiff further testified, however, that Graves presented her with a "schedule" that required her to do "triple duty" in the girls' locker room: making sure the locker room was empty, checking the hall by the locker room, walking down about twenty-five stairs, walking around to the other side of the B building, and walking back up some stairs, on a continuous basis for 50 minutes. Plaintiff testified that when she had previously worked at the locker room while filling in for someone else, she had never been required to monitor the hallway outside the locker room after the students had gone to class or continuously patrol several areas around the locker room or building.[2]

On January 12, 2016, the Board denied Plaintiff's November 12, 2015 grievance. The Board determined that Tingwall's scheduling of a pre-disciplinary hearing on Veterans' Day was a scrivener's error. Also on January 12, 2016, Graves met with Plaintiff and, according to Plaintiff's testimony, Graves took back the chair at "three west." Later that day, Graves sent Plaintiff an email following up on the meeting. Graves noted that the Board had "offered [Plaintiff] the option to break up" her 60-minute lunch break, which she "declined." [58-32] at 2. Graves also stated that Plaintiff had "the opportunity to take over the Girl's Locker Room Duty, which involves being on your feet at all times while on duty, and circulate through the B building, roving through the hallway and up/down the stairs to monitor the hallways near the locker room." *Id*. Graves requested that Plaintiff "make sure to let us know if you would prefer this duty, or if you would like to retain your prior duty of 3rd floor supervision when you return to work." *Id*. Plaintiff

---

[2] Defendant disputes that, when she covered the girls' locker room post previously, Plaintiff did not have to monitor the hallway when classes were in session. As support, Defendant cites Plaintiff's testimony that when she had previously worked the locker room post she would "go in the locker room and make sure it's clear," and then "come out and come down to the hallway." [58-1] at 82. But this testimony is unclear as to what Plaintiff was required to do in the hallway; did she have to constantly climb stairs? Defendant also ignores that Plaintiff responded "Never" when she was asked, "Would you have to do any monitoring of the hall way outside the locker room after the kids had gone to class?" *Id*.

testified that she never received Graves' email; however, she produced it as part of discovery.  See [58-32] (email bearing Plaintiff's Bates numbering "PL000270").

Also on January 12, 2016, Plaintiff sent an email to her union representative Bentley and stated that she was appealing the EOCO's January 4, 2016 decision.  Plaintiff wrote that she had "not been accommodated to date" and that "to add to the insult I was added more duties by authorities." [58-28] at 2.  Plaintiff submitted a handwritten appeal of the EEOC's January 4, 2016 decision.  In the appeal, Plaintiff challenged the EOCO's statements that the job of security officer requires constant standing and walking and that the Park Door Entrance post is staffed only by CPD officers.  Plaintiff also stated that while she "was told that [she] would be temporarily moved to the Locker Room attendant post for thirty days," after she returned to work in January 2016 she "was told that [she] had to continue working the assignment that necessitated the ADA request." *Id*. at 3.  The Board denied Plaintiff's appeal on February 8, 2016.  The Board stated that it had confirmed with Tingwall that the Park Door Entrance post was staffed by CPD, not school security officers.  The Board also stated that it "confirmed with Principal Tingwall that [Plaintiff was] temporarily re-assigned to the Locker Room Attendant post following [her] return to work," but "once [Plaintiff was] informed that [she] was required to climb stairs as part of the post, [she] asked to be returned to [her] third floor post" and Tingwall "honored that request." [58-30] at 2.

From January 15, 2016 through March 6, 2016, Plaintiff had approved short term disability leave.  From January 15, 2016 through March 7, 2016, she was also on approved FMLA leave.  Her job protection status ended on March 18, 2016.  On February 1, 2016, the IDHR issued a decision on Plaintiff's Charge Number 440-2016-00903.  The IDHR stated that it was unable to determine if Plaintiff's allegations established any statutory violations.  The IDHR also issued Plaintiff a right-to-sue letter.

On February 15, 2016, Plaintiff returned to Curie. (It is not clear from the parties' Rule 56.1 statements whether Plaintiff returned to work duties at this time or remained on her approved leave.) On February 16, 2016, Plaintiff wrote a note to Graves in which she indicated that Graves and Tingwall had "both agreed with [her] splitting 30 minutes of [her] lunch up and spreading the time for the duration of the day." [58-34] at 2. Plaintiff stated that her union told her that she had to give Graves and Tingwall "a break schedule." *Id.* Plaintiff testified that she never had a chance to exercise her right to breaks because "[w]hen [she] requested to have it, [she] was summonsed to Principal Tingwall's office" and Tingwall "threatened [Plaintiff] and told [Plaintiff] that she was going to make sure she was going to get rid of me." [58-1] at 279. Plaintiff further testified that she had no other chance to exercise her right to breaks because after that, she was "out on disability." *Id.*

On April 14, 2016, the IDHR dismissed Charge Number 2015CF2939, finding that there was not substantial evidence to support the allegations found in the charge.

According to Defendant, "Curie saw change" by "not allowing security officers to sit while on duty." [57] at 15. At the end of the 2016-17 school year, Curie had 18 arrests, 25 on-campus physical incidences (fights), 2 mob actions, and 2 requests for expulsion.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material

fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III. Analysis

#### A. ADA Failure to Accommodate

In order to prevail on her ADA failure to accommodate claim, Plaintiff must "point to evidence showing that (1) she is a qualified individual with a disability; (2) her employer was aware of this disability; and (3) her employer failed to reasonably accommodate the disability." *Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018). Defendant argues that it is entitled

to summary judgment on Plaintiff's ADA failure to accommodate claim because Plaintiff cannot establish the first and third elements of her claim.

### 1. Essential job functions

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plaintiff bears the burden of proof on this issue[.]" *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir. 1996); see also *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 445 (7th Cir. 2008); *Bay v. Cassens Transport Co.*, 212 F.3d 969, 973 (7th Cir. 2000).

Whether a plaintiff is a qualified individual is a two-part inquiry. The first part—whether Plaintiff "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses," *Bay*, 212 F.3d at 969—is not challenged by Defendant. Defendant argues, however, that Plaintiff cannot meet the second part of the test, which requires Plaintiff to show that she "can perform the essential function of the position held or desired, with or without reasonable accommodation." *Id*. (citing *Weiler*, 101 F.3d at 524). According to Defendant, constant standing and walking is an essential function of the security officer job.

The factors the Court considers "to determine whether a particular duty is an essential function" include (1) the employee's job description; (2) the employer's opinion; (3) the amount of time spent performing the function, (4) the consequences for not requiring the individual to perform the duty, and (5) past and current work experiences. *Gratzl v. Office of Chief Judges of*

*12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Ammons v. Aramark Uniform Servs., Inc*., 368 F.3d 809, 819 (7th Cir. 2004)).  The Court "presume[s] that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary."  *Id*.  "[A]n employer may specify, for legitimate reasons, multiple essential duties for a position, and when an employee is expected to rotate through duties, he 'will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its essential duties.'"  *Id*. (quoting *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001)).

Considering the factors set out in *Gratzl*, the Court concludes that there are material factual disputes concerning whether constant standing and walking are essential functions of the security officer position.  First, CPS's job description does not specify how much standing and walking is required, leaving that specific issue open to interpretation.  While the job description requires security officers to perform sweeps and "actively respond to fights or other issues in the school that threaten the safety of students, staff, and/or guests," [58-41] at 2, it is not clear from the record that a security officer who sits for a few minutes each hour cannot perform these tasks.  Further, one of the listed duties is "maintaining an orderly post and remaining at the post at all times unless otherwise directed by a supervisor," *id.*, which suggests that for some period of time the security officer is expected to remain in one stationary place.

Second, the Court must consider "the employer's opinion" about the security officer position's essential functions.  Defendant asserts that in 2012 "the Office made the decision that all security officers would no longer be allowed to sit while on duty because a seated security officer has reduced capacity to respond to security threats."  [74] at 10.  Defendant, relying on the declaration of Jadine Chou, its Chief of Safety and Security, asserts that "the policy clearly

articulates when security officers are permitted to sit down on the job—never while on duty—and to whom it applies—all security officers district-wide." *Id.* Taking Chou's description of the *district*'s policy at face value, there is still a factual dispute about whether the administration at Curie actually applies the policy to all security officers. Ordinarily, the Court will not "second-guess the employer's judgment in describing the essential requirements for the job," but the Court will "look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions." *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 674 (7th Cir. 1998). It is undisputed that the district's policy went into effect in 2012, but Curie did not implement the policy until the beginning of the 2015-2016 school year, at the earliest, when Tingwall's administration began. And Plaintiff's testimony creates a dispute over whether the policy was put in place in August 2015, as Defendant contends, or November 2015, as Plaintiff maintains. Further, regardless of exactly when the policy went into effect at Curie, Haynes's testimony creates a question of fact concerning whether Tingwall's administration actually enforced the policy or turned a blind eye to other security officers who continued to sit while on the job during the 2015-2016 school year. He testified that there was a chair on the second floor of Building A and one outside the teachers' lunchroom that security used, and that no one "would say anything to them" or remove the chair overnight. [66-1] at 75-76.

The third factor—the amount of time that a security officer performs the function of walking—is also disputed, with Defendant contending that constant walking is required, and Plaintiff and Haynes testifying that a security officer can perform his or her job effectively even when allowed to sit for short periods while students are in class.

The fourth factor considers the consequences of not requiring a security officer to walk constantly. Tingwall and Graves explain in their affidavits that Curie's two buildings contain

multiple stairwells and hallways that are not readily visible from a fixed vantage point. Security officers who are actively circulating, rather than sitting, spend more time checking all areas of their assigned region for security issues, such as loitering students and brewing fights. Whether this, in turn, reduces violence in the school, however, is not an undisputed fact but an inference drawn from statistics showing that the number of fights and arrests at Curie went down between the 2014-2015 school year and the 2015-2016 school year.

Turning to the final factor, past and current work experiences of security officers, there is evidence that security officers were allowed to sit at Curie until at least the start of the 2015-2016 school year and that, after that, other security officers were allowed to sit without any consequence from the administration. Plaintiff and Haynes also testified that sitting for short periods while students were in class did not make them less effective as security officers.

Considering all of the factors together, the Court concludes that a reasonable jury, construing all facts and drawing all reasonable inferences in the light most favorable to Plaintiff, could conclude that constant walking is not an essential element of the security officer position. This is not to say that walking is not a very important part of the security officer position, but only that a reasonable jury could find that needing to sit for a few minutes an hour while students are in class does not render an individual unqualified for the job.

Apart from the issue of constant walking, Defendant argues that Plaintiff's spotty attendance at Curie renders her unqualified to be a security officer. "A 'plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes.'" *Keen v. Teva Sales & Marketing, Inc.*, 303 F. Supp. 3d 690, 728 (N.D. Ill. 2018) (quoting *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017)). In other words, "the ADA does not protect individuals who fail to

show up for work, even when their absences are a result of a disability." *Fogle v. Ispat Inland, Inc.*, 32 Fed. Appx. 155, 157–58 (7th Cir. 2002); cf. *Severson*, 872 F.3d at 479 ("An employee who needs long-term medical leave cannot work and thus is not a 'qualified individual' under the ADA").

Plaintiff argues that she "only took leave time because she was denied her accommodation and in return she was required to stand on her feet in excess of six hours, which caused her swelling and pain." [63] at 10. "But for the Defendant's denial of her request," Plaintiff contends, "her history demonstrate[s] that she would have had reliable attendance." *Id.*

The timing of Plaintiff's absences does not correspond completely to the time periods that Plaintiff was prohibited from using a chair. According to Plaintiff, her chair was taken between March and May 2014 and from November 2015 on. That would mean she had access to a chair when she took FMLA leave from September 30 to December 7, 2014 and when she was absent on September 11, 14, 15, 16, 17, 24 (half day), and 30, 2015, and October 19 and 28, 2015. Nonetheless, the bulk of Plaintiff's absences occurred during the time she was not allowed to use a chair: January 5-10, 2016, January 15 through early March 2016, and March 18, 2016 through February 3, 2017, when she resigned. According to Plaintiff, she went and remained on leave because when she tried to exercise her right to the 30-15-15 break accommodation on February 16, 2016, Tingwall "threatened [Plaintiff] and told [Plaintiff] that she was going to *** get rid of [Plaintiff]." [58-1] at 279. The Court cannot say that Plaintiff's absences prior to being denied a chair were so egregious that that she should not be considered a "qualified individual" under the ADA. These absences did not amount to long-term medical leave, *Severson*, 872 F.3d at 479, and were preceded by Plaintiff's years of acceptable attendance at Curie.

For these reasons, the Court concludes that whether Plaintiff is a qualified individual with a disability is a question for a jury.

### 2. Reasonable accommodation

A "qualified individual" with a disability is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "So defined, the term 'reasonable accommodation' is expressly limited to those measures that will enable the employee to work." *Severson*, 872 F.3d at 479 (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)). "The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Romeo v. Dart*, 222 F. Supp. 3d 707, 713 (N.D. Ill. 2016).

Defendant argues that Plaintiff cannot maintain an ADA claim because she was offered two reasonable accommodations: 1) the 30-15-15 break accommodation; and 2) taking the girls' locker room post. Plaintiff argues that the girls' locker room position was not a reasonable accommodation because it required her to do "triple duty" in the girls' locker room: making sure the locker room was empty, checking the hall by the locker room, walking down about twenty-five stairs, walking around to the other side of the B building, and walking back up some stairs, on a continuous basis for 50 minutes. Plaintiff testified that when she had previously worked at the locker room while filling in for someone else, she had never been required to monitor the hallway outside the locker room after the students had gone to class or continuously patrol several areas around the locker room or building. According to Plaintiff, the girls' locker room assignment

would not "enable [her] to work," *Severson*, 872 F.3d at 479, because it "tripled [her] duty with the intentions to aggravate her pain." [63] at 15. The Court concludes that Plaintiff's testimony creates a material factual dispute over whether the girls' locker room assignment was a "reasonable" accommodation.

Plaintiff does not dispute that the 30-15-15 break accommodation would be a reasonable accommodation to her disability. However, Plaintiff testified that the first time the accommodation was offered, it ended up not being needed because, from August to November 2015, security officers were allowed the use of chairs. See [63] at 14. The second time it was offered, Plaintiff says she tried to schedule the accommodation with Tingwall, but was not able do so because Tingwall told her that she planned to get rid of her. Plaintiff did not ask again because after that she was out on leave. Viewing this testimony and drawing all inferences in the light most favorable to Plaintiff, the Court concludes that there is a material factual dispute concerning whether Plaintiff was denied the right to exercise the 30-15-15 break accommodation.

For these reasons, Defendant's motion for summary judgment on Plaintiff's ADA failure to accommodate claim is denied.

## B.     ADA Retaliation

In count three of her complaint, Plaintiff alleges that Defendant violated Title VII by subjecting her to a hostile work environment after she filed charges in March and June 2014 for age discrimination and retaliation. However, the Court concludes based on its review of the record and the parties' arguments that Plaintiff has an ADA retaliation claim rather than a Title VII retaliation claim. Title VII prohibits an employer from discriminating based on an employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Plaintiff does not argue that she was discriminated against due to membership in any of these protected classes. Instead, the

charge attached to the complaint asserts discrimination based on disability and retaliation for filing charges of age discrimination. [1-1] at 1. Claims based on disability discrimination "cannot proceed under Title VII." *Aku v. Chicago Board of Education*, 2018 WL 2984819, at *9 (N.D. Ill. June 14, 2018); see also *Tarpley v. City Colleges of Chi.*, 87 F. Supp. 3d 908, 913 (N.D. Ill. 2015). Claims for age discrimination are cognizable under the Age Discrimination in Employment Act ("ADEA") rather than Title VII. See *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). However, Plaintiff's response to summary judgment does not identify any facts suggesting that Defendant subjected her to any adverse action based on age or for complaining about age discrimination. Therefore, the Court will construe Plaintiff's retaliation claim as a ADA retaliation claim. Cf. *BRC Rubber & Plastics, Incorporated v. Continental Carbon Company*, -- F.3d --, 2018 WL 3913121, at *7 (7th Cir. Aug. 16, 2018) ("a plaintiff need not plead legal theories" and "when a plaintiff does plead legal theories, it can later alter those theories, and there is no burden on the plaintiff to justify altering its original theory" (internal citation and quotation marks omitted)).

To prevail on an ADA retaliation claim, Plaintiff must prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection between the two. *Koty v. DuPage County*, 900 F.3d 515, 519 (7th Cir. 2018); see also *Emerson v. Dart*, -- F.3d --, 2018 WL 3853761, at *2 (7th Cir. Aug. 14, 2018). If Plaintiff satisfies her initial burden, the burden shifts to Defendant "'to present a non-invidious reason for the adverse employment action.'" *Koty*, 900 F.3d at 519 (quoting *Dickerson v. Board of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011)). "If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual." *Id*.

### 1.      Relevant time period

Defendant argues that Plaintiff's retaliation claim is limited to acts that occurred between March 5, 2015 and December 30, 2015—the 300-day period preceding Plaintiff's filing of the "operative Charge" attached to Plaintiff's complaint, Charge Number 440-2016-00903.   "In Illinois, an individual complaining of discriminatory conduct under the ADA, ADEA, [or] Title VII *** must file a complaint with the EEOC within 300 days of the alleged unlawful conduct." *Edwards v. Illinois Department of Financial*, 210 F. Supp. 3d 931, 942 (N.D. Ill. 2016); see also *Flannery v. Recording Industry Ass'n of America*, 354 F.3d 632, 637 (7th Cir. 2004).

Plaintiff responds that her retaliation claim covers discriminatory conduct that occurred about she filed the governing charge because such conduct was part of a continuing pattern of mistreatment involving similar types of conduct and the same individuals.   See [63] at 15 (citing *Hopkins v. Bd. of Educ. of Chi.*, 73 F. Supp. 3d 974 (N.D. Ill. 2014)).   Plaintiff relies on *Hopkins*, in which the court rejected the Board's argument that events that occurred after the plaintiff filed her EEOC charge were not actionable because the plaintiff failed to exhaust available administrative remedies as to those later events.   The court determined that the plaintiff did "not seek to refer to later events as independently actionable violations, but rather refers to them as part of the same 'campaign' of retaliatory harassment."   73 F. Supp. 3d at 983.   "Just as the events before the 300–day statutory period may constitute the same continuing violation, later actions— up until the filing of this case—may similarly contribute to a 'single wrong' that continues after the filing of the EEOC charge."   *Id*.   In this case, Plaintiff's charge asserts that Plaintiff was not provided with a reasonable accommodation and was discriminated against because of her disability and in retaliation for engaging in protected activity.   See [1-1].   Plaintiff testified that after she complained, she was subjected to a hostile work environment, including daily harassment by the

principal, denial of a reasonable accommodation, and threats of termination. [1] at 5. Ultimately, Plaintiff contends, she was forced to resign in February 2017 as the result of ongoing harassment and failure to accommodate. Plaintiff's testimony suggests a campaign of retaliatory harassment, as in *Hopkins*.

Plaintiff also argues that Defendant's conduct both before and after the March-December 2015 period can be considered as part of a continuing violation because, as "[t]heir very nature involves repeated conduct," *Nat'l RR. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), hostile work environment claims are timely "as long as 'any act falls within the statutory time period,' even if the charge encompasses events occurring prior to the statutory time period." *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 120). Defendant responds that the continuing violation doctrine does not apply to "discrete" discriminatory acts like those alleged in Plaintiff's charges. See [56] at 17 n.1. However, the charges allege harassment and retaliation, among other things, which Defendant has not demonstrated necessarily arise from discrete discriminatory acts rather than an ongoing pattern of harassment. Since Plaintiff maintains that Defendant's conduct forms a single unlawful employment practice falling at least in part within the statutory period, the Court "may consider conduct outside the statute of limitations as part of the hostile work environment claim." *Morgan*, 536 U.S. at 115.

## 2. Adverse employment action

"An adverse employment action is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). "'Such changes can involve the

[plaintiff's] current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace.'" *Id.* (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)); see also *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017).

In its motion for summary judgment, Defendant argues that Plaintiff experienced no adverse action during 2015. Defendant does not address 2016. Plaintiff testified that when she went to speak to Tingwall in February 2016 about scheduling the 30-15-15 break accommodation, Tingwall did not consider her request and told Plaintiff "she was going *** to get rid of me." [58-1] at 279. According to Plaintiff, the principal's and assistant principals' refusal to honor the accommodation of splitting up her break was "humiliating, degrading, and ultimately unhealthy for the Plaintiff." [63] at 18. Plaintiff also contends that her "current wealth" was negatively affected when she was forced to take personal leave time due to the denial of her accommodation, which caused the loss of pay and certain benefits. Further, Plaintiff asserts she was forced to resign in February 2017, as the result of the ongoing harassment and failure to accommodate. This testimony is sufficient to support Plaintiff's claim that she suffered an adverse employment action.

### 3.  Causation

"To establish causation on a claim for retaliation under the ADA, the Plaintiff must show that her protected activity was a 'substantial or motivating factor' behind the adverse employment action." *Johnson v. City of Chicago Board of Education*, 142 F. Supp. 3d 675, 693 (N.D. Ill. 2015).[3] Defendant argues that it is entitled to summary judgment based on the element of causation

---

[3] Under Title VII, retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor. See *University of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); see also *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016).

because Plaintiff "can only show a chain of suspicious timings between her Charges and [Defendant's adverse] actions." [56] at 21.

The Court concludes that there is sufficient evidence of causation to survive summary judgment. The Court focuses in particular on Plaintiff's testimony that when she asked to schedule the 30-15-15 break accommodation that the EOCO offered her, Tingwall would not honor her request and instead threatened to get rid of her. Asserting "rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to his disability" is a "statutorily protected activity" for purposes of an ADA retaliation claim. *Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015); see also *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). "Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Dickerson*, 657 F.3d at 601. Plaintiff testified that after this interaction with Tingwall, she was out on leave and ultimately forced to resign as a result of Tingwall's harassment and Defendant's failure to accommodate her disability. This chain of events provides a close link between Plaintiff's protected activity—requesting the reasonable accommodation she had been offered—and Tingwall allegedly threatening and harassing Plaintiff and denying her right to exercise the accommodation that would have allowed Plaintiff to continue doing her job.

### 4. Legitimate, non-retaliatory reason for Defendant's treatment of Plaintiff

Defendant argues that it has articulated a legitimate, non-retaliatory reason for its treatment of Plaintiff: the District's 2012 "policy" that "school security officers could not sit down while on duty because standing and walking were essential functions," which "Curie adopted in 2015" and "applied to all fourteen security officers." [56] at 22.

It is disputed whether Curie's administration actually applied the "no-sitting" policy to all fourteen security officers. Plaintiff and Haynes both testify that at least a few security officers continued to sit during the 2015-2016 school year, without facing any consequences from the administration. Regardless of the District's or Curie's policy, however, Plaintiff contends that Tingwall denied her the ability to schedule the 30-15-15 break schedule accommodation that she had been offered by the EOCO. That accommodation would have allowed Plaintiff to remain on her feet during her shift, as Defendant claims its policy requires, while at the same time providing Plaintiff an opportunity to sit more frequently during her shift. Thus, Defendant cannot prevail on summary judgment on the rationale that its policy provides a legitimate, non-retaliatory reason for Tingwall to deny the break schedule accommodation.

### C.     FMLA Retaliation

An FMLA retaliation claim contains three elements: "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). "To survive summary judgment on a claim of retaliation under the FMLA, a plaintiff must point to evidence that supports a reasonable inference" that her employer took a materially adverse action against her because she "requested or took protected leave." *Cloutier v. GoJet Airlines, LLC*, 311 F. Supp. 3d 928, 942 (N.D. Ill. 2018). Defendant argues that Plaintiff cannot satisfy the second and third elements of an FMLA retaliation claim.

### 1.     Adverse act

"To count an employer's action as materially adverse, a plaintiff must show that the action would have 'dissuaded a reasonable worker from' engaging in protected activity." *Freelain*, 888

F.3d at 901-02. "This test uses an objective standard, based on how a reasonable employee might react, not the plaintiff's subjective feelings." *Id*. at 902.

Defendant argues that none of the following conduct alleged in Plaintiff's complaint rises to the level of an adverse act for FMLA retaliation purposes: "(1) threats to return to work from FMLA leave; (2) increased job duties when she returned to work; (3) the removal of her chair; and (4) the removal of items from her locker." [56] at 23. Plaintiff says very little about her FMLA claim. According to Plaintiff, she "took FMLA leave between November 2015 and January 2015" and "also took leave after January 2015" and, "[a]s a result the Defendant retaliated against the Plaintiff in [the] same manner described above." [63] at 24.

The Court concludes that there is a material factual dispute concerning whether Plaintiff suffered a materially adverse action. Plaintiff contends that Tingwall denied her the 30-15-15 accommodation that the EOCO had granted and threatened to fire her, and that she was forced to resign as a result of harassment and Defendant's failure to accommodate her disability. Arguably, these actions could dissuade a reasonable worker from requesting FMLA leave.

### 2. Causation

"'To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014) (quoting *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010)). Plaintiff was on (or had very recently returned from) leave when Tingwall threatened to get rid of her and denied her the 30-15-15 break accommodation. Tingwall knew that Plaintiff had taken leave. On January 4, 2016, Plaintiff emailed Tingwall and told her that she was "going back on disability." [58-31] at 3. A reasonable factfinder could infer from

this timing that Plaintiff's exercise of her right to FMLA leave was at least one of the factors that motivated Tingwall's alleged threats and harassment and refusal to accommodate Plaintiff's disability.[4]

**IV.    Conclusion**

For these reasons, the Court denies Defendant's motion for summary judgment [55]. This matter is set for status hearing on October 9, 2018 at 9:00 a.m.

Dated: September 24, 2018

Robert M. Dow, Jr.
United States District Judge

---

[4] The Court finds that the Board has not articulated a legitimate, non-retaliatory reason for allegedly denying Plaintiff the 30-15-15 break accommodation and allowing harassment. The Court's analysis of this issue is the same as in section III.B.3, above.