# Exhibit 1

Case 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 2 of 319 PageID #:1678
Case 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 2 of 319 PageID #:1678
Kim Ammons 08/29/2017

1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4

5   KIM AMMONS,                        )

6          Plaintiff,                  )

7      vs.                             ) No. 16 CV 4884

8   CHICAGO BOARD OF EDUCATION,        )

9          Defendant.                  )

10

11          The deposition of KIM AMMONS, called for

12  examination pursuant to Notice and the Rules of

13  Civil Procedure for the United States District

14  Courts pertaining to the taking of depositions,

15  taken before Tabitha Watson, a notary public within

16  and for the County of Cook and State of Illinois,

17  at One North Dearborne Street, Suite 900, Chicago,

18  Illinois on the 29th day of August, 2017, at the

19  hour of 1:18 p.m.

20

21

22

23  Reported by:  Tabitha Watson, CSR, RPR

24  License No.:  084-004824



1   APPEARANCES:

2        HALL-JACKSON AND ASSOCIATES, P.C., by

3        MS. CHIQUITA HALL-JACKSON

4        166 West Washington Street, Suite 275

5        Chicago, Illinois 60602

6        Phone:  (312) 255-7105

7             Representing the Plaintiff,

8

9        CHICAGO BOARD OF EDUCATION, by

10       MR. REGAN HILDEBRAND

11       One North Dearnborn Street, Suite 900

12       Chicago, Illinois 60602

13       Phone:  (773) 553-1691

14            Representing the Defendant.

15

16

17

18

19

20

21

22

23

24



1                    I N D E X

2    WITNESS                           EXAMINATION

3    KIM AMMONS

4    By Mr. Hildebrand............................  7

5    By Ms. Hall-Jackson.........................273

6    By Mr. Hildebrand...........................293

7

8

9

10

11                 E X H I B I T S

12   NUMBER                         MARKED FOR ID

13   Ammons Deposition

14   Exhibit No. 1.......................    55

15   Exhibit No. 2.......................    67

16   Exhibit No. 3.......................    69

17   Exhibit No. 4.......................    70

18   Exhibit No. 5.......................    75

19   Exhibit No. 6.......................    75

20   Exhibit No. 7.......................    93

21   Exhibit No. 8.......................   264

22   Exhibit No. 9.......................   264

23   Exhibit No. 10......................   264

24   Exhibit No. 11......................    22



```
1              E X H I B I T S

2                 (Continued)

3  NUMBER                          MARKED FOR ID

4  Ammons Deposition

5  Exhibit No. 12......................     30

6  Exhibit No. 13......................     31

7  Exhibit No. 14......................    110

8  Exhibit No. 15......................    111

9  Exhibit No. 16......................    114

10 Exhibit No. 17......................    115

11 Exhibit No. 18......................    127

12 Exhibit No. 19......................    128

13 Exhibit No. 20......................    131

14 Exhibit No. 21......................    139

15 Exhibit No. 22......................    144

16 Exhibit No. 23......................    156

17 Exhibit No. 24......................    158

18 Exhibit No. 25......................    167

19 Exhibit No. 26......................    168

20 Exhibit No. 27......................    170

21 Exhibit No. 28......................    170

22 Exhibit No. 29......................    174

23 Exhibit No. 30......................    177

24
```



```
1              E X H I B I T S

2                (Continued)

3    NUMBER                        MARKED FOR ID

4    Ammons Deposition

5    Exhibit No. 31......................    178

6    Exhibit No. 32......................    191

7    Exhibit No. 33......................    196

8    Exhibit No. 34......................    199

9    Exhibit No. 35......................    203

10   Exhibit No. 36......................    204

11   Exhibit No. 37......................    207

12   Exhibit No. 38......................    211

13   Exhibit No. 39......................    213

14   Exhibit No. 40......................    214

15   Exhibit No. 41......................    216

16   Exhibit No. 42......................    220

17   Exhibit No. 43......................    221

18   Exhibit No. 44......................    223

19   Exhibit No. 45......................    247

20   Exhibit No. 46......................    256

21   Exhibit No. 47......................    250

22   Exhibit No. 48......................    240

23   Exhibit No. 49......................    259

24
```



Case: 1:16-cv-04684 Document #: 187-1 Filed: 03/15/18 Page 7 of 319 PageID #:1683
Case: 1:16-cv-04684 Document #: 187-1 Filed: 02/15/18 Page 7 of 319 PageID #:1483
Kim Ammons 08/29/2017

```
 1                    E X H I B I T S

 2                      (Continued)

 3    NUMBER                           MARKED FOR ID

 4    Ammons Deposition

 5    Exhibit No. 50.....................       260

 6    Exhibit No. 51.....................       240

 7    Exhibit No. 52.....................       263

 8    Exhibit No. 53.....................        11

 9    Exhibit No. 54.....................       288

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1               (Witness sworn.)

2       MR. HILDEBRAND:  Good morning.  We're on the

3    record.  It's 11:18 a.m., Tuesday, August 29th,

4    2017.  We're at the office of the law department

5    for the Board of Education of the City of Chicago.

6    Present in the conference room is myself, attorney

7    for the defendant, as well as Ms. Chiquita -- is

8    it ...

9       MS. HALL-JACKSON:  Hall-Jackson.

10      MR. HILDEBRAND:  Hall-Jackson, counsel for the

11   plaintiff, and the plaintiff, Ms. Ammons.

12                    KIM AMMONS,

13   called as a witness herein, was examined and

14   testified as follows:

15                    EXAMINATION

16   BY MR. HILDEBRAND:

17      Q.   I want to thank you for coming today.

18      A.   Thank you.

19      Q.   My first question for you, have you ever

20   done a deposition before?

21      A.   Never.

22      MR. HILDEBRAND:  Actually, let me strike that

23   question and do some housekeeping first before I

24   forget about it.



1            One thing, Chiquita, I did check to see

2    about document production.  It looks like Lisa sent

3    the initial disclosures document back in June of

4    2016 to you on a disc.  I was checking the file and

5    there were some other documents that should have

6    been produced but I don't think were.  And I'll

7    send those to you, I just want to double check with

8    you today that you're comfortable going forward

9    with the deposition knowing that there's still some

10   documents that I want to produce to you.

11       MS. HALL-JACKSON:  No objections.

12       MR. HILDEBRAND:  Okay.  Yeah.  I found them

13   this morning.  I'll sit down and go through them.

14   It looks like most of them are policy documents

15   that were either available through the human

16   resources' website or available online, but I'll go

17   through them and get them out to you either by,

18   knock on wood, this week or end of next week.

19       MS. HALL-JACKSON:  Sounds good.

20       MR. HILDEBRAND:  Okay.  Thanks.

21   BY MR. HILDEBRAND:

22       Q.   Now, back.

23            Have you ever done a deposition before?

24       A.   No, I have not.



1    Q.   Okay.  I'm going to ask you some questions

2    today about your case.  My main goal is I want to

3    try to figure out what's going on and just see what

4    has happened to you with the board.

5         The first thing, you just took an oath.

6    Do you understand the nature of that oath?

7    A.   Yes.

8    Q.   To tell the truth?

9    A.   That's correct.

10   Q.   When I ask you a question today, I want

11   you to make sure you respond always with a verbal

12   response, never with a physical shaking or nodding

13   of the head.  The court reporter can only take down

14   a verbal response, yes or no.

15   A.   Okay.

16   Q.   I'll remind myself of that because

17   sometimes I forget that.

18        If I ask you a question and you don't

19   understand it, please let me know and I'll rephrase

20   it or reask it.  I really want you to understand

21   the question that I'm asking.

22   A.   Okay.

23   Q.   Usually I ask some pretty good questions.

24   Sometimes I'll ask one and realize that was a bad



1    question and I'll strike it myself.

2            In asking you a question today, I want you

3    to answer to the fullest extent you can.  If you

4    can't remember something I ask you about, because I

5    know we're talking about events that happened in

6    2014, 2015, it's perfectly fine to say I don't

7    remember or I don't recall.  I don't want you

8    making up anything.

9        A.    Right.

10       Q.    If I ask you a question as well, you have

11   to answer the question unless your attorney

12   instructs you not to answer because the question

13   I'm asking is a privileged question.

14       A.    Okay.

15       Q.    Comparably, if I ask you a question, you

16   can't confer with your counsel as long as that

17   question is pending.  I need you to answer the

18   question before you can have any conversations.

19       A.    Okay.

20       Q.    To start off with, do you have any

21   physical condition that effects your memory, your

22   ability to recall anything?

23       A.    No, I don't.

24       Q.    Kind of an odd question.  Have you had



Case: 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 12 of 319 PageID #:1688
Case: 1:16-cv-04884 Document #: 183-1 Filed: 02/15/18 Page 12 of 319 PageID #:1688
Kim Ammons 08/29/2017

 1    anything to drink this morning like alcohol?

 2        A.   I don't drink at all.

 3        Q.   Okay.  Have you had anything to drink this

 4    morning?

 5        A.   Water.

 6        Q.   Just water.  Coffee?

 7        A.   I don't drink coffee.

 8        Q.   Okay.  Are you taking any medication that

 9    would affect your memory?

10        A.   None.

11        Q.   Let me ...

12        MR. HILDEBRAND:  Chiquita, these are exhibits

13    I've premarked.

14    BY MR. HILDEBRAND:

15        Q.   Let me show you what I've premarked as

16    Exhibit 53.  It's a copy of your last doctor's

17    report from Dr. Klor-Gross.  Is that your primary

18    care physician?

19        A.   Yes, it is.

20        Q.   Just looking at the bottom, it has a list

21    of medications.  Do you see that?

22        A.   Mm-hmm.

23        Q.   The first one listed is Allegra?

24        A.   That's correct.

```
 1        Q.   Are you still taking Allegra?

 2        A.   As needed.

 3        Q.   Did you take Allegra today?

 4        A.   No.

 5        Q.   Does Allegra have any effect on your

 6   memory?

 7        A.   None.

 8        Q.   Does it have any effect on you at all?

 9        A.   It helps with the allergy.

10        Q.   Okay.  Like sneezing and coughing?

11        A.   More of a postnasal.

12        Q.   Okay.  Does it make you tired or anything?

13        A.   Oh, no.

14        Q.   I'm not going to go with --

15        A.   Toprol.

16        Q.   The Toprol.  Thank you.  What is Toprol?

17        A.   Hypertension.

18        Q.   Hypertension?

19        A.   Mm-hmm.

20        Q.   Did you take that today?

21        A.   Yes, I did.

22        Q.   Does the Toprol have any effect on your

23   memory?

24        A.   No.
```



 1      Q.   What sort of effect does it have on you,

 2   if any?

 3      A.   None.  No effect.

 4      Q.   And then the next page.  This is a list of

 5   medications where it says, Maxzide, M-A-X-Z-I-D-E,

 6   what is that one?

 7      A.   That's just a water pill.

 8      Q.   Did you take that one today?

 9      A.   No.

10      Q.   You didn't?

11      A.   No.

12      Q.   What sort of effect does it have on you?

13      A.   Going too frequent to --

14      Q.   Bathroom?

15      A.   -- the washroom.

16      Q.   Nothing with memory though?

17      A.   No.

18      Q.   I'll take that back from you now.

19           If you have any questions of me at any

20   time, feel free to ask.

21      A.   No questions.

22      Q.   I want you to feel comfortable.  If you

23   need a break --

24      MR. HILDEBRAND:  If you need a break or if you

 1   need a break ...

 2   BY MR. HILDEBRAND:

 3       Q.   -- let me know because I can have a

 4   tendency to power through these.  I do a lot of

 5   endurance sports, so I'm kind of used to sitting

 6   through and chugging through to get stuff done.

 7           To start off, what's your full name for

 8   the record?

 9       A.   My full name is Kim and my last name is

10   Ammons.

11       Q.   Can you spell that for the record?

12       A.   Yes.  That's A-M-M-O-N-S.

13       Q.   What is your date of birth?

14       A.   ████-1964.

15       Q.   Where you do you currently reside.

16       A.   I live at 8225 South Morgan Street,

17   Chicago, 60620.

18       Q.   Have you always lived at that address?

19       A.   No.

20       Q.   How long have you lived there?

21       A.   Approximately going on three years now.

22       Q.   So it would have been about 2014 or so?

23       A.   Mm-hmm.

24       Q.   Now, I know your complaint with the board,

1    it's events from about maybe 2014 to 2015 or so.

2    Were you living at that residence at that time when

3    you were having some problems with the board?

4        A.   Yes.  That's correct.

5        Q.   Are you married?

6        A.   Single.

7        Q.   Were you ever married?

8        A.   Never.

9        Q.   Do you have any children?

10       A.   Yes.  I have four.  Actually, three that

11   came in as foster children, I adopted three of

12   those.

13       Q.   Okay.

14       A.   I currently have a foster son who just

15   came about two weeks ago.

16       Q.   The three prior foster kids, what were

17   their names?

18       A.   ██████  ████████  ████████      ███   is their

19   last name.

20       Q.   Are they still with you now?

21       A.   Yes.

22       Q.   How old are they?

23       A.   ██████  is 8, looking to be 9 in

24   ██████████   ██████████████   to be exact.   ██████   is

```
 1   10.    ████████ is 11, he'll be 12 in ██████████   And
 2   ████████ is 4.
 3        Q.   Wow.  You're busy.
 4        A.   Yes.  Very.  Very.
 5        Q.   ████████    ██████████ and  ████████  are adopted
 6   now?
 7        A.   Well, guardianship.
 8        Q.   Guardianship.  Okay.  Do you have a
 9   partner or anything?
10        A.   None.
11        Q.   Who is watching the kids today?
12        A.   My mom.
13        Q.   What's your mom's name?
14        A.   Sherlena Ammons, S-H-E-R-L-E-N-A.
15        Q.   How old is she?
16        A.   My mom is 79.
17        Q.   She has a busy day today as well.
18        A.   Yeah.  My sister is there also.  I have a
19   sister who is there.
20        Q.   How old is your sister?
21        A.   She's 53.
22        Q.   What's her name?
23        A.   Joann Ammons.
24        Q.   Did you talk to your mom at all about your
```



 1    case today before the deposition?

 2        A.    No.

 3        Q.    What about your sister?

 4        A.    No.

 5        Q.    Did you talk to anybody today about the

 6    deposition?

 7        A.    No.

 8        Q.    What about coming into the deposition last

 9    couple of days, did you talk to anybody about the

10    subject matter we might discuss today?

11        A.    No.  Not the past couple days.

12        Q.    Did you look at any documents to prepare

13    for the deposition today?

14        A.    No.

15        Q.    Is your dad still alive?

16        A.    No.  Deceased.

17        Q.    I'm sorry.  How long --

18        A.    It has been a while.  '74.

19        Q.    You mentioned your one sister.  Do you

20    have any other siblings?

21        A.    Oh, yes.  I have a big family.  I have

22    ten -- nine other siblings.

23        Q.    That's a big family.

24        A.    Big family.  Yes.

1    Q.   So what's the breakdown, the ten?  How

2  many are brothers, how many are sisters?

3    A.   Four brothers -- six girls, four boys.

4  I'm the eighth child.

5    Q.   Are you the eighth oldest or eighth

6  youngest?

7    A.   Eighth of the youngest.  I have two behind

8  me.

9    Q.   I was the younger one in the family.

10 You're kind of like the forgotten kid.

11   A.   Yeah.

12   Q.   But you also get away with stuff your

13 older siblings can't get away with.

14   A.   Yes.

15   Q.   Do any of your siblings work for Chicago

16 Public Schools?

17   A.   No.  Used to.

18   Q.   Who used to work for the schools?

19   A.   Joann used to work for CPS.

20   Q.   Do you recall the dates?

21   A.   Last maybe 2011, 2012.  Somewhere in

22 there.

23   Q.   What did she do?

24   A.   She was a clerk.



1    Q.   And was she at a particular building?

2    A.   Huh?

3    Q.   Was she at a particular building?

4    A.   She was at Austin High School.

5    Q.   Do you recall what type of work she would

6  do as a clerk?

7    A.   I guess deal with people coming in,

8  customer service.

9    Q.   Okay.  And why did she leave in 2011?

10    A.   She was displaced, my understanding.

11    Q.   Do you know why?

12    A.   I don't know why.

13    Q.   Okay.  Tell me a little bit about your

14  educational background.  Did you graduate from

15  high school?

16    A.   Definitely.  I graduated from Calumet

17  High School.

18    Q.   Do you remember the year?

19    A.   '83.  6-83.  I was an athlete at Calumet,

20  so I received a scholarship.  I wasn't a studious

21  person, but I went to Kennedy-King College on a

22  scholarship to play basketball.  I graduated in '87

23  of May from Kennedy -- King, physical education

24  major.



 1          Actually, I was offered a couple
 2  scholarships, but I put my scholarship on hold to
 3  coach Kennedy-King women.  We went to the
 4  nationals.  The following years, I went to play for
 5  the Chicago State myself.  I didn't graduate.  I
 6  ended up basically withdrawing and taking a job to
 7  help out the family.
 8      Q.   So you played basketball in high school?
 9      A.   Definitely.  College.
10      Q.   That's impressive.  That's one of my worst
11  sports.
12      A.   Right.  Right.  Right.
13      Q.   I never got the hang of the running and
14  bouncing at the same time.  I'm kind of a klutz
15  with that.
16      A.   Right.
17      Q.   So you went to Kennedy-King on a
18  scholarship?
19      A.   Right.  Then I went to Chicago State in
20  '89.
21      Q.   Okay.
22      A.   Actually -- yeah.  '89.  I stayed back a
23  year to coach.
24      Q.   How many years at Chicago State did you



1    do?

2        A.   I only did one year at Chicago State.

3        Q.   And you said you left to help take care of

4    the family?

5        A.   Yeah.  To help take care of the family.

6        Q.   When you graduated from Kennedy-King, you

7    had an associate's in phys ed.

8        A.   Yes.  An associate's in physical

9    education.  I left Chicago State and I had

10   101 hours accumulated, but while at Chicago State,

11   I changed my major to criminal justice.

12       Q.   When you left Chicago State, did you go

13   right to work?

14       A.   Yeah.  I went to Chicago Park District

15   part-time.  Just part-time for the park district.

16       Q.   What sort of work were you doing at the

17   park district?

18       A.   I was an attendant.

19       Q.   What would that mean?

20       A.   Cleaning, janitorial, custodial.

21       Q.   How long were you at the park district?

22       A.   I'm trying to see.  Did I go straight to

23   the park district -- yeah.  I was at the park

24   district first.  Three years to be exact.



1      Q.   I'm going to show you something that might

2  help you.

3      A.   I can remember.  You don't have to.

4      Q.   Oh, no.  I want to show you what I marked

5  previously as Exhibit -- sorry about that -- 11.

6  And the document in front of you, Exhibit 11, have

7  you seen it before?

8      A.   I guess so.  It looks like an application

9  or something.

10     Q.   Yeah.  Let me ask you.  The page in front

11 of you, the very first page, is that your

12 handwriting?

13     A.   Yes, it is.

14     Q.   And then the second page, you see the

15 bottom signature says Kim Ammons and the date is

16 8-23-2000, is that your signature?

17     A.   Yes.

18     Q.   I want to direct your attention to the top

19 where it says employment record?

20     A.   Mm-hmm.

21     Q.   You have two listings there.  The second

22 one is for Chicago Board of Education from

23 February 1994 to June 1997.

24     A.   Mm-hmm.



1    Q.   It says custodian cleaning classrooms, is

2  that correct?

3    A.   Yes, that's correct.  I was a sub-janitor.

4    Q.   And if you look at the second page again,

5  sorry, where it says above that Chicago Park

6  District from May of 1998 to July 3rd of it looks

7  like 2000 as the attendant, is that correct?

8    A.   That's correct.

9    Q.   Where it says Chicago Board of Education,

10  there's a date from June of '97.  Do you remember

11  why you left the Board of Education in June of '97?

12    A.   They privatized.  The sub-janitors at CPS

13  privatized with Ernie Terrell and they were paying

14  peanuts.  Yes.  They weren't paying enough.

15    Q.   Let me take this one back from you.

16         So you were at the Chicago Park District

17  from May of '98 to July 3rd of 2000.  Do you

18  remember why you left?

19    A.   The park district?

20    Q.   Yeah.

21    A.   I was -- actually, while working at the

22  park district, I was asked to coach at Fenger High

23  School, the girls' basketball team, assist

24  actually.  I did, and I did such a good job, I was



1    offered a position of senior security officer.

2        Q.   So you were the assistant basketball

3    coach?

4        A.   Yes.  That was just a stipend.

5        Q.   Do you remember who asked you to --

6        A.   Janet Ollarvia.

7        Q.   How do you spell the last name?

8        A.   O-L-L-A-R-V-I-A.

9        Q.   How long were you acting as an assistant

10   coach?

11       A.   Just that season I was the coach.  That

12   season I believe I ended up getting a better

13   position, plus I had a job as a security person.

14   So I was assisting coach, so I was offered to be an

15   associate coach for the men's team at Kennedy-King,

16   which was a personal goal of mine.

17       Q.   When were you the assistant men's coach at

18   Kennedy-King?

19       A.   During the same time I was security for

20   Fenger High School.  It was after school.  I don't

21   recall the exact date.

22       Q.   Are you still doing that now?

23       A.   No.

24       Q.   When did you stop doing the assistant



1    men's coaching?

2        A.   I don't recall the year.  Also, my

3    motivation was my nephew played basketball and he

4    was on the team.  So after he finished up his two

5    years, I didn't have the motivation any more.

6        Q.   Do you recall being laid off from Chicago

7    Public Schools in Chicago of 2003?

8        A.   Yes, definitely.

9        Q.   What do you remember about the layoff?

10       A.   The layoff came after I had filed some

11   charges -- sexual harassment charges against an

12   employee at Fenger High School.  It was -- they

13   actually laid off all the security and rehired them

14   back.

15       Q.   You said you filed sexual harassment

16   charges against an employee?

17       A.   Definitely.

18       Q.   Who was the employee?

19       A.   Her name was Dondelayo White.  She was red

20   flagged and fired from CPS.

21       Q.   Can you spell the first name?

22       A.   Dondelayo, I think it was

23   D-O-N-D-E-L-A-Y-O, White.

24       Q.   What was --



1        A.   She --

2        Q.   Sorry.  Go ahead?

3        A.   I don't know.  I believe she was acting as

4   administrator, some form of administrator.

5        Q.   And that was at the Fenger High School?

6        A.   That was at Fenger.

7        Q.   Fenger?  What sort of harassment was it?

8        A.   She was making -- she was asking me to

9   have sex, do a lot of things that I was against to

10  her.

11       Q.   How often would she ask?

12       A.   It started out every other day and then

13  she would call every day, and then it got so bad

14  she started telling my sister that she had given --

15  left -- put some extra money on my check.  So she

16  was trying some of everything.

17       Q.   You said she was calling.  Were these

18  phone calls?

19       A.   Oh, yeah.  She was calling my phone.

20       Q.   Anything else besides phone calls?  I

21  mean, was she having face to face conversations

22  with you where she was harassing you?

23       A.   Yeah.  She would call me via radio while I

24  was at work to her office and she would dismiss



1  whoever was in her office to speak to me alone.

2     Q.   You said she was pressuring you to have

3  sex?

4     A.   Yes.

5     Q.   Are you a lesbian?

6     A.   Yes, I am.

7     Q.   But you didn't reciprocate with her, just

8  not interested?

9     A.   Not at all.

10    Q.   Did you file charges?

11    A.   Oh, definitely.

12    Q.   Do you remember whom you filed the

13 charges?

14    A.   The Illinois Department of Human Rights

15 and they countercharged with the EEOC.

16    Q.   Do you recall when you did that?

17    A.   2003 I believe.  Or either -- no, no, no.

18 2002 because I was off work -- I was laid off for a

19 year, 2003.

20    Q.   Do you remember what happened with the

21 charges?

22    A.   Meaning?

23    Q.   Was there ever a decision made by the

24 Illinois Department of Human Rights about the

1  charge you made?

2       A.   I don't recall.

3       Q.   Do you remember having any sort of hearing

4  with the Illinois Department of Human Rights where

5  you were called in to provide testimony about the

6  allegations?

7       A.   Yeah.  Actually, I had mediation.  Yeah.

8  I did have a mediation.  I'm thinking they told me

9  to -- that they were closing and to get a Right to

10 Sue letter from EEOC.

11      Q.   Do you remember if EEOC gave you a Right

12 to Sue letter?

13      A.   Oh, yeah.  They gave me a Right to Sue.

14      Q.   Do you recall bringing a lawsuit?

15      A.   Bringing in a lawsuit.

16      Q.   Filing suit?

17      A.   Oh, yeah.  I retained an attorney.

18      Q.   Do you remember the attorney's name?

19      A.   Mm-hmm.  Laura Wasserman.

20      Q.   How do you spell the last name?

21      A.   I'm wondering if Laura Wasserman was

22 Laura -- it was Wasserman.  W-A-S-S-E-R-M-A-N,

23 Wasserman I believe.

24      Q.   And that's the attorney you think you



Case: 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 30 of 319 PageID #:1706
Case: 1:16-cv-04884 Document #: 88-1 Filed: 02/15/18 Page 30 of 319 PageID #:1706
Kim Ammons  08/29/2017

1    hired for the sexual harassment suit?

2         A.   Well, I know her name is Laura.

3    Wasserman -- there were two ladies.  I believe it

4    was Wasserman and Wasserman, something to that

5    effect.

6         Q.   Did your attorney actually then file a

7    lawsuit on your behalf?

8         A.   Excuse me.  Carol Wasserman.  I want to

9    say Laura was the other lady.

10             Yes, she did.  She filed the lawsuit.

11        Q.   Do you remember when that was?

12        A.   It had to be in 2002.

13        Q.   And what happened with that lawsuit?

14        A.   The board was found guilty and they

15   settled.

16        Q.   Do you remember what the terms of that

17   settlement were?

18        A.   My attorney?

19        Q.   What happened with the settlement?

20        A.   What do you mean?  I don't understand.

21        Q.   You said the board was found guilty.  So

22   what happened afterward, do you remember?

23        A.   I was compensated and returned to work.

24        Q.   Do you remember how much the compensation



1   was?

2       A.   I think it was like 25,000.  That's what I

3   got.  I don't know the exact amount.

4       Q.   And you returned to work?

5       A.   Yeah.  I was offered two schools to

6   interview with.  Marshall High School and Curie

7   High School.

8       Q.   Who made the offer, do you remember?

9       A.   The board's attorney.  I don't know her

10  name.

11      Q.   Let me just show you a couple documents

12  real fast for some record keeping.  The first one I

13  want to show you is what I've marked previously as

14  Exhibit 12, which is a copy of a layoff letter.

15           Have you seen Exhibit 12 previous to

16  today?

17      A.   I've seen this letter.

18      Q.   Do you remember when?

19      A.   I don't recall when.  No, I don't.

20      Q.   Where it says in the second paragraph,

21  quote, I regret to inform you that you will be laid

22  off from your current position effective

23  September 18th, 2003, just to help me clarify, do

24  you remember which position that was?



1      A.   Yes.  Senior security officer -- excuse

2  me.  No, it wasn't security senior back then.  It

3  was called security aide.  They had security

4  officers and I was an aide.

5      Q.   And which school was that?

6      A.   Fenger High School.

7      Q.   Was there a difference between a security

8  aide and a security officer?

9      A.   Yes.  It was a $5,000 different.

10     Q.   In terms of pay?

11     A.   Right.  In terms of pay.

12     Q.   What about in terms of responsibilities,

13  do you know?

14     A.   No.  No.  It was just I guess if they like

15  you or not I'm assuming.

16     Q.   I'll take that back from you.  Let me show

17  you one more marked previously as Exhibit 13.  It's

18  an employment application made for security aide.

19  Have you seen Exhibit 13 previously?

20     A.   Yes.

21     Q.   Do you remember in what context you've

22  seen it before?

23     A.   When I was first getting a job I had to

24  fill it out.



1    Q.   The very first page, is that your

2  handwriting on the document?

3    A.   Yes, it is.

4    Q.   You see at the bottom where it has

5  academic record?

6    A.   Yes, I do.

7    Q.   Is the information there accurate about

8  your educational history?

9    A.   Yes.

10   Q.   The second page, you see your signature at

11 the very bottom?

12   A.   Yes.

13   Q.   And that's your signature?

14   A.   Yes, it is.

15   Q.   At the top, there's employment record

16 where it says Fenger High School?

17   A.   Mm-hmm.

18   Q.   Is that accurate for your employment

19 history?

20   A.   About.  Yes.

21   Q.   Okay.  This was an application made in

22 2004.  Was this the application you made as part of

23 that lawsuit to get a job back with the Chicago

24 Public Schools?

1    A.   I guess.  Yeah.  I wasn't at Fenger

2  anymore.

3    Q.   Okay.  So you said you were given an

4  option between interviewing Curie High School

5  and --

6    A.   Marshall High School.

7    Q.   -- and Marshall High School?

8         Do you recall which high school you

9  interviewed with?

10   A.   Marshall was like 9:00 p.m. Curie was

11  1:00 o'clock p.m.

12   Q.   So you did interview at both?

13   A.   Same day.

14   Q.   What was the outcome of the interviews?

15   A.   Both principals said they heard nothing

16  but good things about me.  They welcomed me.  Curie

17  said the same thing.  I chose Curie.  I'm not a

18  familiar person with the west side, but Curie

19  seemed to be a little closer to -- it was a little

20  closer to where I reside.

21   Q.   Do you remember who the principal was at

22  Marshall who interviewed you?

23   A.   No, I don't recall.

24   Q.   Was it the principal?



1      A.   I believe.

2      Q.   What about at Curie, who interviewed you?

3      A.   Yes.  Very nice lady.  Geri Lynn Jones was

4  her name.  She was principal.

5      Q.   And Ms. Jones interviewed you?

6      A.   Yes, she did.

7      Q.   Do you remember how long she was principal

8  at Curie?

9      A.   I don't know to be exact, but I know her

10  license plate says Curie, so 30 something years my

11  understanding.

12      Q.   Now, was she -- the period of time you

13  worked at Curie, was she always the principal?

14      A.   No.  She was one of the principals that

15  was on television.  They ended up removing her.  I

16  believe it was the school council.  It was pretty

17  big on the news.

18      Q.   Do you remember why she was removed?

19      A.   That's a good one.  No, I can't recall.

20      Q.   Do you happen to remember when that was?

21      A.   2000 -- I want to say '11, '10.  Maybe

22  '10, 2010.

23      Q.   So you started at Curie High School in

24  April of 2004, is that right?



1      A.   That's correct.

2      Q.   When you started 2004, Ms. Jones was your

3   principal for a period of time then?

4      A.   Yes.

5      Q.   And you think she was there until about

6   2010, 2011?

7      A.   I believe.

8      Q.   When you started at Curie in 2004, what

9   was your position?

10      A.   I was senior security or a security aide.

11   Don't quote me on that.  Possibly security aide.

12   The board just changed this name, title I want to

13   say maybe three years ago.

14      Q.   And I'm not talking about in 2004 when you

15   started as a security aide.  Sort of walk me

16   through -- strike that.

17           First off, what were some of your

18   responsibilities as a security aide when you

19   started at Curie?

20      A.   When I started at Curie, I was actually

21   told that I was hired to secure the B building,

22   which is the gym building.  And I started out at

23   the information desk and they rotate and my job was

24   to walk around that whole perimeter of the



Case 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 37 of 319 PageID #:1713
Case 1:16-cv-04884 Document #: 88-1 Filed: 02/15/18 Page 37 of 319 PageID #:1713
Kim Ammons   08/25/2017

1    B building.

2         Q.    You said the B building.  How many

3    buildings is Curie total?

4         A.    Two.

5         Q.    What are the buildings?

6         A.    A building and the B building.  The

7    B building is -- it houses like music, art, and

8    gym.

9         Q.    What about the A building, what does it

10   house?

11        A.    The A building is all of your general ed

12   courses, classes.  English, math, history

13   department, science department, computer labs.

14        Q.    Just to make sure I understood you

15   correctly, when you started at Curie in 2004, you

16   were hired specifically for the B building?

17        A.    That's correct.

18        Q.    Did you have any say in the process of

19   where you wanted to go?

20        A.    No.

21        Q.    You came in and they said you're going to

22   the B building?

23        A.    You're going to the B building.

24        Q.    And you said there was an info desk at the



1  B building?

2     A.   Yes.  There was an info desk where you

3  greet parents, patrons, and students.

4     Q.   Do you remember where the desk was in the

5  B building?

6     A.   Oh, yeah.  Definitely.  With Curie, we

7  have the park district and then you have the school

8  entrance.  So they -- you know, you have to have

9  someone there because you can enter the building

10  and go to the park side.  So for security reasons,

11  we greet them and meet them as they come through

12  the doors to find out the reason for being there.

13     Q.   So was the park district office in the

14  B building as well?

15     A.   Yes.  A little down the hall.

16     Q.   And were you at the info desk?

17     A.   Yes.  Definitely.  I -- yeah.  I was at

18  the information desk.

19     Q.   How long, do you remember, were you at the

20  info desk?

21     A.   Meaning years or hours?

22     Q.   Like in hours.

23     A.   Oh, that was my job.  We worked seven

24  hours.  I was at the desk about five -- four to



 1   five hours per day.

 2       Q.   And at the time you weren't at the desk,

 3   what were you doing then?

 4       A.   I would be posted up by the girls' locker

 5   room on the first floor.

 6       Q.   This is when you first started at Curie?

 7       A.   Yes.

 8       Q.   What were you doing at the girls' locker

 9   room?

10       A.   I wasn't at the girls' locker room.

11   There's a stairwell.  The girls go up to the locker

12   room.  I was beneath.  My job was to clear the

13   corridor.  You know, when the bell rings, droves of

14   students coming over to their classes, my job was

15   to secure that area and make them move along.

16       Q.   If I understand you, the girls' locker

17   room is on the next level?

18       A.   It's up top.

19       Q.   You were on the first floor by the stairs

20   then?

21       A.   Yes.

22       Q.   So the girls would go up and down the

23   stairs and you were just there to guide them?

24       A.   No.  I was -- we had security already in



1   the locker room.  That wasn't my job to make sure

2   they go up the stairs.  My job was more or less to

3   secure that long hallway, which was about a hundred

4   yards.

5       Q.   Okay.

6       A.   You know, the kids come over to go to the

7   classes and I make sure that they move along and no

8   fights, anything like that should arise.

9       Q.   This hundred yard hallway --

10      A.   About a hundred.

11      Q.   -- was that on the first floor?

12      A.   Yeah.  That's first floor.  50 to about

13  100 yards.

14      Q.   So you were doing that hallway monitoring

15  about two hours a day when you first started?

16      A.   Yes.

17      Q.   What happened when your shift was done in

18  the hallway?  Would you go back to the desk or ...

19      A.   Yes.  I would go back to the desk.

20      Q.   And how long would you stay at the desk?

21      A.   For the remainder of the day.

22      Q.   You said your shift was seven hours?

23      A.   Seven hours.

24      Q.   When you were at the info desk, did you



1    have a chair to sit on?

2        A.   Definitely.

3        Q.   What all -- what type of equipment was at

4    the desk?

5        A.   Funny thing about it all, we had no

6    equipment.  I suggested from working there how

7    different people were coming in and just being

8    allowed to go to and from into the building, I

9    suggested to my assistant principal to maybe have

10   like a scan machine where we can put the bags and

11   things up there.

12       Q.   You mean like an X-ray scanner?

13       A.   X-ray scanner.  They didn't have it -- at

14   Curie, they only had it on the Pulaski side of the

15   building because that was the only entrance for the

16   students and actually outside people.  More of the

17   traffic was coming through the Pulaski side.

18       Q.   Where was the Pulaski side?

19       A.   That's the A building.  I was on the

20   Archer side, which is the B building.

21       Q.   Which side?

22       A.   Archer.

23       Q.   You mentioned X-ray equipment.  Were there

24   security issues at Curie?



1    A.    Say that again.

2    Q.    Were there security issues at Curie?  I'm

3 talking about 2004 when you started.

4    A.    No.  Actually, there wasn't a lot of

5 security issues.  It was just, you know, being --

6 observing and from my experience of doing security.

7 I seen how easy someone could bring in a weapon or

8 contraband.  And in one of our security meetings, I

9 was talking with my supervisor and I was asking

10 because we had one of the machines just sitting up

11 against the wall.  I had asked her why wasn't it --

12 why we couldn't use it back there.  She said she

13 didn't think about it, that was a good idea.  So

14 she had them put one back there.

15    Q.    Do you remember which supervisor that was?

16    A.    Cindy Kosik.

17    Q.    Do you know how to spell the last name?

18    A.    K-O-S-I-K.

19    Q.    Do you remember when you had the meeting

20 with Ms. Kosik?

21    A.    I can't recall.

22    Q.    So when you started at Curie in 2004 there

23 weren't a lot of security issues, it may have been

24 just been minor fights in the hallway between



1    students?

2        A.   Definitely.

3        Q.   How old were the students?

4        A.   Students at Curie?

5        Q.   Students at Curie?

6        A.   High school students.  I believe 14 to

7    maybe 18.

8        Q.   Kind of that age where they're still sort

9    of middle school junior high kids and they're all

10   pumped full of hormones, but not yet adults?

11       A.   Right.  Right.

12       Q.   My mom taught junior high for 33 years

13   before retiring, so all of the stories I've heard

14   about kids that age, I don't know how she did it.

15            Did you ever have to break up a fight?

16       A.   All the time.

17       Q.   How often would a fight occur?

18       A.   Are we speaking 2004?

19       Q.   2004.

20       A.   Oh, no.  2004, there wasn't a lot of

21   fights.  Maybe one or two fights per month.

22       Q.   If a fight broke out, what would you do?

23       A.   I would definitely disperse -- with kids,

24   they all come around.  I would disperse the crowd



1    and get to the two individuals or three and pull

2    them to the side and take ID's and call for some

3    type of backup assistance.  Actually, where I was

4    posted was the dean's office.  I was maybe five

5    steps away from the dean's office.  Once I make the

6    call, if he was in there, he'd come out immediately

7    to get the kids.

8        Q.   So you were posted near the dean's office.

9    Was that when you were monitoring the hallway?

10       A.   Yeah.  Monitoring outside of the girls'

11   stairwell.

12       Q.   You were saying earlier about the sexual

13   harassment suit, that you were being harassed over

14   the radio.  Did you have a radio on you in 2004?

15       A.   Definitely.  You have to have a radio.

16       Q.   Was it like a walkie-talkie or the kind

17   the cops have?

18       A.   In our hand, walkie-talkie.

19       Q.   You can access anybody in the building on

20   it?

21       A.   Yes.

22       Q.   Other security officers?

23       A.   Yes.

24       Q.   What about the school administration?



1     A.   Yes.  They carried radios.

2     Q.   Okay.  Now, you started at the info desk,

3 and just for purposes of clarity, I'm going to call

4 it the long hallway.  How long was that sort of

5 your posting position?

6     A.   I believe I was there for -- up until

7 Ms. Jones left I want to say or maybe a year before

8 Ms. Jones left.

9     Q.   And then what was your posting after the

10 hallway at the desk?

11     A.   I was sent to second floor I believe.

12 Yes.  Second floor of the A building.

13     Q.   I forget, what did you call the A

14 building?  It was the -- it began with a P, wasn't

15 it?

16     MS. HALL-JACKSON:  Pulaski.

17 BY MR. HILDEBRAND:

18     Q.   Pulaski.

19     A.   Right.  That's what they call it.  It was

20 the Pulaski side.

21     Q.   Good memory.  And where were you in the

22 A building on the second floor?

23     A.   I was on the east end of the building.  I

24 started out on the east end, second floor.



1    Q.   What sort of work were you doing?

2    A.   My job was to secure the duty post, make

3  sure the kids -- right by my post, there were

4  lockers.  Make sure they get in and out of the

5  lockers, no hanging between lockers.  Walking

6  around after the halls were cleared.  I would take

7  a walk around to the other side, which was the

8  girls' washroom.  I would check all washrooms,

9  stairwells, make sure no one was hiding out.  Then

10  I had to get back to my post.  They demanded you

11  always be present at the post.

12    Q.   Was your post in the A building by any

13  specific point?

14    A.   Yes.  I was outside of the special

15  education classroom.

16    Q.   Did you have a chair at that post?

17    A.   Yes.

18    Q.   What type of chair was it?

19    A.   I actually had a desk and a chair.  Nice

20  comfortable cushion chair.

21    Q.   Let me back up.  When you were in the

22  B building when you first started in the hallway, I

23  forgot to ask you, did you have a chair in that

24  hallway as well?



1     A.   Yes.  I put the chair there.

2     Q.   You put the chair there?

3     A.   That's what security does.  By being by

4  the gym, health room, and all of the above, the

5  custodian staff might move it the night before.  It

6  was on us to go into either the dean's office or a

7  classroom nearby to pull the chair out.

8     Q.   Do you happen to know in 2004 if the

9  administration had any policy about chair use for

10  security guards?

11     A.   Definitely not.  She had given us plush

12  chairs.  I guess it was a Christmas present.  When

13  we came back in January, we had some nice desks and

14  chairs.  New chairs and desks.

15     Q.   Was that January 2005 then?

16     A.   I don't recall the actual year.

17     Q.   That was in the B building?

18     A.   No.  That was in the A building.

19     Q.   That was in the A building?

20     A.   Right.

21     Q.   When you were in the B building back in

22  2004, did the administration -- did they give you

23  the chair or did you get the chair?

24     A.   The chair came with the information desk.



1    There were several chairs there.
2         Q.    What about in the hallway?
3         A.    No.  Because of I guess it being -- like
4    the only thing that was over there was the health
5    room, mats.  But we were told it was okay to have
6    chairs.
7         Q.    Do you remember who told you that?
8         A.    Assistant principal.  Whoever was in
9    charge of security has always been assistant
10   principal.
11        Q.    So now back to the A building when you
12   were there, you had a desk and a chair and that was
13   by the special ed office?
14        A.    Right outside the special ed office.
15        Q.    Was there anything on the desk?
16        A.    No.
17        Q.    If I understand you right, the chair and
18   the desk, the administration provided that?
19        A.    Definitely.
20        Q.    Do you remember who made that decision?
21        A.    Principal.
22        Q.    Was that Ms. Jones as far as you know?
23        A.    No.  I don't know exactly which principal.
24   Just thanked them and that was it.



1    Q.    Do you remember how long you were -- your

2    post lasted at the A building?

3    A.    No.  Because I was everywhere.  I might

4    have ended up on the other end of the second floor

5    first, and then I never returned to a permanent

6    post at the park side, only if like someone was

7    absent or something I would be called upon to go

8    over there.

9    Q.    And the park side is the B building?

10    A.    B building.  Archer side.

11    Q.    Back in 2014 now, were you in the

12    B building again?

13    A.    No.  I was A building.

14    Q.    That was your permanent post?

15    A.    Permanent post.

16    Q.    Where were you in the A building in 2014?

17    A.    I was third floor, three west.

18    Q.    What was on the third floor?

19    A.    Meaning?

20    Q.    What sort of class rooms are up there?

21    A.    Third floor is for freshman -- incoming

22    freshman.

23    Q.    And where were you located on the third

24    floor?



1        A.    I was three west.

2        Q.    What does that mean?

3        A.    That's the third floor on the west end of

4   the building.

5        Q.    What's on the west end?

6        A.    Science department, lunchrooms on both

7   ends actually, girls' washroom.  Inside the

8   lunchroom, you have the counselor's office and used

9   to be a psychologist.

10       Q.    What specific location was your post on in

11  three west?  Was it by a particular office?

12       A.    I was right outside of 347 classroom,

13  which was a science class room and like a small

14  computer lab.

15       Q.    Was your job the same where you would

16  monitor the hallways?

17       A.    Monitor the halls, go around and check

18  washrooms, answer the radio if the attendance

19  office called to get a student out of class, go in

20  and out of the lunchroom.  That's about it.

21       Q.    Once you were done monitoring the

22  hallways, were you expected to be back at your

23  post?

24       A.    Definitely.



1      Q.   In 2014, did you have a chair at your

2  post?

3      A.   Yes, I did.

4      Q.   What about a desk?

5      A.   No desk.

6      Q.   Were the desks taken away at some point,

7  do you know?

8      A.   Yes.  All the desks were taken.

9      Q.   Do you remember when that happened?

10     A.   No, I don't recall.

11     Q.   Do you know why the desks were taken?

12     A.   I don't know that either.

13     Q.   Do you know who made that decision to take

14  them away?

15     A.   No, I don't.

16     Q.   When you had the chair in 2014 when you

17  were at three west, who gave you the chair?

18     A.   Who gave me the chair?

19     Q.   Yeah.

20     A.   I don't know who pulled the chairs out,

21  but we were allowed to have chairs.  All

22  security -- if I go on lunch, they would take the

23  chair.

24     Q.   I guess to clarify my question, did

Case 1:16-cv-04884 Document #:187-1 Filed: 02/15/18 Page 52 of 319 PageID #:1788
Case 1:16-cv-04884 Document #:186-1 Filed: 02/15/18 Page 52 of 319 PageID #:1788
Kim Ammons 08/23/2017

1    someone specific in the administration give you the

2    chair?

3        A.   No.  They didn't give me the chair, but

4    they allowed us to have a chair.

5        Q.   Do you know -- did you ever have any

6    conversations with anyone in the administration

7    about using the chair in early 2014?

8        A.   2014, yeah.  I believe I had a

9    conversation about using a chair.  I don't recall.

10       Q.   Okay.  Now just to clarify, you can't

11   recall a time period or with whom or anyone?

12       A.   No, I don't recall.

13       Q.   Okay.  Which is fine.  So I want to focus

14   on 2014 when you were at three west.  Sort of walk

15   me through your typical day.  You came in on a

16   Monday morning, how would your day go?

17       A.   Wow.  Wonderful.  I come in, go to my

18   locker.  I'm greeted by maybe five, six boys

19   talking sports.  Depending on the month if it's

20   basketball, football, we talk a little bit about

21   sports and laugh or whatever.  Then they, you know,

22   get ready to leave with the bell or whatever.  I

23   did my things, clear the halls out.  I might stop

24   in the washroom or something and I start my



1    roaming.  That's about it.  That was every day.

2        Q.   Where was your locker?

3        A.   Right by my post, three west.

4        Q.   Did you have a specific assigned locker?

5        A.   Yeah.  I was given a locker by the

6    counselor that was responsible for issuing out

7    lockers to the students.  It was our job to ask

8    which locker was available and we'd give them the

9    number and we had to put our name -- tape our names

10   on the lockers.  So at the end of the year, they

11   would cut -- the football team would cut locks off

12   and they would know not to touch our lockers.

13       Q.   That was in 2014 you were doing that?

14       A.   Yes, I believe.

15       Q.   What about other times when you were

16   working at Curie?  What locker usage -- did you

17   always have an assigned locker?

18       A.   Yes.  When I first started, I was on the

19   first floor.  My post was in the B building.  So

20   the lockers were near the main office.  I go and

21   punch in and put my things up in the locker -- put

22   my things in and go punch in depending on the time.

23       Q.   I was going to ask you about punching in.

24   Is there a central location for that?



1      A.   Yes.  Main office.

2      Q.   Where would you take your breaks?  Just to

3  clarify, in 2014.

4      A.   2014, I started taking my breaks in the

5  media center on the second floor, which is the

6  library, sometimes or I would stay in the lunchroom

7  area where my post was.

8      Q.   So the school didn't have a specialized

9  break room for the security staff?

10     A.   No.  No.

11     Q.   Could you use one of the faculty lounges

12  if you wanted to?

13     A.   Yes.  In 2013, actually, they closed out

14  the faculty lunchroom.  I want to say 2013 or 2014

15  it was closed down.

16     Q.   Do you know why that was done?

17     A.   Don't recall.  They started using it for

18  overcrowded students.

19     Q.   So on January 1st of 2014, did you have a

20  chair at three west when you were on that post?

21     A.   January 2014, yes, I recall.

22     Q.   Do you recall when that chair was taken

23  away?

24     A.   My chair I believe was taken away in I



Case 1:16-cv-04884 Document #:187-1 Filed: 03/15/18 Page 55 of 319 PageID #:1731
Case 1:16-cv-04884 Document #:88-1 Filed: 03/15/18 Page 55 of 319 PageID #:732

Kim Ammons 08/29/2017

 1    believe March, April.  Between March, April, and

 2    May.

 3        Q.   Do you remember the year?

 4        A.   Hm?

 5        Q.   The year?

 6        A.   I don't recall to be honest.

 7        Q.   What do you remember about the reasons why

 8    the chair was taken away?

 9        A.   Supposedly -- can you ask that question

10    again?

11        Q.   So at some point in -- between March,

12    April, and May, your chair at Curie you had was

13    taken away?

14        A.   Right.

15        Q.   Do you remember any of the reasons given

16    to you why the chair was taken away?

17        A.   Supposedly the board ordered the chair to

18    be taken.

19        Q.   Do you remember who told you that?

20        A.   I believe I want to say Cottrell or

21    Ms. Bryant.

22        Q.   Who was the second name?

23        A.   Ms. Bryant, assistant principal.

24        Q.   Who was Cottrell?



1    A.   She was assistant principal.

2    MR. HILDEBRAND:  Off the record for just one

3  second.

4                    (Discussion off the record.)

5  BY MR. HILDEBRAND:

6    Q.   I want to show you a couple of documents.

7  The first one I marked as Exhibit 1.

8         Have you ever seen Exhibit 1 before?

9    A.   Yes.

10   Q.   How have you seen it before?

11   A.   It looks like from the union book.  They

12 have different description and titles of jobs that

13 they represent.

14   Q.   Do you recall when you might have seen

15 this before?

16   A.   Just reading my union book, going through

17 the union book.

18   Q.   You see the section that would be the

19 second bolding, principal accountability and

20 general responsibilities?

21   A.   Mm-hmm.

22   Q.   And then the second one where it says,

23 quote, actively responds to fight or other issues

24 in the school that threaten the safety of students,



1    staff, and/or guests?

2        A.   Yes.

3        Q.   Would you say that's an accurate

4    description of the type of responsibility you had

5    as security supervisor or security principal?

6        A.   Can you repeat that?

7        Q.   One of the responsibilities is to actively

8    respond to fights.

9        A.   Right.

10       Q.   Would you say that's an accurate

11   description of the sort of things you were doing as

12   a security office?

13       A.   Definitely.  Yes.

14       Q.   Would it be difficult to actively respond

15   to a fight if you were sitting down in a chair all

16   the time?

17       A.   Yes, it would be difficult.

18       Q.   How so would it be difficult?

19       A.   Because you can't respond.

20       Q.   What about if you had a desk in front of

21   you as well and there's a fight broke out, how hard

22   would that make you be able to actively respond to,

23   say, a fight in the hallway?

24       A.    Well, if a fight is breaking out in the

1  hall, you wouldn't be sitting at a desk.  If kids

2  are in the hall, you would not be sitting at a

3  desk.  So you definitely can actively respond to a

4  fight because you're up at all times when kids are

5  present.

6      Q.  I know kids will be in the hallway

7  between, like, a period shift between -- going from

8  class at 10:00 o'clock, going to class at

9  11:00 o'clock.  Between those periods when kids

10  would be in classes, did you ever see kids in the

11  hallway wandering around?

12      A.  Any time I've seen children in the hall, I

13  would actively get up and attend to those kids or

14  children.

15      Q.  Would it be accurate to say that the kids

16  just aren't going to be in the hallway between

17  classroom changes?

18      A.  That's correct.

19      Q.  Going down the document in front of you,

20  the fourth bullet point.  Do you see where it says

21  fulfill duties assigned related to hall sweeps?

22      A.  Yes.

23      Q.  I'm just kind of curious.  What's a hall

24  sweep?



1    A.    A hall sweep is, for example, when they

2    say police, book them.  A hall sweep is when you're

3    in the hallway and the tardy bell rings, any kids

4    that are straggling out in the hallway -- you would

5    have another security officer on the other end.  It

6    is our job to bring them into the middle, kind of

7    gather them in the middle.  And we have -- we were

8    given some scantron [sic] machines to immediately

9    scan -- keep them from going back down to the

10   attendance office.  You would give them a tardy

11   slip right then and there.  That's a hall sweep.

12       Q.    Okay.  I was just curious.

13       A.    Or you take them to a designated area.  On

14   a Curie floor, there was always deans.  So the

15   dean's office, you can take the kid to the dean's

16   office and then she will, I guess, give them some

17   type of detention or whatever.

18       Q.    Seven down where it says quote, monitor

19   school grounds and school entrances to ensure only

20   authorized personnel and authorized visitors access

21   the school.  Is that an accurate description of one

22   of your responsibilities?

23       A.    It used to be one of my responsibilities

24   when I was at the door.



1     Q.   That was in 2004?

2     A.   That was 2004 -- no.  I was actually at

3  the door before.  In 2014 and 2015, I was at the

4  park -- not the park, Pulaski side for maybe one

5  period, first period.

6     Q.   Do you remember when that was?

7     A.   What year?

8     Q.   Mm-hmm.

9     A.   What month?

10    Q.   Was it 2014 or '15?

11    A.   Yeah.  I was moved down to the door 2014,

12 I want to say March, April.  Yeah.  Around March or

13 April.

14    Q.   You said that was the Pulaski side?

15    A.   Yes.

16    Q.   Do you remember why you were moved?

17    A.   To be honest, I don't know why I was

18 moved, but I do recall I had filed some charges for

19 retaliation around that time.

20    Q.   What type of charges?

21    A.   Excuse me.  Disability, failure to

22 accommodate my disability.

23    Q.   Do you remember the month at all?

24    A.   I know it had to be like -- because I was

1    down there up until June -- up until June, so I

2    believe March -- between March and April.

3        Q.   Was that 2014 or 2015?

4        A.   2015 -- I don't recall the year.

5        Q.   You said you were moved to the Pulaski

6    side for one period at the door?

7        A.   In the morning.

8        Q.   Do you remember what shift that was?

9        A.   That was 7:15 I had to be there.

10       Q.   In --

11       A.   In the morning.

12       Q.   And which door was that?

13       A.   That's the southwest Pulaski side.

14       Q.   Was there anything particular about that

15   door as an entrance door or was it just a normal

16   door?

17       A.   You know what?  It used to be an entrance.

18   It was no longer an entrance.  The teachers come in

19   and that was it.  No one else could come in.  If

20   they came in, I had to direct them to the Archer

21   side.

22       Q.   Was there a desk there?

23       A.   When I first got down there?

24       Q.   When you were at that post at 7:15 on the



1    one door on the Pulaski side.

2        A.   When I got to that post, there was a desk.

3        Q.   What about a chair?

4        A.   A chair.  A couple chairs.

5        Q.   What do you mean when you got to that

6    post?

7        A.   When I was sent to that new post duty,

8    there was an information desk there.

9        Q.   Was it -- was the information desk there

10   after you were there?  Was it ever taken away?

11       A.   Yes.  It was taken away.

12       Q.   Do you remember when that happened?

13       A.   I don't recall the month.  I recall an

14   incident when it was taken away.  I don't know the

15   exact date.

16       Q.   What was the incident?

17       A.   I came to work on a Monday and that Friday

18   when I got home, I realized I had left my blood

19   pressure medicine, but I had some extras at home.

20   When I arrived there to get it to take it, the desk

21   was gone.  I immediately asked the custodian did he

22   see the desk or did they move the desk or whatever.

23   One of the janitors told me that Ms. Cottrell,

24   assistant principal, had moved it herself, pushed



1    it into he believed another lunch -- pushed it like

2    a blind side from the front.  I told him that -- do

3    you know why she pushed it or what and he said that

4    she said it would no longer be there, security

5    won't sit there.  And so I texted her to see if she

6    was in the building to let her know I was looking

7    for the desk to get my meds out.  She said she

8    wasn't there yet.

9        Q.   Who was that again?

10       A.   Ms. Cottrell.  She was assistant

11   principal.  She said she it wasn't in the building

12   yet.  That was like around 8:00 o'clock -- about

13   7:30.  About 7:30, somewhere in there when I got to

14   work.

15           Keep going?

16       Q.   Yeah.

17       A.   Okay.  So when I texted her, I was waiting

18   on her to respond.  She responded that she wasn't

19   in the building, that she was on her way there.

20   She got there -- my next duty was to clear that

21   hallway out before going upstairs.  That's like

22   about 8:00 o'clock for the next period.  I had to

23   do the first floor, monitor the hallway.

24   Ms. Cottrell came up to me and asked me what time



Case 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 64 of 319 PageID #:1740
Case 1:16-cv-04884 Document #: 188-1 Filed: 02/15/18 Page 64 of 319 PageID #:1740
Kim Ammons  08/29/2017

1   was my lunch.  I said 10:00 o'clock.  She said, I

2   need to speak with you.  I said, okay, you want me

3   to come on my lunch?  She said yes.  I said okay.

4   That's fine.  She walked off.  Around 10 or

5   15 minutes after, I received a call from

6   Ms. Cottrell via radio to come to her office.  When

7   I got to her office -- excuse me.  Excuse me.

8       Q.   No.  No.

9       A.   Revisiting this stuff ...

10           When I got to her office she said,

11  Ms. Ammons, I can write you up -- I should write

12  you up.  I said, write me up for what?  Because you

13  threatened -- no.  You accused me of stealing your

14  medicine.  I said, I never accused you of anything.

15  I just asked you if you knew where the desk was so

16  I can get my medicine out.  Excuse me.  She said --

17  she kept -- you did accuse me.  I said, I did not

18  accuse you, Ms. Cottrell.  She says -- so she went

19  on to threatening me and I asked her if she should

20  call me again, that I have my union rep present.

21  And she says fine, get out of my office.  And I

22  walked out of her office and I returned back to the

23  floor.

24           She was -- I could see her by the Pulaski



1   end just standing there staring at me.  Excuse me.

2        Q.   Do you want to take a break?

3        A.   No, I'm fine.

4        Q.   We can take a break.  It's a good point if

5   you want one.

6        A.   No.  I'd like to move on.

7        Q.   Did you get the meds back eventually?

8        A.   No, I didn't.

9        Q.   Okay.  Looking back at Exhibit 1 in front

10  of you, eight down where it talks about actively

11  participate in professional development training,

12  do you recall taking training when you were a

13  security officer at Curie?

14       A.   All the time.

15       Q.   How often, when you say all the time,

16  would you have to take training?

17       A.   Maybe twice out of the year when you

18  return to school in August, there was like a

19  two-day training.

20       Q.   What sort of thing would you talk about in

21  the training?

22       A.   How to deal with people and students and

23  climate control, restorative justice, we even

24  talked about harassment.



1      Q.   How long would the training go on for?

2      A.   It could be two to three days and it was

3  for the whole day.  Then sometimes we have training

4  where if you get out at 12:00, you have to swipe

5  out and go back to the school.

6      Q.   And the last thing I want to ask you while

7  you have the document in front of you, it's the

8  last bullet point at the very bottom, quote, the

9  efforts to deescalate inappropriate student

10 behaviors, what are some of the deescalation things

11 you would learn to do?

12     A.   Wow.  Being a security person, you were

13 parents, counselors, everything.  I would talk to

14 the student about some of the behaviors and let

15 them know if it's inappropriate and the way you

16 should handle the situation and I would -- at one

17 time, we would write -- we had to write down what

18 took place and then I would take it to the dean.

19     Q.   Let me take that back from you now.

20     MR. HILDEBRAND:  Let's take a break.

21                      (A short break was had.)

22     MR. HILDEBRAND:  We're back on record.  It's

23 12:41 p.m.

24 BY MR. HILDEBRAND:



1    Q.   Remember earlier when I was asking you

2   about the security situation in 2004 at Curie and

3   you said there weren't a lot of issues?  Was there

4   any change by 2014 in the security situation at the

5   school?

6    A.   Definitely changed.

7    Q.   How did it change?

8    A.   Well, administration changed.  They --

9   2004, they was a little more strict I believe.

10    Q.   The administration?

11    A.   Yeah.  The administration.  They started

12   allowing the students to be -- back then when I

13   started out, they couldn't wear headphones,

14   couldn't have any cell phones out.  The clothing,

15   the attire was different.

16    Q.   That was 2004?

17    A.   2004.

18    Q.   What about 2014?

19    A.   Oh, boy.  Wild.  Kids were -- more fights,

20   cell phones all day long.

21    Q.   Anything else?

22    A.   Less suspensions.

23    Q.   You said there were more fights.  How

24   often would you see a fight in 2014?

1      A.   Well, there was -- where I worked, the

2   kids wasn't fighting much.  I would hear it over

3   the radio.  That was every other period maybe

4   sometimes.

5      Q.   Which building were you in?

6      A.   I was in the A building in the morning and

7   then I was back on the third floor.  So the fights

8   would be beneath me, like second floor or the

9   lunchrooms on the first floor.

10      Q.   I know you said in 2004 when you started,

11   you broke up some fights now and again, is that

12   right?

13      A.   Not often.  You know, maybe one, two per

14   month, something like that.

15      Q.   What about in 2014?

16      A.   I didn't have to breakup -- one thing I

17   can say is the fights seemed to be away from me.  I

18   didn't have many -- I kind of stopped the fights

19   before they happened.

20      Q.   Let me show you what I've marked as

21   Exhibit 2.  Have you seen Exhibit 2 previously?

22      A.   I've seen this maybe once when I was first

23   hired.

24      Q.   Okay.  Do you see the bullet where it says



 1    essential functions?  It's the third line -- third

 2    bolded section down.

 3        A.    Yes.

 4        Q.    I want you to take a look at that and if

 5    you think that's sort of an accurate description of

 6    what a security officer would do ...

 7        A.    No.  That's not accurate.

 8        Q.    What's inaccurate about it?

 9        A.    Playground areas.  We're high school.  We

10    don't police grounds much.

11        Q.    Okay.

12        A.    We just -- you know, security -- I'm

13    speaking for me or overall?

14        Q.    For you.

15        A.    Oh, for me.  2014, 2015?

16        Q.    Yeah.

17        A.    None of this.

18        Q.    What about where it says patrols hallways

19    and lavatories within building?

20        A.    Definitely patrols hallways.

21        Q.    Do you see at the bottom where it says

22    physical requirements?

23        A.    Yes.

24        Q.    It says -- it mentions walking and



Case 1:16-cv-04884 Document #:187-1 Filed: 03/15/18 Page 70 of 319 PageID #:1746
Case 1:16-cv-04884 Document #:88-1 Filed: 03/15/18 Page 70 of 319 PageID #:1746
Kim Ammons 08/29/2017

1   standing of significant degree?

2       A.   Yes.

3       Q.   Is that an accurate description of

4   security guards' functions, a lot of walking and a

5   lot of standing?

6       A.   No.

7       Q.   How so?

8       A.   You don't do all of that walking.  I mean,

9   you -- every hour, the kids come out, you clear the

10  halls, you check your areas, and you go back to

11  your duty post.

12      Q.   Okay.  I'll take that back from you.  I

13  want to show you next what has been marked as

14  Exhibit 3.  Have you seen Exhibit 3?

15      A.   This looks like the same one from the

16  union handbook.

17      Q.   That would be the first one I showed you,

18  Exhibit 1?

19      A.   Yes.

20      Q.   Do you know Exhibit 3, have you ever seen

21  this particular document before?

22      A.   While looking through my union handbook.

23  That's the only time.

24      Q.   Actually, I have no further questions on



1    this one.

2         The next one I want to show you is

3    Exhibit 4.  Exhibit 4, have you seen this before?

4         A.   In the union handbook.

5         Q.   Do you recall ever seeing this specific

6    exhibit in front of you?

7         A.   Looking through the union handbook.

8         Q.   Okay.  And what I have in front of you,

9    it's a job description for senior security officer.

10   Were you ever a senior security officer at Curie?

11        A.   Yes.

12        Q.   Do you recall when you were made a senior

13   security officer?

14        A.   When I was first hired.  I came over

15   through the lawsuit, I was still returned in the

16   same position.

17        Q.   Okay.

18        A.   No.  I take that back.  Not a senior

19   security officer.  They changed the name.  I was

20   security aide when I got to Curie.  They changed

21   the senior security officer -- I don't recall the

22   date at all.

23        Q.   But you think the name was changed at some

24   point after you started working at Curie?



1    A.   Yeah.  The name changed definitely.

2    Q.   You just can't recall when?

3    A.   I can't recall when.

4    Q.   Do you see the principal accountability

5    and general responsibilities towards the middle of

6    the page, the header?

7    A.   Yeah.  Principal accountabilities.

8    Q.   Then about eight lines down, there's a

9    bullet point that says, monitors school grounds and

10   school entrances via cameras if available to ensure

11   only authorized personnel and authorized visitors

12   access the school, end quote?

13   A.   Yes, I see that.

14   Q.   When you started Curie in 2004, do you

15   recall if they had video cameras at the school?

16   A.   When I started Curie, I wasn't allowed to

17   monitor any cameras.  The cameras were in the

18   uniformed police rooms.

19   Q.   So they did have cameras?

20   A.   They had a camera I believe.

21   Q.   You said it was in the uniformed police

22   room?

23   A.   Yes.

24   Q.   Was that CPD?



1    A.   CPD in the dean's office on the first

2    floor.

3    Q.   How many -- I'm talking about 2004 now.

4    How many CPD officers would have been at the school

5    when you were there?

6    A.   At Curie?

7    Q.   Yeah.

8    A.   Wow.  We've had a total about 6 -- 15 ...

9    Q.   That was in 2004?

10   A.   2004, no.  They had actually about five.

11   Q.   You said the officers would be in the -- I

12   guess the police room as you called it?

13   A.   No.  No.  Those are the uniformed

14   officers.  See, the school has -- Curie was known

15   for hiring police officers part-time.  They were

16   known for that.  And the police officers, they were

17   actually at duty posts at times.  They would be at

18   duty posts as well.  So if something had -- you

19   know, a big fight or whatever, then the police

20   would obviously come out of their room if the kids

21   needed to go to jail or something, and they would

22   get involved.

23   Q.   Okay.  If I understand you correctly,

24   Curie would hire, I guess, people who once worked



1    for CPD and now they were security guards?

2        A.   They were police, actually police

3    officers.  But part-time they were security -- the

4    one time the board called them -- this here applied

5    to them.  We were never supervisors, senior

6    security -- security aids.  The police were

7    supervisors.  On paper, it said security

8    supervisors, but we had like five to seven of them

9    and then whatever year, they had said that the

10   police were in the same union we were in, so they

11   couldn't be anything with CPD.  They had to be

12   security officers.  That's what happened.  But I

13   don't recall the year all this changed.

14       Q.   If I understand you, in 2004, there were

15   uniformed CPD officers in Curie as well as the

16   school security officers?

17       A.   Yeah.  They're still there.  They were

18   there all the way to '14, '15.

19       Q.   It was the uniformed CPD officers who were

20   monitoring the video equipment in this one room?

21       A.   I assume.  I never seen them, but I knew

22   the videos were in that room in their office.

23       Q.   Would any security officers -- I'm talking

24   about the non-uniformed CPS security monitors.



1   Would they monitor any video equipment in 2004?

2       A.   No, I don't think so.

3       Q.   Jumping ahead to 2014, was the video

4   monitoring still there?

5       A.   Not in 2014.  I believe the monitors were

6   there, but no one was watching them.

7       Q.   Do you know when the monitors were stop

8   watched -- strike that.  Let me reask that

9   question.  That was a bad question.

10          Do you know when the monitors were no

11  longer being watched?

12      A.   I believe 2014.  It was hearsay that CPS

13  made the officers come out and do something other

14  than sitting in that office, so you would see them

15  out like in the hallway, more active.

16      Q.   That's the uniformed police officers?

17      A.   Uniformed police officers.

18      Q.   In 2014, 2015, do you remember how many

19  uniformed CPD officers --

20      A.   There has always been two uniformed.

21      Q.   Always two.  Would it ever fluctuate,

22  there might be more in a given time?

23      A.   Never.  Always two.  But, you know, as I

24  stated before, the Chicago part-timers would come I



Case 1:16-cv-04894 Document #:187-1 Filed: 02/15/18 Page 76 of 319 PageID #:1752
Case 1:16-cv-04894 Document #:188-1 Filed: 02/15/18 Page 76 of 319 PageID #:2592
Kim Ammons  08/29/2017

1    guess for work.  So they would have uniforms on,

2    but they were covered, like the shirt.

3         Q.   Okay.  I'll take Exhibit 4 back from you.

4    I want to show you what I've marked as Exhibit 5.

5    I was just wondering if you've seen Exhibit 5

6    before?

7         A.   Never.

8         Q.   You haven't?

9         A.   Never.

10        Q.   Okay.  I'll take that back just.

11             Then the next one I want to show you is

12   Exhibit 6.  Have you seen Exhibit 6 previously?

13        A.   I don't recall this.  It looks familiar.

14   It looks familiar.

15        Q.   How does it look familiar?

16        A.   When I was -- when I returned to -- I

17   returned to Curie from being off due to a

18   disability and I was told to seek out the

19   principals to be accommodated and I did that and

20   she told me with a nasty tone that she was no

21   longer over security and to go find Mr. Morris or

22   Mr. Graves.  I immediately went to find Mr. Morris.

23   After that, he -- I asked him if he was aware of me

24   being accommodated to the locker room.  He told me



1· · he never heard of that, that he would get back to

2· · me after he speaks to Mr. Graves, who had just

3· · become the new security supervisor.

4· · · · · Q.· · Let me ask you, you said when you got

5· · back --

6· · · · · A.· · So.

7· · · · · Q.· · -- from your disability, do you remember

8· · when that was?· I'm not looking for a specific

9· · date.

10· · · · · A.· · I don't recall the exact date, but it was

11· · a couple times.· I ended up coming to work,

12· · leaving, coming back, leaving.· Then it got worse

13· · and I couldn't come back until I want to say maybe

14· · January.· Maybe.· Yeah.· Maybe January.

15· · · · · Q.· · Do you remember what year that was?

16· · · · · A.· · It might have been 2016.· It might have

17· · been.· That's when we had the conversation I

18· · believe about our locker room, the only time I

19· · would have seen something pertaining to the girls'

20· · locker room attendant duty.

21· · · · · Q.· · Okay.· You say when you came back in

22· · presumably January 2016, someone told you to seek

23· · out the principal.

24· · · · · A.· · Yeah.



1    Q.   Do you remember who said to seek out the
2  principal?
3    A.   I believe it was Ms. Bentley from the ADA
4  department of CPS told me to seek out the
5  principal.
6    Q.   Who was the principal?
7    A.   Ms. Tingwall, T-I-N-G-W-A-L-L.
8    Q.   Ms. Tingwall said she was no longer in
9  charge of security, to seek out ...
10   A.   Michael Morris.
11   Q.   What was his function?
12   A.   He was security supervisor.
13   Q.   And who was Graves?
14   A.   He was assistant principal, new, and they
15  had given him I guess the security supervisor
16  title.
17   Q.   Do you see at the top is a date written
18  1-12-2016 on the document in front of you?
19   A.   Mm-hmm.
20   Q.   Is that your handwriting?
21   A.   Looks like it.
22   Q.   Do you know why that date is on this
23  document?
24   A.   This might have been the date they gave me



1    this after the incident.

2        Q.    The incident you were just describing in

3    January?

4        A.    About the locker room?

5        Q.    Yeah.

6        A.    Yeah.  After that incident.

7        Q.    I want to talk about the locker room in a

8    little bit.  Had you ever -- the locker room was on

9    the B building, correct?

10       A.    That's correct.

11       Q.    Which floor was that on?

12       A.    Second floor.

13       Q.    Had you ever been posted to that position

14   in the B building previously?

15       A.    I never was posted up there, but I had to

16   go up for someone who was absent.  The locker room

17   attendant, if she wasn't there then I'd have to go

18   up there for that day.

19       Q.    What sort of work would you do when you

20   were doing that as a locker room attendant?

21       A.    My job was to secure the locker room.

22   When the bell rang, the students come in and get

23   them out -- get them in, get them out as fast as

24   possible.  Then I come out and come back down to my



1  post downstairs.

2      Q.   So you were physically in a locker room

3  for a period of time?

4      A.   Yeah.  And a couple times when the lady

5  who worked there permanent, if she was absent, she

6  would leave the key for me to go into the office

7  and I can stay in the locker room.  If she didn't

8  leave the key, I'd just come -- instead of staying

9  in the locker room, I would come out and come down

10  and stand there at the duty post.

11      Q.   Where would you be actually in the locker

12  room?

13      A.   There's an office, like a caged in office

14  that the attendant -- security person sits inside.

15  There's a desk, a plush chair, newspapers, locker,

16  whatever was in there that day.

17      Q.   That's when the students were in the

18  locker room?

19      A.   While the students were gone.  While the

20  students were gone, after I clear out, I could come

21  back in and sit.  And five minutes before the bell

22  rings, I'll get up and come outside the locker room

23  to give the students their privacy, enough time

24  where I believe they should have been out and then



1    I run them out.

2        Q.    Where would --

3        A.    I'll be standing right outside the door.

4    You come up the stairs, there's like an opening

5    which is a little small hallway, which leads to

6    health room classes, and then you have the girls'

7    locker room door.  So I'd be like right outside the

8    stairwell standing.

9        Q.    So I understand you, you're not actually

10   in the locker room when the kids are changing?

11       A.    No.

12       Q.    You're outside in the hall?

13       A.    I'm outside in the hall.

14       Q.    What are you doing when you're outside in

15   the hall?

16       A.    Standing.  Telling them to come on up.

17   Hurry up and get in the locker room and get out.

18   Just rushing the kids.

19       Q.    Where would the kids be?

20       A.    Coming up the stairs, going into the

21   locker room.

22       Q.    Okay.  And then when would you go into the

23   locker room?

24       A.    When there was time -- enough time to be



1   dressed, come out, go to class.  Run out any late

2   stragglers.

3       Q.   After the kids have changed and gone to

4   the gym for the class, would you do any monitoring

5   of the situation?

6       A.   I would go in the locker room and make

7   sure it's clear, make sure the kids secured --

8   because they know to keep the lockers open and then

9   they say other people are stealing their things.

10  Make sure their locks are on, lock them.  Then I'll

11  come out and come down to the hallway.

12      Q.   Would you have to do any monitoring of the

13  hall way outside the locker room after the kids had

14  gone to class?

15      A.   Never.

16      Q.   What about --

17      A.   It's no big hallway.  The hall is maybe

18  from that window to that wall.  It's just a hall

19  leading to the classroom.  That's all.

20      Q.   What about the stairwell going up?  Would

21  you check it out after the kids had gone to class

22  to make sure there aren't any stragglers?

23      A.   The stairwell is facing me.  You're the

24  stairs and I'm up here -- I'm security, you're



Case 1:16-cv-04884 Document #: 187-1 Filed: 02/15/18 Page 83 of 319 PageID #:1759
Case 1:16-cv-04884 Document #: 188-1 Filed: 02/15/18 Page 83 of 319 PageID #:2692
Kim Ammons 08/29/2017

1    coming up to me.  So I see the stairs.

2        Q.   We're looking eye to eye?

3        A.   Right.  Right.  Eye to eye.

4        Q.   And you said there was a caged off office

5    in the locker room?

6        A.   Yeah.

7        Q.   Where was that when you came into the

8    locker room?

9        A.   You can see the actual cage.  Yeah.

10   There's a cage there.  When I first was hired at

11   Curie, they used to sell -- rent out uniforms and

12   things like that.  So I believe that's what they

13   converted into an office -- allowed security to

14   convert it into an office.

15       Q.   How big --

16       MS. HALL-JACKSON:  Regan, before you ask your

17   next question, can I just go sign some paperwork?

18   My assistant is in the lobby.

19       MR. HILDEBRAND:  Yeah.  We can go off.

20                   (A short break was had.)

21       MR. HILDEBRAND:  Back on the record.  It's

22   1:09 p.m.

23   BY MR. HILDEBRAND:

24       Q.   So you were telling me about the caged



1  area in the girls' locker room.  How large is this

2  caged area?

3      A.   Half of this room -- I wouldn't say half.

4  I'd say from the beginning of the flat screen.

5      Q.   Which side of the flat screen are you

6  talking about?

7      A.   That side.  Beginning.

8      Q.   So let the record reflect --

9      A.   From there to there.

10     Q.   -- there's -- we're in the conference room

11 at the law office and there's a flat screen

12 television on what would be the longer west facing

13 wall.  In the middle of the wall, there's a flat

14 screen TV I'd say about six feet long.

15     MS. HALL-JACKSON:  I agree, counsel.

16     MR. HILDEBRAND:  Ms. Ammons referred to the far

17 left end -- if you're facing the wall, it would be

18 the very far end from that, the doorway into the

19 window.

20 BY MR. HILDEBRAND:

21     Q.   Now I'd estimate that size -- I need a

22 tape measurer.

23          How many lockers were in the locker room?

24 Was it rows of lockers or how was it set up?



1        A.   There were wall lockers, two sets.  Then
2   you had rows, four.
3        Q.   Four rows?  Could you see the entire
4   locker room from the caged office area?
5        A.   No, you couldn't.  But they had put up --
6   they had like a big old mirror you could see the
7   blind spots, so you could see a kid if they came
8   in.
9        Q.   And I presume there was a shower area in
10  the locker room?
11       A.   Yes.
12       Q.   Where was that in relation to the caged
13  area?
14       A.   You could look out the right side of the
15  cage at the shower area.  It was to the back.  You
16  could see the curtain, like stepping to the back of
17  the cage, but they had shower curtains.
18       Q.   Was there any part of the locker room that
19  you couldn't see from the caged area?
20       A.   No.  The mirror, you could pick up the
21  blind spots with the mirror.
22       Q.   Do you know whether in 2015, were there
23  any security incidents in the girls' locker room?
24       A.   All the time.



1    Q.   What kind of things were going on?

2    A.   Fights.

3    Q.   Anything else?

4    A.   I believe coworkers said there was

5  breaking into lockers.

6    Q.   How often would fights happen?

7    A.   Once a week, twice a week.

8    Q.   What about break-in's in the lockers?

9    A.   Not often.  Maybe once a month.

10   Q.   Had you heard there were problems, like

11  some incidents in the girls' locker room?

12   A.   Just coworkers.  We talk about different

13  incidents, people -- girls leaving locks off and

14  open and carelessness.

15   Q.   You mentioned earlier about training.

16  Would you ever have, like, morning meetings with

17  the administrative personnel about security issues

18  in the building?

19   A.   We didn't.  We hadn't had them on the

20  regular.  They had started after -- they started

21  like around January I want to say of 2014, 2015.  I

22  don't recall the exact date, but we didn't have one

23  then.  We had little huddles where all security

24  would leave the floors and come down to the Pulaski



1    door and talk with the administrative head of

2    security.

3        Q.   Who would that be?

4        A.   They changed so frequently.  That was

5    Cottrell and Ms. Bryant.

6        Q.   Would you ever get any e-mail

7    communications about security situations in the

8    building?

9        A.   None.

10       Q.   So just the huddles?

11       A.   Yeah.  Just little five-minute huddles.

12       Q.   I'll take that back from you.

13            In 2015, what was the security situation

14   like in Curie, do you recall?  Had there been any

15   improvements, had it gotten worse?

16       A.   It had gotten worse.  Just about all the

17   police quit.  They started making them finally

18   work.  I believe after some of the charges were

19   filed, they started putting pressure on security.

20   They started telling them they couldn't do some of

21   the things that they were allowed to do.

22       Q.   You said after charges were filed.  What

23   charges?

24       A.   Yeah.  My ADA, disability Department of



1    Human Rights.

2        Q.    You said the administration started

3    putting pressure on security after you filed

4    charges, so what sort of pressure?

5        A.    They started telling them that they had to

6    be security, move around, not all be at one spot.

7    At times, they would be allowed to do the opposite

8    of what we had to do, work.  And they just told

9    them they had to be held accountable and they

10   should be at duty all of their post.  They had a

11   problem with that and a lot of them said if they're

12   going to work as hard as their first job, they

13   ain't going to be there.

14       Q.    You said they.  Is that the uniformed CPD?

15       A.    No.  That's off-duty police officers.

16   They all ended up quitting one after another.

17       Q.    What about the CPS security officer people

18   like you who were hired directly by the school?

19       A.    What about them?

20       Q.    Was there any pressure put upon them at

21   this same time?

22       A.    After the charges were filed because -- a

23   little pressure, not a lot.  Obviously not because

24   when they removed my chair, other security like



1  myself were still sitting.  A couple of us, they

2  would be seen peeking at, watching, or we would be

3  posted in front of a camera.  Our duty post became

4  like a camera.  You had to stand in front of the

5  camera.

6      Q.   You said a couple of you were seen peeking

7  at --

8      A.   No.  A couple administrators were seen.

9  They always had either Morris or this other guy

10  named Perez following you, watching and making sure

11  you're doing what you're supposed to do.

12      Q.   Do you know how many security officers

13  they were watching?

14      A.   I know for a fact three of us.

15      Q.   Do you know which ones?

16      A.   Ms. Smith, David Reyes.

17      Q.   Can you spell the last name for David?

18      A.   R-E-Y-E-S.

19      Q.   Anyone else?

20      A.   Definitely them I believe they were

21  watching them.

22      Q.   Do you know why they were watching?

23      A.   My understanding, they had complained.

24  They requested I believe some disability ADA as



1   well.

2       Q.   Do you know when this happened?

3       A.   During the time they removed the chairs

4   from us -- from me myself.

5       Q.   So about 2015?

6       A.   Yes.  March, April, somewhere in there.

7       Q.   Were the uniformed CPD still on duty at

8   this time?

9       A.   Yes.

10      Q.   And where were they?

11      A.   I'm trying to think.  One might have been

12  standing by -- in the morning they'd be at the scan

13  machine with security like myself.  And then, you

14  know, it was only like -- it ended up being maybe

15  one or two and they had at the B building doors --

16  Archer doors, someone like myself.  So once the

17  kids are in at like 9:00 a.m., that officer might

18  go down and sit with the security like myself or he

19  might man the Pulaski side.  That officer was made

20  like to roam sometimes.

21      Q.   And just to help me clarify, you don't

22  think they were monitoring video in 2015?

23      A.   Who?

24      Q.   The CPD -- the unformed CPD.



1    A.    That was their job inside that room, but

2  they were made to come outside at one point.  So I

3  don't know if or when they would have been looking

4  at that.

5    Q.    Let me back up then.  2015, about the time

6  your chair disappeared, a lot of the off-duty CPD

7  officers left Curie?

8    A.    Yeah.  They all quit.

9    Q.    Do you remember how many that was?

10    A.    Bailiff, King ...

11         About five, six.  And the ones that stayed

12  were the ones that were there when I came.

13    Q.    How many total people worked security at

14  Curie in 2015?  And I'm including the five or six

15  before they left.

16    A.    15 maybe.

17    Q.    So when the off-duty people left, it would

18  have dropped to about nine to ten officers for

19  security, is that accurate?

20    A.    Yeah.  We lost six, seven of them and then

21  regular security quit.  A couple of them left.

22    Q.    Do you remember when they left?

23    A.    2015.

24    Q.    So the number of guards dropped?



1    A.    We lost about eight to nine, yeah.

2    Q.    Number of guards dropped at a time when

3   security in the school was kind of questionable?

4   Is that an accurate description of the situation?

5    A.    No.  They were saying -- they were just

6   saying that if it was going to have to be harder

7   than their first job, then they didn't want to be

8   there anymore, any longer.

9    Q.    I guess what I'm asking, you were saying

10  that there were issues with the kids in 2015, you

11  had fights in the hallway.

12   A.    Yeah.  We were definitely down on police

13  officers and security.  They ended up bringing in

14  like subs, which I've never heard of.  They ended

15  up getting some white jackets to come in needed.

16   Q.    What are white jackets?

17   A.    That's a -- I guess like a climate control

18  the board has.

19   Q.    Do you recall when they came in?

20   A.    They didn't bring them until -- they

21  started the subs -- no.  2015 before June the

22  administrators started subbing with the lunchroom

23  attendants, which is parent workers.  They started

24  using them as security.



1        And August -- the beginning of the year in

2   2016, August, September, October, November, and

3   then that's when they start bringing in white

4   jackets to sub.

5        Q.   Do you know what sort of security

6   background the white jackets had?

7        A.   Amazing thing about it, they didn't

8   have -- some of them were displaced officers --

9   security officers looking for jobs basically.  And

10  they didn't have -- some didn't have any experience

11  at all.

12       Q.   Do you remember the number of them who

13  were brought in?

14       A.   They'd bring in like two at a time.

15       Q.   This was you thought the fall of 2016?

16       A.   Yeah.  A few times while I was off of

17  work, a few coworkers told me they had subs in

18  there on the regular.  Then they ended up promoting

19  some of the lunchroom attendants to security.

20       Q.   What sort of work would the lunchroom

21  attendant do?

22       A.   It was a parent.  It was a parent just

23  working four to five hours, no training, just to be

24  present and a deterrent I guess for the kids while



1    they're eating lunch.

2        Q.    So focus on the time period now when your

3    chair was taken away.  Where was your post when

4    that happened?

5        A.    Third floor, west.

6        Q.    Kind of help me visualize -- I'm going to

7    show you a document I marked as Exhibit 7, which

8    is -- I don't know if you've seen that before.

9    Probably not.

10       A.    I have it in the folder.

11       Q.    What I've given you is a layout of the

12   school.  Is that pretty accurate of the way the

13   school was in 2015?

14       A.    Yes.

15       Q.    On the exhibit I've given you, can you --

16   you were on the third floor.  Can you mark on the

17   document where your post was?

18       A.    It was like up in the corner.  I was about

19   right -- this is not accurate, but ...

20       Q.    Okay.  I'm going to -- if it's all right,

21   I'm going to put a one there and I'm going to label

22   that where it says one on the exhibit.  That was

23   three west?

24       A.    Three west.



1    Q.    And that was April 2015?

2    A.    Mm-hmm.

3    Q.    How long had you been at that post before

4    you ...

5    A.    Years.

6    Q.    Do you happen to recall how many years?

7    A.    I went through so many kids.  I'd say I

8    left the first floor and went to the second floor

9    for maybe a year and I was on the third floor the

10   whole time.  I went through a couple administrators

11   and deans on the third floor.

12   Q.    So when you were on three west, I'm

13   talking about 2015 now, the time period when the

14   chair disappeared, what were your duties?

15   A.    My duties in 2015 were the same as they

16   had always been.  To monitor the halls, the

17   stairwells, check washrooms, take calls whenever

18   they call.  Quite often on the third floor, I would

19   take via radio calls to go get a student out.

20   About the same.

21   Q.    Where you've marked where three west is on

22   Exhibit 7 where the number one is, was that where

23   the chair was?

24   A.    Well, I can't be precise.  Whatever all



 1   this is out here, the lunchroom, the diagram has it
 2   kind of like out.  The lunchroom is -- well, these
 3   are lockers.  I'm out in the center of where I can
 4   see the hallway.  This picture kind of has me in
 5   the cut over here.  But no, if I drew it here then
 6   I'm not at 350.  This diagram is kind of smashed,
 7   packed in.  My -- this is the hallway right here.
 8       Q.   Okay.  So --
 9       A.   So I really belong -- if this is the
10   hallway, my desk is -- my chair would have been
11   right in front of here so I can see.  And that's
12   the other security person.  We see each other at
13   all times.
14       MR. HILDEBRAND:  Let me do some cleaning up.
15   When Ms. Ammons first said here, she was pointing
16   to what would be the center of the science hallway
17   where it says the science door.  And she clarified
18   the second here for the lunchroom, it's the hallway
19   that's directly underneath the lunchroom.
20   BY MR. HILDEBRAND:
21       Q.   Let me ask you this.  On the exhibit that
22   I've given you, can you mark where you think the
23   chair was?
24       A.   Okay.  If this is the hallway, the chair



1    would have been up against the locker -- in front

2    of the locker.  I want to say these are the lockers

3    in back of me.  You can still get around the chair

4    to get to the locker or whatever.  The chair is set

5    out where it has always been for a desk.

6         Q.   Okay.  Let me have it.  I'm going to mark

7    where the little X is here with the letter A and

8    label the A as the chair.

9         A.   Well, sometimes the chair would be --

10   like, if this is the stairwell, there's a wall

11   there.  Sometimes the chair is up against the wall

12   so you can see -- you know, after the hall is

13   cleared, I could see the stairwell.

14        Q.   So mark that for me.

15        A.   You know, I don't want to put it on the

16   wrong -- I don't even see any stairs.

17        Q.   So you're basically saying the chair

18   didn't stay at the same spot every time?

19        A.   No.  Somebody, if I come --

20        Q.   The chair moved?

21        A.   You come to the post, somebody -- the kids

22   would move it.  There's times if you come around,

23   the kid might be sitting in the chair before the

24   class starts or whatever for the day.  No.  It



1    wasn't stationed there.

2        Q.   Okay.  It wasn't screwed to the floor?

3        A.   No.  No.  You could move the chair.

4        Q.   What type of chair was it?

5        A.    It was like a hard classroom chair out of

6    a classroom or it was a plush rolling chair from

7    the computer lab.

8        Q.   When you say it was like a classroom

9    chair, was it the type of classroom desk they have

10   in high school that had the desk built in?

11       A.   No.  They had desks at Curie.  They had a

12   chair and a desk.  It was one with the green seat

13   and green back, kind of hard plastic like chairs.

14   Or if the computer lab didn't have class during

15   that period, you could get -- a teacher would allow

16   you to take a rolling chair out there.

17       Q.   Were you the only security guard who had a

18   chair in April of 2015?

19       A.   No.

20       Q.   How many other guards had one?

21       A.   Everyone had a chair.

22       Q.   Do you know if that was some sort of

23   policy by the school administration that the guards

24   would have a chair?



Case 1:16-cv-04884 Document #:187-1 Filed: 02/15/18 Page 99 of 319 PageID #:1775
Case 1:16-cv-04884 Document #:188-1 Filed: 02/15/18 Page 99 of 319 PageID #:1775
Kim Ammons  08/29/2017

1      A.   Yeah -- I mean, not a policy, but we were

2  allowed to have a chair be at your post at all

3  times.

4      Q.   Do you remember who told you that?

5      A.   That you needed a chair?

6      Q.   That it was okay for the guards to have a

7  chair.

8      A.   Well, the administrators told us when they

9  took the desk that the desk was kind of bulky and

10  it was better to have just the chair.

11      Q.   Do you remember which administrator said

12  that?

13      A.   The head -- Mr. Perry, the principal.

14      Q.   Do you recall when?

15      A.   Kosik, assistant principal.  She I guess

16  was relaying the messages sometimes from him.

17      Q.   Do you recall when, what year?

18      A.   They left in 2015.  Back in -- Kosik

19  wasn't there, but Perry was there.  January, go

20  back to 2014 in December.

21      Q.   When did Principal Tingwall come in?

22      A.   When I met her, it was 2016 in August.  My

23  understanding, they were making transitions.  She

24  was there with the administrators that were still



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 100 of 319 PageID #:1776
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 100 of 319 PageID #:1776
Kim Ammons· 08/25/2017

1   there.  She was there maybe April, May.

2        Q.   Okay.  And when the chair was taken away

3   in the spring of 2015, who was the principal then?

4        A.   Tingwall.

5        Q.   And what --

6        A.   No, no.  Tingwall wasn't the principal.

7   It was taken away in Cottrell, Bryant's time.  It

8   was taken away when they were there.

9        Q.   Looking back at Exhibit 7 in front of you,

10  that was three west.  What were you supposed to

11  monitor when you -- as part of your duties?  The

12  building is kind of a square shape.  You were

13  monitoring the hallways.  Which hallways?

14       A.   In 2015, really, my monitoring was

15  supposed to be the corridor that faced me, the

16  girls' washroom, the lockers right there on my

17  side.  On the other end, it was the exact same

18  thing, the boys' washroom and the lockers.  Then

19  they put on the far end of Curie, they put a

20  security person in the corner.  So it kind of

21  shortened where we had to roam to because they were

22  covering the back end.  Days when they wasn't down

23  there, just from experience and the way I work, I

24  would always make my rounds anyway.



1    Q.   So if the security person was there, you

2   only had to patrol --

3    A.   The stairwell to my right, straight down

4   the hall, the washroom right there on my right, and

5   the locker area there.  I go in and out of the

6   lunchroom and make sure the parent worker was okay,

7   come back out and make sure I was on my duty post.

8    Q.   If the security person wasn't there, you

9   may have to do the whole floor?

10    A.   I wasn't made to do the whole floor.  That

11   was just how I worked.

12    Q.   Okay.

13    A.   I would go around and check the deserted

14   areas and get back around to where I needed to be.

15    Q.   I'm going to jump forward to January 2016

16   with the girls' locker room.  Where is that on this

17   diagram in front of you?

18    A.   Let me find the B building.  Physical

19   education building.  Boys' gym.

20    Q.   Actually ...

21    A.   This is -- yeah.  Hold on.  Second floor.

22   Girls' locker room.  There's the stairs.  There's

23   the girls' locker room.

24    Q.   So can you mark that?



1      A.   Now, looking at this -- you know, you had

2   two entrances you can get into.  This is the

3   pool -- swimming pool and you can enter from the

4   swimming pool -- I mean, you can enter into the

5   girls' locker room to go upstairs there.

6           You said where was I posted?

7      Q.   Where were you posted?

8      A.   In 2016?

9      Q.   In January 2016 when you were offered the

10  girls' locker room attendant position.

11     A.   No.  I wasn't never posted anywhere in

12  2016.

13     Q.   You were talking about how there was the

14  cage room.

15     A.   No.  The cage room was 2014 if I subbed

16  for someone.  2016, I never was in the girls'

17  locker room.  That was an accommodation that I

18  asked for, to go into the girls' locker room, but I

19  was never given that opportunity to go into the

20  girls' locker room.

21     Q.   I'll take that back from you.

22          So I want to talk a little bit about the

23  disabilities that you have.  I know one of them was

24  a problem with your foot, plantar fasciitis?



1     A.    Fascitis.

2     Q.    Do you remember when that started?

3     A.    No.  I can't recall the year.

4     Q.    Did you see anybody for it?

5     A.    Yeah.  A couple doctors I had seen.

6     Q.    Do you remember who?

7     A.    Dr. Guliech was his name down at Saint

8  Joseph Hospital.  I seen Dr. Witz, who is a

9  chiropractor doctor.

10    Q.    Anyone else?

11    A.    I don't recall at this time.  No.

12    Q.    Can you spell Guliech?

13    A.    G-U-L-I-E-C-H.

14    Q.    And was that a man or a woman?

15    A.    Man.  David R. Guliech.

16    Q.    What type of doctor was he?

17    A.    Orthopedic specialist.

18    Q.    What foot was it?

19    A.    For what, the plantar fasciitis?

20    Q.    Yeah.

21    A.    I believe it was the right foot, but I

22  ended up having problems with both feet.

23    Q.    You can't recall though when it first came

24  on?

1      A.   When it flared up is when they took the

2  chairs in March, April when I was made to walk for

3  six hours.  I ended up having to go to the

4  emergency room for severe pain.  I had to see a

5  foot specialist as well.  Her name is Dr. Metz.

6  She's out of Midwest.

7      Q.   What were sort of the physical symptoms

8  you had?

9      A.   Severe back pain, numbness down in the

10  right leg, severe heel pain.

11      Q.   Did you say hip?

12      A.   Heel.  Heel.  Severe heel pain, swelling

13  of the feet.  That was about it.

14      Q.   Was it a regular type of pain or would it

15  kind of come and go?  How would you describe the

16  pain?

17      A.   When I was up on my feet for a long period

18  of time, it became ongoing.  When I was able to

19  monitor it myself, giving it a little rest for

20  maybe two to five minutes at the most, it became a

21  little better, bearable.

22      Q.   Was it noticeable to other people?

23      A.   Yeah.  I had a limp.

24      Q.   Anything else?



1      A.   Nothing else that I can recall.  No.

2      Q.   Do you recall anybody commenting about you

3  look like you were in pain, you had a limp?

4      A.   Yeah.  My coworker Turner -- Ms. Turner.

5  She knew that I was in a lot of pain.  She and I

6  were the ones on the floor together, so she had to

7  cover alone because I was leaving for the day to go

8  to the emergency room.

9      Q.   What was her first name?

10     A.   Evette Turner.

11     Q.   You said she had to cover for you with --

12     A.   Yeah.  She had to cover her post and mine.

13     Q.   And when was that?

14     A.   On or about -- after the moving of the

15  chairs, March, April.

16     Q.   I know another problem you had that you

17  claimed was with the right knee, is that right?

18     A.   Yeah.  I had actually injured my knee

19  while working at Curie.  I was trying to actually

20  stop some kids from clowning and I felt like a pop

21  in my knee.  So I was off work for a minute with

22  the knee.

23     Q.   Do you recall when that occurred?  You

24  said you felt a pop in the knee when that happened.



1    A.   That was -- that wasn't in 2015 with the

2    knee injury.  After all of the standing for six

3    hours, everything was aching.  Knee, back, feet.

4        Q.   What happened?  Do you have any idea?  It

5    just popped?

6        A.   Yeah.  It just -- I guess moving a certain

7    way, it popped.

8        Q.   And do you remember when that happened,

9    the injury itself?

10       A.   No, I don't recall the date.

11       Q.   What sort of treatment did you have for

12   it?

13       A.   Oh, yeah.  I had some physical therapy I

14   believe.  I had to be off of work, just some rest,

15   icing.

16       Q.   Anything else?

17       A.   No.

18       Q.   What was sort of the physical

19   manifestations of the injury?  Your knee popped and

20   then what happened?

21       A.   I didn't have to have any surgery.  It was

22   just rest I guess.  It got better with rest.

23       Q.   Were you in a lot of pain?

24       A.   When it happened, definitely.



1      Q.   What about afterward?

2      A.   Well, it happened and I got worse when I

3  got home, the swelling.  I wasn't able to come to

4  work the next day.

5      Q.   Do you remember how long you were out of

6  work when that happened?

7      A.   No, I don't recall.

8      Q.   When that injury occurred with your right

9  knee, did anybody else notice it?  Was it something

10  that would be noticeable by other people?

11      A.   I had a limp.  I had a limp.

12           Then another time I recall one of the VI

13  students -- I'm trying to see if that's the time I

14  injured my knee.  A VI student hit me in the knee

15  with their machine.  They carry this real heavy

16  metal machine.

17      Q.   Do you remember when that happened?

18      A.   That might have been 2014 I believe.

19  2014.

20      Q.   Who did it?

21      A.   A blind student.  She was rushing and I

22  was going back off of lunch to my post on the third

23  floor and she backed into my knee.  My momentum was

24  going forward and she was coming hard.



Case 1:16-cv-04804 Document #183-1 Filed: 03/15/18 Page 108 of 319 PageID #:1784
Case 1:16-cv-04804 Document #183-1 Filed: 03/15/18 Page 108 of 319 PageID #:1784
Kim Ammons  08/29/2017

1    Q.   And I misunderstood you.  Did she hit you

2    with something?

3    A.   A machine.  They carry like a braille

4    machine.

5    Q.   One of the other injuries you mentioned

6    was back issues with sciatica.

7    A.   Oh, yeah.

8    Q.   Do you recall when that first started

9    happening?

10   A.   Like 2014, 2013, 2014.

11   Q.   Do you remember how it first started?

12   A.   How the sciatica started?

13   Q.   Mm-hmm.

14   A.   You don't know how it starts.  It just

15   flares up.  I know exactly when it became severe

16   was when they removed my chair.

17   Q.   When the sciatica first came on, what were

18   the symptoms you had?

19   A.   Wow.  You get a pain in the right -- on

20   your right lower back and it goes down the back of

21   your leg and it feels like a cramp -- a cramp that

22   won't go away in your calf and it travels down into

23   like the big toe area.

24   Q.   Did you see anybody for that?



1        A.   Oh, yeah.  Definitely.

2        Q.   What sort of treatment did the doctor have

3   for the sciatica?

4        A.   Ice, some heat, massages, and rest.

5        Q.   When you were having problems with the

6   sciatica and it was coming on in 2013, 2014, did

7   you tell anybody at Curie you were having back

8   problems?

9        A.   No, I didn't tell them.

10       Q.   Why is that?

11       A.   I don't think anyone would care.  2014.

12       Q.   Why in 2014?

13       A.   Because that's when I had filed charges

14   and they weren't too friendly.

15       Q.   What charges?

16       A.   Disability accommodations, retaliations,

17   failure to promote, the whole shebang.

18       Q.   What about your problem with your right

19   knee?  Did you ever tell anybody at Curie that you

20   were having problems with your right knee?

21       A.   When I was hit, I had to do an incident,

22   accident report with the insurance -- workmen's

23   comp.  I was off of work.  So the principal is the

24   one who gave me the forms to call in the accident.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 110 of 319 PageID #:1786
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 110 of 319 PageID #:1786
Kim Ammons 08/29/2017

1    Q.   Is that when you were hit by the blind
2    student?
3    A.   Yes.
4    Q.   What about the earlier incident when you
5    said you had the pop in the knee?
6    A.   Did I report it?
7    Q.   Yeah.
8    A.   I believe I did.
9    Q.   Do you remember to whom you reported that
10   incident, the knee pop?
11   A.   It might have been Kosik.
12   Q.   What about the incident with the blind
13   student?
14   A.   That was probably Espinosa.  Whoever is in
15   charge of security, which would be the assistant
16   principal.  They had changed quite often, you know,
17   assistant principals and given security to somebody
18   else.
19   Q.   When the plantar fasciitis was acting up,
20   did you let anybody at Curie know that that was a
21   problem?
22   A.   Yeah.  The person that was requesting my
23   chair at the time.
24   Q.   And who was that?



Case: 1:16-cv-04864 Document #: 187-1 Filed: 03/15/18 Page 111 of 319 PageID #:1787
Case: 1:16-cv-04864 Document #: 93-1 Filed: 03/15/18 Page 111 of 319 PageID #:1787
Kim Ammons   08/29/2017

·1· · · ·A.· ·Cottrell and Ms. Bryant.

·2· · · ·Q.· ·And do you remember what they said to you?

·3· · · ·A.· ·Well, Ms. Bryant said to me that when she

·4· ·took over that Cottrell started to take the chair

·5· ·and that it was her job to continue with the

·6· ·removal of my chair.

·7· · · ·Q.· ·Did she explain what she meant by that,

·8· ·like why the chair was being taken away?

·9· · · ·A.· ·No.· She didn't explain, but I kind of had

10· ·an idea because I had filed previous charges

11· ·against Ms. Cottrell for harassment and

12· ·retaliation.

13· · · ·Q.· ·And those were the charges you talked

14· ·about a couple minutes ago, the retaliation, the

15· ·failure to promote?

16· · · ·A.· ·Right.

17· · · ·Q.· ·Do you remember an incident when you

18· ·dropped a laptop on your foot?

19· · · ·A.· ·A laptop?

20· · · ·Q.· ·Yeah.

21· · · ·A.· ·Never happened.

22· · · ·Q.· ·Let me show you what I marked as

23· ·Exhibit 14.

24· · · ·A.· ·Laptop?· I don't recall that one.



1    Q.   Exhibit 14 is a copy of a medical record

2    from Dr. Sloan Metz.  Have you seen this document

3    before?

4    A.   I don't recall ever dropping a laptop on

5    my foot.  No.

6    Q.   No memory of that at all?

7    A.   No.  I don't recall that one.

8    Q.   I was just curious.  I was reading his

9    records and --

10   A.   That's a she.

11   Q.   She.  Sorry.  It mentions the laptop

12   dropped on the foot, but doesn't say where that

13   happened.

14   A.   No.

15   Q.   Do you remember ever dropping a laptop on

16   your foot while working in Curie or anything?

17   A.   Never.

18   Q.   I'll take that one back.  That will just

19   remain a mystery.

20        I want to show you what I've marked as

21   Exhibit 15.  This is a -- if you've seen this

22   document before, it's from Chicago Orthopedics.

23   Quote, history of present illness and describes Kim

24   Ammons, 52-year-old female.  PT, for patient, is

 1    here for evaluation of right knee.  She was injured

 2    at work on 12-9-14 and was struck on the medial

 3    aspect of her right knee by a student with a

 4    20-pound metal typewriter.  Is that what you were

 5    talking about earlier with the blind student?

 6        A.   Yes.  The braille machine.

 7        Q.   That incident when you were struck by the

 8    typewriter, the braille machine, you reported that

 9    the school?

10        A.   Yes.

11        Q.   Do you remember to whom you reported it?

12        A.   Say that again.

13        Q.   To whom you reported the incident.

14        A.   Assistant principal.  I don't know

15    exactly.  I can't recall who it was.  I was given

16    the necessary paperwork to call the incident in to

17    Sedgwick.

18        Q.   The doctor in his records notes that you

19    had increased pain and swelling and you had

20    difficulty walking and standing.  Did you go back

21    to work after this incident?

22        A.   No.

23        Q.   Do you remember how long you were out?

24        A.   No.  But what I do know is when I did go



1    back, I was still experiencing some pain and

2    swelling and I told the supervisor.

3        Q.   Who was the supervisor?

4        A.   In 2015, Cottrell.

5        Q.   So you told Cottrell you had been hit on

6    the knee, you were still having issues with it?

7        A.   Right.

8        Q.   Do you remember what her response was?

9        A.   Take it easy.

10       Q.   Anything else?

11       A.   No.

12       Q.   Did you still have your chair at that

13   time?

14       A.   Yes.

15       Q.   Do you know did you have the chair before

16   you were hit on the knee with the typewriter?

17       A.   Yes.

18       Q.   Did you do any physical therapy for the

19   knee injury?

20       A.   I believe I did.  I believe I did for a

21   moment.

22       Q.   Do you remember what type you did?

23       A.   What do you mean what type?  Physical

24   therapy for the knee?

Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 115 of 319 PageID #:1391
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 115 of 319 PageID #:1391
Kim Ammons  08/29/2017

1    Q.   Mm-hmm -- excuse me.  Yes.

2    A.   Exercises, strengthening, things of that

3    nature.  I had to go all the way on Belmont, Saint

4    Joe's therapy.

5    Q.   Do you remember how long you did PT for?

6    A.   I don't recall.  I do know that when I

7    returned to work I still had to go to therapy in

8    the evening.

9    Q.   I want to show you what I marked as

10   Exhibit 16.  Same file from Dr. Guliech.  Have you

11   seen this exhibit before?

12   A.   No.

13   Q.   It's dated February 4th, 2015 at the top,

14   do you see that?

15   A.   Mm-hmm.

16   Q.   To the best of your recollection -- sorry.

17   Strike that.

18        Towards the bottom it says, plan, work

19   restrictions, full-duty.  To the best of your

20   recollection, is that about the time period

21   February 4th, 2015 when you went back to work

22   because of the knee injury?

23   A.   Mm-hmm.

24   Q.   When you got back --



1    A.   I believe just reading his notes here, we

2    were having some issues with getting approved from

3    the insurance and there was a mess with that.  They

4    hadn't approved I guess to pay him, so he had given

5    me some things to do at home and I returned to

6    work.  Yeah.  I believe.

7        MR. HILDEBRAND:  I need to take a break.

8                      (A short break was had.)

9        MR. HILDEBRAND:  Back on the record.  It's

10   2:00 p.m. precisely.

11   BY MR. HILDEBRAND:

12       Q.   I want to talk about the chair a little

13   bit.  Do you remember was that removed on April 1st

14   of 2015?

15       A.   I don't know the exact date.

16       Q.   Let me show you what I've marked as

17   Exhibit 17.  Have you seen 17 before?  It's an

18   e-mail to Ms. Leek (phonetic).

19       A.   Mm-hmm.

20       Q.   First off, where you see the date

21   Wednesday, April 29, 2015 at 9:00 a.m., is that

22   your e-mail address?

23       A.   Yes, it is.

24       Q.   Okay.  It starts off I e-mailed



1   Mr. Para (phonetic) to check the status of my

2   complaints.  Who is Mr. Para?

3       A.   He was an investigator for the board, CPS.

4       Q.   What complaints are you talking about?

5       A.   Complaints were Ms. Cottrell, the removing

6   of the desk, my medicine missing, changing my post

7   during the week.  My post duty changed twice during

8   the week.  Whenever there's a complaint, there was

9   always a retaliation from Ms. Cottrell.

10          Once Ms. Bryant confirmed it by telling me

11  that Cottrell wanted to go after my chair, they had

12  sent someone out to the school to investigate,

13  which was Mr. Para.

14      Q.   So you said your post was changed two

15  times.  When was that?

16      A.   Yeah.  April.  So it was March -- in March

17  I want to say.  Part of March.

18      Q.   That was in 2015?

19      A.   Yes.  Ms. Cottrell -- I had wrote a letter

20  to the principal about her behavior and she --

21      Q.   Just to clarify, that was Cottrell?

22      A.   That was Ms. Laura Cottrell.  Right.  She

23  had started coming after me.  On one of my

24  particular moves, she put me on the second floor.



1  She took me from the third floor, put me on the

2  second floor, 2S.

3          While on my duty post, my job was to go

4  around and clear the halls and all of that.  I

5  noticed I was taking all the calls on the other

6  end, which is two east.  And back then, Michael

7  Morris was just regular security like myself and he

8  was gone most of the time.  So I ended up having to

9  do his work as well.  And when I went around to

10 that side to check the back end of the halls and

11 all of that, I noticed when I walked past

12 Mr. Morris and Ms. Cottrell kissing.  I immediately

13 kept going back to my post.

14          About maybe five, ten minutes after that,

15 Morris surfaced, Ms. Cottrell surfaced, but they

16 were standing on the other end I'm sitting in.  She

17 went away and right after that, she called via

18 radio, all security come to her office.

19          Before that -- that was like on a Monday.

20 The week before that Monday, my duty was changed.

21 I was brought to the second floor.  Well, she was

22 gone for a couple days.  Her and Mr. Morris were

23 gone out of the building for maybe like three days.

24 And that was a Monday when they returned.  She



1  called security -- after I seen them, she called

2  security, all security come to her office. When we

3  got to her office, she was handing out a sheet of

4  paper and I looked and it was a -- like the heading

5  was schedule. Grant you, she had just given me a

6  schedule that -- maybe three, four days prior to

7  that. So I took it, but what I did think was she

8  had told me to go to the second floor. She didn't

9  put it in writing. So when I got to her office,

10  she was giving me the actual hardcopy of the

11  schedule. So I immediately folded it up, put it in

12  my back pocket and went back to the post.

13          When I got to the post, there was another

14  security officer. Ms. Leara (phonetic). She was

15  standing there and I'm standing there with her

16  because that's my post. So I'm thinking she was

17  just there. She's like, Kim, didn't you just look

18  at your schedule? I was like, no, what do you

19  mean? She's like, you're no longer here. I'm

20  like, what? So I pulled it out and I looked and I

21  was placed into the three west -- I mean two west

22  lunchroom, which security, we don't work

23  lunchrooms. I was put in there the whole day. So

24  that was a regular duty post of mine. So I'm like,



1    okay.

2           Before I went to the lunchroom, I went up

3    to the third floor, which was Ms. Smith and

4    Ms. Turner.  And I asked them, your guys schedule

5    change?  They was like, no, why you say that?  I

6    said, well, mine was changed.  Let me see yours.

7    So we pulled them out and I was the only security

8    whose schedule had changed.

9           Right after I went into the lunchroom,

10   Ms. Cottrell walked through the lunchroom with a

11   little grin on her face.  So I'm like, okay.  Here

12   we go.

13       Q.   May I ask you, in 2015, how were schedules

14   given out?

15       A.   2015, schedules wasn't given out -- we

16   would always come back on the same schedule.  It

17   was never changed until after all of that.  But we

18   would always come back on the same schedule.  And

19   that happened with the new principal in 2016.  You

20   know, we was told when we got there that we would

21   follow the same schedule.

22       Q.   How did you find out about the schedule

23   normally?

24       A.   Day one when we first -- when I first got



Case 1:16-cv-04884 Document #:187-1 Filed: 03/15/19 Page 121 of 319 PageID #:1397
Case 1:16-cv-04884 Document #:93-1 Filed: 03/15/19 Page 121 of 319 PageID #:1397
Kim Ammons 08/29/2017

1    hired?

2        Q.    Mm-hmm.

3        A.    The principal gave the schedule to us, but

4    I've had the same -- I had the same schedule the

5    whole time up until if I complained, there was

6    always a consequence.  If I contacted my union,

7    there was always a consequence.  So my schedule

8    changed quite frequent.

9        Q.    How would you find out about the change?

10       A.    It would be in my mailbox.

11       Q.    Like a little piece of a paper?

12       A.    Yeah.  It would be a piece of paper,

13   placed in the mailbox.  But, again, I'd be the only

14   one moving.

15       Q.    When you started working at Curie, did

16   anyone tell you you would be guaranteed a specific

17   post?

18       A.    No.  But I truly believe that we were

19   given posts based on our experience and our skills.

20   If you were good in your job -- you know, I was

21   pretty good with working with the freshman and

22   preparing them for the second floor, to move down.

23   So I guess the previous principals left me on the

24   third floor with the freshman.



1      Q.   Going back to the e-mail in front of you,

2   it says, quote, on April 1st, 2015 at 7:15 a.m. my

3   chair was removed.  Do you see that?

4      A.   Mm-hmm.

5      Q.   Is that accurate about the timeframe when

6   the chair was removed to the best of your

7   recollection?

8      A.   April 16th?

9      Q.   April 1st.

10      A.   April 1st?  That's about accurate.

11   Somewhere in there.

12      Q.   It continues, "I have worked for over ten

13   years at Curie and have always had a chair at my

14   post."  Is that accurate?

15      A.   That's accurate.

16      Q.   Help me clarify, when you started at Curie

17   ten years ago based on this e-mail, how did you

18   have a chair?

19      A.   What do you mean?

20      Q.   Did someone give it to you?

21      A.   Yeah.  The administrators approved the

22   chairs.  It just changed different -- either from

23   comfortable to hard, you know, we were given plush

24   chairs, we were given desks.



1    Q.   The e-mail continues, "I went and spoke to

2    Ms. Bryant, B-R-Y-A-N-T, about my chair.  Bryant

3    said, Ms. Ammons, I am finishing off what Cottrell,

4    C-O-T-T-R-E-L-L, had started to do."  What does

5    that mean, what Cottrell had started to do?

6    A.   Cottrell -- I'm assuming, I don't know for

7    sure -- was going to move my chair.  From the

8    complaints to the board, CPS, and the principal,

9    they removed -- Cottrell called all security to her

10   office and she stated they were taking her baby

11   from her and they were giving it to Ms. Bryant.

12   That's all she said.  So she was removed from

13   security as a security boss and then Ms. Bryant

14   took over.  That's what I was talking about in that

15   paragraph.

16   Q.   Then it continues, "I told Ms. Bryant I

17   had a doctor's statement on file."  Do you recall

18   which doctor that was?

19   A.   Which doctor?

20   Q.   Yeah.

21   A.   When I told her I had a doctor's statement

22   on file, it was back in 2000 and something.  I had

23   problems with my heel, something to that effect,

24   and the doctor had given me -- I don't know the



1   doctor's name, had given me some type of boot to

2   wear, given me a boot or something to wear.  So I

3   had to give the statement to the principal -- I

4   want to say Ms. Jones or Mr. Perry had a statement

5   on file.  That's what I was referring to, a

6   statement.

7          Ms. Bryant said, well, if you have that

8   statement on file, then you can keep the chair.

9   And she got up and left and she was supposed to

10  come back and let me know if I had a statement on

11  file.  I continued working without a chair.  I had

12  severe pains.  I ended up leaving, having to go to

13  the doctor.  And the doctor sent new statements,

14  new physical information to -- faxed it over to

15  Ms. Bryant.

16         So after that, the chair was given back by

17  Ms. Bryant.  Then maybe -- I don't know exactly the

18  timeframe.  It wasn't that long.  I want to say

19  maybe a week, three or four days later, Ms. Bryant

20  sent an e-mail and she didn't send it -- she didn't

21  tell me about an e-mail.  She told Ms. Turner about

22  an e-mail that she had sent for the people that had

23  given her statements -- doctor statements.

24     Q.   So let me back you up where it says the



1    doctor statement on file.  Let me clarify.  You

2    don't remember the doctor's name?

3        A.   That I seen after?

4        Q.   Where it says, I had a doctor's statement

5    on file?

6        A.   For the sciatica.  It was probably from

7    Metz or Guliech it would have come from.

8        Q.   I'm talking earlier --

9        A.   No.  No.  Back when?  No.  I don't recall.

10       Q.   Okay.

11       A.   I don't remember.  I know I seen a doctor

12   downtown on LaSalle.  It was an orthopedic

13   specialist.

14       Q.   Do you remember what that doctor's

15   statement said, anything?

16       A.   No.  I don't recall what it says.

17       Q.   The e-mail continues where it says "I

18   called my doctor, she ordered me to immediately go

19   to Saint Joseph's Hospital vascular department."

20   Do you see that?

21       A.   Yeah.

22       Q.   Which door was that?

23       A.   That was Klor.

24       Q.   Klor-Gross?

Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 126 of 319 PageID #:1892
Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 126 of 319 PageID #:1892
Kim Ammons  08/29/2017

1    A.    Yeah.  She was hoping that I didn't have

2  any blood clots, so she told me to go immediately

3  to Saint Joseph emergency room, which I did.

4    Q.    You went to the ER?

5    A.    Yeah.  Went to the ER.

6    MR. HILDEBRAND:  I don't know if we have those

7  records for that visit.

8    MS. HALL-JACKSON:  I don't have them.

9    MR. HILDEBRAND:  Yeah, I may request them just

10  to get them.  I looked through my stuff.  We've got

11  Metz, we've got Sloan --

12    THE WITNESS:  Sloan is Metz.

13    MR. HILDEBRAND:  Sorry.  Guliech, Metz,

14  Klor-Gross, and then Gary -- Dr. Gary with the long

15  last name.  I'll actually -- what I might do, I

16  might send a subpoena out to Saint Joseph's

17  Hospital.

18  BY MR. HILDEBRAND:

19    Q.    Just to help me clarify.  So this happened

20  April 1st.  To the best of your recollection, was

21  it April 1st you went to Saint Joseph's?

22    A.    I don't recall the exact date, but yeah, I

23  did go to Saint Joseph's Hospital.

24    Q.    Do you happen to know -- your primary care



1    physician, does she have any relationship with

2    Saint Joseph?

3        A.   Yeah.  She's out of Saint Joseph.

4        Q.   Okay.  That might help trying to find the

5    records.

6        MS. HALL-JACKSON:  Just for clarification, I'm

7    sorry, which doctor?

8        THE WITNESS:  Klor.  That's my primary doctor.

9    BY MR. HILDEBRAND:

10       Q.   How long have you been seeing her?

11       A.   Over ten years.

12       Q.   Did you say ten?

13       A.   Over.

14       Q.   Okay.  Your e-mail talks about seeing a

15   foot specialist.  Do you remember who that was?

16       A.   Sloan Metz.

17       Q.   I want you to flip the exhibit over.  At

18   the very bottom, you see there's a response by

19   Donna Leek to your e-mail.  Do you recall that

20   response?

21       A.   Yes.

22       Q.   And then at the very top, there's another

23   e-mail from Delilah Bentley --

24       A.   That's correct.

1    Q.    -- to Ms. Leek and to yourself and it

2    talks about the ADA.  Do you recall this e-mail?

3    A.    Yes.

4    Q.    I'll take that exhibit back from you.

5          Now, I think earlier you testified that

6    the planta fasciitis intensified because you were

7    standing on your feet more with the chair being

8    taken away?

9    A.    Oh, yes.

10   Q.    Do you recall, after the chair was taken

11   away, when it really started bothering you?

12   A.    It started bothering me maybe like the

13   third hour.  The third hour after because I didn't

14   work the full day.  I recall not working the full

15   day.

16   Q.    Let me show you Exhibit 18.

17   A.    Or I worked the full day and couldn't work

18   the next day.

19   Q.    Exhibit 18 is a copy from Dr. Klor's

20   records for April 16th, 2015.  You were inquiring

21   about a referral to Dr. Sloan Metz or Dr. David

22   Guliech for the pain in the back of her calf and

23   feet.  Is that a fair time period when you were

24   checking with the doctors about the pain.



1    A.    Yep.

2    Q.    Okay.  I'll take that one back.

3         That first visit you had with Dr. Metz

4    about the pain, do you recall anything about it?

5    A.    Meaning?

6    Q.    Sort of what you talked about.

7    A.    Yeah.  I believe I told her they had taken

8    my chair away.  I called my primary doctor and she

9    ordered me to go to the emergency room and

10   suggested that I speak with a foot specialist.  And

11   she sent documentation for the school to

12   accommodate me on several occasions, in which they

13   didn't.

14   Q.    Let me show you what I've marked as

15   Exhibit 19.  It's a copy from Dr. Metz's record

16   that we got.  Do you see where it says at the top,

17   patient presents C-O, severe pain in both feet?

18   A.    Mm-hmm.

19   Q.    Take a second to read that for me.

20   A.    (Inaudible.)

21   Q.    What was that?

22   A.    It says, at work and she could not sit for

23   a six-and-a-half-hour shift.  That's a mistake

24   obviously.  I never sat for six and a half hours.



1    Q.   What was the mistake?

2    A.   Six and a half hours.  It says patient

3    presents with severe pain in both feet, if worse

4    then write -- if worse -- what is that?  Starting

5    yesterday after her chair was removed at work and

6    she could not sit for a six-and-a-half-hour shift.

7    That makes no sense.

8    Q.   The typographical error was the six and a

9    half hours?

10   A.   No.  That she could not sit for a

11   six-and-a-half-hour shift.  I never sat for six and

12   a half hours.

13   Q.   What about -- the visit was on April 17th,

14   2015.  Do you recall having severe pain in your

15   feet that day?

16   A.   Oh, yeah.  Definitely.

17   Q.   It started when the chair was removed?

18   A.   Yes.

19   Q.   You were working security at the school at

20   the time?

21   A.   Yes, I was.

22   Q.   And you were usually able to sit down on

23   occasion for about five to ten minutes?

24   A.   Yes.



1    Q.   Were you working a seven-hour shift?

2    A.   Seven hours.

3    Q.   You were having severe pain in the arches,

4  in your heels, is that accurate?

5    A.   No.  I was having severe pain from my back

6  down my leg into my feet and I went to Saint Joseph

7  Hospital.  I also made an appointment to see the

8  foot specialist as well because my feet were aching

9  and I had an appointment with the orthopedic for

10  the sciatica.

11   Q.   At the very bottom, do you see where it

12  says examination today?

13   A.   Mm-hmm.

14   Q.   It says, quote, applied removable arch

15  strapping on both feet and advised the

16  patient -- PT is the original term -- to use these

17  in addition to the custom devices.  What were the

18  custom devices that you had?

19   A.   Orthotics.  They go in your shoes.

20   Q.   Like slip-on types of --

21   A.   Yeah.  They're like a sport orthotic 3.0

22  to help with the planta fasciitis, any arch or heel

23  pain.

24   Q.   How long have you been using those?



1      A.   I don't recall how long.

2      Q.   Did you use them?

3      A.   Oh, definitely.

4      Q.   All the time?

5      A.   All the time.

6      Q.   Doctor continues, quote, advise PT to sit

7  when possible at work and I will give her a note

8  stating that this is to offload her F-A-S-C-I-A.

9  Of course I'm getting that one out.  To the best of

10  your recollection, is that an accurate description?

11      A.   That's correct.

12      Q.   I'll take that back.

13           Do you recall making a request with CPS on

14  April 29th, 2015 for a reasonable accommodation?

15      A.   I recall asking for accommodation on or

16  about -- in April, yes.

17      Q.   Let me show you what I marked previously

18  as Exhibit 20.  It's a couple of pages, so I will

19  give you a minute to take a look at it.

20      A.   Yes.  I recall this.

21      Q.   You've seen it before?

22      A.   Yes.

23      Q.   I just want to go through it to verify

24  some things on it.  The information on the very



1    front page where it says confidential at the top,

2    is that your handwriting?

3        A.   Yes, it is.

4        Q.   The employee ID and mailing address are

5    blackened out for confidential reasons, for

6    privacy.  From what you can tell where you're

7    working and that, is all that accurate?

8        A.   Yes.

9        Q.   And then the second page, I'll give you a

10   chance to take a look at that.

11           Is that your handwriting?

12       A.   Yes, it is.

13       Q.   Number nine asks, quote, what

14   accommodation is being requested?  If more than one

15   accommodation is being requested, please list each

16   one individually.  And the answer is see statement

17   attached to allow me to sit or rest as needed.

18   That's your handwriting?

19       A.   Yes.

20       Q.   Is that accurate?

21       A.   Yes, it is.

22       Q.   Number ten says, quote, please detail your

23   medical condition for each accommodation being

24   requested.  The answer, I have plantar fasciitis in



1    which a lot of continuous pressure is put on my

2    feet.  Without a break, they swell and ache.  Is

3    that your handwriting?

4         A.   Yes, it is.

5         Q.   And is that accurate?

6         A.   Yes.

7         Q.   Then number 11 says, quote, how are you

8    impaired?  Please describe your limitations.

9    Response, I am impaired having to walk for six and

10   a half hours per day without a break.  It

11   contributes to my disability by not being to [sic]

12   rest when needed.  Is that your handwriting?

13        A.   Yes, it is.

14        Q.   Is that accurate?

15        A.   Yes.

16        Q.   You were doing a seven-hour shift?

17        A.   Right.

18        Q.   And it says six and a half hours here.

19   What were you doing for the other 30 minutes?

20        A.   Lunch.

21        Q.   And was your lunch break -- was it

22   scheduled at a set time or did it vary during the

23   day?

24        A.   Well, the lunch was a set time.  Like



 1    fourth period every day.

 2        Q.   What time was that?

 3        A.   10:00.  About 10:00 o'clock.

 4        Q.   And you got a set 30 minutes for lunch?

 5        A.   Right.

 6        Q.   Did you have any other break times during

 7    the day?

 8        A.   The strangest thing about all of this, not

 9    until I filed retaliation charges I've had an hour

10    lunch.  After the filing charges, I was told by

11    Ms. Tingwall now that I can -- Tingwall and Delilah

12    Bentley, that I can use my break time too.  The

13    15 minutes in the morning and I guess 15 minutes

14    afternoon.

15        Q.   And you said it was after you filed

16    charges?

17        A.   Yes.

18        Q.   Which charges?

19        A.   After I filed the charges for harassment

20    of Ms. Cottrell.

21        Q.   Do you remember what year that was?

22        A.   2015.

23        Q.   With whom did you file the charges?

24        A.   The Illinois Department of Human Services,

1    the EEOC, CPS.

2        Q.   12 says, quote, how would the

3    accommodations assist you.  The answer, the

4    accommodation of just sitting for a short time will

5    allow me to take some pressure off of my feet,

6    back, and right knee.  Is that your handwriting?

7        A.   That's correct.

8        Q.   And is that accurate?

9        A.   Yes, it is.

10       Q.   There's nothing in 13.

11            The third page, do you see the signature

12   on that page?

13       A.   Mm-hmm.  Yes, I do.

14       Q.   Is that your signature?

15       A.   Yes, it is.

16       Q.   Did you have anybody help you fill out

17   this request for reasonable accommodation or did

18   you do it all by yourself?

19       A.   All by myself.

20       Q.   Continue to the next page.  There is a

21   release for medical information to -- you see the

22   physician's name, a number for Dr. Sloan Metz?

23       A.   Mm-hmm.

24       Q.   Is that accurate?



1    A.   You said her name is in there?

2    Q.   Do you see number four on the form?

3    A.   I'm on the wrong page.

4    Q.   Next page.

5    A.   The health --

6    Q.   Let me do that for you.  I think you

7  skipped one page over.  Here you go.

8    A.   Okay.  Number four?  Yeah.  Sloan Metz.

9    Q.   Number six, Dr. David Guliech?

10    A.   Mm-hmm.

11    Q.   Let me ask.  Is this your handwriting on

12  this page?

13    A.   Yes, it is.

14    Q.   Is that your signature at the bottom?

15         Let's talk about Dr. Sloan Metz.  Do you

16  recall seeing her?

17    A.   Yes, seeing Sloan Metz.

18    Q.   I want you to flip to -- it will be the

19  last three pages where it starts with health care

20  provider certification.  The page in front of you

21  right now.

22    A.   Okay.  This one.

23    Q.   Is this your signature -- I'm sorry.  Is

24  this your handwriting?

1      A.   Yes, that's my handwriting.

2      Q.   Where at exactly?

3      A.   Here.

4      Q.   Where at?  Can you point?

5      MR. HILDEBRAND:  Let the record reflect that

6  Ms. Ammons is pointing to where it says at the top

7  of the document, I, the undersigned health care

8  provider, certifies the information provided

9  concerning Kim Ammons ...

10  BY MR. HILDEBRAND:

11      Q.   The name Kim Ammons is your handwriting?

12      A.   Mm-hmm.

13      Q.   What about the handwriting below the

14  statement there?

15      A.   That's the doctor's handwriting.

16      Q.   Flip over to the next page.  The doctor

17  describes please detail patient's diagnosis, quote,

18  pain and attachment of plantar F-A-S-C-I-A.  Got it

19  out.

20           Then number three says, quote, pain in

21  bottom of foot area with difficulty walk, plus

22  standing for long periods.  Is that a pretty

23  accurate description of the condition?

24      A.   Yes.



1    Q.   When -- did Dr. Metz examine you to make

2    that determination I'm assuming?

3    A.   Yes.

4    Q.   Did Dr. Metz make any sort of

5    determination how long the condition would last?

6    A.   Not how long.  She just suggested that if

7    given accommodation, it would help with the

8    condition.

9    Q.   Let me go to the last page.  Number seven

10   says, quote, are the medical conditions or

11   impairments you described in paragraph six

12   permanent?  If not, what is the projected duration

13   of the patient's limitations or impairment that

14   will interfere with his or her ability to perform

15   his or her job functions?  And the answer was no,

16   six to eight weeks.

17   A.   Right.

18   Q.   Is that about accurate?

19   A.   I guess so.

20   Q.   We'll come back up on number five where it

21   has a description of the major life activities

22   affected by the medical condition.  It says, quote,

23   walking or standing for long periods without the

24   ability to sit down.  Is that accurate?



1      A.   Yes, it is.

2      Q.   And then number six, how does the

3   patient's medical condition or impairment limit his

4   or her ability to perform his or her job functions?

5   Please describe in detail the answer.  She has

6   difficulty walking for extended periods of time

7   without the ability to sit down.  Is that pretty

8   accurate?

9      A.   That's correct.

10     Q.   Did Dr. Metz specify anywhere in here how

11  long you should be sitting for?  Do you see that?

12     A.   Not here, but on some of her doctor

13  statements I believe she had put a time.

14     Q.   Do you remember how much time?

15     A.   Maybe five to ten minutes at the most.

16     Q.   I'll take that one back from you now.

17          I'm going to show you what I've marked as

18  Exhibit 21.  Have you seen Exhibit 21 before?

19     A.   I believe.

20     Q.   It's a couple pages there.  Take a look.

21     A.   Yeah.  This is the same one I just looked

22  at.  Similar, just a different doctor.

23     Q.   On the very first page, is that your

24  handwriting?



Case: 1:16-cv-04864 Document #: 187-1 Filed: 03/15/19 Page 141 of 319 PageID #:1847
Case: 1:16-cv-04864 Document #: 93-1 Filed: 03/15/18 Page 141 of 319 PageID #:2993
Kim Ammons· 08/29/2017

·1· · · · A.· · No.

·2· · · · Q.· · Okay.· The second page -- actually, turn

·3· ·to the last page first before we do those pages.

·4· · · · · · · Is your handwriting on this last page?

·5· · · · A.· · No.

·6· · · · Q.· · That's to the best of your recollection

·7· ·Dr. Guliech's signature where it says health care

·8· ·provider's signature?

·9· · · · A.· · Yes.

10· · · · Q.· · Did you see Dr. Guliech about that time

11· ·period?

12· · · · A.· · I can't recall.

13· · · · Q.· · Take a look at the other pages in here

14· ·where it says, number one, please detail patient's

15· ·diagnosis.· And the answer, right knee pain,

16· ·inflammation.· Is that a pretty accurate

17· ·description?

18· · · · A.· · Yes.

19· · · · Q.· · What was going on with your right knee, do

20· ·you remember, in July of 2015?

21· · · · A.· · Reoccurring just inflammation from I

22· ·believe what was going on in April, May, June.

23· · · · Q.· · What type of physical manifestations were

24· ·you having with the right knee at that time?



1      A.    Stiffness, swelling, popping sensations.

2      Q.    Number three says, what are the patient's

3  physical or mental impairments?  Answer, pain with

4  prolonged standing.  Is that pretty accurate?

5      A.    Yes.

6      Q.    How would you rate the pain?

7      A.    Standing a long period of time, 10 being

8  the worst, I would be 7, 8.

9      Q.    What about if you were sitting down?

10     A.    For a break for five minutes?  None.

11     Q.    What about just walking in general?

12     A.    No severe pain.  I probably would be at a

13  1, 2.  It's bearable.

14     Q.    What about with your foot with the plantar

15  fasciitis, how would you describe --

16     A.    I didn't have no severe pain.  That

17  usually happens when you stand for a long period of

18  time, the feet.  It starts affecting the feet.

19     Q.    So how would you describe -- if you had

20  been standing for a long period of time, how would

21  you describe the pain?

22     A.    Excruciating where I have to get off of

23  them or ice them or go to the doctor.

24     Q.    Where would it be on your scale of 1 to



1  10?

2       A.   The first time when I stood for six and a

3  half hours, it was a 10, in which made me run to

4  the hospital.  But about 8.  About an 8.

5       Q.   What about if you have been sitting for a

6  little bit?

7       A.   It helps.  It helped.  About a -- maybe

8  about a 5, 4.

9       Q.   What about when walking?

10      A.   Bearable.

11      Q.   I want to go back to the document in front

12  of you.  The doctor notes, what is patient's

13  prognosis as to each impairment and/or condition?

14  Answer, needs a chair to sit down every 15 to

15  20 minutes.  Is that pretty accurate?

16      A.   Yes.

17      Q.   5 talks about major life activities

18  affected.  Answer, unable to stand or walk for

19  prolonged periods.  Is that accurate?

20      A.   That's accurate.

21      Q.   6 says, how does the patient's medical

22  condition or impairment limit his or her ability to

23  perform his or her job functions?  Please describe

24  in detail.  Answer, needs to sit every 15 to



1    20 minutes.  Is that accurate?

2         A.   That's accurate.

3         Q.   7, are the medical conditions or

4    impairments you describe in paragraph 6 permanent?

5    If not, what is the projected duration of the

6    patient's limitation or impairments that will

7    interfere with his or her ability to perform his or

8    her job functions?  Answer, permanent.  Is that

9    accurate?

10        A.   I guess so.

11        Q.   Do you still have problems with your right

12   knee today?

13        A.   No.

14        Q.   When did the problems go away?

15        A.   When I hadn't returned back to work.  I

16   was going through some therapy, just with rest, not

17   working I guess.

18        Q.   Do you recall when was the last time you

19   were at work?

20        A.   December 2016.

21        Q.   What about your feet?  How are they today?

22        A.   A lot better.

23        Q.   When did the plantar fasciitis clear up?

24        A.   I want to say January, February.



1    Somewhere in there.

2        Q.   Of which year?

3        A.   2016.

4        Q.   Do you still have flare-ups today with it

5    or is it pretty much gone?

6        A.   No, I don't have any problems.

7        Q.   I'll take Exhibit 21 back.

8             What about your back?  I know that was a

9    problem.  How is it today?

10       A.   Better.  I haven't had any problems.

11       Q.   When did the back problems go away, do you

12   remember?

13       A.   When I left Curie and after therapy.

14   About January, February, somewhere in there.

15       Q.   I want to show you next what I've marked

16   as Exhibit 22.  A couple pages, if we can kind of

17   take a look at it.  Let me know when you're done.

18       A.   I'm done.

19       Q.   Okay.  Have you seen Exhibit 22 before?

20       A.   I think after -- yeah.  I've seen that

21   after, like in January 2016 I believe.

22       Q.   Do you remember how you got a copy of it?

23       A.   It might have been -- I don't recall.  No.

24       Q.   Which is perfectly fine if you don't.



1· · · · · · I'll have you look at the very last page

2· ·where it says it's from Delilah PA Bentley with the

3· ·Equal Opportunity Compliance Office administrator?

4· · · ·A.· ·Mm-hmm.

5· · · ·Q.· ·Does that name sound familiar to you?

6· · · ·A.· ·Yes.

7· · · ·Q.· ·Were you in communication with Bentley

8· ·between the time you filed your reasonable

9· ·accommodation request up until this date, which was

10· ·August 13th of 2015?

11· · · ·A.· ·Yes.· I was e-mailing her, but she

12· ·wouldn't respond.· She didn't do much in

13· ·responding, but --

14· · · ·Q.· ·Did she never --

15· · · ·A.· ·Huh?

16· · · ·Q.· ·Did she never respond?

17· · · ·A.· ·Oh, she responded.· She responded.· She's

18· ·the one who told me to -- that the principal would

19· ·accommodate me, to seek her out when I get back to

20· ·work.

21· · · ·Q.· ·I want to direct you to the second page of

22· ·the document.· You see where it says the word

23· ·response at the very top?

24· · · ·A.· ·Response?



·1· · · ·Q.· ·Right there.· It says, quote, and this is

·2· ·from Ms. Bentley, it is the understanding of the

·3· ·EOCO that you'll be provided temporary assistance

·4· ·of having a chair present at your security area

·5· ·during the pendency of this request, which was

·6· ·initiated during the school year 2014 to 2015.· Do

·7· ·you recall having the chair brought back for a

·8· ·period of time at Curie after it was taken away?

·9· · · ·A.· ·What I do recall, when she told me to seek

10· ·out the principal and I was told to find

11· ·Mr. Graves, in which I did, and he told me -- I

12· ·told him that I was supposed to be accommodated to

13· ·the locker room and he told me that I was good and

14· ·I was needed on the third floor.· He asked

15· ·Mr. Morris would it be okay if he had given me a

16· ·chair to go to the third floor, in which I did go

17· ·to the third floor.· And I put the chair back out

18· ·there because he told me to -- I could.

19· · · · · · Then the next day, when I got back to

20· ·work, I was on my duty post and I was called via

21· ·radio by Mr. Graves to come to the principal's

22· ·office conference room.· When I got to the

23· ·principal's conference room, he had a laptop out

24· ·and he was a different person from the day before.



1    He was like yelling, saying basically I lied, that

2    Principal Tingwall told him I was not supposed to

3    be accommodated.  And he stated that he would come

4    on the floor and take the chair.

5            And he -- when I was making my rounds,

6    going towards the washroom, I seen Mr. Graves, but

7    I didn't know he was coming for me then.  When I

8    came back out, he was standing there with a sheet

9    of paper in his hand.  He was talking and he says,

10   hold on one second.  Then he took -- went to the

11   spot and he took the chair, pushed it into the

12   lunchroom, and he handed me a new schedule telling

13   me to go to I guess the locker room the next day.

14   And on this paper was a job that was three times my

15   duty on the third floor.  There was no

16   accommodation.  He also stated that there would be

17   no chair in the locker room.

18       Q.   When was that?

19       A.   When I returned back from disability.  I

20   don't recall the date -- actual date.

21       Q.   Was that the end of 2015 going into 2016?

22       A.   Yeah.  It was in 2016 I believe.

23       Q.   Let me ask you.  You filed for the ADA

24   request on April 29th, 2015.  Did you have a chair



1    from that date until the date you got this letter

2    in the mail?

3        A.   No.  From April I went out on disability.

4    I was out -- school ended in June.  We were out for

5    the summer.  I had applied for ADA.  I didn't hear

6    back from Bentley at all.  I constantly called and

7    e-mailed her because I knew it was time to go back

8    to work.

9            I learned in the summer while I was out

10   that we had a new principal.  I reached out to

11   Ms. Bentley and she told me -- I told her I had

12   never received anything with the accommodation or

13   not.  I didn't know if the new principal would have

14   known about any of this and she told me that

15   they would -- that she would contact the new

16   principal and discuss the accommodations with her.

17           I came back to Curie in August 2016.  I

18   was still on the same post duty, third floor, three

19   west.  There were some changes.  I had a chair in

20   September.

21       Q.   In 2015, were you doing a lot of walking

22   as a security guard?

23       A.   I was doing my regular job.  Yeah.

24       Q.   And that included perimeter checks,



1    checking exits, checking stairwells?

2        A.    Everything.  Doing everything.

3        Q.    That next paragraph says, quote, first

4    based upon the job description of your position and

5    after consulting with Jadine Chou, J-A-D-I-N-E,

6    C-H-O-U, chief security, Department of Safety and

7    Security, Brian Bond, B-R-I-A-N, B-O-N-D, and

8    former Assistant Principal Rochelle Bryant,

9    R-O-C-H-E-L-L-E, B-R-Y-A-N-T, it was determined

10   that your job requires almost constant walking.

11   Would you say that's a pretty accurate description

12   of your job function?

13       A.    Accurate walking, but we were allowed to

14   be able to sit.

15       Q.    It continues, also, your assignment

16   requires perimeter checks of exit area to

17   adequately perform the essential functions of your

18   job.  Were you checking exit areas?

19       A.    I was doing all of that.

20       Q.    You were told what the essential functions

21   of your job were?

22       A.    Was I told that?

23       Q.    Mm-hmm.

24       A.    By whom?



1    Q.   By someone in the administration.

2    A.   No.

3    Q.   But you had seen the exhibits I had showed

4  you earlier from the union book that talked about

5  some of the job functions, that's correct?

6    A.   After complaining.  Some of the functions,

7  because we didn't have to do all of what the book

8  stated.

9    Q.   You were telling me earlier about some of

10  the training that you took as a security officer

11  and they were talking about -- some of it you said

12  was customer service, interacting with the kids and

13  that.  Some of your functions was, like,

14  deescalating conflict in that as well.

15    A.   Right.

16    Q.   Did they ever talk to you about sort of

17  your job functions in general?  Like, how did you

18  learn, I need to patrol this hallway?  How did you

19  learn, I need to be by this stairwell?

20    A.   Just from experience.  You know, being

21  proactive and securing the building.  Some of that

22  is common sense.  You know, securing the building,

23  securing yourself.  So I mean, it was looked to as

24  my home, you know?  Be aggressive, watch your



1    doors.  That's how I looked at my job, securing

2    that building.  So no, they didn't just actually

3    say, well, you do this, you do that.  No.

4            What we will discuss in the meeting

5    trainings is situations.  If you're sitting at a

6    duty post and someone comes in and this happens,

7    how do you handle that.  You know, that was brought

8    up in training.

9        Q.   I know you mentioned there was one time

10   you were on the third floor, you were in the

11   southwest area and there was another individual who

12   was in another part of the hallway and sometimes

13   you would monitor his or her area if she or he

14   wasn't there.  How would you know if that person

15   wasn't coming in for a particular day?

16       A.   Via radio.  After filing charges and the

17   retaliation, the communication stopped with me

18   period.  So I would listen on the radio to that

19   person not coming in.  But prior to that, you know,

20   they would tell you when you first arrive such and

21   such is not here today.  That stopped.  All that

22   stopped.  So I would either notice they're not

23   there or hear it on the radio.  Making my rounds,

24   you can see the person is not there and the traffic



1  is on that end and I'll go down and disperse that

2  area.

3      Q.   Would you have access to e-mail when you

4  were on the job?

5      A.   Yeah.  We have access to e-mail.  I didn't

6  use it a lot.

7      Q.   How would you access it.

8      A.   Meaning?

9      Q.   Like where would you go if you wanted to

10  check your e-mail?

11      A.   The media center where I spent my lunch

12  time.

13      Q.   The letter continues in what would be the

14  fourth paragraph, quote, allowing you additional

15  time to sit while on duty would in effect remove

16  some of the essential functions of your job.  The

17  ADA does not require an employer to remove

18  essential functions to accommodate an employee.

19  Therefore, your request to have a chair at your

20  assignment post is denied.  Do you remember being

21  told the chair will be denied?

22      A.   Being denied from the principal who took

23  the chair.

24      Q.   Which principal is that?



1    A.    Bryant and Tingwall had it taken by

2    assistant principal ...

3    Q.    One of the functions of your job was to

4    deescalate situations and stop fights, right?

5    A.    I wouldn't be sitting down when kids were

6    in the hall.  That would never have been a problem

7    of mine.  I was always able to work my job.

8    Q.    What if you had kids in the hallway though

9    because there wasn't a classroom change, they were

10   in the hallway and a fight broke out and you were

11   sitting?

12   A.    Whenever there are any students in the

13   hallway, I'm always up, active, dispersing them,

14   moving them around.  You never sit when any adult

15   or student is present in the hall.

16   Q.    What about monitoring hallways?  That was

17   something you described as a function.  Wouldn't

18   you have a hard time monitoring the hallways if you

19   were sitting down all the time?

20   A.    No.  I didn't sit like that at all.  I

21   might have sat two to three minutes at the most to

22   actually take a break, but there were times when I

23   didn't get to sit.  Never when anyone was in the

24   hall.  I knew the time from the experience of the



1    years that I've been working security what is

2    needed, when to move, when not to move.

3        Q.   The letter continues where it talks about

4    the accommodation notes, quote, it is the

5    understanding of the EOCO that you currently take

6    the one-hour lunch break, but you may choose to

7    take a 30-minute lunch break with two 15-minute

8    breaks.  Therefore, you may choose to take a

9    30-minute lunch break with two 15-minute breaks to

10   address your limitations related to constant

11   standing and walking.  Is that accurate?

12       A.   That was accurate, but I had an incident

13   with that.

14       Q.   What was that?

15       A.   When the chair was removed and I was off

16   on disability, when I returned, I was told from I

17   want to say security supervisor Morris that we can

18   do that, but we had to let them know if we chose to

19   take that.  And I started feeling pain and I called

20   Mr. Perez, who was the supervisor, to ask for a

21   break.  When I did that, he said okay, Ms. Ammons,

22   go ahead, take the break.

23            On my way to the break, I got called back

24   from Mr. Perez to come to Principal Tingwall's



1   office.  When I got on my way to principal

2   Tingwall's office, I asked a coworker to accompany

3   me.  Her name was Ms. Pennington.  She was security

4   as well.  When we got in there, Ms. Tingwall asked

5   Ms. Pennington to leave.  And she says, well,

6   Ms. Ammons asked that I come with her.  She said

7   she didn't care.  She had to leave.

8           So when she left, she asked me, so you

9   need a break?  I was like, yes.  She says,

10  Mr. Perez, can you leave the office?  She dismissed

11  Perez as well.  Then she started about, I heard all

12  about you.  It's my job to remove you, to get you

13  out of here.  And she threw some threats that I

14  don't actually recall now, but she did say she had

15  heard so much about me, other administrator's were

16  given a hard time and the removal of me would be

17  the last thing that she would make sure happens.

18      Q.   When was this conversation?

19      A.   It was November I believe.

20      Q.   Of which year?

21      A.   2015.

22      Q.   Who said that to you?

23      A.   Tingwall.  Principal.

24      Q.   Done with that document.  Next one I'm



1    going to show you is what I marked as Exhibit 23.

2    Have you ever seen Exhibit 23 before?

3         A.   I don't recall.

4         Q.   Look at the very last page.  This is from

5    Chicago Orthopedics and Sports Medicine.  Is that

6    where Dr. Guliech was located?  I'm sorry.  Not

7    Dr. Guliech.  Strike that.  Charles Mercier.

8         A.   Yes.

9         Q.   And you recall seeing Dr. Mercier?

10        A.   I seen Mercier for -- I recall seeing

11   Mercier for I think carpal tunnel.

12        Q.   Do you recall when that was?

13        A.   No.  I don't recall the date.

14        Q.   You see the date on this, August 28, 2015?

15   It's by the signature line.  Flip a page over.

16        A.   2015.

17        Q.   I want you to look at the second page

18   where it talks about please detail patient's

19   diagnosis.  Answer, degenerative disc disease/joint

20   disease, lumbar spine.  Stenosis/spinal stenosis,

21   lumbar spine.  And mechanical low back pain.  Is

22   that a pretty accurate description of what you were

23   suffering?  Turn the page over.  Right here.

24   Number one.



1      A.   I never seen Mercier for sciatica.  This

2  is Guliech.  I seen him for back.  Mercier is a

3  hand doctor.

4      Q.   Mercier is a hand?

5      A.   Yes.

6      MS. HALL-JACKSON:  Listen to the question.

7  BY MR. HILDEBRAND:

8      Q.   I guess what I don't understand then, this

9  is what came as part of your personnel file.  It

10  has this form and it has Dr. Mercier's name and

11  signature on it.  It has information about back.

12      A.   Dr. Mercier is out of this office.

13      Q.   So who diagnosed your back problem?

14      A.   That would have been Guliech.

15      Q.   Do you remember when you saw him for your

16  back problem?

17      A.   Don't recall the date.

18      Q.   And just to clarify, Mercier is in the

19  same office as Guliech?

20      A.   Yes.

21      Q.   Was there ever a time when Dr. Guliech was

22  unavailable and you saw somebody else?

23      A.   No.

24      Q.   I'll take this one back.



1      MR. HILDEBRAND:  Do you want to take a break.

2      MS. HALL-JACKSON:  Mm-hmm.

3                    (A short break was had.)

4      MR. HILDEBRAND:  Back on the record.  It's

5  3:10.  We're good.

6  BY MR. HILDEBRAND:

7      Q.   I want to show you next what I've marked

8  as Exhibit 24.  Have you seen this document before?

9      A.   Yes.

10      Q.   Is that your handwriting?

11      A.   Yes, it is.

12      Q.   And flip it over for me.  Is that your

13  signature towards the bottom?

14      A.   Yes, it is.

15      Q.   What was the context of this handwritten

16  note?  I'll give you a chance to read it.

17      A.   Yeah.  Surprise is what it is.  I had a

18  chair all the time and after all of the, I guess,

19  contacting and complaining and retaliation, I was

20  on the post.  I had just finished clearing the

21  hall, hall was empty.  Assistant Principal Oladipo

22  walked up and asked if she could speak with me.  I

23  was with a janitor.  That was his floor, Mike.  I

24  didn't move.  She continued talking, so I somewhat

1   leaned back.  She's African, so you really can't

2   understand what she was saying.  But she had stated

3   that Principal Tingwall had told her to come take

4   my chair and I was like, you know, I thought I was

5   being accommodated.  She was like, I don't have

6   anything to do with that, Ms. Ammons.  You have to

7   speak with Ms. Tingwall.

8            I did.  I went to speak with Ms. Tingwall.

9   When I got to her office, she had the blinds

10  closed.  I could see -- she had them somewhat

11  cracked, she had someone in there.

12           I went back to the floor and I continued

13  working and I just didn't feel good at all.  Didn't

14  feel good.  So I called Mr. Morris via radio to let

15  him know, I believe this is the time, that I was

16  going to take half a day and that Tingwall wasn't

17  available and that Ms. Oladipo was gone from the

18  floor, because her office is on the floor.  He said

19  he would inform Principal Tingwall via radio.

20           So I did, I went on for the day.  And I

21  believe -- I don't really recall.  This might have

22  been like a Friday because I believe when I came

23  back, I was called by Tingwall via radio to come to

24  her office.  And she was very angry, shouting that



 1   I didn't follow protocol.  I just punched out and

 2   left the building.  I told her, that wasn't true.

 3   I consulted with my supervisor and he told me to

 4   go.

 5          She insisted to continue and told me to

 6   leave, that I would be written up.  I'm like, wow.

 7   That's what happened.

 8      Q.   Let me ask you -- the document in front of

 9   you, flip it over for a second.  It says the date

10   at the top, November 6th, 2015, is that about the

11   time period you wrote this letter?

12      A.   Yes.

13      Q.   And it talks about when you speak to

14   Principal Tingwall about having your chair taken

15   away.  Is that what it says?

16      A.   Mm-hmm.

17      Q.   The letter I just showed you for the

18   reasonable accommodation denied you the request for

19   having a chair.  Why was the chair back on

20   November 26th, 2015?

21      A.   Why was it back?

22      Q.   Yeah.

23      A.   I don't recall that date.  What do you

24   mean?



1      Q.   I just showed you the letter from CPS that

2   denied -- you had asked for a chair as a reasonable

3   accommodation under the ADA and the school said

4   they weren't going to give you a chair because it

5   would take away some of your essential job

6   functions.  Instead, they were going to give you

7   the opportunity to take your one-hour lunch break

8   and cut it up into two smaller breaks.

9      A.   I wasn't given a chair then.  I was off on

10  disability.  After the chair was removed is when I

11  went to the doctor and they took me off and they

12  asked -- when I came for an accommodation that I

13  never got from them.  I was told to go to the third

14  floor, that I would get a chair, and the chair was

15  removed that one time.  I never received a chair

16  after that.

17          The letter that you're, I believe, talking

18  about, I was off of work.  I would have been off of

19  work.  I didn't see that letter.

20     Q.   Well, the letter said they weren't going

21  to give you a chair, that request was being denied,

22  and that was in August of 2015 when this letter

23  came out.  The letter you have here in front of

24  you, November 15th, says the chair was taken away.



1   What I'm wondering is if CPS was denying you a

2   chair, why was it back if it was taken away again

3   by November of 2015?  Did you take the chair back

4   and use one anyway?

5       A.   No.  Never that.  If I had a chair, it was

6   given.  I was allowed to sit.  I don't recall --

7   you kind of got me confused now with the

8   August 2015.  Can you repeat that again?

9       Q.   So August 15th, we just talked about that

10  letter that I showed you.  It was Exhibit 22.  That

11  was the response on August 13th, 2015 to your

12  request for a reasonable accommodation under the

13  Americans with Disabilities Act.  One of the

14  requests you made was for a chair.

15          I showed you -- it's on the second page,

16  fourth paragraph, quote, therefore, your request to

17  have a chair at your assignment post is denied.  So

18  on August 13th, 2015, CPS said, we're not going to

19  give you a chair.  We can't do that because it

20  would go into -- it would make it harder for you to

21  do your job, but we're going to give you this

22  opportunity for breaks.  Do you understand what I'm

23  saying?

24      A.   No.  We had chairs August 2015.  We were



1   allowed chairs, obviously, from the principal.  I

2   never brought a chair out.  The chair was out.  All

3   security had chairs.  So we were allowed to have

4   chairs up until the chair was taken in November.

5   And Principal Tingwall followed up after,

6   threatening me with an e-mail stating obviously

7   this here, what the board said about -- I had a

8   chair from the time I met her all the way up until

9   November.

10        Q.   Wasn't the chair taken away on April 1st,

11   2015?

12        A.   That was another administration.  Cottrell

13   started it because of the complaint retaliation,

14   all of the above.  She was there from April --

15   March, April, May.  I ended up going out on

16   disability.  So the school year ended in June.  I

17   was gone already.  So when I returned, I returned

18   in August of 2015.  There was a new principal.

19            So the chairs were there.  We were

20   working -- basically a relief that that

21   administration is gone and we was not bothered

22   September about a chair at all.  We were allowed to

23   sit at our duty post.

24        Q.   When you say you came back for the



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 165 of 319 PageID #:1841
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/19 Page 165 of 319 PageID #:1841
Kim Ammons  08/29/2017

1    2015-2016 school year --

2        A.   That's correct.

3        Q.   -- every security guard had a chair again?

4        A.   Yes.

5        Q.   Did anybody tell you why they had chairs?

6        A.   It was just a normal routine thing for

7    security to have a chair at their duty post.

8        Q.   I guess what I'm confused in is why would

9    CPS tell you that your request for a chair was

10   being denied August 13th, 2015 to have everybody

11   have chairs there when the school year started

12   again at the end of the year.  It's contradictory?

13       A.   I agree.

14       Q.   Did anybody tell you when you came back in

15   2015 that -- did anybody in the administration

16   explain why the chairs were back?

17       A.   No.  When we came back in August, we met

18   with Tingwall -- Principal Tingwall and she said as

19   of that date, everybody will follow their usual

20   schedules, their duty posts, everything stays the

21   same.  In which, I ended up at three west and that

22   was my regular duty post.

23       Q.   The bottom of the letter -- I'll take

24   Exhibit 22 back.



1· · · · · · The bottom of the letter talks about

2· ·you're asking for an accommodation to get the same

3· ·treatment as others and being able to sit down.· Do

4· ·you remember who the others were you're talking

5· ·about?

6· · · ·A.· ·Yes.· Everybody except for -- myself

7· ·basically is all I could see.· I didn't worry about

8· ·others, but others were sitting except for me.

9· · · ·Q.· ·Do you remember their names?

10· · · ·A.· ·All the security on the floor.· Oliver,

11· ·Pennington, Turner, Cain, C-A-I-N, and Mohammed.

12· · · ·Q.· ·Was Mohammed his last name?

13· · · ·A.· ·Yes.· I guess.· I don't know.· He was a

14· ·new security guy.

15· · · ·Q.· ·Turn to the second page.· You send that CC

16· ·for Tingwall, Oladipo, and I have a hard time

17· ·reading the last names.· Asyambe, and Laino?· The

18· ·carbon copy.

19· · · ·A.· ·She was new.· She came in also in -- they

20· ·were both new.

21· · · ·Q.· ·Do you recall giving them copies of this

22· ·letter?

23· · · ·A.· ·Yes.

24· · · ·Q.· ·Did you ever get a response to this



Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/19 Page 167 of 319 PageID #:1843
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/19 Page 167 of 319 PageID #:1843
Kim Ammons· 08/29/2017

1    letter?

2        A.   No.

3        Q.   From Principal Tingwall?

4        A.   No.

5        Q.   What about Oladipo, O-L-A-D-I-P-O.  Did

6    you ever get a response from her from it?

7        A.   I did get a response from her after this

8    letter I believe.  I was on my duty post on the

9    third floor at the beginning of the day and

10   Ms. Oladipo came and asked could she speak to me in

11   her office.  When I got in her office, she --

12   before I went in, I asked her, could any

13   disciplinary come up out of this meeting?  And she

14   says, no, no, why do you think that or whatever.

15            So I went in and she started crying.  She

16   says, why did you tell my peers that I told you

17   that Principal Tingwall had me remove your chair?

18   I said, I didn't know it was a secret.  You did

19   tell me that fact, that you made sure I knew it

20   wasn't you behind it.  You said Principal Tingwall.

21            She was upset, she was angry.  That was

22   the nature of that meeting.  She let me out.

23       Q.   What about -- was it Asyambe?  Did you

24   ever get a response to the letter?



·1· · · · A.· · No.· I didn't know him at all.· He just

·2· ·stayed away.· He was a new guy.· By me being at the

·3· ·door, he would come in in the morning, you know,

·4· ·look the other way, stayed his distance.· I didn't

·5· ·get a chance to meet him.

·6· · · · Q.· · And what about the last one, Laino?

·7· · · · A.· · No.· She said nothing.

·8· · · · Q.· · No response from her?

·9· · · · A.· · No response at all.

10· · · · Q.· · Okay.· I'll take that back.

11· · · · · · · You were talking about an incident on

12· ·November 6th, 2015, not punching out.· I just want

13· ·to show you a couple letters from that real fast

14· ·because I kind of know the details about it.

15· · · · · · · The first one is marked as Exhibit 25.

16· · · · A.· · Mm-hmm.

17· · · · Q.· · Have you seen Exhibit 25 before?

18· · · · A.· · Yes.

19· · · · Q.· · Do you remember when you saw it

20· ·previously?

21· · · · A.· · It was put it my mailbox I believe.

22· · · · Q.· · Why don't you turn to the second page?· Do

23· ·you see the signature line where it says refused to

24· ·sign?



1    A.    Right.

2    Q.    Why did you refuse to sign the document?

3    A.    That was after she had threatened me.

4    Q.    Who threatened you?

5    A.    Tingwall.  Principal Tingwall.

6    Q.    How did she threaten you?

7    A.    By telling me she's going to make sure

8  that I'm out of Curie and that I just left the

9  building without following protocol.

10    Q.    Just to clarify, you did leave the

11  building?

12    A.    I punched out after letting my supervisor

13  know that I was leaving for the day.

14    Q.    That was because your back was bothering

15  you or what was it?

16    A.    No.  I just felt dizzy.  Felt sick,

17  nauseated.

18    Q.    I'll take back Exhibit No. 25.  I want to

19  show you what I've marked next as Exhibit 26.  Have

20  you seen Exhibit 26 before?

21    A.    Yes.

22    Q.    How have you seen it previously?

23    A.    This one was put in the mailbox.  She had

24  made a mistake with the first date I guess.

1     Q.   Who made a mistake?

2     A.   Principal Tingwall had me come to the

3  school for a hearing and it was a holiday.  She

4  disrupted my holiday to come for a disciplinary

5  hearing.  When I got to the school, it was closed.

6     Q.   I'll have you take a look at the second

7  page of the document.  Do you see the signature

8  line where it says refused to meet, signed without

9  union rep?

10    A.   That's correct.

11    Q.   Why was that?

12    A.   Because of the threat that she had made.

13    Q.   That would be Tingwall?

14    A.   Tingwall.  Principal Tingwall.

15    Q.   Do you remember the name of your union rep

16 in November of 2015?

17    A.   His name was Charles Hunt and Tramaine

18 Reeves.  I had two different people that she -- I

19 contacted Reeves.  She told me she contacted my

20 union rep, which was not my union rep.

21    Q.   Which union were you a member of?

22    A.   70 -- Local 73.

23    Q.   Is that SEIU?

24    A.   SEIU.  That's correct.



1    Q.   I'll show you Exhibit 27.  It's a written

2    reprimand.  Have you seen that before?

3    A.   Don't recall this.

4    Q.   Do you recall anybody in the

5    administration at Curie telling you they were going

6    to put a reprimand in your file?

7    A.   Never.

8    Q.   Never seen this document before?

9    A.   Never seen it.

10   Q.   Do you recall making a new request for

11   reasonable accommodation on December 11, 2015?

12   A.   I don't recall the date, but I recall

13   appealing a couple times for accommodation.

14   Q.   Let me show you what I've marked as

15   Exhibit 28.  Have you seen this document before?

16   A.   I've seen the document before.

17   Q.   And how have you seen it previously?

18   A.   Have I seen it previously?

19   Q.   How have you?

20   A.   How have I?  This is from the liability I

21   believe.

22   Q.   Do you recall being in communication with

23   Ms. Bentley in November of 2015, December of 2015?

24   A.   I reached out to Ms. Bentley several times

1    and there's times she didn't respond immediately.

2        Q.   I want you to look at the very last page.

3    Do you see the signatures -- is that your signature

4    on the document?

5        A.   Yes, it is.

6        Q.   And at the very front page, is that your

7    handwriting?

8        A.   Yes, it is.

9        Q.   Is the information on the first page

10   accurate as of what would have been December 2015?

11       A.   Yes, it is?

12       Q.   Second page I want to take a look at, is

13   that your handwriting?

14       A.   Yes, it is.

15       Q.   Number nine says, quote, what

16   accommodation is being requested.  If more than one

17   accommodation is being requested, please list each

18   one individually.  Answer, number one, park doors,

19   entrance, front where security sits and log in the

20   public presently.  Number two, locker room

21   attendant.  Is that accurate?

22       A.   Yes, it is.

23       Q.   This is your handwriting, right?

24       A.   Yes, it is.



1     Q.   Why did you request either the park door

2   entrance or the locker room attendant?

3     A.   Because I was aware that park doors, they

4   were allowed to sit and the locker room as well.

5   They were allowed to sit.  Also, the security that

6   was securing the door had just got hired, hadn't

7   met probation.  Same with the locker room.

8     Q.   So at the park doors entrance where you're

9   saying people were allowed to sit, what sort of

10  arrangement did they have there for sitting

11  purposes?

12    A.   They had chairs, they had the scan

13  machines and everything was the height of the chair

14  and the table.

15    Q.   You mean an X-ray machine?

16    A.   The X-ray machine.  You stand up to verify

17  ID and the signatures to sign in if people are

18  signing in.  Other than that, they wasn't allowed

19  to -- they didn't have to go and walk or anything.

20    Q.   With a locker room attendant, where were

21  people sitting there?

22    A.   In the caged office.  And their job was to

23  basically maintain that locker room area.

24    Q.   And the hallways outside?



1      A.    Yeah.  There was really no one in the

2  hallway outside once the kids were in the class.

3      Q.    But when kids were --

4      A.    Teachers were out there more so.

5      Q.    But like when kids were transitioning --

6      A.    Oh, yeah.  You'd be outside the locker

7  room.

8      Q.    Next line ten says, quote, please detail

9  your medical condition for each accommodation being

10  requested.  It says, my medical condition plantar

11  fasciitis, foot -- left foot.  See doctor's note.

12  Is that accurate?

13      A.    Yes.

14      Q.    Number 11, says, quote, how are you

15  impaired?  Please describe the limitations.

16  Answer, I am unable to walk or stand continuously

17  for six hours, I need to sit 10 minutes each hour.

18  Is that accurate?

19      A.    Yes.

20      Q.    12, how would the accommodation assist

21  you?  Answer, will allow me to continue to be

22  productive as a senior security officer by allowing

23  me to sit for minutes every hour.  Is that correct?

24      A.    That's correct.



1    Q.   I have no further questions on that.

2         Next thing I want to show you is labeled

3    Exhibit 29.  Have you seen Exhibit 29 before?

4    A.   Yes.

5    Q.   How have you seen it previously?

6    A.   Have I seen it previously?

7    Q.   Yeah.

8    A.   I've seen it when I was working, asking

9    for accommodations.

10   Q.   I'll just have you take a look at the

11   second to last page.  You see it's from Dr. Sloan

12   Metz?

13   A.   Yes.

14   Q.   That's the same Sloan Metz you saw earlier

15   when you were having your foot problems?

16   A.   Yes.

17   Q.   It's a woman this time, right?  I'll have

18   you take a look at -- strike that.

19        The page in front of you with the doctor's

20   name, is your handwriting on that anywhere?

21   A.   This page here?

22   Q.   Yeah.  That page.

23   A.   No.

24   Q.   Okay.  Go back to the second page where it

1   says, one, please detail patient's diagnosis.  Do

2   you see that?

3        A.   Mm-hmm.

4        Q.   It says chronic plantar fasciitis left, is

5   that accurate?

6        A.   Yes.

7        Q.   Number three where it says, what are the

8   patient's physical impairments?  Answer, painful

9   left -- I can't read the word.

10       MS. HALL-JACKSON:  You're a genius if you can.

11  BY MR. HILDEBRAND:

12       Q.   And heel with extended standing or

13  walking.  Is that --

14       A.   Yes, it is.

15       Q.   -- accurate?

16            What is the patient's prognosis as to each

17  impairment and/or condition, fair.  Is that

18  accurate?

19       A.   Yes, it is.

20       Q.   Number six, how does the patient's medical

21  condition or impairment limit his or her ability to

22  perform his or her job functions?  Please describe

23  in detail.  Answer, she is unable to walk or stand

24  continuously for six plus hours.  She needs to sit

1    ten minutes each hour.  Is that accurate?

2        A.   Yes.

3        Q.   Five, where it says identify all major

4    life activities, the answer is none.  Is that

5    accurate?

6        A.   That's correct.

7        Q.   Seven, are the medical conditions or

8    impairments that you describe in paragraph 6

9    permanent?  If not, what is the projected duration

10   of the patient's limitation or impairment that will

11   interfere with his or her ability to perform his or

12   her job functions?  Answer is no, 6 to 12 -- looks

13   like weeks.

14       A.   Months.

15       Q.   Could be months.  I'm not sure.

16       A.   I take it as months.

17       Q.   Is that accurate?

18       A.   Yes.

19       Q.   Okay.  I'll take 29 back from you.

20            So do you recall -- you made this request

21   for either going to the park doors or the locker

22   room.  Do you recall hearing anything from

23   Ms. Bentley that they were going to try to

24   accommodate you by putting you in the locker room?



Case 1:16-cv-04884 Document #183-1 Filed: 03/15/19 Page 178 of 319 PageID #:1854
Case 1:16-cv-04884 Document #193-1 Filed: 03/15/19 Page 178 of 319 PageID #:4952
Kim Ammons· 08/29/2017

1      A.   Yes.

2      Q.   Do you remember when you heard from her

3  about that?

4      A.   When I was due to return from disability.

5      Q.   Let me show you what I marked as

6  Exhibit 30.  That's an e-mail -- Exhibit 30 is an

7  e-mail from Ms. Bentley to you.  Do you recall this

8  e-mail?

9      A.   I don't recall.  I recall the

10  conversation, not the e-mail.

11      Q.   I mean, it says December 29, 2015

12  Ms. Bentley e-mailed you, "I spoke with your

13  principal and we are exploring a temporary

14  accommodation of assigning you to the locker room

15  for a trial period.  I will be in touch with you

16  once the details are worked out."

17      A.   Right.  We had that conversation.  So when

18  this came, it was after the conversation.  She told

19  me that -- she asked what accommodations -- she

20  asked where.  I told her.  She said, well, she will

21  speak with the principal and that being around the

22  holidays, she was out of town or something and that

23  she would get back to me.  The principal promised

24  to get back to her.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 179 of 319 PageID #:1855
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 179 of 319 PageID #:992
Kim Ammons - 08/29/2017

1      Q.   Ms. Bentley?

2      A.   Ms. Bentley.  That's correct.  That's when

3  I also spoke to her and she told me when it was

4  time to return to seek out the principal for the

5  accommodation.

6      Q.   Okay.  I'll take that one back.  I'm going

7  to show you next what I've marked as Exhibit 31.

8  It's two and a half pages.  I'll give you a chance

9  to take a look at it.

10          Have you seen Exhibit 31 before?

11     A.   Yes.  I recall.

12     Q.   How have you seen it previously?

13     A.   No.  I haven't seen it previously.

14     Q.   You said you had seen it before.

15     A.   Yeah.  I seen it back when, I believe, I

16  was off of work.

17     Q.   Was this when you were on short-term

18  disability?

19     A.   Yes.

20     Q.   I want you to look at the second page of

21  the document.  The first paragraph talks about how

22  the school sent a letter to you back in August

23  explaining that your job requires some constant

24  walking.  Do you recall that letter, we talked



1    about it earlier?

2        A.   No.  Don't recall that.

3        Q.   The August 13th letter we had talked about

4    just a few minutes ago from EOCO?  It was

5    Exhibit 22.

6        A.   I can't recall.

7        Q.   The letter goes on about job training and

8    the need for walking and standing during job

9    training.  We were talking about that, how there

10   might be need to stand and walk because of your

11   job.

12       A.   Yeah.  I recall what you're saying now.

13       Q.   Okay.

14       A.   That ...

15       Q.   What I want to direct you to is the fourth

16   paragraph of this letter where it says, quote, that

17   EOCO also considered your request for reassignment

18   or alternate duty post, specifically either the

19   park door east entrance or the locker room

20   attendant post.  Regarding the park door entrance

21   post, it is the understanding of the EOCO that the

22   school utilizes security with Chicago Police

23   Department to fill that post and that post is not

24   available to security school officers or to you.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 181 of 319 PageID #:1857
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 181 of 319 PageID #:493
Kim Ammons· 08/29/2017

1    Were you aware that the park door entrance is only

2    monitored by the CPD?

3        A.   No.  That was not true because there was a

4    young man named Marco who that was his duty post

5    there and he had been on the job for about 60 days.

6        Q.   What's Marco's full name?

7        A.   I don't know.  I really didn't get a

8    chance.  I know he was an ex Curie student.

9        Q.   Did you see anybody else at the park door

10   who was not CPD?

11       A.   Yes.  David Reyes and myself a couple

12   times when -- whichever one of them were either not

13   there or running late, then I would take that post.

14       Q.   So did you ever see uniformed Chicago

15   Police Department officers at the park door

16   entrance?

17       A.   Uniformed?  Never.

18       Q.   What about the off-duty officers you were

19   talking about earlier?

20       A.   Yeah.  Some of them worked there at

21   different times.  But we shared that spot.  They

22   will be somewhere else and similar security like

23   myself would cover the park doors.

24       Q.   The paragraph above the one I just read,



1  and I'm sorry I got out of order, says, "Allowing

2  you additional time to sit while on duty when it in

3  effect removes some of the essential functions of

4  your job, the ADA does not require an employer to

5  remove essential functions to accommodate an

6  employee.  Therefore, your request to sit for ten

7  minutes of each work hour as needed is denied."  Do

8  you remember being told you weren't going to be

9  allowed to sit ten minutes for each hour of work?

10      A.   No.  I was not at work then.  No.

11      Q.   Did anybody ever tell you that you weren't

12  going to be allowed to sit for ten minutes every

13  hour?

14      A.   No.

15      Q.   Rather than doing that, the letter says,

16  Principal Tingwall will on a temporary basis of

17  30 days reassign your post to the locker room

18  attendant post.  Please be advised, however, this

19  is not a sitting position.  Further, it is the

20  understanding of the EOCO that the locker room

21  attendant monitors the locker room for the first

22  ten minutes and the last ten minutes of each hour

23  and then must monitor the hallway near the locker

24  room.  At the end of the 30-day period, this



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 183 of 319 PageID #:1859
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 183 of 319 PageID #:1859
Kim Ammons 08/29/2017

1    assignment will be reviewed by Principal Tingwall

2    and the EOCO to determine its effectiveness.  Is

3    that an accurate statement?

4         A.   What do you mean accurate statement, that

5    I was told that?

6         Q.   Were you told that, that --

7         A.   No.

8         Q.   -- you would be offered a temporary post

9    in the locker room?

10        A.   No.

11        Q.   So no one at the school ever told you that

12   Principal Tingwall was going to let you use the

13   locker room?

14        A.   No.  Not that I recall.  When I had told

15   them what Delilah Bentley told me, that's when

16   Principal Graves suggested that I go to the third

17   floor.  Then after that is when he removed -- took

18   the chair and he came with a paper stating that I

19   would have to do -- triple my duty over in the

20   locker room, that no other security officer ever

21   had done at Curie.

22        Q.   So what was the triple duty?

23        A.   I was supposed to make sure the locker

24   room was empty, check that hall right there by the



1   locker room, come down about 25 stairs plus, walk

2   around to the other side of the B building, go back

3   up some stairs, and do this on a continuous for

4   50 minutes.

5       Q.   And you said Graves gave you a piece of

6   paper that had all of this outlined on it?

7       A.   Yeah.  He made a schedule for me to

8   follow.  That's when I told him that was no

9   accommodation.  I mean, this was worse than my job

10  on the third floor of ten years.

11      Q.   That schedule that Graves gave you, how

12  would you describe it?  It was written down

13  obviously.  Was it handwritten?  Was it typed?

14      A.   I believe, I don't really recall, that he

15  had typed it.  He had his laptop out when I was

16  down there.  So I don't know about that.  I don't

17  really recall what the letter was.

18      Q.   But you recall it being --

19      A.   I do recall that it was a whole lot that

20  would have -- that I wouldn't have been able to do.

21      Q.   You recall it being very specific about

22  where you were supposed to go in the locker room

23  and the hallways?

24      A.   Definitely.  Down the stairs, in the back,



 1  around the side.  But I do know that no security

 2  ever was told to do that type of work.

 3      Q.   I showed you this document earlier,

 4  Exhibit No. 6.  Is that the document Mr. Graves

 5  gave you?

 6      A.   I don't recall.

 7      Q.   Do you have any other documents that talk

 8  about these extra duties you have to do?  Because

 9  that's the only one I have that describes the

10  locker room attendant.

11      A.   No.

12      Q.   That document doesn't describe the

13  specificity you were just telling me about, where

14  you were supposed to go, like down the hallway,

15  around ...

16      A.   Some of this I recall being on that paper,

17  about walking up and down the stairs, circulating

18  around.  No other security has that duty or ever

19  had that duty.

20      Q.   But as far as you know, you don't have

21  that document that Graves gave you?

22      A.   I don't know offhand.

23      Q.   Wouldn't you have wanted to keep a

24  document like that?



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 186 of 319 PageID #:1862
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 186 of 319 PageID #:902
Kim Ammons· 08/29/2017

1· · · ·A.· ·Would I have known to keep it?

2· · · ·Q.· ·Would you have wanted to keep a document

3· ·like that?

4· · · ·A.· ·Definitely.· That document along with all

5· ·the other documents.

6· · · ·Q.· ·I'll take that back from you.

7· · · · · · So you came back to work around January

8· ·5th, 2016.· Do you remember leaving that day though

9· ·to go back on extension to short-term disability?

10· · · · A.· ·Yeah.· Walking, working, no breaks.· I

11· ·recall pain.· I recall seeing a doctor.· I hadn't

12· ·been accommodated and I was off on disability.

13· · · · Q.· ·So you went out and you came back, was it

14· ·around January 11th, 2016 from disability?

15· · · · A.· ·I don't recall the date.

16· · · · Q.· ·Early January?

17· · · · A.· ·Somewhere in January.

18· · · · Q.· ·Okay.

19· · · · A.· ·Maybe the beginning.

20· · · · Q.· ·When you came back after -- from

21· ·disability in January, did you meet with any of the

22· ·school administrators when you first came back?

23· · · · A.· ·When I came back, that's when I was told

24· ·to find Ms. Tingwall I believe.· And she told me to



1    go speak with the supervisor and the new principal,

2    and Mr. Morris is who I ran into coming down the

3    hall.

4         Q.   Who is Mr. Morris?

5         A.   Michael Morris, supervisor.

6         Q.   Did you talk to anybody else besides

7    Mr. Morris?

8         A.   That day?

9         Q.   Yeah.

10        A.   No.  I talked to Mr. Morris.  He told me

11   he wasn't aware of any accommodations and for me to

12   go to my regular duty post, which was the third

13   floor.

14        Q.   Was that the three west one you showed me

15   earlier?

16        A.   Yes.  Three west.  And I heard him via

17   radio calling Mr. Graves.  After that, maybe 10,

18   15 minutes after that, he called me to the

19   principal's office, Mr. Morris.  That's where

20   Mr. Graves was.

21        Q.   When you were -- you were talking to

22   Mr. Graves and Mr. Morris at the same time?

23        A.   Yes.  We both -- they both when I walked

24   in -- Graves was standing, Mr. Morris was sitting.



1      Q.   Do you have any recollection of -- in your

2   conversation with Mr. Morris and Mr. Graves, recall

3   telling them that you were entitled to ten-minute

4   extra breaks each hour as an accommodation?

5      A.   Yeah.  I recall I believe telling them

6   that I was supposed to be accommodated and that

7   Ms. Bentley told me that I would be accommodated

8   into the locker room and allowed to sit down.

9   That's when Mr. Graves suggested that I take a

10  chair, pull a chair out on the third floor.

11     Q.   Do you remember though telling them that

12  you were also entitled to having a break every ten

13  minutes an hour during the day?

14     A.   No, I don't recall that.

15     Q.   So Graves told you to take a chair to sit

16  down?

17     A.   He told me -- he told Mr. Morris that he

18  needed me to work the third floor and would it be

19  okay if I take a chair out there.  Mr. Morris

20  agreed with him and they told me to go take a

21  chair, which I did.

22     Q.   Did they -- during this conversation you

23  had with Mr. Graves and Mr. Morris, did they ever

24  offer you the accommodation of the locker room?



1     A.   No.  They were hearing from me what the

2   accommodations were supposed to be in the locker

3   room.  Mr. Graves felt, I guess, that I should be

4   on the -- he needed me more on the third floor,

5   freshman floor.

6     Q.   Did you -- when you had this first meeting

7   with Mr. Morris and Mr. Graves, did you ever reject

8   going to the locker room, telling them no, I'm not

9   going to the girls' locker room, I want to go to my

10  third floor post?

11    A.   No.  Never.  Why would I?  I thought I

12  would be accommodated.  So they suggested that I go

13  to the third floor.

14    Q.   And did you go to the third floor?

15    A.   Yes, I did.

16    Q.   When you went to the third floor, and this

17  was on January 11th when you came back, were you in

18  that same location where you --

19    A.   Three west.  I worked three west and I

20  worked a full day.

21    Q.   And did you have a chair that day?

22    A.   Yes, I did.

23    Q.   Mr. Graves gave you the chair?

24    A.   That's correct.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 190 of 319 PageID #:1866
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 190 of 319 PageID #:1966
Kim Ammons  08/29/2017

1    Q.   Did you have any meeting the next day on

2  January 12th when you came back to work with

3  Mr. Graves and Mr. Morris?

4    A.   When I came back, I was in the building

5  for approximately I want to say an hour and I was

6  called via radio by Mr. Graves to come to his

7  office.  When I got there he said, I have -- I want

8  to evaluate you.  I have to evaluate you.

9    Q.   When was this?

10    A.   I don't recall the exact date, but he

11  said, I'm going to evaluate you and I said, how

12  could you evaluate me?  I haven't been here.  He

13  insisted that I get evaluated.  He became upset,

14  told me to sign it, I refused to sign it.  He then

15  pushed the paper out, it fell to the floor.  He

16  told me to go back to my post.  He was angry.

17    Q.   You don't recall though when this

18  happened?

19    A.   No.  I don't know exact date.

20    Q.   Time of year in general?

21    A.   I know I had just returned to work -- back

22  to work.

23    Q.   This was sometime in 2016?

24    A.   That's correct.



1      Q.   Do you recall any meeting you would have

2   had with Mr. Graves and Mr. Morris on January 12th,

3   2016 where they sat down with you and read the

4   reasonable accommodation letter that the board

5   issued on January 4th?

6      A.   Not sat down, no.  The only time I met

7   with Mr. Morris and Mr. Graves was when he called

8   me back down the next day after having a chair and

9   he was angry, saying, you was not supposed to be

10  accommodated.  I'm coming to take the chair.  That

11  was the only conversation.  No.  I didn't read

12  anything.

13     Q.   You don't recall them talking to you about

14  this letter from the EOCO saying that you weren't

15  going to be allowed to sit, but you were going to

16  have this accommodation of going to the locker

17  room?

18     A.   No.  I recall Mr. Graves telling me that

19  Ms. Tingwall says basically you lied, you was not

20  supposed to be accommodated.

21     Q.   Did you get --

22     A.   I'm looking like, huh?  Where?  Why?  As

23  far as I know, I should have been accommodated from

24  Ms. Bentley's conversation telling me that the



1   principal agreed to accommodate me to the locker

2   room based on what I asked for, that duty post.

3   Because I knew if I needed to take a break, there

4   was a chair.  That's why I asked for the

5   accommodation.

6        Q.   Did you get upset?

7        A.   Upset?  No, I don't get upset like that.

8        Q.   Did you walk out?

9        A.   Oh, no.  They dismissed me, told me to go

10  back to the third floor.

11       Q.   So you didn't leave the building and go to

12  the EOCO office to report that they weren't

13  accommodating you?

14       A.   I believe I went and called Ms. Bentley

15  asking -- trying to get some information from her

16  because I was confused and she didn't answer.  Yes,

17  I did go home, take a half a day I believe that

18  day.

19       Q.   I'm going to show you what I marked

20  previously as Exhibit 32.  See at the very bottom

21  where it says on Thursday, January 14, 2016 at 9:19

22  a.m., Kim Ammons, is that your e-mail address?

23       A.   Mm-hmm.

24       Q.   And the e-mail says, quote, I was



1    expecting to go to my locker room duty that

2    Ms. Bentley told me was mine.  Instead, I was sent

3    to another duty post at the northwest doors and

4    report to the third floor following.  What was the

5    northwest doors?

6         A.   That's the Pulaski door.

7         Q.   And which building were those?

8         A.   That's the A building.

9         Q.   And who told you to report to the

10   northwest doors?

11        A.   I believe Mr. Morris told me to report to

12   the northwest doors.

13        Q.   And then the third floor, is that the

14   three west you're talking about?

15        A.   Yes.

16        Q.   Do you recall reporting to the northwest

17   doors at all at Pulaski?

18        A.   Yes, I do.  That was the day when I had

19   asked Mr. Morris if he was aware of the

20   accommodation and he told me no, that he would

21   speak with Mr. Graves about it.  And he said in the

22   mean time, just follow your schedule.  After

23   leaving the northwest doors, report to my duty post

24   on the third floor, three west.



1      Q.   How long were you at the northwest doors?

2      A.   A period.  A period.  Maybe 7:15 to --

3  about an hour I want to say, 50 minutes to an hour.

4      Q.   What sort of work were you doing at the

5  northwest doors?

6      A.   Just standing there, securing the door I

7  believe after the teachers -- you know, some of the

8  teachers were coming in.

9      Q.   If I remember right, is that the door

10  where the teachers would come in and out?

11     A.   Yeah.

12     Q.   And then you went to the three west

13  afterwards?

14     A.   Three west.  That's correct.

15     Q.   How long were you at that post?

16     A.   I was up there for about half an hour

17  before -- during that time I heard Mr. Morris

18  calling Mr. Graves.  He told him to meet him in the

19  conference room.  After that, they called me.

20  Mr. Morris called me via radio to come to the

21  principal's conference room.

22     Q.   I want you to flip the page over.  At the

23  very bottom, you see there's a reply by Delilah

24  Bentley where it says, dear Ms. Ammons, it's my

1    understanding that you should have been offered the

2    locker room assignment again, as was indicated in

3    your accommodation letter.  Do you remember this --

4    excuse me -- response from Ms. Bentley?

5         A.   22nd?

6         Q.   Yeah.

7         A.   Yes.

8         Q.   So it's your claim that you were never

9    given the locker room assignment at all?

10        A.   No.

11        Q.   You never rejected?

12        A.   Never rejected.

13        Q.   The accommodation letter that we talked

14   about maybe 20, 30 minutes ago talked about you

15   having your lunch break broken up.  You'd have a

16   30-minute lunch break and two 15-minute breaks.

17   Was that given to you?

18        A.   It wasn't offered.  That was the day that

19   I requested it is when I was called by Mr. Perez,

20   who was acting as a supervisor as well, to take a

21   break and Ms. Tingwall had me come to her office.

22   So no, I wasn't given a break.

23        Q.   When was this conversation with Mr. Perez?

24        A.   I don't recall the exact date, but it was



1    the same date when she threatened me.

2        Q.   If you look at --

3        A.   November.  I don't know the exact date.

4        Q.   If you look at the top of the e-mail,

5    there's a reply.  Ms. Bentley responds, "Dear

6    Ms. Ammons, I would be happy to discuss the

7    accommodation letter with you.  Please be aware

8    that it was stressed in the letter this is not a

9    seated assignment.  You requested a locker room

10   assignment in your request form.  So when I spoke

11   with Principal Tingwall, she was amenable to a

12   trial period to determine if this assignment helped

13   to address your limitation.  However, as an

14   essential function that you serve on the post, I

15   visited Curie last school year, so I recall where

16   the locker room post is.  Again, I would be happy

17   to discuss this with you."  Did you ever have any

18   discussions with Ms. Bentley about the

19   accommodation letter and the locker room

20   accommodation?

21       A.   Meaning to be able to sit down or what

22   she's talking about?

23       Q.   What she's talking about.  She wants to

24   talk with you about what's going on, the



1    accommodation request.  She has made the offer to

2    talk.  Did you ever talk with her after this on the

3    22nd?

4         A.   I always -- we were e-mailing each other

5    back and forth, so I believe so.

6         Q.   What about after January 22nd, do you

7    recall any further e-mail communications with her?

8         A.   I was off work then.  No.

9         Q.   I'll take that back from you.  I want to

10   show you next what I've marked as Exhibit 33.  It's

11   about two and a quarter pages long.  I'll give you

12   a chance to take a look at it.

13        A.   Mm-hmm.

14        Q.   Have you seen this document before?

15        A.   Yes.

16        Q.   Is that your handwriting?

17        A.   Yes, it is.

18        Q.   I don't believe I see a signature on it

19   though on the last page.  But it is your

20   handwriting?

21        A.   It's mine.

22        Q.   This was the appeal of your EOCO decision.

23   I want to just -- there's a couple things I want to

24   ask you about in it.  About six lines down the



1    first page you wrote, to stand and walk constantly

2    is something that is not required when students are

3    in class, do you see that?

4        A.    Mm-hmm.

5        Q.    That's a yes?

6        A.    Yes.

7        Q.    Okay.  Were you told that walking and

8    standing were not required when students were in

9    class?

10       A.    Well, when -- meaning when I was hired or

11   through training?  No.  We walk while students are

12   in class, but we were also able to have a seat when

13   we needed to, maybe two, three minutes, five

14   minutes at the most.  No.  That's just my job.  I

15   knew it required walking.  Sometimes while the

16   students were in class to just check my halls and

17   my washrooms.

18       Q.    So it continues, past practices at Curie

19   High School and city-wide policies currently at

20   other schools is police the halls during student

21   movement.  Where did you get that information?

22       A.    Just past practices.  I mean, security

23   training, other security officers, that's what we

24   do.



1    Q.   What about this city-wide policies

2    currently at other schools?  Where did you get that

3    information?

4    A.   Different friends that work security,

5    going in other schools.  It was never a city-wide

6    policy.

7    Q.   Which schools, do you remember?

8    A.   Paul Cuffee, Simeon, Gresham, Fenger,

9    Bowen, Dunbar, Julian, Tilden.

10   Q.   Just to help me understand, what was your

11   understanding of this school policy they had

12   regarding security guards with sitting?

13   A.   What was the policy?

14   Q.   Mm-hmm.  You said there was a city-wide

15   policy at other schools regarding policing the

16   hallways.  So what was your understanding of the

17   policy?

18   A.   I'm really not understanding what you're

19   saying.

20   Q.   Your letter says that there was a

21   city-wide policy currently at other schools

22   policing hallways.  You just listed a couple of

23   schools.  When you wrote this letter, did you have

24   any understanding of what that policy was that

1    other schools within CPS security guards were

2    allowed to sit down?

3         A.   Security guards were allowed to sit and

4    their job was to patrol hallways.  That's what I

5    meant.

6         Q.   That's all I have on this.

7              Next thing I want to show you, it's marked

8    as Exhibit 34.  It's a denial of your ADA appeal.

9    Do you remember seeing this document in front of

10   you?

11        A.   Yes.

12        Q.   I want to direct your attention to the

13   very last sentence where it says quote, however,

14   once you were informed that you were required to

15   climb stairs as a part of the post, you asked to be

16   returned to your third floor post.  Principal

17   Tingwall honored that request.  Again, when you

18   returned to Curie, did you ever reject the offer of

19   being placed in the locker room attendant position

20   because it would require you to climb stairs to the

21   locker room?

22        A.   Never.

23        Q.   Hundred percent certain of that?

24        A.   Hundred percent certain.



Case 1:16-cv-04884 Document #:187-1 Filed: 02/15/18 Page 201 of 319 PageID #:1937
Case 1:16-cv-04884 Document #:93-1 Filed: 02/15/18 Page 201 of 319 PageID #:1497
Kim Ammons - 08/29/2017

1    Q.   Would climbing stairs have been a problem

2    for you?

3    A.   No.

4    Q.   I'll take that back.

5         In your time at Curie as a security

6    officer, were you ever evaluated?

7    A.   Oh, yes.

8    Q.   How were the evaluations done?  Were they

9    done -- would you meet with Morris and Graves on an

10   individual basis?  Was it done annually?  How did

11   it work?

12   A.   I never had any evaluations with Morris

13   and Graves.  But prior to them, the other

14   administrators, they had evaluation day.  They

15   would call you down and you knew, you were aware

16   when the evaluation period was.  So you would come

17   down to be evaluated by an administrator.

18   Q.   When was the evaluation period?

19   A.   I don't recall the exact ...

20   Q.   I'm not looking for the exact date.  Was

21   it done ...

22   A.   Near getting off of the school year.

23   Q.   Okay.  And what sort of things when you

24   were evaluated would they critique you on?



1    A.   My performance was based on attendance,

2  how you dealt with the kids, your professionalism.

3  I don't recall exactly how it went.  I just always

4  got nice evaluations until I filed charges.  After

5  that, I got some bad ones -- I got a bad one.

6    Q.   And when was that?

7    A.   Around I believe 20 -- Cottrell time.  I

8  want to say 2014, 2015.

9    Q.   When you were critiqued in these

10 evaluations, how would you respond?

11    A.   Respond to the -- I never had to respond.

12 They were always good.  I responded to the bad one,

13 the one I didn't approve of through my union.

14    Q.   How did it feel when someone gave you a

15 critique, say a negative criticism?  How would you

16 respond to that?

17    A.   What do you mean?  I don't understand.

18    Q.   Would you get upset if someone gave you

19 negative criticism or would you take it in stride?

20    A.   Oh, no.  I wouldn't take it in stride

21 because I take pride in my work.  So no, I would

22 definitely ask, but I hadn't received any other

23 than that one time and I knew and felt that it was

24 due to the retaliation and because I had contacted



1    the Illinois Department of Human Rights and the

2    EOCO.

3        Q.    So you would respond.  Would you be

4    professional when you responded to criticism?

5        A.    Are you speaking about the principal, if I

6    had to speak to the principal or any job?

7        Q.    So it's -- when you were working at Curie,

8    one of the administrators comes back to you and

9    gives you a critique about your performance and

10   offers a suggestion of how to make it better.  How

11   would you respond to that?

12       A.    I would say thank you.  No problem.

13   Hopefully they ended it out with some positive

14   feedback and I would say thank you.

15       Q.    And if the feedback wasn't positive,

16   say --

17       A.    I would just listen.  They wouldn't get a

18   response -- a negative response.  No.

19       Q.    Not get upset?

20       A.    They wouldn't see it.  I don't think

21   anyone would be happy after knowing you take pride

22   in your job and you get a negative evaluation or

23   response, but they would never see it.  No.

24       Q.    I want to show you a couple documents.



Case 1:16-cv-04804 Document #187-1 Filed: 03/15/19 Page 204 of 319 PageID #:1880
Case 1:16-cv-04804 Document #183-1 Filed: 03/15/19 Page 204 of 319 PageID #:1880
Kim Ammons  08/29/2017

1    The first one I marked as Exhibit 35.  Have you

2    seen this one before, Exhibit 35?

3         A.    2012.  Yes.

4         Q.    And do you recall the context in which

5    you've seen it previously?

6         A.    Yes.

7         Q.    This is one of your evaluation forms from

8    the Curie school?

9         A.    That's correct.

10        Q.    Is this one they would normally use for

11   evaluation purposes?

12        A.    Yes.

13        Q.    Is that your signature where it says ESP?

14        A.    Yes.

15        Q.    And what below that, do you know whose

16   signature that is?

17        A.    That was Mr. Perry.  He was the principal.

18        Q.    In 2013?

19        A.    2013.

20        Q.    Do you recall anything about this

21   evaluation, anything?

22        A.    Actually, that was just his signature.  He

23   was never one to evaluate me.  This was given to me

24   by an assistant principal.

Case 1:16-cv-04884 Document #187-1 Filed: 03/15/19 Page 205 of 319 PageID #:1881
Case 1:16-cv-04884 Document #193-1 Filed: 03/15/19 Page 205 of 319 PageID #:1881
Kim Ammons 08/29/2017

1    Q.   Do you remember in 2013 who that would

2    have been?

3    A.   That might have been Ms. Kosik.

4    Q.   How do you spell the last name?

5    A.   K-O-S-I-K.  Or Espinosa.  One of them.

6    Q.   I'll take back 35.  I want to show you

7    what I've marked as Exhibit 36.  Have you seen

8    Exhibit 36 before?

9    A.   Yes, I have.

10   Q.   When have you seen this previously?

11   A.   2014.

12   Q.   Is this your -- well, it says no

13   signature, refused to sign ESP.  Is that your

14   handwriting?

15   A.   No, that's not my handwriting.

16   Q.   What about the name below that?

17   A.   That's the principal.

18   Q.   Perry?

19   A.   Perry.

20   Q.   In 2014, do you know who was doing your

21   evaluation then?

22   A.   Espinosa.

23   Q.   I want to show you 35 again.  Keep both

24   up.

1          So in Exhibit 35, which was your 2013

2    evaluation, attendance was marked as an 88, but in

3    the 2013 [sic] one, it was marked as a 60.  Had

4    your attendance changed in 2013?

5         A.   2013?  This says 2014.

6         Q.   Well, the one where it's -- sorry.  The

7    one --

8         A.   Right here?

9         Q.   Yeah.

10        A.   Yeah.  It definitely changed.  I was under

11   a lot of stress.  Stress from harassment.

12        Q.   What harassment?

13        A.   Retaliation from complaining and filing

14   charges at the Illinois Department of Human Rights

15   and the union.

16        Q.   Were you out a lot from August 2013 to May

17   of 2014?

18        A.   I don't recall the dates.

19        Q.   The next one, dependability, and the prior

20   one from 2012 to 2013 was a 90.  Do you see that?

21        A.   Yes.

22        Q.   And then in 2013-2014, it dropped to 85.

23   Slight drop from 90.  Do you see that?

24        A.   Yes, I do.

1    Q.   What are they looking at when they're

2    talking about dependability.  Do you know?

3    A.   No, I don't know anything.  My

4    dependability and personal relations had never

5    changed.  They might be speaking on attendance

6    maybe.

7    Q.   So you don't know what dependability means

8    in terms of a factor for the evaluation?

9    A.   No.  Not really.

10   Q.   What about personal relations?

11   A.   My personal relations was great.

12   Q.   Do you know what that factor means,

13   personal relations?

14   A.   Approachable, able to talk to I assume.  I

15   don't know.

16   Q.   What about quality of work?

17   A.   My quality of work was great.  I went

18   above and beyond my duty.  I ran programs, I helped

19   out with students after school, nonpaying jobs.

20   Q.   Do you know what is meant by quality of

21   work, the term we're looking at?

22   A.   Not really.

23   Q.   What about the one below that, quantity of

24   work?



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 208 of 319 PageID #:1884
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 208 of 319 PageID #:1884
Kim Ammons 08/29/2017

1      A.   Not really.

2      Q.   Okay.  So I'll take back 35 from you.

3   Exhibit 35 is like a -- that you refused to sign,

4   it was a dip in your overall evaluation?

5      A.   Definitely.

6      Q.   How did you respond to that?

7      A.   I believe I reached out to the EOCO and

8   the -- my union rep.

9      Q.   Who was your union rep?

10     A.   Tramaine Reeves.

11     Q.   How would you describe your relationship

12   with Tramaine Reeves?

13     A.   My relationship?  He was a union rep.  I

14   didn't really have a relationship with him.  I

15   thought he was lax with representing me.

16     Q.   I mean, did you have a cordial

17   relationship with him?

18     A.   In the beginning after he was lax, I

19   didn't have the same relationship I believe as just

20   meeting him day one.  But no, we were never

21   buddies.

22     Q.   I'm going to show you what I've marked as

23   Exhibit 37.  That's an e-mail from Tramaine Reeves

24   to you.  Have you seen this before?

1    A.   Yeah.  I've seen this before.

2    Q.   Do you recall when you've seen it

3  previously?

4    A.   No.

5    Q.   Is that -- where it says to, is that your

6  e-mail address?

7    A.   Mm-hmm.  That's me.  Yes.

8    Q.   Who's Frank Kline?

9    A.   That's I believe someone with the union.

10   Q.   That's the SEIU?

11   A.   Yes.

12   Q.   What about the name next to it, Taalib-Din

13 Ziyad?  It's Taalib-Din, last name Z-I-Y-A-D.

14   A.   You said who is he?

15   Q.   Yeah.  Who is he?

16   A.   I believe he was like a vice-president or

17 something.

18   Q.   With the union?

19   A.   With the union.

20   Q.   Okay.  Mr. Reeves wrote to you, "I got in

21 contact with Assistant Principal Cottrell in part

22 about the positions that were posted last summer.

23 Although other individuals were promoted to the

24 positions, I inquired about getting feedback that I

1   could share with you that will potentially help

2   your chances for promotional opportunities in the

3   future."  Do you know what he's talking about, what

4   positions that were posted last summer?

5       A.   Yeah.  He's speaking about while off work

6   for the summer break, I had learned that through

7   Ms. Pennington, she had actually came to my house

8   and told me that Curie was looking for a

9   supervisor.  I knew from past experience of all of

10  the harassment, retaliation nonsense that I

11  wouldn't have had a chance.  But she stated that

12  she felt I would be a good supervisor and fair.  I

13  asked her, was it a difference in pay?  She said

14  yes, she was told that.

15           I applied for the position.  I didn't get

16  a response from Cottrell or an interview.  When we

17  came back to work for that year in August, we were

18  introduced to Mike Morris and Ceaser Perez, who had

19  just got the job as security.  He was an ex-student

20  from Curie.

21           I then contacted the union rep to let him

22  know that I didn't even get an interview and that I

23  was more qualified than the chosen one.  And that

24  was it.



1      Q.   But you applied for the job?

2      A.   Oh, definitely.  Yeah.  I applied for the

3  position.  And I assumed Cottrell gave him this

4  down here telling me different things I need to do

5  or whatever, whatever reason --

6      Q.   Where --

7      A.   -- that I wasn't picked, which I didn't

8  expect her to have anything good to say anything

9  because I filed retaliation and harassment charges.

10      MR. HILDEBRAND:  Just to clarify for the

11  record, when Ms. Ammons pointed to the document,

12  she was pointing to where it says, "To paraphrase

13  what was shared, here is some constructive

14  criticism given by the assistant principal.  One,

15  if you're corrected or reproved don't become

16  irritable and/or dismissive.  Two, respect everyone

17  equally and be reflective.  Three, a good leader is

18  reflective and humble enough to accept constructive

19  criticism from their supervisors as well as their

20  peers."

21           So you said you went to Mr. Reeves about

22  what happened with this position.  Did the union

23  follow up?  Did they file a grievance?

24      A.   He said they would meet with them, the



1   administrators about it.  He came to Curie and

2   spoke with all security staff except for Morris and

3   Perez.  He stated that if they, in fact, did hire

4   these people, that they were wrong for doing it and

5   that he will file a grievance after telling them

6   that they can't hire these two individuals.

7        Q.   What happened then?

8        A.   He didn't get back to me at all.  I kept

9   calling his office, leaving messages.  One of our

10  conversations, he said that he knew Mr. Morris

11  personally, that they attended the same church I

12  believe, which I thought was a conflict of

13  interest.  Then he stated that I -- that I applied

14  late to his understanding, that I applied late,

15  which was kind of strange.  I applied when I

16  learned of the position opening.

17       Q.   I'll take that back from you.

18            I'll show you what I have marked as

19  Exhibit 38 next.  Have you seen Exhibit 38 before?

20       A.   Yeah.  I seen this.

21       Q.   Do you remember when you've seen it?

22       A.   I don't really recall.

23       Q.   It's an e-mail from Christopher Graves,

24  right?



Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/19 Page 213 of 319 PageID #:1889
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 213 of 319 PageID #:892
Kim Ammons 08/29/2017

1      A.   Yes.

2      Q.   That's one of the supervisors at Curie

3  school?

4      A.   Right.  It would have had to have come

5  after I was off of work.

6      Q.   I believe you testified earlier that you

7  were never offered the locker room position, yet

8  Mr. Graves in the second paragraph indicates that,

9  "You have the opportunity to take over the girls'

10  locker room duty, which involves being on your feet

11  at all times while on duty and circulate through

12  the B building, roaming through the hallway and up

13  and down the stairs to monitor the hallways and the

14  locker rooms.  Please be sure to let us know if you

15  would prefer this duty of if you would like to

16  retain your prior duty of third floor supervision

17  when you return to work."  It looks like to me

18  Mr. Graves offered you the opportunity to work on

19  the girls' locker room.

20      A.   I was out on disability.

21      Q.   But it says when you return to duty.

22      A.   I never returned back to work in

23  January -- after January.

24      Q.   When was the last day at the school?



1      A.   I don't recall the date.

2      Q.   Did you return on January 14th?

3      A.   Did I return -- I don't recall.

4      Q.   Mr. Graves wrote in the first paragraph

5  that you were offered the option to break up your

6  60-minute breaks, which you declined.  Do you

7  remember declining that option?

8      A.   No.

9      Q.   I'll take that.

10          I want to show you next what I marked as

11  Exhibit 39.  Have you seen Exhibit 39 before?

12     A.   There's more to this.  I recall writing

13  this myself.

14     Q.   That's your handwriting?

15     A.   Yes, it is.

16     Q.   What is this, do you remember?

17     A.   Yeah.  This was after I had gone for the

18  day and he told me go to the third floor to get a

19  chair.  So I guess the other part to that should

20  have been talking about the next day when he took

21  the chair.

22     Q.   So you wrote this?

23     A.   Yeah.  I remember writing this.

24     Q.   Do you remember why you wrote this?



 1        A.   I was probably talking to EOCO or Bentley
 2    or someone and just some documentation.
 3        Q.   **I'm just asking about these because**
 4    **there's some of these and there are documents you**
 5    **gave us, but they're a bit broken up.**
 6        A.   Yes.  That was in January.  January 12th
 7    when I arrived to the duty post.  January 12th on
 8    here.
 9        Q.   **Were you doing this every day when you**
10    **arrived?**
11        A.   What's that, doing what?
12        Q.   **Taking notes down and that.**
13        A.   No.  I would document if something had
14    happened to me.  I wasn't just taking notes.  If
15    something happened that I needed to be reminded of,
16    I would write on something.
17        Q.   **Okay.  That is definitely your**
18    **handwriting?**
19        A.   Yes.
20        Q.   **Okay.  I'll take that back.  Exhibit 40**
21    **I'm going to show you next.  I think before we do**
22    **40 we'll take a quick break.**
23                     (A short break was had.)
24    BY MR. HILDEBRAND:



1    Q.   Have you seen Exhibit 40 before?

2    A.   I believe.  My doctor ...

3         Yeah.  This is the doctor's note.

4    Q.   Which doctor's note?

5    A.   Gary Ogurkiewicz.

6    Q.   There isn't a date on it except to say you

7    saw him on January 14th, 2016 -- actually, strike

8    that.

9         There is a date.  It's at the very, very

10   top.  It looks like February 2nd, 2016.  It's

11   February 2016.  My question I have for you in

12   looking at this, at the very bottom where it says,

13   please reopen my claim ASAP, do you see that?

14   A.   Yeah.

15   Q.   Do you know to whom you were addressing

16   this note?

17   A.   Sedgwick, insurance company.

18   Q.   That's all I have for this.  I wasn't sure

19   who it went to.

20        MR. HILDEBRAND:  Let's take a break.

21                    (A short break was had.)

22        MR. HILDEBRAND:  Back on the record.  I figure

23   we've got maybe an hour and a half left.  Not too

24   much longer.

Case: 1:16-cv-04684 Document #: 187-1 Filed: 03/15/19 Page 217 of 319 PageID #:1893
Case: 1:16-cv-04684 Document #: 93-1 Filed: 03/15/18 Page 217 of 319 PageID #:1893
Kim Ammons - 08/29/2017

1    BY MR. HILDEBRAND:

2         Q.   We left off with Exhibit 40, which we're

3    done with.

4              I want to start now with Exhibit 41.  It's

5    a two-sided document.  I want to ask you about the

6    front side.  Have you seen this document before?

7         A.   Yes.

8         Q.   Do you recall when you've seen it

9    previously?

10        A.   Yes.

11        Q.   What was that?

12        A.   This was a -- yeah.  I was trying to get a

13   break and they never got back to me about the

14   break.  And -- yes, I recall seeing this.

15        Q.   Is that your handwriting?

16        A.   Yes, it is.

17        Q.   And is that your signature on the bottom?

18        A.   Yes, it is.

19        Q.   And Mr. Graves is your supervisor,

20   Christopher Graves?

21        A.   Yes.

22        Q.   You see where it says towards the bottom,

23   Tramaine said that you both agree with me splitting

24   30 minutes of my lunch up and spreading the -- is

1    that time for the duration of the day?

2        A.   Yes.

3        Q.   And what are you talking about there, if

4    you remember?

5        A.   They had -- my union rep had told me that

6    he and I guess Mr. Graves had a conversation, or

7    Tingwall or someone, about splitting up -- using my

8    lunch to take a break to rest.

9        Q.   Do you remember when Tramaine had that

10   conversation?

11       A.   I don't recall the date.

12       Q.   I want you to flip this over now.  Is this

13   your handwriting on the back side of this document?

14       A.   Yes.

15       Q.   You know how I showed you those notes

16   earlier?  It was in Exhibit 39.

17       A.   Yes.

18       Q.   Is that a part of the same notes you were

19   taking when you were on the job?

20       A.   Possibly.  I don't know.  I don't really

21   recall.

22       Q.   Well, I mean, we see it says at the top

23   here -- you see where it says February 16, 2016 at

24   7:00 a.m., return to work with -- something



1    restriction statement from Dr. Gary O.

2        A.   Right.

3        Q.   Is that an accurate one?

4        A.   Yes.

5        Q.   Okay.  I'll take that back.

6             Now, I know earlier you were talking about

7    some of your charges with the Illinois Department

8    of Human Rights.  Before we get to those, did you

9    file any grievances against CPS for any violations

10   of the collective bargaining agreement?

11       A.   Yes.  I filed grievances.

12       Q.   Do you recall a grievance in September of

13   2014 regarding a position for lead security

14   officer?  I think you were talking about that a

15   little bit earlier.

16       A.   That's what we were talking about.  Right.

17       Q.   And do you know what the outcome of that

18   grievance was?

19       A.   He said that -- Mr. Reefs said that said

20   they hired from outside of Curie.  It wasn't the

21   principal, it was the Board of Education that did

22   the hiring, but it was posted at Curie.

23       Q.   Did you later believe that you weren't

24   interviewed for the position because you're a



1  lesbian?

2      A.   I later believed it was because it was due

3  to retaliation and complaining.

4      Q.   What about your sexual orientation?

5      A.   Possibility, because I had overheard a

6  young man, he was a teacher, Mr. Pratt, say that

7  Mr. Perry told him that is why I didn't get any

8  opportunities at Curie.

9      Q.   Were you out on the job?

10     A.   What do you mean out on the job?

11     Q.   I mean ...

12     A.   Oh, no.  No.  No.  Assumptions.

13     Q.   How would people know you were a member of

14  the LGBTQ community?

15     A.   The only thing I could assume is how I got

16  to Curie.  You know, the administrators were there

17  when I came to Curie.  One of the administrator's,

18  Ms. Kosik, had mentioned she didn't know what

19  happened to me before I got there and all of that

20  kind of stuff.  But no.  Very professional.  All

21  assumptions.

22     Q.   When you were at Curie -- and I'm talking

23  2014, 2015, did the school have any sort of LGBTQ

24  affinity group?



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 221 of 319 PageID #:1897
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/19 Page 221 of 319 PageID #:1997
Kim Ammons - 08/29/2017

1 A. 2014, when I first got to Curie, but 2014

2 it had -- it wasn't as big as it was when I got

3 there. The guy that was in charge had retired. He

4 was a chairperson over special education.

5 Q. Was that like a gay-straight alliance for

6 the students or what was it?

7 A. Yeah. It was a pretty big program. They

8 had the flags and all of that up in each

9 counselor's office.

10 Q. Were they like the pride flags for --

11 A. Yeah. The pride flags, triangles.

12 Q. To let kids know that they had an ally in

13 this office?

14 A. Oh, yeah. And then they had meetings

15 after school.

16 Q. Did you ever go to any of those meetings?

17 A. Never.

18 Q. I'm going to show you what I marked

19 previously as Exhibit 42.

20 MS. HALL-JACKSON: Off the record.

21     (Discussion off the record.)

22 BY MR. HILDEBRAND:

23 Q. Exhibit 42, the document in front of you,

24 have you seen this document before?

Case: 1:16-cv-04884 Document #: 187-1 Filed: 02/15/19 Page 222 of 319 PageID #:1898
Case: 1:16-cv-04884 Document #: 93-1 Filed: 02/15/19 Page 222 of 319 PageID #:1893
Kim Ammons  08/29/2017

1      A.   Yes.

2      Q.   How have you seen it before?

3      A.   This was something that was filed I

4  believe with the union.

5      Q.   Is this your handwriting on the document?

6      A.   Yes, it is.

7      Q.   Is that your signature at the bottom?

8      A.   Yes, it is.

9      Q.   I think you testified earlier that

10  Mr. Reeves -- Tramaine Reeves got back to you and

11  said that the union wasn't going forward because

12  you had not applied for the position in a timely

13  manner?

14      A.   That's what he had stated.  Right.

15      Q.   I'm assuming then you filed this grievance

16  by yourself?  I'm kind of trying to figure out,

17  like, why you filled out the form then.

18      A.   He had me fill it out.  I believe he had

19  me fill this out or I had to give this to his boss.

20      Q.   Okay.  I'll take that back from you.

21          The next grievance I want to show you is

22  Exhibit 43.  Have you seen Exhibit 43 before?

23      A.   Yes.

24      Q.   How have you seen it before?

1      A.   You said how have I seen it?

2      Q.   Yeah.  How?

3      A.   I was showed by the union rep.

4      Q.   Is that --

5      A.   Mr. Reeves.

6      Q.   And this was involving a grievance where

7   on November 10th, 2015 you received a directive

8   from Principal Tingwall to attend a

9   pre-disciplinary hearing?

10      A.   Yes.  And actually, that was a holiday and

11   school was not open.  It was locked.  So my time

12   there, they were requesting that she -- that I be

13   paid for the time that I spent up there waiting for

14   her.

15      Q.   Do you know what the outcome of this

16   grievance was?

17      A.   At first, it was denied and then he

18   appealed it and it went through arbitration I

19   believe.  And it was found that she had to pay me.

20      Q.   So he -- who appealed?  Was it Mr. --

21      A.   Yeah.  We appealed and I had to go and

22   speak with the SEIU attorneys for arbitration and

23   then they later on told me that I would in fact be

24   compensated for my time.



Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/19 Page 224 of 319 PageID #:1900
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 224 of 319 PageID #:1900
Kim Ammons 08/29/2017

 1     Q.   Earlier you said he appealed.  Who is he?

 2     A.   I'm assuming Tramaine Reeves appealed the

 3  decision.  They took it through arbitration.

 4     Q.   Okay.  I'll take 43 back from you.

 5          The next one I'm going to show you is

 6  Exhibit 44.  It's another grievance that was filed.

 7  Have you seen this document before?

 8     A.   Yes.

 9     Q.   And do you recall how you've seen it

10  before?

11     A.   The record -- from my union rep, Tramaine

12  Reeves, showed it to me.

13     Q.   Do you remember what this grievance was

14  about?

15     A.   The evaluation.  Trying to make me be

16  evaluated when I returned back to work.

17     Q.   That was back to Curie?

18     A.   Back to Curie.

19     Q.   Was this when you were off on your

20  disability?

21     A.   Yes.  I was out on disability.

22     Q.   Do I understand you correctly that you

23  were out, you came back, that's when the

24  administration at Curie wanted you to do a midyear

1    evaluation?

2         A.   He called me and -- I wasn't in the

3    building longer than 30 minutes.  He called me in

4    and told me to -- that he needed to evaluate me.

5    And that's when I asked him how could he evaluate

6    me.  He became angry and I -- I'm trying to think.

7    I filled out something like an assessment myself.

8    He disagreed with some of the things I had on the

9    assessment.  He kind of, like, tossed it back to me

10   and it hit the floor, and he told me I could leave

11   the office.

12        Q.   Did he tell you why he needed to evaluate

13   you when you got back, do a midyear evaluation?

14        A.   No, he didn't.

15        Q.   Did he say if anybody else was going to be

16   participating in the midyear evaluation?

17        A.   With us?

18        Q.   With you and Mr. Graves.  Was anybody

19   else --

20        A.   No.  It was just him and I.

21        Q.   And this grievance that was filed, do you

22   know what the outcome of it was?

23        A.   They denied --

24        Q.   Do you recall --



·1· · · ·A.· · -- doing any of this I guess.

·2· · · ·Q.· · Do you recall the reason why it was

·3· ·denied?

·4· · · ·A.· · No.· I don't recall.

·5· · · ·Q.· · After it was denied, was there any appeal

·6· ·made?

·7· · · ·A.· · I don't recall.· I don't remember.

·8· · · ·Q.· · Do you think Mr. Reeves might remember?

·9· · · ·A.· · I don't know.

10· · · ·Q.· · Would you have any objection to me

11· ·contacting him to find out?· I just -- I don't know

12· ·what happened.

13· · · ·A.· · I have no problem.

14· · · ·Q.· · Okay.· I'll take that back.

15· · · · · · ·One of the things I want to talk to you

16· ·about now is do you remember an incident when you

17· ·had a personal lock on your locker and it was cut

18· ·off?

19· · · ·A.· · Yes, I do.

20· · · ·Q.· · Do you remember when that happened?

21· · · ·A.· · I don't actually recall the date when it

22· ·happened.· I know it was after the retaliation of

23· ·filing charges I believe against Ms. Cottrell.· And

24· ·I was at work -- actually, I was working on the



1   three south end for duty and Mr. Morris came up and

2   asked me -- no, I walked over to my locker.  I went

3   to the locker first at the beginning of the day and

4   I noticed my -- because they had me downstairs at

5   another duty.  When I got to the floor, I headed to

6   my locker and the lock was gone and my name was

7   gone.  I opened it up, all my belongings were gone.

8   So I went to look for the counselor who issued out

9   the lock -- the locker.  She wasn't available.

10          So while sitting on my other post,

11  Mr. Morris came up to me and he said, Ms. Ammons,

12  have you spoken to Mr. Vargus?  I was like, no.  He

13  was like, yeah, yeah, he was looking for you

14  because your lock was cut off.  I'm like, okay.

15  What for?  I'm here.  I'm in the building.  Why

16  didn't he call me on the radio?  He said, I don't

17  even know.  I don't have a clue.

18          So about 30 minutes after him, or less,

19  Mr. Vargus surfaced, the dean.  He says,

20  Ms. Ammons, has Mr. Morris talked to you?  I was

21  like, yeah, he said that you needed to speak to me

22  and that my lock was cut off.  I asked him where

23  are my belongings because he's a dean.  He said,

24  you can go in my office, we have a lost and found,



1    to look for your belongings.

2            When I went down there, the only things

3    that were mine were slush boots that I wore when it

4    would snow.  I told him there were more things

5    missing.  He told me to speak with Cottrell -- Ms.

6    Cottrell.  I didn't see Ms. Cottrell until it was

7    almost time to go home and I asked her and she was

8    like, no, I didn't order no lock to be cut off.

9    She called Mr. Vargus over the radio.

10           So that went back and forth.  Nobody

11   ordered the lock to be cut off.  So the next day, I

12   drafted a letter and gave it to Mr. Perry, the

13   principal, about my belongings and everything and

14   he never got back to me about it.  I would see him,

15   he would go the other way.  So I contacted the

16   union, Mr. Reeves, and I guess he contacted them.

17   Then I got a letter -- I was called down to the

18   principal's conference room by Ms. Cottrell

19   herself.  When I walked in, she said, Ms. Ammons,

20   Mr. Perry is busy.  He can't speak with you, but he

21   told me to give you this.  And she gave me a sheet

22   of paper.  As I read it, he was saying in there

23   that he's the principal, he can do what he wants to

24   do, he took the lock, he cut it off himself -- he



1    ordered to have it cut off, and he wasn't giving me

2    anything back that I lost.

3        Q.    So what were your belongings in the

4    locker?

5        A.    Cell phone, iPod, my security jacket

6    mainly.  I believe some gym shoes.

7        Q.    Anything else?

8        A.    I don't recall.

9        Q.    And did you get any of that back?

10       A.    Nothing.

11       Q.    Did you file a police report when your

12   property disappeared like that?

13       A.    To be honest, no, I didn't.  I didn't

14   think I could.  I recall myself following the

15   proper protocol by talking to the union rep.

16           After that, the guy that's the boss of the

17   principal -- so after that, I was moved to the

18   B building in the corner by the girls' washroom.

19   That was my new duty post that day, to go back

20   there.  It just so happened the head guy of the

21   network walked past with the gym teacher.  I asked

22   him if I -- I asked the gym teacher -- I heard of

23   the guy's name, Principal Perry's boss's name and I

24   heard the gym teacher say his name.  I wasn't



1    certain, so I asked the gym teacher if he could

2    tell me the name of the guy with him.  He told me

3    it was the principal's boss.

4          So the guy turned around and he looked and

5    I said, if you don't mind when you finish, can I

6    speak with you?  He was like sure, sure.  He came

7    back.  It was time for me to go to the other

8    building.  So I told him where I would be, three

9    west.  I wasn't certain that he would come over

10   there, but he did, he showed up.

11         He asked me what happened.  I told him

12   about the locker and all of the harassment.  He

13   told me that he has heard and gotten several

14   e-mails about the unprofessionalism and the

15   harassment.  He asked if anybody else's lock was

16   cut.  I told him no.  He was like, wow, I need you

17   to e-mail me all of what we talked about, and I

18   did.

19         I get emotional talking about all this

20   crap.

21      Q.   We can take a break if you want.

22      A.   No.  I'm fine.  Let's go.

23         So after that, he started coming in the

24   building and then they were -- different people



1    were complaining and he -- it started hearsay that

2    they were going to remove these people and all

3    that, and the school year ended.

4           So I would change, as a matter of fact --

5    I didn't have a locker, so I would change in my

6    car.

7           So the school year ended and I heard --

8    Mr. Perez kept calling me trying to get me to come

9    to Curie to work in the summer with the new

10   principal for whatever reason.  I hadn't worked

11   summer in over ten years.  He was persistent on me

12   to come to work.  I told him I couldn't.  I was

13   doing other things.  So that's when I got

14   Tingwall -- she told me I feel like I know who you

15   are already.

16       Q.   So you said when the lock was cut off, you

17   were looking for the counselor?

18       A.   Yes.

19       Q.   Do you remember that person's name?

20       A.   Perkins.  Joy Perkins.  She was standing

21   with Ms. Cottrell.

22       Q.   Okay.  When all this was going on with the

23   lock, do you remember were you on FMLA at this

24   time?



1        A.   What do you mean?

2        Q.   The Family Medical Leave Act.  I know --

3        A.   When they cut the lock?

4        Q.   Yeah.

5        A.   No.  I was there.  They cut the lock, I

6   was in -- they must have did it the day before I

7   returned.

8        Q.   I know you were at school, but were you on

9   family medical leave related to your disability

10   when the lock was cut?

11        A.   I don't recall.  No.  I don't recall.  I

12   just recall being at work and the lock was cut and

13   I had said to them, why didn't you guys call me

14   over the radio if you needed the locker?  And

15   nobody had an answer to that.  They just said -- I

16   believe Mr. Vargus said they didn't tell him whose

17   locker it was.

18        Then Mr. Perry -- I believe Mr. Perry told

19   him to cut it.  And Mr. Perry's letter was that he

20   can do that and I guess he had told all security

21   that he needed the lockers at that time, in which

22   that was never true.

23        Q.   I believe you testified earlier that you

24   believe the lock was cut because of the charges you



1    had made --

2        A.   Definitely.

3        Q.   -- with the Department of Human Rights?

4        A.   Definitely.

5        Q.   Any other reasons?

6        A.   With Mr. Perry, I assumed because I was a

7    lesbian.  I was getting harassment from him.

8        Q.   Did Mr. Perry know you were a lesbian?

9        A.   No.  It had to be assumptions from --

10   Mr. Pratt told me that's why I wasn't getting any

11   favors was because of that.  So Mr. Perry never

12   knew anything about my lifestyle.

13       Q.   You said Mr. Perry was harassing you

14   because you were a lesbian.  What sort of

15   harassment would he be doing?

16       A.   Denying me of opportunities such as

17   programs -- a program I tried to start there with

18   some of the worst students.  Same program I did

19   over at Fenger High School.  It was to kind of

20   change these students.  These kids were averaging

21   at least five F's.  The program -- it would be the

22   only program where kids that didn't have good

23   grades could participate, but it was to encourage

24   them, to give them something positive to do, but



1    they had to bring their grades up and they had to

2    attend a tutoring program that I was a part of.

3    For a long time, he let me have the program.

4        Q.   You said it was a tutoring program?

5        A.   Yeah -- no.  It's called Hip Hop Away From

6    Violence.  The kids were able to come in and

7    showcase some of their talents as far as poetry,

8    things of that nature.

9        Q.   You said you did something similar at

10   Fenger?

11       A.   Yeah.  I ran the program.  It was actually

12   alternative.  That was the last thing a kid could

13   be a part of before they kicked them out.  So I

14   turned around some I had 60 young men.  It was for

15   men.  It was for the young men, boys.  I had 60

16   boys.  I took them to Cook County jail on a scared

17   straight program.

18       Q.   Do you remember when you did that?

19       A.   That was like in 2002, '03.

20       MR. HILDEBRAND:  Off the record.

21                    (Discussion off the record.)

22   BY MR. HILDEBRAND:

23       Q.   I want to show you what I've marked

24   previously as Exhibit 45.  I know you were talking



1    about -- first off, before I ask the question, have
2    you seen 45 before?
3        A.   Yeah.  Yes.  This was from Mr. Perry I
4    believe.
5        Q.   Is that the letter you were talking about
6    a couple minutes earlier?
7        A.   I believe so.
8        Q.   Do you see where it says, now comes
9    Principal Phillip C. Perry, towards the middle
10   of --
11       A.   Yes.
12       Q.   And it says number one, quoting, school
13   lockers are the property of the Chicago Public
14   Schools system, not the property of any employee,
15   student, or any other private individual.  Have you
16   ever been told that about those lockers being the
17   property of the school?
18       A.   No.
19       Q.   Are you given the student handbook when
20   you start a school year?
21       A.   No.
22       Q.   Have you ever seen a copy of the student
23   handbook?
24       A.   I don't recall.



1    Q.   Do you happen to know back in 2014 if the

2    student handbook said anything about locker usage?

3    A.   No.

4    Q.   The next one, two, says, quote, notices to

5    remove locks affixed to board property were

6    visually displayed on lockers customarily used by

7    Curie employees explicitly informing said employees

8    that the locks would be removed, and then a

9    parenthetical, cut, if not voluntarily removed.  Do

10   you recall any notices being put up about locks on

11   lockers?

12   A.   No.  We were told -- security was told

13   that, from security supervisors as well as the

14   counselors, as long as we put our names up there,

15   then they wouldn't touch them.  I was given tape

16   and paper, sticky note, from the counselor Coronado

17   to put my name up there.

18   Q.   On the locker?

19   A.   On the locker.  Right.  Tape it up there

20   on the locker.

21   Q.   You see at the top it says September 19th,

22   2014, is this about the time period the lock was

23   cut off in 2014?

24   A.   I don't recall that.  No.  I don't recall



1   the date.

2        Q.   Let's say not the exact date.  Do you

3   remember where it was within the school period?

4   Towards the start of the school period, the middle

5   of the year, end of the school period?

6        A.   It was around this date because I was

7   changing at my car and it wasn't cold, cold yet.

8   So ...

9        Q.   Okay.  I'm just -- when the school year

10  started and you got this locker from the counselor,

11  was that Ms. Perkins who gave you the locker?

12       A.   No.  When school started, I received a

13  lock -- you get a locker -- I got a lock in 2004.

14  I only moved my locker from the first floor because

15  I was moved.  Wherever I was moved, if I was there

16  for a period of time, then I would get another

17  locker from the counselor.

18            When I left the first floor in 2004 I

19  believe or '05, I was always either second floor or

20  third floor.  I went to the second floor and had a

21  lock -- locker.  So you never have to change.

22  That's always your locker.  Then when I went to the

23  third floor, I had that locker for about five, six,

24  seven years.



1    Q.   When you first got your locker assigned

2    when you first started, did anybody keep a written

3    record of that, where security officers had their

4    lockers?

5    A.   The counselor is the one responsible for

6    the locker number so they wouldn't issue it to a

7    student.

8    Q.   Then in 2004, were you labelling the

9    locker with a piece of tape and paper like you said

10   so that people knew that was your locker?

11   A.   Yeah.  I'd just say security.

12   Q.   Okay.  What about when you changed lockers

13   when you moved to the third floor?

14   A.   Always.  Always.  Because at the end of

15   the year, the football team and the coaches, the

16   kids go around and cut the lock off.  We're usually

17   in the building when this takes place when they're

18   cutting the locks and that's why it was kind of

19   strange that this time of year you're cutting a

20   lock off.  They would do this at the end of the

21   school year in June.

22   Q.   My question, when you moved from the first

23   or the third floor, did you let anybody know you

24   were changing lockers?



Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/18 Page 239 of 319 PageID #:1945
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 239 of 319 PageID #:1945
Kim Ammons  08/29/2017

1      A.   On the first floor?

2      Q.   From the first floor to the second floor

3  to a different locker.

4      A.   No.  I didn't let the first floor know.  I

5  went to the third floor and asked for a locker.

6  The first floor, I assumed the counselor would see

7  which lockers they had available for the students

8  and then they would issue them out to the students.

9          When I went to the third floor, I have to

10  check -- you have to check with the counselor to

11  make sure you're not taking a locker from a

12  student.  So they'll tell you which number is

13  available.  That was the choice of locker that he

14  gave me and I let him know I'm in locker such and

15  such.  I had that locker for six, seven years.

16      Q.   Do you know -- so when you changed lockers

17  to the third floor and you talked to the counselor,

18  was it a man or a woman?

19      A.   A man.  Coronado, David Coronado.

20      Q.   Do you know if Mr. Coronado took any --

21  wrote any record down of when lockers were assigned

22  to particular security officers?

23      A.   No, I don't know.  I don't know that.

24      Q.   I guess my concern with the whole tape and



1    paper thing is you're in a high school with a bunch

2    of teenage boys running around.  Couldn't they just

3    rip that off a locker if they felt like it?

4        A.   They never did.  I had entertained that,

5    but no, they didn't.  All the years, six, seven

6    years, the name stayed on the locker.  After all of

7    the complaining and the retaliation, all of a

8    sudden my name is gone, the lock is gone, my things

9    are gone.  Who did it?

10       Q.   I apologize to teenage boys, but being a

11   teenage boy myself, I know what you do.

12            I can't remember if I asked you this or

13   not.  Did you -- was there ever a grievance filed

14   over the lock incident?

15       A.   I definitely called the union about it and

16   I believe I was told that that was not in the

17   bargaining, that I would have to go to EEOC or the

18   police to file a charge.

19       Q.   Just to be clear, after being told that,

20   you didn't file a police report after your stuff

21   was taken?

22       A.   No, I didn't.

23       Q.   Did you file anything with EEOC?

24       A.   I believe I mentioned this at the EEOC.



1    Yes.

2         Q.   Okay.  I'll take that back from you.

3              You were talking --

4         A.   I think it was an amendment or something

5    like that.

6         Q.   I know you were talking about the charges

7    and your attorney and I are going to do some

8    housekeeping to kind of make the charges a little

9    bit easier in your complaint.  I have it right

10   here.

11             Paragraph 47, it says on or about

12   March 27th, 2014, the plaintiff filed a charge with

13   IDHR that alleges she was harassed due to her age

14   and in retaliation for filing the charge,

15   discrimination in 2012 --

16        MS. HALL-JACKSON:  Which exhibit?

17        MR. HILDEBRAND:  It's Exhibit 51.

18             And then Exhibit 48, which is a document

19   from the Illinois Department of Human Rights,

20   investigation report, it has a list on the second

21   page of the history of Ms. Ammons' charges.  It

22   indicates that the March 27th, 2014 charge was

23   charge number 2014 CA 2496.  Are you okay to

24   stipulating that's the charge number and the date



1    just for record keeping purposes.

2        MS. HALL-JACKSON:  So stipulated, but that CF,

3    it sounds like you pronounced it CA.

4        MR. HILDEBRAND:  Okay.

5        MS. HALL-JACKSON:  No problem.

6        MR. HILDEBRAND:  For March 27th, 2014 the

7    charge was 2014 CA 2496.

8        MS. HALL-JACKSON:  You said A again.

9        MR. HILDEBRAND:  Is it F?

10       MS. HALL-JACKSON:  That's what I have.

11       MR. HILDEBRAND:  Is it F on yours?

12       MS. HALL-JACKSON:  Mm-hmm.

13       MR. HILDEBRAND:  That's for the June 18th,

14   2014.

15       MS. HALL-JACKSON:  You're on Exhibit 48, second

16   page?

17       MR. HILDEBRAND:  Second page.

18       MS. HALL-JACKSON:  And it goes, on contested

19   facts one, two, three, four?

20       MR. HILDEBRAND:  Sorry.  I'm looking at the

21   third paragraph.  There's a typo then on -- it

22   looks like they made a typo.  It's charge 2496.

23       MS. HALL-JACKSON:  2496.  So stipulated.

24       MR. HILDEBRAND:  Okay.  And then the complaint,



1   paragraph 48 says, on or about June 18th, 2014,

2   plaintiff filed a charge with IDHR that alleged she

3   was denied overtime due to her age.  And then it's

4   Exhibit 51.  And then Exhibit 48 indicates that

5   the -- Page 2 again, June 18th, 2014, the charge

6   was 2014 CF 3295.

7        MS. HALL-JACKSON:  So stipulated.

8        MR. HILDEBRAND:  That makes it much easier.

9   BY MR. HILDEBRAND:

10       Q.   I'm doing that to make it easier for us to

11  figure out the charges.

12            The first charge, it was for March 27th,

13  2014.  It was filed -- do you recall what that

14  charge was about?

15       A.   March 2014?

16       Q.   Yes.

17       A.   I don't recall the date.  It was probably

18  some overtime I believe.  I applied for some

19  overtime and it was denied and it was given to -- I

20  believe it was for night school and it was given to

21  someone with less seniority than myself.

22       Q.   Let me show you what I have marked as

23  Exhibit 51.  I'll let you take a look at that.

24  Exhibit 51 is a copy of the complaint from your



1    lawsuit.  Have you seen this document before?

2        MS. HALL-JACKSON:  The front page.

3    BY MR. HILDEBRAND:

4        Q.   Here.

5        A.   Front page.  Yes.

6        Q.   Just flip to the last page for me, the

7    verification certification.  Is that your signature

8    on the document?

9        A.   Yes, it is.

10       Q.   I want to direct you to the fifth page of

11   Exhibit 51 to paragraph 47 where it talks about the

12   March 27, 2014 charge and says, "Plaintiff filed a

13   charge with IDHR that alleged she was harassed due

14   to her age and retaliation for filing a charge of

15   discrimination in 2002."  Does that kind of help

16   refresh your recollection as to what the charge was

17   about?

18       A.   No, I can't recall.

19       Q.   You do remember filing the charge though?

20       A.   Yes, definitely.

21       Q.   When you filed that charge, do you know if

22   anybody at Curie school knew about it?

23       A.   Principal, assistant principal, person

24   that I filed the charge against.



1      Q.   And who would that have been?

2      A.   2014 March, probably Laura Cottrell.

3      Q.   I'm sorry.  There was a siren outside.

4      A.   Ms. Cottrell, Assistant Principal

5  Cottrell.

6      Q.   Any recollection why you filed the charge

7  against her?

8      A.   Vaguely.  I believe it was due to her

9  giving overtime duty to someone with less seniority

10 than myself.

11     Q.   Do you recall the name of that person?

12     A.   Ceaser Perez.  He was the one promoted to

13 supervisor.

14     Q.   Was that the position you had applied for?

15     A.   Yes.

16     Q.   Do you know if anybody else knew about

17 this March 2014 charge to the IDHR?

18     A.   No.  I don't recall.

19     Q.   Do you recall who else you might have

20 named besides Ms. Cottrell?

21     A.   No, I can't recall who else other than

22 that.

23     Q.   You filed this charge.  Did anything

24 happen to you at Curie after you filed this charge?



1    A.    Yeah.  I believe I was moved -- my duty

2    post was moved.  I don't recall anything else.

3    Q.    Just the move of the duty post?  How was

4    it moved?

5    A.    I was sent down to cover the northwest

6    doors.  Yeah.  I was sent down to cover the

7    northwest doors.  And when I was down there,

8    another security officer would come over and allow

9    me to go to the washroom.  And I recall an incident

10   where Ms. Cottrell came and told him -- David Reyes

11   that he would be written up if he got caught

12   talking to me on my post again.

13   Q.    How did you find out that she had told

14   Mr. Reyes he would be written up?

15   A.    Because when I asked him to cover any

16   other time after that, he told me that he couldn't

17   and I noticed Ms. Cottrell would come and

18   periodically pop around the corner to see if he was

19   down there on my end.  So it had got so bad to

20   where I would have to ask the janitor to cover the

21   door because, you know, everyone else was afraid to

22   cover it.

23   Q.    I want to go back to Exhibit 7.  Could you

24   mark on the school layout where the northwest doors



1   are?

2          Sorry.  My pen is dead.

3      A.   Pulaski.  Northwest would be the Pulaski

4   door.  Right outside the child development school.

5   Right there.

6      Q.   What I'll do, where it's marked with the X

7   on this, I'll mark that with a two and label

8   that --

9      A.   In front of the camera.  Northwest end.

10     Q.   Northwest doors.

11     MR. HILDEBRAND:  Chiquita, before I give this

12  to the court reporter, I'll make a copy for both of

13  us so we can have it.

14     MS. HALL-JACKSON:  Perfect.

15  BY MR. HILDEBRAND:

16     Q.   Do you remember what the outcome of this

17  charge was?

18     A.   I don't know what the outcome was, but I

19  know that Ms. Cottrell was let go around May,

20  April, May.

21     Q.   Of 2014?

22     A.   No.  2015.  No.  She was let go --

23  Tingwall -- Cottrell was let go before June 2015.

24  She was let go around April, May.



1    Q.   Okay.  Let me show you a document I marked

2    previously as Exhibit 46.  Have you seen Exhibit 46

3    previously?

4    A.   Yes.  I believe.

5    Q.   How have you seen that before?

6    A.   This is when I believe I had to close to

7    go to EOC -- the EOC to get a Right to Sue letter.

8    Q.   The document in front of you is an order

9    of closure from the Department of Human Rights and

10   it relates to charge 2496, which was the March 2014

11   charge.  It says, quote, complainant, meaning you,

12   having submitted a written request to withdraw the

13   charge pursuant to the department rules and

14   regulations, now therefore, it is hereby ordered

15   that complainant's request to withdraw is approved

16   and that complainant's charge be the same is

17   closed.

18           So it's basically saying that you withdrew

19   the charge.  Do you recall why you withdrew the

20   charge?

21   A.   More than likely I recall withdrawing a

22   charge to request a Right to Sue letter from EEOC.

23   You had to close to the Illinois Department of

24   Human Rights first.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 249 of 319 PageID #:1925
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/19 Page 249 of 319 PageID #:1925
Kim Ammons 08/29/2017

1    Q.   Anything else?

2    A.   No.

3    Q.   And then the next charge was on June 18th,

4  2014.  That was charge number 3295.  Do you

5  remember anything about that one?

6    A.   2014?

7    Q.   June 18, 2014?

8    A.   I don't remember.

9    Q.   I'll direct you to Page 5 of Exhibit 51

10  again, paragraph 48 where it says -- do you see it?

11  On or about June 18, 2014, the plaintiff filed a

12  charge with IDHR that alleged that she was denied

13  overtime due to her age.

14    A.   Let me see.

15    Q.   Page 5.

16    A.   Page 5.

17    Q.   There you go.  Paragraph 48, right at the

18  center of the page.  I'll reread it.  On or about

19  June 18, 2014, the plaintiff filed a charge with

20  IDHR that alleged that she was denied overtime due

21  to her age.

22    A.   Yeah.  That's the time about the night

23  school with Perez getting the position.

24    Q.   And do you know with this charge, the June



Case: 1:16-cv-04884 Document #: 187 Filed: 03/15/19 Page 250 of 319 PageID #:1926
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 250 of 319 PageID #:2627
Kim Ammons 08/29/2017

1    2014 charge, if anyone at Curie knew about you

2    filing it?

3        A.   No, they didn't know.

4        Q.   They did not know?

5        A.   Not any of my peers or administrators.

6    More than likely the administrators.

7        Q.   So just to help me clarify, your peers

8    didn't know?

9        A.   No.

10       Q.   What about the administrator's?  Do you

11   have ...

12       A.   I assume they were maybe served these

13   papers.

14       Q.   Do you remember with this June charge who

15   you named in the complaint?

16       A.   More than likely it was Laura Cottrell,

17   assistant principal, because she was the one

18   responsible for giving out security duties.

19       Q.   Would you have been in school in June --

20   mid June, June 18th, this time of year when you

21   filed the charge or would school have been let out

22   by then?

23       A.   I don't believe we got out the 18th.  I

24   really don't recall the dates.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 251 of 319 PageID #:1987
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 251 of 319 PageID #:1927
Kim Ammons - 08/29/2017

1    Q.   I can always look that up.  That's no

2  problem.

3         Do you know what happened with this

4  charge?

5    A.   No.  I don't know what happened to the

6  charge.

7    Q.   I'll show you what I marked as Exhibit 47.

8  And Exhibit 47, have you seen that before?

9    A.   More than likely this was the same thing

10  with asking to close out the Illinois Department of

11  Human Rights.

12    Q.   It's an order of closure on charge 3295,

13  which is for the June 2014 charge and it says that

14  you had submitted a written request to withdraw the

15  charge and they're granting the request.  Do you

16  remember why you withdrew the request?

17    A.   To get a Right to Sue letter.

18    Q.   I'll take back 47 from you.

19         So your next charge, it was -- do you

20  recall one on September 25th, 2014, and this was

21  charge 0758 regarding a failure to promote, that's

22  a senior position, for security officers?

23    A.   Yes.

24    Q.   And we've talked a little bit about that



Case: 1:16-cv-04894 Document #: 187 Filed: 03/15/18 Page 252 of 319 PageID #:1928
Case: 1:16-cv-04894 Document #: 95-1 Filed: 03/15/18 Page 252 of 319 PageID #:2673
Kim Ammons 08/29/2017

1    one.  Let me -- I just want to show you what I've

2    marked as Exhibit 48 just to see if you've seen the

3    document.

4         A.   Never seen this document, but I was aware

5    of that date.

6         Q.   You haven't seen the document in front of

7    you?

8         A.   No.

9         Q.   I'll see if I want to ask you anything

10   from it in just a second.

11              With that position, when they advertised

12   it, do you remember if there was a deadline that

13   you had to apply to by a certain date?

14        A.   No.

15        Q.   Don't remember any e-mail to that effect?

16        A.   I don't recall the date.  But when I seen

17   it, that's when I applied.

18        Q.   Do you remember when that was?

19        A.   School was out.  Maybe July.  June, July,

20   somewhere around there.  We were out for summer

21   break.  But my understanding, the guys who were

22   promoted were in the acting -- they were acting as

23   supervisors in the summertime.

24        Q.   So I understand you, your complaint on



1· · that was you believe you weren't selected because

2· · of your sexual orientation and your age?

3· · · · A.· ·Right.

4· · · · Q.· ·Was there any other reason?

5· · · · A.· ·Filing charges, retaliation, and

6· · complaining to the union.

7· · · · Q.· ·This charge was filed in September --

8· · December 25th, 2014.· Do you happen to know if

9· · anyone in the administration knew about the charge

10· being filed?

11· · · · A.· ·Definitely.· Cottrell -- Ms. Cottrell and

12· Mike Morris.

13· · · · Q.· ·Anyone else?

14· · · · A.· ·I don't know.

15· · · · Q.· ·I know you said with the -- one of the

16· charges, I believe it was the June one, that you

17· had to talk to your peers about it.· Did you talk

18· to any of your peers about this charge in September

19· of 2014 regarding the supervisor position?

20· · · · A.· ·Not a charge.· I talked to a couple of my

21· peers about the position, the overtime.

22· · · · Q.· ·Do you remember who you talked to?

23· · · · A.· ·I believe I spoke with Pennington and

24· Ms. Smith.



1      Q.   That's Alice Pennington?

2      A.   Yes.  Alice Pennington, Sonnada Smith, and

3  Dave Reyes.

4      Q.   And that was just about the position?

5      A.   Yeah.  About the position, how many

6  positions were available, and that I wanted to

7  work.

8      Q.   Do you recall -- I'm talking specifically

9  about this charge now.  Talking to them about this

10  charge --

11      A.   I never talked to my peers about a charge.

12      Q.   Even with the March 20, 2014 charge?  Did

13  you ever talk to peers about them?

14      A.   About charges?

15      Q.   The March 24 -- the March 27, 2014 charge,

16  did you ever tell your peers about that?

17      A.   I don't recall that.

18      Q.   What about the administrators?  Did you

19  ever tell them, hey, I just filed a charge against

20  you?

21      A.   Never.

22      Q.   None of them?

23      A.   None of them.

24      Q.   Okay.  I'm done with 48.  I'll take that

1    back from you.

2           You have in front of you Exhibit 51, your

3    complaint.  Why don't you look at paragraph 49?

4    It's on Page 5.  It says, quote, her hostile work

5    environment included being harassed daily by the

6    school's principal.  Which principal was that?

7        A.    Laura Cottrell.

8        Q.    Any other principals in the building?

9        A.    Daily?  No, it was Laura Cottrell.

10       Q.    What sort of harassment did you see from

11   Ms. Cottrell?

12       A.    Moving -- changing my schedule daily,

13   coming in and out of my duty post.  I had an

14   incident where she -- after I had complained to the

15   principal and gave him something about her, she

16   came and followed me, demanding that I give her a

17   copy.  Why you didn't give me one?  Why you didn't

18   give me one?  You talked about me.  Why you didn't

19   give me one?  All kind of stuff.  That's about it.

20       Q.    It then says, "She was required to submit

21   various medical statements to permit her to return

22   to work with accommodations."  Was that in 2014 at

23   all?

24       A.    I don't recall the date.



Case: 1:16-cv-04004 Document #: 187-1 Filed: 03/15/18 Page 256 of 319 PageID #:1932
Case: 1:16-cv-04004 Document #: 93-1 Filed: 03/15/18 Page 256 of 319 PageID #:693
Kim Ammons 08/29/2017

1    Q.    Do you remember submitting medical

2  documentation in mid 2015 and late 2015 for ADA

3  purposes?

4    A.    Yeah.  That was with Ms. Bryant, the

5  assistant principal.  Bryant.  The doctor

6  statement.

7    Q.    Paragraph goes on that the school

8  principal refused her reasonable accommodations.

9  Do you see that?

10    A.    Mm-hmm.

11    Q.    Is that a yes?

12    A.    You said the school principal refused ...

13    Q.    Her reasonable accommodations.

14    A.    Yes.

15    Q.    Which principal was that?

16    A.    That was -- 2014?  No.  Refused my

17  accommodation was Tingwall.

18    Q.    And then it goes on, "As a result,

19  Principal Tingwall then drafted a separate job

20  description that outlined extra job duties for the

21  plaintiff."  Is that accurate?

22    A.    Yes.

23    Q.    Because you testified earlier that was

24  Mr. Graves that did that?



1      A.   Yes.  But he says Tingwall told him

2  basically that I lied about my accommodation.

3      Q.   So did Principal Tingwall or Mr. Graves

4  draft the separate job description?

5      A.   I don't know who draft it.  Mr. Graves is

6  the one who came to my post and removed the chair

7  and told me this is what I would have to do in the

8  locker room.

9      Q.   Towards the end of the paragraph, it also

10  says, "There were also several threats to get her

11  fired on several occasions."  Do you see that?

12      A.   No, I don't see that.

13      Q.   Here.  There.  Right here.

14      A.   Okay.

15      Q.   You see that now?

16      A.   Yes.

17      Q.   Do you recall who made the threats?

18      A.   Tingwall in her office when she asked

19  Ms. Pennington and Mr. Perez to leave the office.

20      Q.   And when was that?

21      A.   That was in November.  I don't know the

22  exact date.

23      Q.   Do you remember the year?

24      A.   2016.



Case: 1:16-cv-04884 Document #: 187 Filed: 03/15/19 Page 258 of 319 PageID #:1984
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 258 of 319 PageID #:1984
Kim Ammons 08/29/2017

1    Q.   And was there anybody else present besides

2   Tingwall?

3    A.   No.

4    Q.   Did Tingwall have any other threats

5   against you?

6    A.   Not that I can recall.

7    Q.   Okay.  I'll take that back from you.

8        We were just talking about the last charge

9   involving what would have been the supervisor

10  position.  Do you remember the outcome of that one?

11  Did the Illinois Department of Human Rights

12  determine that the decision not to interview you

13  and offer you a position was wrong?

14   A.   No.  I believe that's when I

15  withdrawed [sic] to just go to EEOC for a Right to

16  Sue.

17   Q.   Let me direct your attention back to

18  Exhibit 48.  This is the copy of the decision

19  regarding your charge 7 58 and that was the

20  complaint you made.  See where it says findings and

21  conclusions?

22   A.   Mm-hmm.

23   Q.   Finding of a lack of substantial evidence

24  is recommended because the department's



1  investigation did not reveal that complainant was

2  harassed due to her age, 49, sexual orientation,

3  homosexual ...

4       MR. HILDEBRAND:  Off the record.

5                      (Discussion off the record.)

6  BY MR. HILDEBRAND:

7       Q.   Or in retaliation for filing previous

8  discrimination charges.  End quote.  Does that

9  sound right that they dismissed the charges against

10 the board?

11      A.   I don't recall.

12      Q.   I'll take that.

13      MR. HILDEBRAND:  We can go off the record.

14                      (Discussion off the record.)

15      MR. HILDEBRAND:  Back on.  It's 5:53.

16 BY MR. HILDEBRAND:

17      Q.   Last charge I want to talk with you about,

18 it was -- it was charge 2939.  That was filed

19 May 4th, 2015.  Do you remember anything about that

20 one?

21      A.   May 4th, 2015?

22      Q.   Yeah.

23      A.   I don't recall.

24      Q.   It dealt with your present disability.

 1    Let me give you what's shown as Exhibit 49.  I

 2    don't know if you've seen this document before.

 3    Have you?

 4        A.   No, I haven't.

 5        Q.   I want you to turn to the second page of

 6    the document.  You see where it says, towards the

 7    center, complainant's allegations counts A to D?

 8        A.   A to D?  Counts A to D down there?

 9        Q.   Right here.  Where my thumb is.

10        A.   Oh, yeah.

11        Q.   It says, "Complainant, a current senior

12    security officer, alleges that from April 16, 2015,

13    to May 4, 2015 she was subjected to harassment

14    because of her disabilities, feet disorder, right

15    knee disorder, back disorder, sciatica, and

16    hypertension.  Is that an accurate description?

17        A.   Yes.

18        Q.   The one I think I had a question about was

19    the hypertension.  I know you've given me medical

20    evidence regarding the feet disorder, your back,

21    and I think it was the knee.  Do you remember when

22    you were first diagnosed with hypertension?

23        A.   During the Fenger harassment.

24        Q.   Do you remember when that was?



1      A.   I believe 2002.

2      Q.   That's what you were taking the meds for?

3      A.   Yes.

4      Q.   How is your hypertension today?

5      A.   It's controlled.

6      Q.   When you -- when it first came on, this

7  was back in 2002, were you seeing Dr. Klor-Gross at

8  that time?

9      A.   Yes.

10     Q.   And do you know, did she put you on

11 medication at that time for the hypertension?

12     A.   I believe so.  Due to stress and all of

13 that.

14     Q.   Let me show you what I marked as Exhibit

15 50 real fast.  I just want to verify something on

16 that.  This is one of the -- one of

17 Dr. Klor-Gross's medical records that she provided

18 us.  Do you see towards the very top where it says

19 patient history?  Medical --

20     A.   Yes.

21     Q.   -- as of 4-16-2005.  And three, it says as

22 of April 16, 2015 you were diagnosed with

23 hypertension, was that accurate?

24     A.   Yes.



1     Q.   Did you know -- you were on medication for
2   hypertension.  Did anybody ever see you at CPS take
3   your medication for hypertension?
4     A.   I don't understand what you're saying.
5     Q.   Were you taking -- you're on meds for
6   hypertension?
7     A.   Right.
8     Q.   Were you taking the meds at the school
9   when you were on the job?
10    A.   Yeah, I would.  I would take it after I
11  maybe eat something, about 7:00 something.
12    Q.   Do you ever recall anybody asking you what
13  were you taking?
14    A.   No.
15    Q.   Did you ever tell any of your peers at the
16  school, I'm taking hypertension meds?
17    A.   No.  Not until my medication came up
18  missing out of my -- well, the desk became missing
19  and then I noticed the medicine was gone.  I told
20  Michael Hanes, the janitor and Ms. Cottrell, who
21  was in there.
22    Q.   When was that?
23    A.   I don't recall the dates.
24    Q.   You said at one point Ms. Cottrell left

1    the school, is that right?

2        A.   Yeah.  She was -- just out of nowhere.

3    She was telling everybody that she was leaving to

4    take a job out of state.

5        Q.   When Principal Tingwall came in, did you

6    ever make a comment to her about you were on

7    hypertension medication?

8        A.   No.

9        Q.   What about your other supervisors like

10   Mr. Morris or Mr. Graves?

11       A.   No.

12       Q.   Do you ever remember making a request to

13   the board for a reasonable accommodation on account

14   of your hypertension?

15       A.   No.

16       Q.   Okay.  I'll take that one -- I'll take 50

17   back from you.  Do you remember what happened with

18   the outcome of this charge, charge 2939?

19       A.   I don't understand what you're saying.

20       Q.   The charge involving your disability claim

21   that you filed with the IDHR, charge 2939.  Do you

22   know what happened at the end of it?

23       A.   No.  No, I don't recall.  All I know is I

24   filed with EEOC, so I have a right to sue.



1    Q.   I don't know why I'm asking you when I

2    have it right here.  Exhibit 52.  Have you seen

3    both pages of this exhibit before?

4    A.   Yes.

5    Q.   Do you recall when you --

6    A.   When --

7    Q.   When you saw it.

8    A.   No.

9    Q.   The only question I really had on it was,

10   do you see on the very first page, quote, my

11   current position is senior security officer?

12   A.   First page?

13   Q.   Yeah.  It's toward the middle of the page.

14   Right here.  Where it says my current position is

15   senior security officer.

16   A.   Yes.

17   Q.   Do you remember when you became a senior

18   security officer?

19   A.   Seems after I had started filing charges

20   and complaining and they started changing titles.

21   I just heard it.  No one gave me any paperwork

22   saying that I was a senior security officer.

23   Q.   I'll take 52 back from you.  I'll take 49

24   back from you as well.

Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 265 of 319 PageID #:1941
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 265 of 319 PageID #:947
Kim Ammons 08/29/2017

1          Are you aware of the board's

2   nondiscrimination policies?

3      A.   No, I'm not.

4      Q.   Let me show you a couple exhibits.  The

5   first one I want to show you is Exhibit 8.  See if

6   you've seen that before.

7      A.   I think I've seen this from the EOCO

8   website.

9      Q.   So you do know that the board has a policy

10  making it illegal to discriminate against people on

11  account of race, religion, national origin?

12     A.   Yes.

13     Q.   And that this includes retaliation in the

14  workplace?

15     A.   Right.

16     Q.   Okay.  I'll take that back from you.

17          I want to show you what I marked as

18  Exhibit 9.  See if you've seen that one before.

19     A.   Yes.  Yes.  I've seen this before.

20     Q.   It's a policy including -- it includes

21  gender identity and expression as a part of the

22  nondiscrimination policy.  Do you remember where

23  you've seen this one before?

24     A.   On the EOCO website.



Case: 1:16-cv-04804 Document #: 187 Filed: 03/15/19 Page 266 of 319 PageID #:1942
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 266 of 319 PageID #:3473
Kim Ammons· 08/29/2017

·1· · · · Q.· ·And you'd have access to the website as a

·2· ·board employee?

·3· · · · A.· ·Yes.

·4· · · · Q.· ·I want to show you what I marked as

·5· ·Exhibit 10 regarding Family Medical Leave Act.

·6· ·Have you ever seen this one before?

·7· · · · A.· ·I don't believe so.

·8· · · · Q.· ·Were you aware that -- strike that.

·9· · · · · · ·I'll take that back.

10· · · · · · ·You mentioned Officer Marco earlier.· You

11· ·don't remember his last name?

12· · · · A.· ·Marco Camarillo I want to say.

13· · · · Q.· ·Cam ...

14· · · · A.· ·I believe it's C-A-M-A-R-I-L-L-O.· I

15· ·always thought that was his first name.

16· · · · Q.· ·I forgot how you described him.· He was --

17· ·how did you describe him earlier?

18· · · · A.· ·Ex Curie student.· Yeah.· He was an ex

19· ·Curie student.

20· · · · Q.· ·Do you remember anything about the time

21· ·when he graduated or anything?· I'm trying to

22· ·narrow down the timeframe so I can find him.

23· · · · A.· ·No.· I don't recall.· He looked familiar.

24· ·He looked like he was there when I was there I



1    believe.

2        Q.   So when you left -- what's your current

3    status now in terms of CPS?

4        A.   I resigned.  I was -- felt like I was

5    pushed out.

6        Q.   Do you remember what date that was?

7        A.   February something.

8        Q.   Do you remember the year?

9        A.   2017.

10       Q.   I know in your interrogatories you

11   indicated that you had put your resume on Indeed

12   around 2015, 2016.  Did you get any job offers

13   after posting your resume?

14       A.   Job offers from Indeed?

15       Q.   Did anybody contact you after posting your

16   resume and extend an offer to interview?

17       A.   I'm not quite getting what you're saying?

18   Have I been -- was I looking for work when I was

19   off?

20       Q.   Yes.

21       A.   Oh, yeah.  I've always looked for work.  I

22   have my engineer -- stationery engineer license.  I

23   just never used it -- actually, I did try to get a

24   position with the board and I wasn't successful.



1          With Indeed, I constantly apply for

2    engineer positions.  I was recently contacted for a

3    position in which I just turned them down.  They

4    had cancelled an interview.  The person that was

5    supposed to interview me, she was out sick.  So I

6    had got involved with my daycare and when they

7    called back later offering me to come for another

8    interviewed, I declined.

9         Q.   You say you had a safety engineering --

10        A.   Stationery engineering.  City of Chicago

11   stationery engineering license.

12        Q.   What does that sort of give you?

13        A.   Engineer for the public schools.

14   Maintaining boilers, maintenance, the upkeep of the

15   school.  Heating and air-conditioning, things of

16   that nature.

17        Q.   Do you remember when you got that?

18        A.   Oh, that's a good one.  I got it in maybe

19   2008.

20        Q.   How did you go about getting it?

21        A.   I studied for the test.  I had gotten a

22   little training.  I have a brother and sister who

23   were engineers as well.  It was somewhat a

24   motivation for me to do.  That's how I got it.  I



1    just studied hard.  I failed a couple times.  I

2    failed twice.  I was determined the third time if I

3    didn't pass this time, I was just going to move on.

4    I remember -- I recall taking the test and I just

5    received my foster kids and they were actually in

6    the van waiting on me to come out.  I passed on

7    April Fool's Day, so I thought it was a joke.  I

8    thought it was a joke.

9         Q.   Pleasant joke though.

10        A.   I had to call all my family to the

11   computer to get me to believe that I actually

12   passed.  That's how I got my license.

13        Q.   You said you had applied for a position

14   for the board.  Was this after you got your

15   license?

16        A.   Not right after.  Not right after.  No.  I

17   might have applied after all of the stress,

18   harassment in Curie, just looking for maybe another

19   outlet.

20        Q.   But you don't remember the date?

21        A.   I don't recall the date.  Definitely not.

22        Q.   Do you remember what the position was?

23        A.   For stationery engineer, CPS.

24        Q.   Was it any particular school?



Case 1:16-cv-04804 Document #187-1 Filed: 03/15/18 Page 270 of 319 PageID #:1946
Case 1:16-cv-04804 Document #183-1 Filed: 03/15/18 Page 270 of 319 PageID #:1946
Kim Ammons  08/29/2017

1      A.   No.   It was just a website looking for

2  engineers.

3      Q.   You said you were contacted for a

4  position, but they cancelled the interview

5  because --

6      A.   That was recent.   That was maybe -- this

7  is July.   I applied on Indeed for -- you know, on

8  Indeed, you just apply for an engineer -- assistant

9  engineer position.   You don't know where it's for,

10  but when I got the phone call it was for a complex

11  at -- over on Beach Drive or Avenue, Lake Shore

12  Drive.   There were two complexes condominiums.

13      Q.   Do you remember the name?

14      A.   Beach something.   Beach court.   Beach

15  front.   It was 4800 Beach Drive, Lakeshore Drive.

16      Q.   So it was a condominium complex?

17      A.   Two condominiums.   Right.   It was

18  assistant engineer position.

19      Q.   And you said that was relatively recent,

20  like about --

21      A.   Oh, yeah.   That was about a month ago.

22      Q.   But you declined the offer to interview

23  when they called you back?

24      A.   Yes.   They had -- it was when I was

1   preparing for the interview, the lady called and

2   told me that they would contact me to reschedule.

3   So I continued looking for work.  Then when she

4   called that time, I was actually in the process of

5   running a summer camp out of a church, a summer

6   camp.

7        Q.   And which church is that?

8        A.   Faith.  Lutheran Faith.  83 and Sangamon,

9   Chicago.

10       Q.   What type of summer camp was that?

11       A.   Stop the violence.  I was asked by the

12  kind of block club to come.  And they was aware

13  that I had a recreation background, things of that

14  nature.  So they asked if I could come and help run

15  the summer camp.

16       Q.   Were you paid for that position?

17       A.   Not really.  No.  Unpaid position.

18  Volunteer.

19       Q.   I know I've gotten a copy of your 2014

20  taxes.  Do you have any copy of your tax returns

21  from 2015 onward?

22       A.   At home?

23       Q.   Mm-hmm.

24       A.   Yeah.  I can get them.



Case 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 272 of 319 PageID #:1948
Case 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 272 of 319 PageID #:842
Kim Ammons· 08/29/2017

1    Q.   Were you filing for income tax after 2014?

2    A.   Definitely.

3    Q.   So it would have been the form 1040?

4    A.   Yes.

5    MR. HILDEBRAND:  Yeah.  I would like to get a

6  copy of those.  I know we had talked about the

7  damages calculations.  If you have those today for

8  me ...

9    MS. HALL-JACKSON:  I might have a 2014, 2015

10  for you.  I think it has already been produced, but

11  I do have 2014, 2015.

12    MR. HILDEBRAND:  Okay.  Because the only one we

13  received was the 2014 one.

14    MS. HALL-JACKSON:  I'll have my assistant make

15  a copy.  Hopefully I didn't leave it on my desk.

16       Oh.  They're right here.

17    MR. HILDEBRAND:  I'll get in touch about some

18  of the other damages stuff we need as well.  I'll

19  shoot you an e-mail about it.

20  BY MR. HILDEBRAND:

21    Q.   After you left in 2015 up until the

22  present, you mentioned a couple positions.  Do you

23  remember any other jobs you may have applied for?

24    A.   Several.  Recreational jobs, park



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 273 of 319 PageID #:1949
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 273 of 319 PageID #:1949
Kim Ammons - 08/29/2017

1    district.  Yeah.  Because it was summer.

2        Q.    Do you remember when?

3        A.    I don't recall the dates.  January,

4    February, sometime after that.

5        Q.    Of?

6        A.    Of 2016.

7        Q.    Did you use Indeed for those, all of these

8    positions?

9        A.    Park district, I might have gone directly

10   to the website.  Majority of the time I'm on

11   Indeed.

12       Q.    Okay.  Do you have your Indeed account set

13   up where it allows you to save your past job

14   applications?

15       A.    I'm not that good with a computer, but I

16   know I have a resume on Indeed.  Yes.

17       Q.    Because I guess what I want to know maybe

18   is if you have any possibility of having your

19   Indeed account that would sort of show me the steps

20   you've taken to look for other work.  I know the

21   account can be set up that way.  If that's

22   something you can take a look at for me.  We can

23   chat about that as well.

24       MR. HILDEBRAND:  That's all the questions I've



1    got.

2         MS. HALL-JACKSON:  I'll probably have less than

3    ten minutes then hopefully we can get out of here.

4              Off the record.

5                        (Discussion off the record.)

6                        EXAMINATION

7    BY MS. HALL-JACKSON:

8         Q.   Earlier, opposing counsel asked you to

9    identify and take him through your daily routine

10   while at Curie and you gave a kind of vague answer.

11   Can you elaborate on what happens when you arrive

12   to work until the time you leave work?

13        A.   Yes.  Excuse me.  I get to work 7:15, get

14   to my locker.  I have time to do some things

15   because the kids are not due until 7:30 or 7:45 on

16   the floor -- actually, my duty post.

17             What else?  So you're right.  I have time

18   to walk around and check the building, you know,

19   the floors, talk to some of the kids as they're

20   coming up about 7:30.  It's a 50-minute class

21   period.  So it unusual takes about five to ten

22   minutes to get the halls cleared.  We have about 35

23   to 40 minutes of time before the next class starts

24   for the day.



1       Q.   And during those 45 to 35 minutes that you

2   have while the kids are actively in class, what

3   exactly is security expected to do?

4       A.   We're expected to make our rounds, check

5   areas, make sure no one is hiding out.  If any kids

6   are tardy, make sure they go to the class

7   immediately.  Then we're expected to go back to the

8   duty and hang out there.

9       Q.   And at your duty post, how long do you

10   think you're stationary there during that 50-minute

11   period?

12       MR. HILDEBRAND:  Let me ask a clarification.

13   Which time period are you talking about now?

14       MS. HALL-JACKSON:  While the kids are in class.

15       MR. HILDEBRAND:  I mean what year.  Are you

16   talking about when she started at Curie?  Are you

17   talking about like ...

18       MS. HALL-JACKSON:  2014 and 2015.

19       MR. HILDEBRAND:  Okay.

20   BY MS. HALL-JACKSON:

21       Q.   I'm sorry.  So 2014, 2015 timeframe now

22   we're focusing on.  So while the kids are in the

23   50-minute class period, you described where you

24   have to now go clear the hallways, make sure



1    they're clear, do your rounds, then you return back

2    to your post.  How long do you say you're estimated

3    to be at your post?

4        A.   30 to 35 minutes.

5        Q.   So 30 to 35 minutes.  And during that 30

6    to 35 minutes at your post, what exactly are you

7    supposed to be doing?

8        A.   Just being present.  Be there.

9        Q.   Is it a possibility that you can sit

10   during that 30 to 35 minutes for 5 to 10 minutes at

11   a time?

12       A.   Definitely.  Definitely.

13       Q.   Would that interfere with the central

14   functions of your job duties?

15       A.   Definitely not.

16       Q.   In the event that you're not sitting, what

17   exactly are you doing?

18       A.   Working.  I'm working when I'm not

19   sitting.

20       Q.   And by working?

21       A.   Roaming, checking, responding to calls.

22   If a teacher should step out, I have to be

23   available.  Actually, we were told to be at the

24   duty posts because being posted there, if something



Case: 1:16-cv-04884 Document #: 183-1 Filed: 03/15/18 Page 277 of 319 PageID #:1953
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 277 of 319 PageID #:1953
Kim Ammons - 08/29/2017

1    should arise out of the classroom, the teacher can

2    step out and kind of wave us down.  That's about

3    it.

4         Q.   Can you see a teacher waving you down

5    while you're sitting?

6         A.   Definitely.

7         Q.   Are you observing -- strike that.

8              In the past, you guys were allowed to sit,

9    correct?

10        A.   That's correct.

11        Q.   There were chairs at each end of each

12   post?

13        A.   Each end of each post and each floor all

14   throughout the building.

15        Q.   Were these same central duties the same

16   back then as in 2014 and 2015?

17        A.   Same exact duties.

18        Q.   Have your job duties changed since 2004

19   to -- through 2010?

20        A.   No, it has not.

21        Q.   Had your job duties changed from 2010 to

22   2012?

23        A.   No, it had not.

24        Q.   From 2004 through 2015, had your job

1    duties changed?

2        A.   My job duties had changed after I filed

3    charges.  After I filed charges, my job duties

4    changed.  They started moving me around to

5    different areas of the building.

6        Q.   So your personal job duties changed?

7        A.   Yes.

8        Q.   As far as where you were required to be

9    located at?

10       A.   Yes.

11       Q.   Have the central functions of an overall

12   security guard or security officer job titled --

13   strike that, job duties change?

14       A.   No.

15       Q.   Earlier, it was discussed that you were --

16   that it was suggested by the ADA department that

17   you break your hour lunch into a 30-minute lunch

18   and two 15-minute breaks.  Do you recall that?

19       A.   Yes.

20       Q.   And it was suggested in multiple e-mails

21   to you.  Do you recall receiving those e-mails?

22       A.   I believe after I was out on disability.

23       Q.   And did you ever get an opportunity to

24   take advantage of that 30-minute lunch and two



1    15-minute breaks?

2         A.    Never.

3         Q.    Do you know why?

4         A.    When I requested to have it, I was

5    summonsed to Principal Tingwall's office and she

6    dismissed the person, Mr. Perez, who I asked for

7    the break from.  Actually, he told me I can take

8    the break over the radio.  When I was getting ready

9    to go on a break, I was called back to the

10   principal's office.  That's when she threatened me

11   and told me that she was going to make sure she was

12   going to get rid of me.

13        Q.    There was no time after that in which you

14   were able to exercise that opportunity?

15        A.    Never.  I was out on disability.

16        Q.    Can we turn to Exhibit 24 -- what was

17   previously marked as Exhibit 24.  I'm sorry.

18        MS. HALL-JACKSON:  For some reason my

19   Exhibit 24 is attached to the back of Exhibit 23,

20   just in case you can't find it.  I don't know if

21   she has a copy in front of her, would you mind?

22        MR. HILDEBRAND:  Here.

23   BY MS. HALL-JACKSON:

24        Q.    Can you please look at this document?



1     A.   Mm-hmm.

2     Q.   And you recall being questioned about this

3  document earlier?

4     A.   Yes.

5     Q.   Can you turn to the back of Exhibit 23?

6  Is this your signature?

7     A.   Yes, it is.

8     Q.   And you copied a few people on there.

9     A.   Yes.

10    Q.   Do you know the positions of each one of

11 these people you copied?

12    A.   They were -- following Tingwall, they're

13 all assistant principals.

14    Q.   And when you say assistant principal, all

15 assistant principals for Curie?

16    A.   Curie assistant principals.

17    Q.   Going back to the front of the letter, you

18 identified -- what was your purpose of this letter?

19    A.   The purpose of this letter was I thought I

20 was supposed to be accommodated according to

21 Ms. Bentley.  She had told me that she would inform

22 Tingwall -- she would speak to Ms. Tingwall.  After

23 they took the chair, I was wondering why would you

24 take the chair if you had been informed of my



1    accommodations.

2        Q.   And further down, about midway through,

3    you talk about the first floor and third floor.

4    What exactly were you explaining here about the

5    first and third floor -- or first, second, and

6    third floor?

7        A.   Yeah.  Immediately after they took the

8    chair and on my way to speak to Ms. Tingwall, I

9    stopped at the second floor and the first floor to

10   make sure everyone else's chair was taken and, in

11   fact, they were all sitting in their chairs, the

12   security, at their duty post.

13       Q.   And you were just making that reflective

14   in -- what you observed in that letter?

15       A.   Definitely.

16       Q.   And did you ever have any further proof

17   that others were sitting down on this particular

18   day or any other day since this incident on the

19   first, second, or third floor?

20       A.   I had -- yeah.  I had proof that others

21   were sitting.  I had gotten some pictures from

22   coworkers that once I was out of the building,

23   these people were allowed to sit.  I witnessed the

24   sitting myself when I went over to the B building.



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 282 of 319 PageID #:1958
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/19 Page 282 of 319 PageID #:1958
Kim Ammons - 08/29/2017

1    Security was sitting in the locker room as well as

2    the park doors, similar security like myself was

3    sitting at their duty post.

4         Q.   And you mentioned earlier that you are a

5    parent of three or four children at this point?

6         A.   Yes.

7         Q.   Do they attend Chicago Public Schools?

8         A.   Definitely.  Three of them do.

9         Q.   Are you active in dropping them and

10   picking them up?

11        A.   Every day.

12        Q.   Do you go inside the school buildings?

13        A.   Definitely.

14        Q.   Do you interact with security at all?

15        A.   All the time.  I was inquiring actually

16   about the school.  When you walk in, there's an

17   information desk like what we have.  The older

18   gentleman is at the desk, very comfortable, happy

19   and -- to have a job, and is proud of his job.  He

20   spoke on how many years he had been doing security.

21        Q.   And this -- at this information desk, is

22   there a chair provided for this gentleman?

23        A.   Oh, a very comfortable plush chair.

24        Q.   Have you been at other CPS schools --



1    strike that.

2           Have you been to other CPS schools between

3    2014 and 2017?

4        A.   Quite a bit of schools.  Yes.  I've

5    attended Tilden, Dunbar, Simeon -- I have family

6    that attends Simeon -- Julian.  I have family

7    members that play sports.  When you go to games,

8    when you come in, you're greeted by security

9    sitting at their duty post.

10          I have friends who still work security on

11   the north side.  They're sitting as well, never

12   told any different, that there was no sitting in

13   security.

14          If you don't mind me mentioning, back when

15   I was at Curie, I was told after filing charges

16   that the chairs were not supposed to be removed by

17   security's supervisor, who is the boss of all the

18   security in the school.

19       Q.   You said you were told that, but who

20   informed you of that?

21       A.   His name was Dedrick Vaughn.

22       Q.   Dedrick Vaughn?

23       A.   Yeah.

24       Q.   Do you mind spelling his last name for the



1    record?

2        A.   V-A-U-G-H-N.

3        Q.   What was his title at the time?

4        A.   Security -- I don't know his exact title,

5    but I do know that he was from the network and he's

6    responsible for other schools in that network area.

7        Q.   So he was responsible for multiple schools

8    including Curie?

9        A.   Definitely.

10       Q.   And he confirmed that Tingwall and anyone

11   at Curie did not have the authority to remove

12   chairs?

13       A.   Definitely.

14       Q.   Did you ever receive anything directly

15   from the board, and when I say board, Chicago Board

16   of Education/Chicago Public Schools, directing that

17   chairs be removed?

18       A.   Never.

19       Q.   Do you recall ever going into a meeting or

20   a training where a memo or anything a

21   representative from the board outlined where you

22   guys were not allowed to use chairs?

23       A.   No.

24       Q.   There was a lot of questions back and



1    forth about you being offered a temporary post in

2    the girls' locker room.  Do you recall that line of

3    questions earlier today?

4         A.   Yeah.  I recall.

5         Q.   And were you ever offered the temporary

6    post in the girls' locker room?

7         A.   No.

8         Q.   And why do you say no when he presented

9    you with two or three e-mails outlining opportunity

10   to work in the girls' locker room?

11        A.   Because I was out on disability obviously

12   when those e-mails were presented.  I didn't get an

13   opportunity -- I was -- I told them that I was

14   supposed to be accommodated to the locker room and

15   Mr. Graves felt that I should be on the third floor

16   and that he would give me a chair.

17        Q.   So you actually did not receive those

18   e-mails you were presented with today?

19        A.   No.

20        Q.   And when you did reach out to Mr. Graves

21   and Ms. Bentley regarding the actual temporary post

22   in the locker room, did you ever take the position

23   in the locker room?

24        A.   No.  I wasn't able to.  I was out on



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 286 of 319 PageID #:1962
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 286 of 319 PageID #:1962
Kim Ammons· 08/29/2017

1   disability.

2       Q.   About how long would you say you were out

3   on disability?

4       A.   Up until I resigned, February 2017.

5       Q.   Starting when?

6       A.   I don't recall the exact date, but I

7   recall my last time being at Curie was the day that

8   the chair was taken by Mr. Graves.

9       Q.   Was this the same day that he gave you

10  that extensive list for the girls' locker room?

11      A.   Yes, it was.

12      Q.   And so as soon as he gave you the -- take

13  us through that particular incident after he took

14  the chair and you were called back down to his

15  office.  What happened at that point?

16      A.   I wasn't called back to his office.  He

17  took the -- he gave me the note and it was near my

18  lunch.  It was my lunch almost.  It was time for

19  lunch, but I would continue working, walking,

20  uncomfortable, a little pain.  And I went for lunch

21  I believe and I told Mr. Graves or Mr. Morris that

22  I was going to take a half a day.  I contacted the

23  union and told him what had took place.  I called

24  Ms. Bentley actually driving, I called the doctor,



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 287 of 319 PageID #:1963
Case: 1:16-cv-04884 Document #: 93-1 Filed: 02/15/18 Page 287 of 319 PageID #:963
Kim Ammons - 08/29/2017

1    and I went straight to my doctor's office.

2         Q.   And did you return to work --

3         A.   No.

4         Q.   -- after that?

5         A.   I have not returned to CPS.

6         Q.   What was your understanding when you were

7    supposed to actually start that locker room

8    assignment?

9         A.   The next day.

10        Q.   So the following day from your last day?

11        A.   Right.

12        Q.   So you never had -- is it safe to say you

13   never had the opportunity to exercise your right to

14   that assignment?

15        A.   That's correct.

16        Q.   Moving to Exhibit 33.  Do you recall this

17   document being presented to you earlier today?

18        A.   Yes, I do.

19        Q.   And in here, you mention Marco at some

20   point?

21        A.   Right.

22        Q.   Do you see his name at all?

23        A.   Yes, I do.

24        Q.   Did you identify his last name on this



1    document?

2        A.   Not earlier.  It came to me that it was

3    Camarillo I believe -- I thought Camarillo was his

4    first name.

5        Q.   But is his name identified completely in

6    here?

7        A.   Yes.

8        Q.   For the record, what is his complete name?

9        A.   Marco Camarillo.

10       Q.   Thank you.  Since your time at CPS and

11   mainly between 2013 and 2016, have you ever

12   received a disciplinary action for being

13   insubordinate to a principal or anyone?

14       A.   No.

15       Q.   You were asked a few questions earlier

16   about how did you know if administration knew about

17   your multiple charges of discrimination and

18   retaliation.  You weren't sure.  Could you turn to

19   Exhibit 49 and 48?  48 first.

20       MR. HILDEBRAND:  Here's 48.

21       THE WITNESS:  Thank you.

22   BY MS. HALL-JACKSON:

23       Q.   Could you go to Page 9 and 10?  The page

24   numbers are identified in the top corner.



 1      A.    48?

 2      Q.    48.  9 and 10.

 3            Just for the record, what does Exhibit 54

 4   identify on the first page there?

 5      A.    Department of Human Rights investigation

 6   report.

 7      Q.    Okay.  And then Page 9 of 10, there's a

 8   part of that that says witness list on that page,

 9   do you see that?

10      A.    Witness ...

11      Q.    List.

12      A.    Yeah.  Witness list.

13      Q.    And it identifies witnesses under A B, C,

14   and D?

15      A.    Yes.

16      Q.    Do you see any administration there as

17   witnesses?

18      A.    Laura Cottrell.  She's an administrator.

19      Q.    Make sure you talk to her.

20      A.    Oh.  Laura Cottrell is the administrator

21   on this list.

22      Q.    Is there anyone else?

23      A.    No.

24      Q.    What about C?

Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 290 of 319 PageID #:1966
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 290 of 319 PageID #:996
Kim Ammons 08/29/2017

1    A.    Joseph Vargus, he's the dean.  He was the
2  dean of students.
3    Q.    And was he the dean of students inside of
4  Curie?
5    A.    Yes.  He was Curie's dean of students.
6    Q.    So he was a witness and he was a -- strike
7  that.
8          Would he have been made aware of this
9  particular charge if he served as a witness?
10   MR. HILDEBRAND:  Objection, calls for
11 speculation.
12 BY MS. HALL-JACKSON:
13   Q.    Do you know if he actually -- strike that.
14         Does the witness list identify Mr. Vargus?
15   A.    Yes.
16   Q.    And under Ms. Cottrell, do you see a
17 parenthesis that says FFC?
18   A.    Under Cottrell?  Yes.
19   Q.    Did you have a fact finding conference
20 where you guys sat down in a setting something like
21 this?
22   A.    With Cottrell?  Never.
23   Q.    You don't recall Ms. Cottrell sitting --
24   A.    Never.

Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/18 Page 291 of 319 PageID #:1867
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 291 of 319 PageID #:2997
Kim Ammons·08/29/2017

1      Q.   -- across from you?

2      A.   Not with me.

3      Q.   Did you ever have a fact finding

4  conference with an investigator sitting there?

5      A.   And Ms. Cottrell?  Never.

6      Q.   Okay.

7      A.   Never with Ms. Cottrell.

8      Q.   Next to Mr. Vargus, what does the last

9  parenthesis say?

10     A.   Telephone interview.

11     Q.   So is it safe to say Ms. Cottrell and

12 Mr. Vargus was aware of your charge?

13     A.   Definitely.

14     Q.   Moving to Exhibit 49, Page 8 of 8.

15     A.   Page 49 ...

16     Q.   Just for the record, what is -- based on

17 the first page, what is Exhibit 49?

18     A.   8 of 8?

19     Q.   Mm-hmm.  What is that?  What does 49 say?

20     A.   49?

21     Q.   What does the caption read?

22     A.   Department of Human Rights investigation

23 report.

24     Q.   And Page 8 of 8, do you see a witness list

Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/19 Page 292 of 319 PageID #:1968
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 292 of 319 PageID #:1968
Kim Ammons - 08/29/2017

1  on there as well?

2       A.   Yes.  Witness list, 8 of 8.  Yes, I do.

3       Q.   Under witness number two, whose name is

4  identified?

5       A.   Assistant Principal Rochelle Bryant.

6       Q.   So is it safe to say Assistant Principal

7  Rochelle Bryant was aware of this charge?

8       A.   Yes.

9       Q.   You used the word retaliation a lot.  Did

10  you engage in protective activity?

11       MR. HILDEBRAND:  Objection, calls for a legal

12  conclusion.

13  BY MS. HALL-JACKSON:

14       Q.   Did you complain to the board at any

15  point?

16       A.   Oh, definitely.

17       Q.   How did you do that?

18       A.   Through e-mails, phone calls, I spoke with

19  the investigator Para on numerous occasions about

20  the retaliation, what I was going -- experiencing,

21  harassment.  That is about it.

22       Q.   Did file any grievances?

23       A.   Definitely.

24       Q.   Did you attend any -- did you ever file



1    any charges with the Illinois Department of Human

2    Rights or EEOC?

3         A.   Yes, I did.  Also, I had an interview with

4    Julius Simmons from CPS.

5         Q.   And what is his title?

6         A.   It's a lady.  She was an investigator I

7    believe.

8         Q.   And when you complained, was -- strike

9    that.

10             What was your complaints about overall in

11   general?

12        A.   The ongoing harassment, the failure to

13   promote, retaliation, different things that I was

14   going through every day with the administrator --

15   some of the administrators.

16        Q.   In return, what do you feel like the

17   administration did to you?

18        A.   Meaning?  I don't know what you mean.

19        Q.   How did they retaliate against you in your

20   opinion?

21        A.   Denying me promotions, denying me

22   overtime.  What else?  Just -- just refusing me to

23   have peace of mind.

24        Q.   Would you describe your work environment



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 294 of 319 PageID #:1970
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/18 Page 294 of 319 PageID #:1970
Kim Ammons 08/29/2017

1    as hostile?

2        A.   Definitely.

3        Q.   Did you notice that there was increased

4    surveillance towards you?

5        A.   I don't know what you mean.

6        Q.   When I say increased surveillance, did you

7    notice people peeping at you, observing you more

8    than the other coworkers?

9        A.   Definitely.

10       MS. HALL-JACKSON:  No further questions.

11       MR. HILDEBRAND:  I just have a couple of them.

12                    FURTHER EXAMINATION

13   BY MR. HILDEBRAND:

14       Q.   The surveillance you were just talking

15   about, do you know who was doing it?

16       A.   Ms. Cottrell, Mr. Perry.  They had Perez

17   and Mr. Morris peeking and watching my every move.

18       Q.   What do you mean by peeking?

19       A.   I would find -- I would see them down on

20   the other end of the hall.  You see a head and it

21   would be one of them peeking around at me.

22       Q.   How would you notice they were peeking

23   around the corner?

24       A.   Observing, security, walking, looking.  I



1   noticed a body looking at me and peeking and then

2   they'll come step out and I'll realize it was them.

3        Q.   Did any of your peers make similar

4   comments to you that they saw these individuals

5   peeking around corners as well?

6        A.   Yeah.  Mike Hanes would tell me that you

7   didn't see -- or Dave Reyes, you didn't see

8   Ms. Tingwall down here peeking at you?  Oladipo,

9   the other assistant principal.  Every time you turn

10  around, Mr. Graves was looking from the opposite

11  end of my post.

12       Q.   Do you know were they watching other

13  security guards?

14       A.   Couldn't have been.  They were watching me

15  all the time.

16       Q.   Did you hear that they were watching --

17       A.   No.

18       Q.   -- other security guards besides you?

19       A.   No.

20       Q.   You said you didn't have a fact finding

21  conference with Ms. Cottrell.  What about with

22  Rochelle Bryant?

23       A.   Never.

24       Q.   Never?



1           The investigator, Ms. Simmons, do you

2    remember when you talked to her?

3        A.   I believe I was off of work.  Her and I

4    had actually three appointments.  She was sick --

5    according to her, she was sick.  Another time she

6    had to reschedule.  I don't recall what for, but

7    the third time, the -- it was like two, three

8    months down the road that she had contacted me to

9    meet her down at the board for a meeting.  Never

10   heard anything of the finding of the meeting or

11   anything.

12       Q.   The conversation with Mr. Vaughn that you

13   talked about, do you remember when that was?

14       A.   Dedrick?

15       Q.   Yeah.

16       A.   It was after they removed my desk from the

17   northwest end and when my medicine came up missing.

18   They had moved me to the southwest door and the

19   desk -- we had two desks actually.  There was

20   another desk that was on that end.  They had pushed

21   around away from where they had put me to post up,

22   so they removed that desk as well.  So he was

23   coming -- he always came to see me when he was in

24   the school.  I was actually standing like away, on



1   the side by the desk.  He was like, hey, why is

2   this desk here?  I said, they said you said to

3   remove the desk.  He said, oh, no, I never told

4   Ms. Cottrell to move the desk.  I said, her

5   security supervisor said that she was told by the

6   principal to remove the desk.  He says, oh, no, we

7   had a conversation.  They know I wasn't talking

8   about Curie.  Curie has always been known to be a

9   good school.  We was talking about an example at

10  Bogan where the security supervisor had come in and

11  whoever the security officer was never left his

12  chair.  But definitely Curie was not one of those

13  schools.

14       Q.   You testified that your children attend

15  CPS school.  Which school do they go to?

16       A.   Paul Cuffee.

17       Q.   And the gentleman that you're talking

18  about, do you remember his name?

19       A.   Yes.  I know his name -- last name.  I

20  don't know his first name.  Officer Kane.

21       Q.   Do you know if that's C-A-N-E or K?

22       A.   I don't.  I just met him going in and out

23  and seeing everything at that school for quite some

24  time.  My mom stays over that way.



Case 1:16-cv-04804 Document #:187-1 Filed: 03/15/18 Page 298 of 319 PageID #:1974
Case 1:16-cv-04804 Document #:183-1 Filed: 03/15/18 Page 298 of 319 PageID #:1974
Kim Ammons 08/29/2017

 1     Q.   You mentioned you had friends at some

 2  north side schools.  Which schools were you talking

 3  about?

 4     A.   I don't know the exact school name.

 5     Q.   What about your friend --

 6     A.   But I do talk to them on the regular.

 7     Q.   What about your friends' names?  Who are

 8  your friends there?

 9     A.   I really don't want to disclose that if I

10  don't have to.

11     Q.   I mean, you have to answer my questions.

12     A.   Her last name is Walton.

13     Q.   Spell that.

14     A.   W-A-L-T-O-N.

15     Q.   Anybody else?

16     A.   No.

17     Q.   Okay.  How do you know this person?

18     A.   Which person?

19     Q.   Walton?

20     A.   She used to work for Fenger.

21     Q.   Are you in touch with her anymore?

22     A.   I haven't spoken to her this year, no.

23     Q.   When was the last time?

24     A.   Probably last year sometime I believe.



1    Q.   And one last question.  You talked about
2  photographs that you had from coworkers.  Do you
3  have those photographs?
4    A.   Yeah.  I have some photos.
5    Q.   Do you remember when they were taken?
6    A.   March 2016 I believe.  Some of them were
7  March 2016.  I know I was out of the building the
8  majority of the time when some of them were
9  sitting.
10    Q.   I don't want to keep you here going
11  through your phone.
12    MR. HILDEBRAND:  Can we talk about getting
13  those?
14    MS. HALL-JACKSON:  Sure.
15    MR. HILDEBRAND:  I didn't know there was
16  photographic ...
17    MS. HALL-JACKSON:  And actually some were
18  tendered over if I'm not mistaken in this case.
19  But I'll make sure you get them.
20    MR. HILDEBRAND:  Yeah.  Because I don't recall
21  seeing them in the stuff I have.  So I'll follow up
22  on that as well.
23         Those are all the questions I've got on
24  follow-up.  Anything.



Case: 1:16-cv-04884 Document #: 183-1 Filed: 03/15/18 Page 300 of 319 PageID #:1976
Case: 1:16-cv-04884 Document #: 183-1 Filed: 03/15/18 Page 300 of 319 PageID #:1976
Kim Ammons 08/29/2017

1          MS. HALL-JACKSON:  Nothing.

2                    (Discussion off the record.)

3          MS. HALL-JACKSON:  We'll waive the read on the

4     transcript.  And then, secondly, we also reserve

5     the right to pick back up the deposition in the

6     event that they send production from defendant's

7     counsel something that's worth picking up the

8     deposition.

9          MR. HILDEBRAND:  We talked about that

10    yesterday.  So I'll get those documents out to you.

11                    (Witness excused.)

12

13

14

15

16

17

18

19

20

21

22

23

24



1    STATE OF ILLINOIS  )

2                       )  SS:

3    COUNTY OF C O O K  )

4        I, Tabitha Watson, a notary public within and

5    for the County of Cook and State of Illinois, do

6    hereby certify that heretofore, to-wit, on the 29th

7    of August, 2017, personally appeared before me, at

8    One North Dearborne Street, Suite 900, Chicago,

9    Illinois, KIM AMMONS, in a cause now pending and

10   undetermined in the United States District Court,

11   Northern District of Illinois, Eastern Division,

12   wherein KIM AMMONS is the Plaintiff, and CHICAGO

13   BOARD OF EDUCATION is the Defendant.

14       I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in the

19   presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to the



Case: 1:16-cv-04684 Document #: 187-1 Filed: 03/15/18 Page 302 of 319 PageID #:1978
Case: 1:16-cv-04684 Document #: 93-1 Filed: 03/15/18 Page 302 of 319 PageID #:1978
Kim Ammons 08/29/2017

1  foregoing deposition was waived by counsel for the

2  respective parties.

3      I further certify that the taking of this

4  deposition was pursuant to Notice, and that there

5  were present at the deposition the attorneys

6  hereinbefore mentioned.

7      I further certify that I am not counsel for nor

8  in any way related to the parties to this suit, nor

9  am I in any way interested in the outcome thereof.

10     IN TESTIMONY WHEREOF:  I have hereunto set my

11 hand and affixed my notarial seal this 15th day of

12 September.

13

14

15

16 

17 _____

18 NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19

20

21

22

23

24



Case: 1:16-cv-04884 Document #: 187-1 Filed: 03/15/19 Page 303 of 319 PageID #:1979
Case: 1:16-cv-04884 Document #: 93-1 Filed: 03/15/19 Page 303 of 319
Kim Ammons 08/29/2017

| Exhibits | |
|---|---|
| Exhibit 1 | |
| Exhibit 2 | |
| Exhibit 3 | |
| Exhibit 4 | |
| Exhibit 5 | |
| Exhibit 6 | |
| Exhibit 7 | |
| Exhibit 8 | |
| Exhibit 9 | |
| Exhibit 10 | |
| Exhibit 11 | |
| Exhibit 12 | |
| Exhibit 13 | |
| Exhibit 14 | |
| Exhibit 15 | |
| Exhibit 16 | |
| Exhibit 17 | |
| Exhibit 18 | |
| Exhibit 19 | |
| Exhibit 20 | |
| Exhibit 21 | |
| Exhibit 22 | |
| Exhibit 23 | |
| Exhibit 24 | |
| Exhibit 25 | |
| Exhibit 26 | |
| Exhibit 27 | |
| Exhibit 28 | |
| Exhibit 29 | |
| Exhibit 30 | |
| Exhibit 31 | |
| Exhibit 32 | |
| Exhibit 33 | |
| Exhibit 34 | |
| Exhibit 35 | |
| Exhibit 36 | |
| Exhibit 37 | |
| Exhibit 38 | |
| Exhibit 39 | |
| Exhibit 40 | |
| Exhibit 41 | |
| Exhibit 42 | |
| Exhibit 43 | |
| Exhibit 44 | |
| Exhibit 45 | |
| Exhibit 46 | |
| Exhibit 47 | |
| Exhibit 48 | |
| Exhibit 49 | |
| Exhibit 50 | |
| Exhibit 52 | |
| Exhibit 53 | |
| Exhibit 54 | |

**$**

**$5,000**
31:9

**0**

**03**
233:19
**05**
236:19
**0758**
250:21

**1**

**1**
55:7,8 64:9 69:18
141:13,24

**1-12-2016**
77:18
**10**
16:1 34:21,22 63:4
141:7 142:1,3
173:17 186:17 265:5
275:10 287:23
288:2,7
**100**
39:13
**101**
21:10
**1040**
271:3
**10:00**
57:8 63:1 134:3
**10th**
222:7
**11**
16:1 22:5,6 34:21
133:7 170:11 173:14
**11-25-1964**
14:14
**11:00**
57:9
**11:18**
7:3
**11th**
185:14 188:17
**12**
16:1 30:14,15 135:2
173:20 176:12
**12-9-14**
112:2
**12:00**
65:4
**12:41**
65:23
**12th**
189:2 190:2 214:6,7
**13**
31:17,19 135:10
**13th**
145:10 162:11,18
164:10 179:3
**14**
42:6 73:18 110:23
111:1 191:21
**14th**
213:2 215:7
**15**
59:10 63:5 72:8
73:18 90:16 111:21
134:13 142:14,24
186:18
**15-minute**
154:7,9 194:16
277:18 278:1
**15th**
161:24 162:9
**16**
114:10 217:23
259:12 260:22
**16th**
121:8 127:20
**17**
115:17
**17th**
129:13
**18**
42:7 127:16,19
248:7,11,19
**18th**
30:23 241:13 242:1,
5 248:3 249:20,23
**19**
128:15
**1994**
22:23

**1997**
22:23
**1998**
23:6
**19th**
235:21
**1:00**
33:11
**1:09**
82:22
**1st**
53:19 115:13 121:2,
9,10 125:20,21
163:10

**2**

**2**
67:21 141:13 242:5
**20**
131:18 142:15 143:1
194:14 201:7 253:12
**20-pound**
112:4
**2000**
23:7,17 34:21
122:22
**2002**
27:18 29:12 233:19
243:15 260:1,7
**2003**
25:7 27:17,19 30:23
**2004**
32:22 34:24 35:2,8,
14 36:15 41:3,22
42:18,19,20 43:14
46:8,22 59:1,2 66:2,
9,16,17 67:10 71:14
72:3,9,10 73:14 74:1
236:13,18 237:8
276:18,24
**2005**
46:15
**2008**
267:19
**2010**
34:22 35:6 276:19,
21
**2011**
18:21 19:9 35:6
**2012**
18:21 203:3 205:20
240:15 276:22
**2013**
53:13,14 107:10
108:6 203:18,19
204:1 205:1,3,4,5,
16,20 287:11
**2013-2014**
205:22
**2014**
10:6 14:22 15:1
48:11,16 50:1,16
51:7,8,14 52:13
53:3,4,14,19,21
59:3,10,11 60:3
66:4,18,24 67:15
68:15 74:3,5,12,18
85:21 98:20 101:15
106:18,19 107:10
108:6,11,12 146:6
201:8 204:11,20
205:5,17 218:13
219:23 220:1 235:1,
22,23 240:12,22,23
241:6,7,14 242:1,5,
6,13,15 243:12
244:2,17 246:21
247:10 248:4,6,7,11,
19 249:1 250:13,20
252:8,19 253:12,15

**254:22 255:16**
270:19 271:1,9,11,
13 274:18,21 276:16
282:3
**2015**
10:6 15:1 59:3 60:3,
4 68:15 74:18 84:22
85:21 86:13 89:5,22
90:5,14,23 91:10,21
93:13 94:1,13,15
97:18 98:18 99:3,14
105:1 113:4 114:13,
21 115:14,21 116:18
119:13,15 121:2
127:20 129:14
131:14 134:22
140:20 145:10 146:6
147:21,24 148:21
155:21 156:14,16
160:10,20 161:22
162:3,8,11,18,24
163:11,18 164:10,15
167:12 169:16
170:11,23 171:10
177:11 201:8 219:23
222:7 246:22,23
255:2 258:19,21
259:12,13 260:22
266:12 270:21
271:9,11,21 274:18,
21 276:16,24
**2015-2016**
164:1
**2016**
8:4 76:16,22 92:2,15
98:22 100:15 101:8,
9,12,16 119:19
143:20 144:3,21
147:21,22 148:17
185:8,14 189:23
190:3 191:21 215:7,
10,11 217:23 256:24
266:12 272:6 287:11
298:6,7
**2017**
7:4 266:9 282:3
285:4 300:7
**21**
139:18 144:7
**22**
144:16,19 162:10
164:24 179:5
**22nd**
94:5 196:3,6
**23**
156:1,2 278:19
279:5
**24**
158:8 253:15
278:16,17,19
**2496**
240:23 241:7,22,23
247:10
**25**
167:15,17 168:18
183:1
**25,000**
30:2
**25th**
250:20 252:8
**26**
168:19,20
**26th**
160:20
**27**
170:1 243:12 253:15
**27th**
240:12,22 241:6
242:12
**28**
156:14 170:15

**29**
115:21 174:3 176:19
177:11
**2939**
258:18 262:18,21
**29th**
7:3 131:14 147:24
300:6
**2:00**
115:10
**2nd**
215:10
**2S**
117:2

**3**

**3**
69:14,20
**3.0**
130:21
**30**
34:10 133:19 134:4
177:6 181:17 194:14
216:24 224:3 226:18
275:4,5,10
**30-day**
181:24
**30-minute**
154:7,9 194:16
277:17,24
**31**
178:7,10
**32**
191:20
**3295**
242:6 248:4 250:12
**33**
42:12 196:10 286:16
**34**
199:8
**347**
49:12
**35**
203:1,2 204:6,23
205:1 207:2,3
273:22 274:1 275:4,
5,6,10
**350**
95:6
**36**
204:7,8
**37**
207:23
**38**
211:19
**39**
213:11 217:16
**3:10**
158:5
**3rd**
23:6,17

**4**

**4**
16:2 70:3 75:3 142:8
259:13
**4-16-2005**
260:21
**40**
214:20,22 215:1
216:2 273:23
**41**
216:4
**42**
220:19,23
**43**
221:22 223:4

**44**
223:6
**45**
233:24 234:2 274:1
**46**
247:2
**47**
240:11 243:11
250:7,8,18
**48**
240:18 241:15
242:1,4 248:10,17
251:2 253:24 257:18
287:19,20 288:1,2
**4800**
269:15
**49**
254:3 258:2 259:1
263:23 287:19
290:14,15,17,19,20
**4th**
15:24 114:13,21
190:5 258:19,21

**5**

**5**
75:4,5 142:8,17
248:9,15,16 254:4
275:10
**50**
39:12 183:4 193:3
260:15 262:16
**50-minute**
273:20 274:10,23
**51**
240:17 242:4,23,24
243:11 248:9 254:2
**52**
263:2,23
**52-year-old**
111:24
**53**
11:16 16:21
**54**
288:3
**58**
257:19
**5:53**
258:15
**5th**
185:8

**6**

**6**
72:8 75:12 142:21
143:4 176:8,12
184:4
**6-83**
19:19
**60**
180:5 205:3 233:14,
15
**60-minute**
213:6
**60620**
14:17
**6th**
160:10 167:12

**7**

**7**
93:7 94:22 99:9
141:8 143:3 245:23
257:19
**70**
169:22



Case: 1:16-cv-04804 Document #: 137-1 Filed: 03/15/19 Page 304 of 319 PageID #:1980
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/18 Page 304 of 319

Kim Ammons 08/29/2017

**73**
169:22
**74**
17:18
**79**
16:16
**7:00**
217:24 261:11
**7:15**
60:9,24 121:2 193:2
273:13
**7:30**
62:13 273:15,20
**7:45**
273:15

**8**

**8**
15:23 141:8 142:4
264:5 290:14,18,24
291:2
**8-23-2000**
22:16
**8225**
14:16
**83**
19:19 270:8
**85**
205:22
**87**
19:22
**88**
205:2
**89**
20:20,22
**8:00**
62:12,22

**9**

**9**
15:23 264:18 287:23
288:2,7
**90**
205:20,23
**900**
300:8
**97**
23:10,11
**98**
23:17
**9:00**
33:10 89:17 115:21
**9:19**
191:21

**A**

**A-M-M-O-N-S**
14:12
**a.m.**
7:3 89:17 115:21
121:2 191:22 217:24
**ability**
10:22 138:14,24
139:4,7 142:22
143:7 175:21 176:11
**absent**
48:7 78:16 79:5
**academic**
32:5
**accept**
210:18
**access**
43:19 58:20 71:12
152:3,5,7 265:1
**accident**
108:22,24

**accommodate**
59:22 128:12 145:19
152:18 176:24 181:5
191:1
**accommodated**
75:19,24 146:12
147:3 159:5 185:12
187:6,7 188:12
190:10,20,23 279:20
284:14
**accommodating**
191:13
**accommodation**
101:17 131:14,15
132:14,15,23 135:4,
17 138:7 145:9
147:16 148:12 154:4
160:18 161:3,12
162:12 165:2
170:11,13 171:16,17
173:9,20 177:14
178:5 183:9 187:4,
24 190:4,16 191:5
192:20 194:3,13
195:7,19,20 196:1
255:17 256:2 262:13
**accommodations**
108:16 135:3 148:16
174:9 177:19 186:11
188:2 254:22 255:8,
13 280:1
**accompany**
155:2
**account**
262:13 264:11
272:12,19,21
**accountabilities**
71:7
**accountability**
55:19 71:4
**accountable**
87:9
**accumulated**
21:10
**accurate**
32:7,18 56:3,10
57:15 58:21 68:5,7
69:3 90:19 91:4
93:12,19 121:5,10,
14,15 130:4 131:10
132:7,20 133:5,14
135:8,24 137:23
138:18,24 139:8
140:16 141:4
142:15,19,20 143:1,
2,9 149:11,13
154:11,12 156:22
171:10,21 173:12,18
175:5,15,18 176:1,5,
17 182:3,4 218:3
255:21 259:16
260:23
**accuse**
63:17,18
**accused**
63:13,14
**ache**
133:2
**aching**
105:3 130:8
**Act**
162:13 231:2 265:5
**acting**
24:9 26:3 109:19
194:20 251:22
**action**
287:12
**active**
74:15 153:13 281:9
**actively**
55:23 56:7,14,22

**activities**
57:3,13 64:10 274:2
**activities**
138:21 142:17 176:4
**activity**
291:10
**actual**
46:16 82:9 118:10
147:20 284:21
**ADA**
77:3 86:24 88:24
247:3 147:23 148:5
152:17 161:3 181:4
199:8 255:2 277:16
**addition**
130:17
**additional**
152:14 181:2
**address**
14:18 115:22 132:4
154:10 191:22
195:13 208:6
**addressing**
215:15
**adequately**
149:17
**administration**
43:24 46:9,22 47:18
51:1,6 66:8,10,11
87:2 97:23 150:1
163:12,21 164:15
170:5 223:24 252:9
287:16 288:16
292:17
**administrative**
85:17 86:1
**administrator**
26:4 98:11 145:3
200:17 288:18,20
292:14
**administrator's**
155:15 219:17
249:10
**administrators**
88:8 91:22 94:10
98:8,24 121:21
185:22 200:14 202:8
211:1 219:16 249:5,
6 253:18 292:15
**adopted**
15:11 16:5
**adult**
153:14
**adults**
42:10
**advantage**
277:24
**advertised**
251:11
**advise**
131:6
**advised**
130:15 181:18
**affect**
11:9
**affected**
138:22 142:18
**affecting**
141:18
**affinity**
219:24
**affixed**
235:5
**aforesaid**
300:17,23
**afraid**
245:21
**African**
159:1
**afternoon**
134:14

**afterward**
29:22 106:1
**age**
42:8,14 240:13
242:3 243:14
248:13,21 252:2
258:2
**aggressive**
150:24
**agree**
83:15 164:13 216:23
**agreed**
187:20 191:1
**agreement**
218:10
**ahead**
26:2 74:3 154:22
**aide**
31:3,4,8,18 35:10,
11,15,18 70:20
**aids**
73:6
**air-conditioning**
267:15
**alcohol**
11:1
**Alice**
253:1,2
**alive**
17:15
**allegations**
28:6 259:7
**alleged**
242:2 243:13
248:12,20
**alleges**
240:13 259:12
**Allegra**
11:23 12:1,3,5
**allergy**
12:9
**alliance**
220:5
**allowed**
40:8 50:21 51:4
71:16 82:13 86:21
87:7 98:2 149:13
162:6 163:1,3,22
172:4,5,9,18 189:1,
12 187:8 190:15
199:2,3 276:8
280:23 283:22
**allowing**
66:12 152:14 173:22
181:1
**ally**
220:12
**alternate**
179:18
**alternative**
233:12
**Amazing**
92:7
**amenable**
195:11
**amendment**
240:4
**Americans**
162:13
**Ammons**
7:11,12 14:10 16:14,
23 22:15 63:11
83:16 95:15 111:24
122:3 137:6,9,11
154:21 155:6 159:6
191:22 193:24 195:6
210:11 226:11,20
227:19 300:9,12
**Ammons'**
240:21

**amount**
30:3
**and/or**
56:1 142:13 175:17
210:16
**angry**
159:24 166:21
189:16 190:9 224:6
**annually**
200:10
**anymore**
33:2 91:8 297:21
**apologize**
239:10
**appeal**
196:22 199:8 225:5
**appealed**
222:18,20,21 223:1,
2
**appealing**
170:13
**appeared**
300:7
**application**
22:8 31:18 32:21,22
**applications**
227:14
**applied**
73:4 130:14 148:5
209:15 210:1,2
211:13,14,15 221:12
242:18 244:14
251:17 268:13,17
269:7 271:23
**apply**
251:13 267:1 269:8
**appointment**
130:7,9
**appointments**
295:4
**Approachable**
206:14
**approve**
201:13
**approved**
115:2,4 121:21
247:15
**approximately**
14:21 189:5
**April**
34:24 54:1,12 59:12,
13 60:2 89:6 94:1
97:18 99:1 103:2
104:15 115:13,21
116:16 121:2,8,9,10
125:20,21 127:20
129:13 131:14,16
140:22 147:24 148:3
163:10,14,15
246:20,24 259:12
260:22 268:7
**arbitration**
222:18,22 223:3
**arch**
130:14,22
**Archer**
40:20,22 48:10
60:20 89:16
**arches**
130:3
**area**
38:15 53:7 58:13
84:2 84:4,9,13,15,
19 100:5 107:23
137:21 146:4 149:16
151:11,13 152:2
172:23 283:6
**areas**
68:9 69:10 100:14
149:18 274:5 277:5

**arise**
39:8 276:1
**arrangement**
172:10
**arrive**
151:20 273:11
**arrived**
61:20 214:7,10
**art**
36:7
**ASAP**
215:13
**asks**
132:13
**aspect**
112:3
**assessment**
224:7,9
**assigned**
52:4,17 57:21 237:1
238:21
**assigning**
177:14
**assignment**
149:15 152:20
162:17 182:1 194:2,
9 195:9,10,12 286:8,
14
**assist**
23:23 135:3 173:20
**assistance**
43:3 146:3
**assistant**
24:2,9,17,24 40:9
47:8,9 54:23 55:1
61:24 62:10 77:14
82:18 98:15 109:15,
17 112:14 149:8
153:2 158:21 203:24
208:21 210:14
243:23 244:4 249:17
255:5 269:8,18
271:14 279:13,14,
15,16 291:3,6 294:9
**assisting**
24:14
**associate**
24:15
**associate's**
21:7,8
**assume**
73:21 206:14 219:15
249:12
**assumed**
210:3 232:6 238:6
**assuming**
31:15 122:6 138:2
221:15 223:2
**assumptions**
219:12,21 232:9
**Asyambe**
165:17 166:23
**athlete**
19:19
**attached**
132:17 278:19
**attachment**
137:18
**attend**
57:13 222:8 233:2
281:7 291:24 296:14
**attendance**
49:18 58:10 201:1
205:2,4 206:5
**attendant**
21:18 23:7 76:20
78:17,20 79:14
92:21 101:10 171:21
172:2,20 179:20
181:18,21 184:10
199:19



attendants
91:23 92:19
attended
211:11 282:5
attends
282:6
attention
22:18 199:12 257:17
attire
66:15
attorney
7:6 10:11 28:17,24
29:6,18 30:9 240:7
attorney's
28:18
attorneys
222:22
August
7:3 64:18 92:1,2
98:22 145:10 148:17
156:14 161:22
162:8,9,11,18,24
163:18 164:10,17
178:22 179:3 205:16
209:17 300:7
Austin
19:4
authority
283:11
authorized
58:20 71:11
Avenue
269:11
averaging
232:20
aware
75:23 172:3 180:1
186:11 192:19 195:7
200:15 251:4 264:1
265:8 270:12 289:8
290:12 291:7

B

B-O-N-D
149:7
B-R-I-A-N
149:7
B-R-Y-A-N-T
122:2 149:9
baby
122:10
back
8:3,22 13:18 20:22
23:15 25:14 31:2,16
32:23 39:18,19
41:12,14 45:10,21
46:13,21 47:11
48:11 49:22 58:9
63:22 64:7,9 65:5,
19,22 66:12 67:7
69:10,12 70:18 75:3,
10 76:1,5,12,13,21
78:24 79:21 82:21
84:15,16 86:12 90:5
96:3 97:13 98:18,20
99:9,22 100:7,14
101:21 103:9 105:3
106:22 107:6,20
108:7 111:18 112:20
113:1 114:21,24
115:9 117:6,10,13
118:12 119:16,18
121:1 122:22
123:10,16,24 124:9
127:4,22 128:2
130:5 131:12 135:6
138:20 139:16
142:11 143:15
144:7,8,11 145:19
146:7,17,19 147:8,

bell
38:13 51:22 58:3
78:22 79:21
Belmont
114:3
belong
95:9
belongings
226:7,23 227:1,13
beneath
38:12 67:8
Bentley
77:3 126:23 134:12
145:2,7 146:2 148:6,
11 170:23,24 176:23
177:7,12 178:1,2
182:15 187:7 191:14
192:2 193:24 194:4
195:5,18 214:1
279:21 284:21
285:24
Bentley's
190:24
big
17:21,23,24 34:17
72:19 81:17 82:15
84:6 107:23 220:2,7
birth
14:13
bit
19:13 51:20 78:8
101:22 115:13 142:6
214:5 218:15 240:9
250:24 282:4
blackened
132:5
blind
62:2 84:7,21 106:21
109:1,12 112:5
blinds
159:9
block
270:12
blood
61:18 125:2
boat
7:5 9:4 14:24 15:3
22:22,23 23:9,11 29:14,
21 35:12 54:17 73:4
91:18 116:3 122:8
163:7 190:4 218:21
235:5 258:10 262:13
264:9 265:2 266:24
268:14 283:15,21
291:14 295:9 300:13
board's
30:9 264:1
body
294:1
Bogan
296:10
boilers
267:14
bolded
68:2
bolding
55:19
Bond
149:7
book
55:11,16,17 58:2
150:4,7
boot
123:1,2
boots
227:3
boss
122:13 221:19
228:16 229:3 282:17

boss's
228:23
bothered
163:21
bothering
127:11,12 168:14
bottom
11:20 22:15 32:4,11
65:8 68:21 114:18
126:18 130:11
136:14 137:21
158:13 164:23 165:1
191:20 193:23
215:12 216:17,22
221:7
bouncing
20:14
Bowen
198:9
boy
66:19 239:11
boys
18:3 51:18 233:15,
16 239:2,10
boys'
99:18 100:19
braille
107:3 112:6,8
break
13:23,24 14:1 42:15
53:9 64:2,4 65:20,21
82:20 115:7,8 133:2,
10,21 134:6,12
141:10 153:22
154:6,7,9,21,22,23
155:9 158:1,3 161:7
187:12 191:3
194:15,16,21,22
209:6 213:5 214:22,
23 215:20,21
216:13,14 217:8
229:21 251:21
277:17 278:7,8,9
break-in's
85:8
breakdown
18:1
breaking
56:24 85:5
breaks
53:2,4 154:8,9 161:8
162:22 185:10 187:4
194:16 213:6 277:18
278:1
breakup
67:16
Brian
149:7
bring
41:7 58:6 91:20
92:14 233:1
bringing
28:14,15 91:13 92:3
broke
42:22 56:21 67:11
153:10
broken
194:15 214:5
brother
267:22
brothers
18:2,3
brought
92:13 117:21 146:7
151:7 163:2
Bryant
54:21,23 86:5 110:1,
3 116:10 122:2,11,
13,16 123:7,15,17,
19 149:8 153:1
255:4,5 291:5,7

294:22
Bryant's
99:7
buddies
207:21
building
19:1,3 35:21,22
36:1,2,6,7,9,11,16,
22,23 37:1,5,9,14
40:8,15,19,20 43:19
44:12,14,22,23
45:12,22 46:17,18,
19,21 47:11 48:2,9,
10,12,13,16 49:4
52:19 62:6,11,19
67:5,6 68:19 78:9,14
85:18 86:8 89:15
99:12 100:18,19
117:23 150:21,22
151:2 160:2 168:9,
11 183:2 189:4
191:11 192:7,8
212:12 224:3 226:15
228:18 229:8,24
237:17 254:8 273:18
276:14 277:5
280:22,24 298:7
buildings
36:3,5 281:12
built
97:10
bulky
98:9
bullet
57:20 65:8 67:24
71:9
bunch
239:1
busy
16:3,17 227:20

C

C-A-I-N
165:11
C-A-M-A-R-I-L-L-O
265:14
C-A-N-E
296:21
C-H-O-U
149:6
C-O
128:17
C-O-T-T-R-E-L-L
122:4
CA
240:23 241:3,7
cage
82:9,10 84:15,17
101:14,15
caged
79:13 82:4,24 83:2
84:4,12,19 172:22
Cain
165:11
calculations
271:7
calf
107:22 127:22
call
26:13,23 43:2,6
44:3,13,19 63:5,20
94:18 108:24 112:16
200:15 226:16
231:13 268:10
269:11
called
7:13 28:5 31:3 48:7
49:19 72:12 73:4
117:17 118:1 122:9
124:18 128:8 146:20

148:6 154:19,23
159:14,23 186:18
189:6 190:7 191:14
193:19,20 194:19
224:2,3 227:9,17
233:5 239:15 267:7
269:23 270:1,4
278:9 285:14,16,23,
24
calling
26:17,19 186:17
193:18 211:9 230:8
calls
26:18,20 94:17,19
117:5 275:21 289:10
291:11,18
Calumet
19:16,19
Cam
265:13
Camarillo
265:12 287:3,9
camera
71:20 88:3,4,5 246:9
cameras
71:10,15,17,19
camp
270:5,6,10,15
cancelled
267:4 269:4
caption
290:21
car
230:6 236:7
carbon
165:18
care
11:18 21:3,5 108:11
125:24 136:19 137:7
140:7 155:7
carelessness
85:14

15:18 16:1,5
Carol
29:8
carpal
156:11
carried
44:1
carry
106:15 107:3
case
9:2 17:1 278:20
298:18
caught
245:11
Ceaser
209:18 244:12
cell
66:14,20 228:5
center
53:5 95:3,16 152:11
248:18 259:7
central
52:24 275:13 276:15
277:11
certification
136:20 243:7
certifies
137:8
certify
300:6,14,24
CF
241:2 242:6
chair
40:1 45:16,18,19,20,
23 46:1,2,7,9,23,24
47:12,17 50:1,16,17,
18,23 51:2,3,4,7,9
53:20,22,24 54:8,12,

16,17 56:15 61:3,4
79:15 87:24 90:6
93:3 94:14,23 95:10,
23,24 96:3,4,8,9,11,
17,20,23 97:3,4,5,6,
9,12,16,18,21,24
98:2,5,7,10 99:2
107:16 109:23
110:4,6,8 113:12,15
115:12 116:11
121:3,6,13,18 122:2,
7 123:8,11,16 127:7,
10 128:8 129:5,17
142:14 146:4,7,16,
17 147:4,11,17,24
148:19 152:19,21,23
154:15 158:18 159:4
160:14,19 161:2,4,9,
10,14,15,21,24
162:2,3,5,14,17,19
163:2,4,8,10,22
164:3,7,9 166:17
172:13 182:18
187:10,15,19,21
188:21,23 190:8,10
191:4 213:19,21
256:6 279:23,24
280:8,10 281:22,23
284:16 285:8,14
296:12

**chairperson**
220:4

**chairs**
46:12,14 47:1,6
50:20,21 61:4 89:3
97:13 103:2 104:15
121:22,24 162:24
163:1,3,4,19 164:5,
11,16 172:12 276:11
280:11 282:16
283:12,17,22

**chance**
132:10 158:16 167:5
178:8 180:8 196:12
209:11

**chances**
209:2

**change**
66:4,7 119:5 120:9
153:9 230:4,5
232:20 236:21
277:13

**changed**
21:11 35:12 66:6,8
70:19,20,23 71:1
73:13 81:3 86:4
109:16 116:7,14
117:20 119:6,8,17
120:8 121:22 205:4,
10 206:5 237:12
238:16 276:18,21
277:1,2,4,6

**changing**
80:10 116:6 236:7
237:24 254:12
263:20

**charge**
28:1 47:9 77:9
109:15 220:3 239:18
240:12,14,22,23,24
241:7,22 242:2,5,12,
14 243:12,13,14,16,
19,21,24 244:6,17,
23,24 246:17
247:10,11,13,16,19,
20,22 248:3,4,12,19,
24 249:1,14,21
250:4,6,12,13,15,19,
21 252:7,9,18,20
253:9,10,11,12,15,
19 257:8,19 258:17,
18 262:18,20,21
289:9 290:12 291:7

**charges**
25:11,16 27:10,13,
21 59:18,20 86:18,
22,23 87:4,22
108:13,15 110:10,13
134:9,10,16,18,19,
23 151:16 201:4
205:14 210:9 218:7
225:23 231:24
240:6,8,21 242:11
252:5,16 253:14
258:8,9 263:19
277:3 282:15 287:17
292:1

**Charles**
156:7 169:17

**chat**
272:23

**check**
8:1,7 26:15 45:8
49:17 69:10 81:21
94:17 100:13 116:1
117:10 152:10
182:24 197:16
238:10 273:18 274:4

**checking**
8:4 127:24 149:1,18
275:21

**checks**
148:24 149:16

**Chicago**
7:5 14:17 18:15
20:5,19,24 21:2,9,
10,12,14 22:22 23:5,
9,16 25:6,7 32:23
74:24 111:22 156:5
179:22 180:14
234:13 267:10 270:9
281:7 283:15 300:8,
12

**chief**
149:6

**child**
18:4 246:4

**children**
15:9,11 57:12,14
281:5 296:14

**Chiquita**
7:7 8:1 11:12 246:11

**chiropractor**
102:9

**choice**
238:13

**choose**
154:6,8

**chose**
33:17 154:18

**chosen**
209:23

**Chou**
149:5

**Christmas**
46:12

**Christopher**
211:23 216:20

**chronic**
175:4

**chugging**
14:6

**church**
211:11 270:5,7

**Cindy**
41:16

**circulate**
121:11

**circulating**
184:17

**City**
7:5 267:10

**city-wide**
197:19 198:1,5,14,

21

**claim**
194:8 215:13 262:20

**claimed**
104:17

**clarification**
126:6 274:12

**clarified**
95:17

**clarify**
30:23 50:24 51:10
53:3 89:21 116:21
121:16 124:1 125:19
157:18 168:10
210:10 249:7

**clarity**
44:3

**class**
48:20 49:13,19 57:8
81:1,4,14,21 96:24
97:14 173:2 197:3,9,
12,16 273:20,23
274:2,6,14,23

**classes**
36:12 38:14 39:7
57:10 80:6

**classroom**
45:15 46:7 49:12
57:17 81:19 97:5,6,
8,9 153:9 276:1

**classrooms**
23:1

**cleaning**
21:20 23:1 95:14

**clear**
38:12 51:23 62:20
69:9 79:20 81:7
117:4 143:23 239:19
274:24 275:1

**cleared**
45:6 96:13 273:22

**clearing**
158:20

**clerk**
18:24 19:6

**climate**
64:23 91:17

**climb**
199:15,20

**climbing**
200:1

**close**
247:6,23 250:10

**closed**
53:13,15 159:10
169:5 247:17

**closer**
33:19,20

**closing**
28:9

**closure**
247:9 250:12

**clothing**
66:14

**clots**
125:2

**clowning**
104:20

**club**
270:12

**clue**
226:17

**coach**
20:3,23 23:22 24:3,
10,11,14,15,17

**coaches**
237:15

**coaching**
25:1

**coffee**
11:6,7

**cold**
236:7

**collective**
218:10

**College**
19:21 20:9

**comfortable**
8:8 13:22 45:20
121:23 281:18,23

**comment**
262:6

**commenting**
104:2

**comments**
294:4

**common**
150:22

**communication**
145:7 151:17 170:22

**communications**
86:7 196:7

**community**
219:14

**comp**
108:23

**company**
215:17

**Comparably**
10:15

**compensated**
29:23 222:24

**compensation**
29:24

**complain**
291:14

**complainant**
247:11 258:1 259:11

**complainant's**
247:15,16 259:7

**complained**
88:23 120:5 254:14
292:8

**complaining**
150:6 158:19 205:13
219:3 230:1 239:7
252:6 263:20

**complaint**
14:24 116:8 163:13
240:9 241:24 242:24
249:15 251:24 254:3
257:20

**complaints**
116:2,4,5 122:8
292:10

**complete**
287:8

**completely**
287:5

**complex**
269:10,16

**complexes**
269:2

**Compliance**
145:3

**computer**
36:13 49:14 97:7,14
268:11 272:15

**Computer-aided**
300:20

**concern**
238:24

**conclusion**
291:12

**conclusions**
257:21

**condition**
10:21 132:23 137:23
138:5,8,22 139:3

**coffee** — duplicate removed

142:13,22 173:9,10
175:17,21

**conditions**
138:10 143:3 176:7

**condominium**
269:16

**condominiums**
269:12,17

**confer**
10:16

**conference**
7:6 83:10 146:22,23
193:19,21 227:18
289:19 290:4 294:21

**confidential**
132:1,5

**confirmed**
116:10 283:10

**conflict**
150:14 211:12

**confused**
162:7 164:8 191:16

**consequence**
120:6,7

**considered**
179:17

**constant**
149:10 154:10
178:23

**constantly**
148:6 197:1 267:1

**constructive**
210:13,18

**consulted**
160:3

**consulting**
149:5

**contact**
148:15 208:21
266:15 270:22

**contacted**
120:6 169:19 201:24
209:21 227:15,16
267:2 269:3 285:22
295:8

**contacting**
158:19 225:11

**contested**
241:18

**context**
31:21 158:15 203:4

**continue**
110:5 135:20 160:5
173:21 285:19

**continued**
123:11 158:24
159:12 270:3

**continues**
121:12 122:1,16
124:17 131:6 149:15
152:13 154:3 197:18

**continuous**
133:1 183:3

**continuously**
173:16 175:24

**contraband**
41:8

**contradictory**
164:12

**contributes**
133:11

**control**
64:23 91:17

**controlled**
260:5

**conversation**
51:9 76:17 155:18
177:10,17,18 187:2,
22 190:11,24 194:23
217:6,10 295:12

296:7

**conversations**
10:18 26:21 51:6
211:10

**convert**
82:14

**converted**
82:13

**Cook**
233:16 300:5

**copied**
279:8,11

**copies**
165:21

**cops**
43:17

**copy**
11:16 30:14 111:1
127:19 128:15
144:22 165:18
234:22 242:24
246:12 254:17
257:18 270:19,20
271:6,15 278:21

**cordial**
207:16

**corner**
93:18 99:20 228:18
245:18 287:24
293:23

**corners**
294:5

**Coronado**
235:16 238:19,20

**correct**
9:9 11:24 15:4 23:2,
3,7,8 35:1 36:17
57:18 78:9,10
126:24 131:11 135:7
139:9 150:5 164:2
169:10,24 173:23,24
176:6 178:2 188:24
189:24 193:14 203:9
276:9,10 286:15
300:22

**corrected**
210:15

**correctly**
36:15 72:23 223:22

**corridor**
38:13 99:15

**Cottrell**
54:20,24 61:23
62:10,24 63:6,18
86:5 99:7 110:1,4,11
113:4,5 116:5,9,11,
19,21,22 117:12,15
119:10 122:3,5,6,9
134:20 163:12 201:7
208:21 209:16 210:3
225:23 227:5,6,18
230:21 244:2,4,5,20
245:10,17 246:19,23
249:16 252:11
254:7,9,11 261:20,
24 288:18,20
289:16,18,22,23
290:5,7,11 293:16
294:21 296:4

**coughing**
12:10

**council**
34:16

**counsel**
7:10 10:16 83:15
273:8 299:7

**counselor**
52:6 226:8 230:17
235:16 236:10,17
237:5 238:6,10,17



counselor's
49:8 220:9
counselors
65:13 235:14
countercharged
27:15
counts
259:7,8
County
233:16 300:3,5
couple
17:9,11 20:1 30:11
55:6 61:4 76:11 79:4
88:1,6,8 90:21 94:10
102:5 110:14 117:22
131:18 139:20
144:16 167:13
170:13 180:11
196:23 198:22
202:24 234:6 252:20
264:4 268:1 271:22
293:11
courses
36:12
court
9:13 246:12 269:14
300:10
cover
104:7,11,12 180:23
245:5,6,15,20,22
covered
75:2
covering
99:22
coworker
104:4 155:2
coworkers
85:4,12 92:17
280:22 293:8 298:2
CPD
71:24 72:1,4 73:1,
11,15,19 74:19
87:14 89:7,24 90:6
180:2,10
CPS
18:19 23:12 25:20
73:24 74:12 77:4
87:17 116:3 122:8
131:13 135:1 161:1
162:1,18 164:9
199:1 218:9 261:2
266:3 268:23 281:24
282:2 286:5 287:10
292:4 296:15
cracked
159:11
cramp
107:21
crap
229:20
criminal
21:11
criticism
201:15,19 202:4
210:14,19
critique
200:24 201:15 202:9
critiqued
201:9
crowd
42:24
crying
166:15
Cuffee
198:8 296:16
Curie
30:6 33:4,10,16,17,
18 34:2,8,10,13,23
35:8,19,20 36:3,15
37:6 38:6 40:14,24
41:2,22 42:4,5 52:16

54:12 58:14 64:13
66:2 70:10,20,24
71:14,16 72:6,14,24
73:15 75:17 82:11
86:14 90:7,14 97:11
99:19 104:19 108:7,
19 109:20 111:16
120:15 121:13,16
144:13 146:8 148:17
168:8 170:5 180:8
182:21 195:15
197:18 199:18 200:5
202:7 203:8 209:8,
20 211:1 212:2
218:20,22 219:8,16,
17,22 220:1 223:17,
18,24 230:9 235:7
243:22 244:24 249:1
265:18,19 268:18
273:10 274:16
279:15,16 282:15
283:8,11 285:7
289:4 296:8,12
Curie's
289:5
curious
57:23 58:12 111:8
current
30:22 259:11
263:11,14 266:2
curtain
84:16
curtains
84:17
cushion
45:20
custodial
21:20
custodian
23:1 46:5 61:21
custom
130:17,18
customarily
235:6
customer
19:8 150:12
cut
52:11 95:5 161:8
225:17 226:14,22
227:8,11,24 228:1
229:16 230:16
231:3,5,10,12,19,24
235:9,23 237:16
cutting
237:18,19

**D**

D-O-N-D-E-L-A-Y-
O
25:23
dad
17:15
daily
254:5,9,12 273:9
damages
271:7,18
date
14:13 22:15 23:10
24:21 61:15 70:22
76:9,10 77:17,22,24
85:22 105:10
115:15,20 125:22
145:9 147:20 148:1
156:13,14 157:17
160:9,23 164:19
168:24 170:12
185:15 189:10,19
194:24 195:1,3
200:20 213:1 215:6,
9 217:11 225:21

236:1,2,6 240:24
242:17 251:5,13,16
254:24 256:22 266:6
268:20,21 285:6
dated
114:13
dates
18:20 205:18 249:24
261:23 272:3
Dave
253:3 294:7
David
88:16,17 102:15
127:21 136:9 180:11
238:19 245:10
day
16:17 26:12,13
33:13 38:1 39:15,21
51:15,16 52:1 65:3
66:20 78:18 79:16
96:24 104:7 106:4
118:23 119:24
127:14,15,17,18
129:15 133:10,23
134:1,7 146:19,24
147:13 151:15
159:16,20 166:9
168:13 185:8 186:8
187:13 188:20,21
189:1 190:8 191:17,
18 192:18 194:18
200:14 207:20
212:24 213:18,20
214:9 217:1 226:3
227:11 228:19 231:6
268:7 273:24 280:18
281:11 285:7,9,22
286:9,10 292:14
daycare
267:6
days
17:9,11 65:2 99:22
117:22,23 118:6
123:19 180:5 181:17
dead
246:2
deadline
251:12
deal
19:7 64:22
dealt
201:2 258:24
dean
65:18 226:19,23
289:1,2,3,5
dean's
43:4,5,8 46:6 58:15
72:1
deans
58:14 94:11
dear
193:24 195:5
Dearborne
300:8
Deceased
17:16
December
98:20 143:20
170:11,23 171:10
177:11 252:8
decision
27:23 47:20 50:13
196:22 223:3
257:12,18
declined
213:6 267:8 269:22
declining
213:7
Dedrick
282:21,22 295:14

deescalate
65:9 153:4
deescalating
150:14
deescalation
65:10
defendant
7:7 300:13
defendant's
299:6
degenerative
156:19
degree
69:1
Delilah
126:23 134:11 145:2
182:15 193:23
demanded
45:10
demanding
254:16
denial
199:8
denied
152:20,21,22 160:18
161:2,21 162:17
164:10 181:7 222:17
224:23 225:3,5
242:3,19 248:12,20
denying
162:1 232:16 292:21
department
7:4 27:14,24 28:4
36:13 49:6 77:4
86:24 124:19 134:24
149:6 179:23 180:15
202:1 205:14 218:7
232:3 240:19 247:9,
13,23 250:10 257:11
277:16 288:5 290:22
292:1
department's
257:24
dependability
205:19 206:2,4,7
depending
51:19 52:22
deposition
7:20 8:9,23 17:1,6,8,
13 299:5,8
describe
103:15 133:8 139:5
141:15,19,21 142:23
143:4 173:15 175:22
176:8 183:12 184:12
207:11 265:17
292:24
describes
111:23 137:17 184:9
describing
78:2
description
55:12 56:4,11 58:21
68:5 69:3 70:9 91:4
131:10 137:23
138:21 140:17
149:4,11 156:22
255:20 256:4 259:16
deserted
100:13
designated
58:13
desk
35:23 36:24 37:2,4,
16,18,20,24 38:2
39:18,19,20,24 40:4
44:2,10 45:19 46:24
47:12,15,18 50:4,5
56:20 57:1,3 60:22
61:2,8,9,20,22 62:7
63:15 79:15 95:10

96:5 97:9,10,12 98:9
116:6 261:18 271:15
281:17,18,21
295:16,19,20,22
296:1,2,3,4,6
desks
46:13,14 50:6,8,11
97:11 121:24 295:19
detail
132:22 137:17 139:5
140:14 142:24
156:18 173:8 175:1,
23
details
167:14 177:16
detention
58:17
determination
138:2,5
determine
182:2 195:12 257:12
determined
149:9 268:2
deterrent
92:24
development
64:11 246:4
devices
130:17,18
diagnosed
157:13 259:22
260:22
diagnosis
137:17 140:15
156:19 175:1
diagram
95:1,6 100:17
difference
31:7 209:13
difficult
56:14,17,18
difficulty
112:20 137:21 139:6
dip
207:4
direct
22:18 60:20 145:21
179:15 199:12
243:10 248:9 257:17
directing
283:16
directive
222:7
directly
87:18 95:19 272:9
283:14
disabilities
101:23 162:13
259:14
disability
59:21,22 75:18 76:7
86:24 88:24 108:16
133:11 147:19 148:3
154:16 161:10
163:16 177:4 178:18
185:9,12,14,21
212:20 223:20,21
231:9 258:24 262:20
277:22 278:15
284:11 285:1,3
disagreed
224:8
disappeared
90:6 94:14 228:12
disc
8:4 156:19
disciplinary
166:13 169:4 287:12
disclose
297:9

disclosures
8:3
discriminate
264:10
discrimination
240:15 243:15 258:8
287:17
discuss
17:10 148:16 151:4
195:6,17
discussed
277:15
discussion
55:4 220:21 233:21
258:5,14 273:5
299:2
discussions
195:18
disease
156:20
disease/joint
156:19
dismiss
26:24
dismissed
155:10 191:9 258:9
278:8
dismissive
210:16
disorder
259:14,15,20
disperse
42:23,24 152:1
dispersing
153:13
displaced
19:10 92:8
displayed
235:6
disrupted
169:4
distance
167:4
district
21:14,15,17,21,23,
24 23:6,16,19,22
37:7,13 272:1,9
300:10,11
Division
300:11
dizzy
168:16
doctor
102:9,16 108:2
112:18 122:18,19,24
123:13,23 124:1,11,
18 126:7,8 128:8
131:6 137:16
139:12,22 141:23
142:12 157:3 161:11
185:11 215:2 255:5
285:24
doctor's
11:16 122:17,21
123:1 124:2,4,14
137:15 173:11
174:19 215:3,4
286:1
doctors
102:5 127:24
document
8:2,3 22:6 32:2
57:19 65:7 69:21
77:18,23 93:7,17
111:2,22 137:7
142:11 145:22
155:24 158:8 160:8
168:2 169:7 170:8,
15,16 171:4 178:21
184:3,4,12,21,24
185:2,4 196:14



199:9 210:11 214:13
216:5,6 217:13
220:23,24 221:5
223:7 240:18 243:1,
8 247:1,8 251:3,4,6
259:2,6 278:24
279:3 286:17 287:1

**documentation**
128:11 214:2 255:2

**documents**
8:5,10,14 17:12
30:11 55:6 184:7
185:5 202:24 214:4
299:10

**Dondelayo**
25:19,22

**Donna**
126:19

**door**
58:24 59:3,11 60:6,
12,15,16 61:1 80:3,7
86:1 95:17 124:22
167:3 172:1,6
179:19,20 180:1,9,
15 192:6 193:6,9
245:21 246:4 295:18

**doors**
37:12 89:15,16
151:1 171:18 172:3,
8 176:21 180:23
192:3,5,10,12,17,23
193:1,5 245:6,7,24
246:10 281:2

**doorway**
83:18

**double**
8:7

**downstairs**
79:1 226:4

**downtown**
124:12

**draft**
256:4,5

**drafted**
227:12 255:19

**dressed**
81:1

**drew**
95:5

**drink**
11:1,2,3,7

**Drive**
269:11,12,15

**driving**
285:24

**drop**
205:23

**dropped**
90:18,24 91:2
110:18 111:12
205:22

**dropping**
111:4,15 281:9

**droves**
38:13

**due**
75:17 177:4 201:24
219:2 240:13 242:3
243:13 244:8
248:13,20 258:2
260:12 273:15

**duly**
300:15

**Dunbar**
198:9 282:5

**duration**
138:12 143:5 176:9
217:1

**duties**
57:21 94:14,15
99:11 184:8 249:18

255:20 275:14
276:15,17,18,21
277:1,2,3,6,13

**duty**
45:2 61:7 62:20
69:11 72:17,18
76:20 79:10 87:10
88:3 89:7 100:7
116:7 117:3,20
128:24 146:20
147:15 148:18 151:6
152:15 163:23
164:7,20,22 166:8
179:18 180:4 181:2
182:19,22 184:18,19
186:12 191:2 192:1,
3,23 206:18 212:10,
11,15,16,21 214:7
226:1,5 228:19
244:9 245:1,3
254:13 273:16
274:8,9 275:24
280:12 281:3 282:9

---

**E**

**e-mail**
86:6 115:18,22
121:1,17 122:1
123:20,21,22 124:17
126:14,19,23 127:2
152:3,5,10 163:6
177:6,7,8,10 191:22,
24 195:4 196:7
207:23 208:6 211:23
229:17 251:15
271:19

**e-mailed**
115:24 148:7 177:12

**e-mailing**
145:11 196:4

**e-mails**
229:14 277:20,21
234:9,12,18 291:18

**earlier**
43:12 66:1 85:15
109:4 112:5 124:8
127:5 150:4,9
174:14 179:1 180:19
184:3 186:15 212:6
217:16 218:6,15
221:9 223:1 231:23
234:6 255:23
265:10,17 273:8
277:15 279:3 281:4
284:3 286:17 287:2,
15

**early**
51:7 185:16

**easier**
240:9 242:8,10

**east**
44:23,24 117:6
179:19

**Eastern**
300:11

**easy**
41:7 113:9

**eat**
261:11

**eating**
93:1

**ed**
21:7 36:11 47:13,14

**education**
7:5 19:23 21:9 22:22
23:9,11 45:15
100:19 218:21 220:4
300:13

**Education/chicago**
283:16

**educational**
19:14 32:8

**EEOC**
27:15 28:10,11
135:1 239:17,23,24
247:22 257:15
262:24 292:2

**effect**
12:5,8,22 13:1,3,12
29:5 122:23 152:15
181:3 251:15

**effective**
30:22

**effectiveness**
182:2

**effects**
10:21

**efforts**
65:9

**eighth**
18:4,5,7

**elaborate**
273:11

**else's**
229:15 280:10

**emergency**
103:4 104:8 125:3
128:9

**emotional**
229:19

**employee**
25:12,16,18 132:4
152:18 181:6 234:14
265:2

**employees**
235:7

**employer**
152:17 181:4

**employment**
22:19 31:18 32:15,
18

**empty**
158:21 182:24

**encourage**
232:23

**end**
8:18 44:23,24 48:4
49:3,5 52:10 58:5
64:1 71:12 83:17,18
99:17,19,22 117:6,
10,16 147:21 152:1
164:12 181:24 226:1
236:5 237:14,20
245:19 246:9 256:9
258:8 262:22
276:11,13 293:20
294:11 295:17,20

**ended**
20:6 24:12 34:15
48:4 76:11 87:16
89:14 91:13,14
92:18 102:22 103:3
117:8 123:12 148:4
163:15,16 164:21
202:13 230:3,7

**ends**
49:7

**endurance**
14:5

**engage**
291:10

**engineer**
266:22 267:2,13
268:23 269:8,9,18

**engineering**
267:9,10,11

**engineers**
267:23 269:2

**English**
36:12

**ensure**
58:19 71:10

**enter**
37:9 101:3,4

**entertained**
239:4

**entire**
84:3

**entitled**
187:3,12

**entrance**
37:8 40:15 60:15,17,
18 171:19 172:2,8
179:19,20 180:1,16

**entrances**
58:19 71:10 101:2

**environment**
254:5 292:24

**EOC**
247:7

**EOCO**
146:3 154:5 179:4,
17,21 181:20 182:2
190:14 191:12
196:22 202:2 207:7
214:1 264:7,24

**Equal**
145:3

**equally**
210:17

**equipment**
40:3,6,23 73:20 74:1

**ER**
125:4,5

**Ernie**
23:13

**error**
129:8

**ESP**
203:13 204:13

**Espinosa**
109:14 204:5,22

**essential**
68:1 149:17,20
152:16,18 161:5
181:3,5 195:14

**estimate**
83:21

**estimated**
275:2

**evaluate**
189:8,11,12 203:23
224:4,5,12

**evaluated**
189:13 200:6,17,24
223:16

**evaluation**
112:1 200:14,16,18
202:22 203:7,11,21
204:21 205:2 206:8
207:4 223:15 224:1,
13,16

**evaluations**
200:8,12 201:4,10

**evening**
114:8

**event**
275:16 299:6

**events**
10:5 15:1

**eventually**
64:7

**Evette**
104:10

**evidence**
257:23 259:20

**ex-student**
209:19

**exact**
15:24 21:24 24:21

30:3 34:9 61:15
76:10 85:22 99:17
115:15 125:22
189:10,19 194:24
195:3 200:19,20
236:2 256:22 276:17
283:4 285:6 297:4

**examination**
7:15 130:12 273:6
293:12

**examine**
138:1

**examined**
7:13

**Excruciating**
141:22

**excuse**
29:8 31:1 59:21
63:7,16 64:1 114:1
194:4 273:13

**excused**
299:11

**exercise**
278:14 286:13

**Exercises**
114:2

**exhibit**
11:16 22:5,6 30:14,
15 31:17,19 55:7,8
64:9 67:21 69:14,18,
20 70:3,6 75:3,4,5,
12 93:7,15,22 94:22
95:21 99:9 110:23
111:1,21 114:10,11
115:17 126:17
127:4,16,19 128:15
131:18 139:18
144:7,16,19 156:1,2
158:8 162:10 164:24
167:15,17 168:18,
19,20 170:11,15
174:3 177:6 178:7,
10 179:5 184:4
191:20 196:10 199:8
203:1,2 204:7,8
205:1 207:3,23
211:19 213:11
214:20 215:1 216:2,
4 217:16 220:19,23
221:22 223:6 233:24
240:16,17,18 241:15
242:4,23,24 243:11
245:23 247:2 248:9
250:7,8 251:2 254:2
257:18 259:1 260:14
263:2,3 264:5,18
265:5 278:16,17,19
279:5 286:16 287:19
288:3 290:14,17

**exhibits**
11:12 150:3 264:4

**exit**
149:16,18

**exits**
149:1

**expect**
210:8

**expected**
49:22 274:3,4,7

**expecting**
192:1

**experience**
41:6 92:10 99:23
120:19 150:20
153:24 209:9

**experiencing**
113:1 291:20

**explain**
110:7,9 164:16

**explaining**
178:23 280:4

**explicitly**
235:7

**exploring**
177:13

**expression**
264:21

**extend**
266:16

**extended**
139:6 175:12

**extension**
185:9

**extensive**
285:10

**extent**
10:3

**extra**
26:15 184:8 187:4
255:20

**extras**
61:19

**eye**
82:2,3

---

**F**

**F's**
232:21

**F-A-S-C-I-A**
113:18 137:18

**face**
26:21 119:11

**faced**
99:15

**facing**
81:23 83:12,17

**fact**
88:14 166:19 211:3
222:23 230:4 280:11
289:19 290:3 294:20

**factor**
206:8,12

**facts**
241:19

**faculty**
53:11,14

**failed**
268:1,2

**failure**
59:21 108:17 110:15
250:21 292:12

**fair**
127:23 175:17
209:12

**Faith**
270:8

**fall**
92:15

**familiar**
33:18 75:13,14,15
145:5 265:23

**family**
17:21,23,24 18:9
20:7 21:4,5 231:2,9
265:5 268:10 282:5,
6

**fasciitis**
101:24 102:19
109:19 127:6 130:22
132:24 141:15
143:23 173:11 175:4

**Fascitis**
102:1

**fast**
30:12 78:23 167:13
260:15

**favors**
232:11

**faxed**
123:14



**February**
22:23 114:13,21
143:24 144:14
215:10,11 217:23
266:7 272:4 285:4

**feedback**
202:14,15 208:24

**feel**
13:20,22 159:13,14
201:14 230:14
292:16

**feeling**
154:19

**feels**
107:21

**feet**
83:14 102:22
103:13,17 105:3
127:7,23 128:17
129:3,15 130:6,8,15
133:2 135:5 141:18
143:21 212:10
259:14,20

**fell**
189:15

**felt**
104:20,24 168:16
188:3 201:23 209:12
239:3 266:4 284:15

**female**
111:24

**Fenger**
23:22 24:20 25:12
26:5,6,7 31:6 32:16
33:1 198:8 232:19
233:10 259:23
297:20

**FFC**
289:17

**fight**
42:15,17,22 55:23
56:15,21,23,24 57:4
66:24 72:19 153:10

**fighting**
67:2

**fights**
39:8 41:24 42:21
56:8 66:19,23 67:7,
11,17,18 85:2,6
91:11 153:4

**figure**
9:3 215:22 221:16
242:11

**file**
8:4 27:10 29:6
114:10 122:17,22
123:5,8,11 124:1,5
134:23 157:9 170:6
210:3 211:5 218:9
228:11 239:18,20,23
291:22,24

**filed**
25:10,15 27:12
29:10 59:18 86:19,
22 87:3,22 108:13
110:10 134:9,15,19
145:8 147:23 201:4
210:9 218:11 221:3,
15 223:6 224:21
239:13 240:12
242:2,13 243:12,21,
24 244:6,23,24
248:11,19 249:21
252:7,10 253:19
258:18 262:21,24
277:2,3

**filing**
28:16 134:10 151:16
205:13 225:23
240:14 243:14,19
249:2 252:5 258:7
263:19 271:1 282:15

**fill**
31:24 135:16 179:23
221:18,19

**filled**
221:17 224:7

**finally**
86:17

**find**
37:12 75:21,22
100:18 119:22 120:9
126:4 146:10 185:24
225:11 245:13
265:22 278:20
293:19

**finding**
257:23 289:19 290:3
294:20 295:10

**findings**
257:20

**fine**
10:6 51:13 63:4,21
64:3 144:24 229:22

**finish**
229:5

**finished**
25:4 158:20

**finishing**
122:3

**fired**
25:20 256:11

**five-minute**
86:11

**flagged**
25:20

**flags**
220:8,10,11

**flare-ups**
144:4

**flared**
103:1

**flares**
107:15

**flat**
83:4,5,11,13

**flip**
126:17 136:18
137:16 156:15
158:12 160:9 193:22
217:12 243:6

**floor**
38:5,19 39:11,12
44:11,12,22,24 48:4,
17,18,21,24 49:3
52:19 53:5 58:14
62:23 63:23 67:7,8,9
72:2 78:11,12 93:5,
16 94:8,9,11,18 97:2
100:9,10,21 104:6
106:23 116:24
117:1,2,21 118:8
119:3 120:22,24
146:14,16,17 147:4,
15 148:18 151:10
158:23 159:12,18
161:14 165:10 166:9
182:17 183:10
186:13 187:10,18
188:4,5,10,13,14,16
189:15 191:10
192:4,13,24 199:16
212:16 213:18
224:10 226:5
236:14,18,19,20,23
237:13,23 238:1,2,4,
5,6,9,17 273:16
276:13 280:3,5,6,9,
19 284:15

**floors**
85:24 273:19

**fluctuate**
74:21

**FMLA**
230:23

**focus**
51:13 93:2

**focusing**
274:22

**folded**
118:11

**folder**
93:10

**follow**
119:21 160:1 164:19
183:8 192:22 210:23
298:21

**follow-up**
298:24

**Fool's**
268:7

**foot**
101:24 102:18,21
103:5 110:18 111:5,
12,16 126:15 128:10
130:8 137:21 141:14
173:11 174:15

**football**
51:20 52:11 237:15

**foregoing**
300:21

**forget**
7:24 9:17 44:13

**forgot**
45:23 265:16

**forgotten**
18:10

**form**
26:4 136:2 157:10
195:10 221:17 271:3

**forms**
108:24 203:7

**forward**
8:8 100:15 106:24
221:11

**foster**
15:11,14,16 268:5

**found**
8:12 29:14,21
222:19 226:24

**fourth**
57:20 134:1 152:14
162:16 179:15

**Frank**
208:8

**free**
13:20

**frequent**
13:13 120:8

**frequently**
86:4

**freshman**
48:21,22 120:21,24
188:5

**Friday**
61:17 159:22

**friend**
297:5

**friendly**
108:14

**friends**
198:4 282:10 297:1,
8

**friends'**
297:7

**front**
22:10,16 56:20 57:19
62:2 64:9 65:7 70:6,
8 77:18 88:3,4 95:11
96:1 99:9 100:17
121:1 132:1 136:20
142:11 160:8 161:23
171:6,19 174:19
199:9 216:6 220:23

**243**:2,5 246:9 247:8
251:6 254:2 269:15
278:21 279:17

**fulfill**
57:21

**full**
14:7,9 42:10 127:14,
17 180:6 188:20

**full-duty**
114:19

**fullest**
10:3

**function**
77:11 149:12 153:17
195:14

**functions**
68:1 69:4 138:15
139:4 142:23 143:8
149:17,20 150:5,6,
13,17 152:16,18
153:3 161:6 175:22
176:12 181:3,5
275:14 277:11

**Funny**
40:5

**future**
209:3

G

**G-U-L-I-E-C-H**
102:13

**games**
282:7

**Gary**
125:14 215:5 218:1

**gather**
58:7

**gave**
28:11,13 50:17,18
77:24 108:24 120:3
183:5,11 184:5,21
188:23 201:14,18
210:3 214:5 227:12,
21 236:11 238:14
254:15 263:21
273:10 285:9,12,17
294:10

**great**
206:11,17

**green**
97:12,13

**greet**
37:3,11

**greeted**
51:18 282:8

**Gresham**
198:8

**grievance**
210:23 211:5
218:12,18 221:15,21
222:6,16 223:6,13
224:21 239:13

**grievances**
218:9,11 291:22

**grin**
119:11

**grounds**
58:19 68:10 71:9

**group**
219:24

**guaranteed**
120:16

**guard**
97:17 148:22 164:3
277:12

**guardianship**
16:7,8

**guards**
46:10 73:1 90:24
91:2 97:20,23 98:6
198:12 199:1,3
294:13,18

**guards'**
69:4

**guess**
19:7 22:8 31:14 33:1
46:12 47:3 50:24
58:16 72:12,24 75:1
77:15 91:9,17 92:24
98:15 105:6,22
115:4 120:23 134:13
138:19 143:10,17
147:13 157:8 158:18
164:8 165:19 168:24
188:3 213:19 217:6
225:1 227:16 231:20
238:24 272:17

**guests**
56:1

**guide**
38:23

**guilty**
29:14,21

**Guliech**
102:7,12,15 114:10
124:7 125:13 127:22
136:9 140:10 156:6,
7 157:2,14,19,21

**Guliech's**
140:7

**guy**
88:9 165:14 167:2
220:3 228:16,20
229:2,4

**guy's**
228:23

**guys**
119:4 231:13 251:21
276:8 283:22 289:20

**gym**
35:22 36:8 46:4 81:4
100:19 228:6,21,22,
24 229:1

H

**half**
83:3 128:24 129:2,9,
12 133:10,18 142:3
159:16 178:8 191:17
193:16 215:23
285:22

**hall**
37:15 57:1,2,12,21,
23 58:1,2,11 80:12,
13,15 81:13,17,18
96:12 100:4 153:6,
15,24 158:21 182:24
186:3 293:20

**Hall-jackson**
7:9,10 8:11,19 44:16
82:16 83:15 125:8
126:6 157:6 158:2
175:10 220:20
240:16 241:2,5,8,10,
12,15,18,23 242:7
243:2 246:14 271:9,
14 273:2,7 274:14,
18,20 278:18,23
287:22 289:12
291:13 293:10
298:14,17 299:1,3

**halls**
45:6 49:17 51:23
69:10 94:16 117:4,
10 197:16,20 273:22

**hallway**
39:3,9,14,18 41:24
43:9 44:4,10 45:22,
24 47:2 56:23 57:6,
11,16 58:3,4 62:21,
23 74:15 80:5 81:11,
17 91:11 95:4,7,10,
16,18,24 150:18
151:12 153:8,10,13
173:2 181:23 184:14

**giving**
103:19 118:10
122:11 165:21 228:1
244:9 249:18

**goal**
9:2 24:16

**good**
7:2 8:19 9:23 23:24
33:16 34:19 41:13
44:21 64:4 120:20,
21 146:13 158:5
159:13,14 201:12
209:12 210:8,17
232:22 267:18
272:15 296:9

**grades**
232:23 233:1

**graduate**
19:14 20:5

**graduated**
19:16,22 21:6
265:21

**Grant**
118:5

**granting**
250:15

**Graves**
75:22 76:2 77:13
146:11,21 147:6
182:16 183:5,11
184:4,21 186:17,20,
22,24 187:2,9,15,23
188:3,7,23 189:3,6
190:2,7,18 192:21
193:18 200:9,13
211:23 212:8,18
213:4 216:19,20
217:6 224:18 255:24
256:3,5 262:10
284:15,20 285:8,21
294:10

**gay-straight**
220:5

**gender**
264:21

**general**
36:11 55:20 71:5
141:11 150:17
189:20 292:11

**genius**
175:10

**gentleman**
281:18,22 296:17

**Geri**
34:3

**girls**
18:3 38:11,22 85:13

**girls'**
23:23 38:4,8,10,16
43:10 45:8 49:7
76:19 80:6 83:1
84:23 85:11 99:16
100:16,22,23 101:5,
10,16,18,20 188:9
212:9,19 228:18
284:2,6,10 285:10

**give**
46:22 51:1,3 52:8
58:10,16 79:23
122:10 123:3 131:7,
19 132:9 158:16
161:4,6,21 162:19,
21 178:8 196:11
221:19 227:21
232:24 246:11

**giving**
254:16,17,18,19
259:1 267:12 284:16



**hallways**
49:16,22 68:18,20
99:13 153:16,18
172:24 183:23
198:16,22 199:4
212:13 274:24

**hand**
43:18 147:9 157:3,4

**handbook**
69:16,22 70:4,7
234:19,23 235:2

**handed**
147:12

**handing**
118:3

**handle**
65:16 151:7

**handwriting**
22:12 32:2 77:20
132:2,11,18 133:3,
12 135:6 136:11,24
137:1,11,13,15
139:24 140:4 158:10
171:7,13,23 174:20
196:16,20 204:14,15
213:14 214:18
216:15 217:13 221:5

**handwritten**
158:15 183:13

**Hanes**
261:20 294:6

**hang**
20:13 274:8

**hanging**
45:5

**happen**
34:20 46:8 85:6 94:6
125:24 235:1 244:24
252:8

**happened**
9:4 10:5 27:20
29:13,19,22 39:17
50:9 61:12 67:19
73:12 89:2 93:4
104:24 105:4,8,20,
24 106:2,6,17
110:21 111:13
119:19 125:19 160:7
189:18 210:22 211:7
214:14,15 219:19
225:12,20,22 228:20
229:11 250:3,5
262:17,22 285:15

**happening**
107:9

**happy**
195:6,16 202:21
281:18

**harassed**
43:13 240:13 243:13
254:5 258:2

**harassing**
26:22 232:13

**harassment**
25:11,15 26:7 29:1
43:13 64:24 110:11
134:19 205:11,12
209:10 210:9
229:12,15 232:7,15
254:10 259:13,23
268:18 291:21
292:12

**hard**
56:21 87:12 97:5,13
106:24 121:23
153:18 155:16
165:16 268:1

**hardcopy**
118:10

**harder**
91:6 162:20

**he'll**
16:1

**head**
9:13 86:1 98:13
228:20 293:20

**headed**
226:5

**header**
71:6

**heading**
118:4

**headphones**
66:13

**health**
46:4 47:4 80:6
136:5,19 137:7
140:7

**hear**
67:2 148:5 151:23
294:16

**heard**
33:15 42:13 76:1
50:10 91:14 155:11,
15 177:2 186:16
193:17 228:22,24
229:13 230:7 263:21
295:10

**hearing**
28:3 169:3,5 176:22
188:1 222:9

**hearsay**
74:12 230:1

**heat**
108:4

**Heating**
267:15

**heavy**
106:15

**heel**
103:10,12 122:23
130:22 175:12

**heels**
130:4

**height**
172:13

**held**
87:9

**helped**
142:7 195:12 206:18

**helps**
12:9 142:7

**heretofore**
300:6

**hey**
253:19 296:1

**hiding**
45:9 274:5

**high**
19:4,15,17 20:8
23:22 24:20 25:12
26:5 30:6,7 31:6
32:16 33:4,6,7,8
34:23 42:6,9,12 68:9
97:10 197:19 232:19
239:1

**HILDEBRAND**
7:2,10,16,22 8:12,
20,21 11:12,14
13:24 14:2 44:17
55:2,5 65:20,22,24
82:19,21,23 83:16,
20 95:14,20 115:7,9,
11 125:6,9,13,18
126:9 137:5,10
157:7 158:1,4,6
175:11 210:10
214:24 215:20,22
216:1 220:22
233:20,22 240:17

**harder** → 
241:4,6,9,11,13,17,
20,24 242:8,9 243:3
246:11,15 258:4,6,
13,15,16 271:5,12,
17,20 272:24
274:12,15,19 278:22
287:20 289:10
291:11 293:11,13
298:12,15,20 299:9

**hip**
103:11 233:5

**hire**
72:24 211:3,6

**hired**
29:1 35:21 36:16
67:23 70:14 82:10
87:18 120:1 172:6
197:10 218:20

**hiring**
72:15 218:22

**history**
32:8,19 36:12
111:23 240:21
260:19

**hit**
106:14 107:1 108:21
109:1 113:5,16
224:10

**Hm**
54:4

**hold**
20:2 100:21 147:10

**holiday**
169:3,4 222:10

**holidays**
177:22

**home**
61:18,19 106:3
115:5 150:24 191:17
227:7 270:22

**homosexual**
258:3

**honest**
54:6 59:17 228:13

**honored**
199:17

**Hop**
233:5

**hoping**
125:1

**hormones**
42:10

**hospital**
102:8 124:19
125:17,23 130:7
142:4

**hostile**
254:4 293:1

**hour**
69:9 127:13 134:9
173:17,23 176:1
181:7,9,13,22 187:4,
13 189:5 193:3,16
215:23 277:17

**hours**
21:10 37:21,22,24
38:1 39:15,22,23
92:23 103:3 105:3
128:24 129:2,9,12
130:2 133:10,18
142:3 173:17 175:24

**house**
36:10 209:7

**housekeeping**
7:23 240:8

**houses**
36:7

**huddles**
85:23 86:10,11

**human**
8:15 27:14,24 28:4

**humble**
210:18

**hundred**
39:3,9,10 199:23,24

**Hunt**
169:17

**Hurry**
80:17

**hypertension**
12:17,18 259:16,19,
22 260:4,11,23
261:2,3,6,16 262:7,
14

**I**

**ice**
108:4 141:23

**icing**
105:15

**ID**
132:4 172:17

**ID's**
43:2

**idea**
41:13 105:4 110:10

**identified**
279:18 287:5,24
291:4

**identifies**
288:13

**identify**
176:3 273:9 286:24
288:4 289:14

**identity**
264:21

**IDHR**
240:13 242:2 243:13
244:17 248:12,20
262:21

**illegal**
264:10

**Illinois**
27:14,24 28:4
134:24 202:1 205:14
218:7 240:19 247:23
250:10 257:11 292:1
300:1,5,9,11

**illness**
111:23

**immediately**
43:6 58:8 61:21
75:22 117:12 118:11
124:18 125:2 171:1
274:7 280:7

**impaired**
133:8,9 173:15

**impairment**
138:13 139:3
142:13,22 175:17,21
176:10

**impairments**
138:11 141:3 143:4,
6 175:8 176:8

**impressive**
20:10

**improvements**
86:15

**inaccurate**
68:8

**inappropriate**
65:9,15

**Inaudible**
128:20

**incident**
61:14,16 78:1,2,6
108:21 109:4,10,12
110:17 112:7,13,16,
21 154:12 167:11
225:16 239:14 245:9
254:14 280:18
285:13

**incidents**
84:23 85:11,13

**included**
148:24 254:5

**includes**
264:13,20

**including**
90:14 264:20 283:8
285:8

**income**
271:1

**incoming**
48:21

**increased**
112:19 293:3,6

**individual**
151:11 200:10
234:15

**individually**
132:16 171:18

**individuals**
43:1 208:23 211:6
294:4

**inflammation**
140:16,21

**info**
36:24 37:2,16,20
39:24 44:2

**inform**
30:21 159:19 279:21

**information**
32:7 35:23 37:18
46:24 61:8,9 123:14
131:24 135:21 137:8
157:11 171:9 191:15
197:21 198:3
281:17,21

**informed**
199:14 279:24
282:20

**informing**
235:7

**initial**
8:3

**initiated**
146:6

**injured**
104:18 106:14 112:1

**injuries**
107:5

**injury**
105:2,9,19 106:8
113:19 114:22

**inquired**
208:24

**inquiring**
127:20 281:15

**inside**
49:7 79:14 90:1
281:12 289:3

**insisted**
160:5 189:13

**instructs**
10:12

**insubordinate**
287:13

**insurance**
108:22 115:3 215:17

**intensified**
127:6

**interact**
281:14

**interacting**
150:12

**interest**
211:13

**interested**
27:8

**interfere**
138:14 143:7 176:11
275:13

**interrogatories**
266:10

**interview**
30:6 93:12 209:16,
22 257:12 266:16
267:4,5 269:4,22
270:1 290:10 292:3

**interviewed**
33:9,22 34:2,5
218:24 267:8

**interviewing**
33:4

**interviews**
33:14

**introduced**
209:18

**investigate**
116:12

**investigation**
240:20 258:1 288:5
290:22

**investigator**
116:3 290:4 291:19
292:6 295:1

**involved**
72:22 267:6

**involves**
212:10

**involving**
222:6 257:9 262:20

**ipod**
228:5

**irritable**
210:16

**issue**
237:6 238:8

**issued**
190:5 226:8

**issues**
40:24 41:2,5,23
55:23 66:3 85:17
91:10 107:6 113:6
115:2

**issuing**
52:6

**J**

**J-A-D-I-N-E**
149:5

**jacket**
228:5

**jackets**
91:15,16 92:4,6

**Jadine**
149:5

**jail**
72:21 233:16

**Janet**
24:6

**janitor**
158:23 245:20
261:20

**janitorial**
21:20

**janitors**
61:23

**January**
46:13,15 53:19,21
76:14,22 78:3 85:21
98:19 100:15 101:9



143:24 144:14,21
185:7,14,16,17,21
188:17 189:2 190:2,
5 191:21 196:6
212:23 213:2 214:6,
7 215:7 272:3
**Joann**
16:23 18:19
**job**
20:6 23:24 24:13
31:23 32:23 35:23
37:23 38:12,14 39:1,
2 45:2 49:15 52:7
58:6 70:9 78:21
87:12 90:1 91:7
110:5 117:3 120:20
138:15 139:4 142:23
143:8 147:14 148:23
149:4,10,12,18,21
150:5,17 151:1
152:4,16 153:3,7
155:12 161:5 162:21
172:22 175:22
176:12 178:23
179:7,8,11 180:5
181:4 183:9 197:14
199:4 202:6,22
209:19 210:1 217:19
219:9,10 255:19,20
256:4 261:9 262:4
266:12,14 272:13
275:14 276:18,21,24
277:2,3,6,12,13
281:19
**jobs**
55:12 92:9 206:19
271:23,24
**Joe's**
114:4
**joke**
268:7,8,9
**Jones**
34:3,5 35:2 44:7,8
47:22 123:4
**Joseph**
16:2 102:8 125:3
126:2,3 130:6 289:1
**Joseph's**
124:19 125:16,21,23
**Joy**
230:20
**Julian**
198:9 282:6
**Julius**
292:4
**July**
23:6,17 140:20
251:19 269:7
**jump**
100:15
**Jumping**
74:3
**June**
8:3 22:23 23:10,11
60:1 91:21 140:22
148:4 163:16 237:21
241:13 242:1,5
246:23 248:3,7,11,
19,24 249:14,19,20
250:13 251:19
252:16
**junior**
42:9,12
**justice**
21:11 64:23

15:18,24 16:5

**K**

**K-O-S-I-K**
41:18 204:5
**Kane**
296:20
**keeping**
30:12 241:1
**Kennedy**
19:23
**Kennedy-king**
19:21 20:3,17 21:6
24:15,18
**key**
79:6,8
**kicked**
233:13
**kid**
18:10 58:15 84:7
96:23 233:12
**kids**
15:16 16:11 39:6
42:9,14,23 43:7 45:3
57:1,4,6,9,10,13,15
58:3 66:19 67:2 69:9
72:20 80:10,18,19
81:3,7,13,21 89:17
91:10 92:24 94:7
96:21 104:20 150:12
153:5,8 173:2,3,5
201:2 220:12
232:20,22 233:6
237:16 268:5
273:15,19 274:2,5,
14,22
**Kim**
7:12 14:9 22:15
111:23 118:17
137:9,11 191:22
300:9,12
**kind**
10:24 14:5 18:10
20:14 42:8 43:16
57:23 58:6 67:18
85:1 91:3 93:6 95:2,
4,6 97:13 98:9
99:12,20 103:15
110:9 144:16 162:7
167:14 211:15
219:20 221:16 224:9
232:19 237:18 240:8
243:15 254:19
270:12 273:10 276:2
**King**
19:23 90:10
**kissing**
117:12
**Kline**
208:8
**Klor**
124:23 126:8
**Klor's**
127:19
**Klor-gross**
11:17 124:24 125:14
260:7
**Klor-gross's**
260:17
**klutz**
20:14
**knee**
104:17,18,21,22,24
105:2,3,19 106:9,14,
23 108:19,20 109:5,
10 112:1,3 113:6,16,
19,24 114:22 135:6
140:15,19,24 143:12
259:15,21
**knew**
63:15 73:21 104:5

148:7 153:24 166:19
191:3 197:13 200:15
201:23 209:9 211:10
232:12 237:10
243:22 244:16 249:1
252:9 287:16
**knock**
8:18
**knowing**
8:9 202:21
**Kosik**
41:16,20 98:15,18
109:11 204:3 219:18

**L**

**lab**
49:14 97:7,14
**label**
93:21 96:8 246:7
**labeled**
174:2
**labelling**
237:8
**labs**
36:13
**lack**
257:23
**ladies**
29:3
**lady**
29:9 34:3 79:4 270:1
292:6
**laid**
25:6,13 27:18 30:21
**Laino**
165:17 167:6
**Lake**
269:11
**Lakeshore**
269:15
**laptop**
110:18,19,24 111:4,
11,15 146:23 183:15
**large**
83:1
**Lasalle**
124:12
**lasted**
48:2
**late**
81:1 180:13 211:14
255:2
**laugh**
51:21
**Laura**
28:19,21,22 29:2,9
116:22 244:2 249:16
254:7,9 288:18,20
**lavatories**
68:19
**law**
7:4 83:11
**lawsuit**
28:14,15 29:7,10,13
32:23 70:15 243:1
**lax**
207:15,18
**layoff**
25:9,10 30:14
**layout**
93:11 245:24
**lead**
218:13
**leader**
210:17
**leading**
81:19
**leads**
80:5

**leaned**
159:1
**Leara**
118:14
**learn**
65:11 150:18,19
**learned**
148:9 209:6 211:16
**leave**
19:9 51:22 79:6,8
160:6 168:10 191:11
224:10 231:2,9
256:19 265:5 271:15
273:12
**leaving**
76:12 85:13 104:7
123:12 168:13 185:8
192:23 211:9 262:3
**Leek**
115:18 126:19 127:1
**left**
21:3,9,12 23:11,18
26:15 44:7,8 61:18
83:17 90:7,15,17,21,
22 94:8 98:18
120:23 123:9 144:13
155:8 160:2 168:8
173:11 175:4,9
215:23 216:2 236:18
261:24 266:2 271:21
296:11
**leg**
103:10 107:21 130:6
**legal**
291:11
**lesbian**
27:5 219:1 232:7,8,
14
**letter**
28:10,12 30:14,17
96:7 116:19 148:1
152:13 154:3
160:11,17 161:1,17,
19,20,22,23 162:10
164:23 165:1,22
166:1,8,24 178:22,
24 179:3,7,16
181:15 183:17
190:4,14 194:3,13
195:7,8,19 198:20,
23 227:12,17 231:19
234:5 247:7,22
250:17 279:17,18,19
280:14
**letters**
167:13
**letting**
168:12
**level**
38:17
**LGBTQ**
219:14,23
**liability**
170:20
**library**
53:6
**license**
34:10 266:22 267:11
268:12,15
**lied**
147:1 190:19 256:2
**life**
138:21 142:17 176:4
**lifestyle**
232:12
**limit**
139:3 142:22 175:21
**limitation**
143:6 176:10 195:13

**limitations**
133:8 138:13 154:10
173:15
**limp**
103:23 104:3 106:11
**lines**
71:8 196:24
**Lisa**
8:2
**list**
11:20 13:4 132:15
171:17 240:20
285:10 288:8,11,12,
21 289:14 290:24
291:2
**listed**
11:23 198:22
**listen**
151:18 157:6 202:17
**listings**
22:21
**live**
14:16
**lived**
14:18,20
**living**
15:2
**lobby**
82:18
**Local**
169:22
**located**
48:23 156:6 277:9
**location**
49:10 52:24 188:18
**lock**
81:10 225:17 226:6,
9,14,22 227:8,11,24
229:15 230:16,23
231:3,5,10,12,24
235:22 236:13,21
237:16,20 239:8,14
**locked**
222:11
**locker**
38:4,8,10,11,16 39:1
51:18 52:2,4,5,8,16,
17,21 75:24 76:18,
20 78:4,7,8,16,20,21
79:2,7,9,11,15,18,22
80:7,10,17,21,23
81:6,13 82:5,8 83:1,
23 84:4,10,18,23
85:11 96:1,2,4
100:5,16,22,23
101:5,10,17,18,20
146:13 147:13,17
171:20 172:2,4,7,20,
23 173:6 176:21,24
177:14 179:19
181:17,20,21,23
182:9,13,20,23
183:1,22 184:10
187:8,24 188:2,8,9
190:16 191:1 192:1
194:2,9 195:9,16,19
199:19,21 212:7,10,
14,19 225:17 226:2,
3,6,9 228:4 229:12
230:5 231:14,17
235:2,18,19,20
236:10,11,13,14,17,
21,22,23 237:1,6,9,
10 238:3,5,6,11 239:5
256:8 257:1

**lockers**
45:4,5 52:7,10,12,20
81:8 83:23,24 84:1
85:5,8 95:3 96:2

**99:16,18 231:21**
234:13,16 235:6,11
237:4,12,24 238:7,
16,21
**locks**
52:11 81:10 85:13
235:5,8,10 237:18
**log**
171:19
**long**
10:16 14:20 17:17
21:21 24:9 34:7
37:19 39:3,20 44:4
48:1 65:1 66:20
83:14 94:3 103:17
106:5 112:23 114:5
123:18 125:14
126:10 130:24 131:1
137:22 138:5,6,23
139:11 141:7,17,20
193:1,15 196:11
233:3 235:14 274:9
275:2 285:2
**longer**
60:18 62:4 74:11
75:21 77:8 83:12
91:8 118:19 215:24
224:3
**looked**
118:4,20 125:10
139:21 150:23 151:1
229:4 265:23,24
266:21
**lost**
90:20 91:1 226:24
228:2
**lot**
14:4 26:9 41:4,23
42:20 66:3 69:4,5
87:11,23 90:6 104:5
105:23 133:1 143:22
148:21 152:6 183:19
205:11,16 283:24
291:9
**lounges**
53:11
**low**
156:21
**lower**
107:20
**lumbar**
156:20,21
**lunch**
50:22 62:1 63:1,3
93:1 106:22 133:20,
21,24 134:11
152:11 154:6,7,9
161:7 194:15,16
216:24 217:8
277:17,24 285:18,
19,20
**lunchroom**
49:8,20 53:6,14
91:22 92:19,20 95:1,
2,18,19 100:6
118:22 119:2,9,10
147:12
**lunchrooms**
49:6 67:9 118:23
**Lutheran**
270:8
**Lynn**
34:3

**M**

**M-A-X-Z-I-D-E**
13:5
**machine**
40:10 89:13 106:15,
16 107:3,4 112:6,8



machines
41:10 58:8 172:13
made
27:23 28:1 30:8
31:18 32:21,22
47:20 50:13 70:12
74:13 89:19 90:2
100:10 103:2 130:7
142:3 162:14 166:19
168:24 169:1,12
176:20 183:7 196:1
225:6 232:1 241:22
256:17 257:20 289:8
mail
148:2
mailbox
120:10,13 167:21
168:23
mailing
132:4
main
9:2 52:20 53:1
maintain
172:23
Maintaining
267:14
maintenance
267:14
major
19:24 21:11 138:21
142:17 176:3
majority
272:10 298:8
make
9:11 12:12 36:14
38:15 391,7 43:5
45:2,4,9 56:22 81:6,
7,10,22 99:24 100:6,
7 138:1,4 155:17
162:20 168:7 182:23
202:10 223:15
238:11 240:8 242:10
246:12 262:6 271:14
274:4,5,6,24 278:11
280:10 288:19 294:3
298:19
makes
129:7 242:8
making
10:8 26:8 86:17
88:10 98:23 131:13
147:5 151:23 170:10
262:12 264:10
280:13
man
89:19 102:14,15
180:4 219:6 238:18,
19
manifestations
105:19 140:23
manner
221:13
March
54:1,11 59:12 60:2
89:6 103:2 104:15
116:16,17 163:15
240:12,22 241:6
242:12,15 243:12
244:2,17 247:10
253:12,15 298:6,7
Marco
180:4 265:10,12
286:19 287:9
Marco's
180:6
mark
93:16 95:22 96:6,14
100:24 245:24 246:7
marked
22:4 30:13 31:17

55:7 67:20 69:13
75:4 93:7 94:21
110:22 111:20 114:9
115:16 128:14
131:17 139:17
144:15 156:1 158:7
167:15 168:19
170:14 177:5 178:7
191:19 196:10 199:7
203:1 204:7 205:2,3
207:22 211:18
213:10 220:18
233:23 242:22 246:6
247:1 250:7 251:2
260:14 264:17 265:4
278:17
married
15:5,7
Marshall
30:6 33:6,7,10,22
massages
108:4
math
36:12
mats
47:5
matter
17:10 230:4
Maxzide
13:5
meaning
27:22 37:21 48:19
128:5 152:8 195:21
197:10 247:11
292:18
means
206:7,12
meant
110:7 199:5 206:20
measurer
83:22
mechanical
156:21
media
53:5 152:11
medial
112:2
mediation
28:7,8
medical
111:1 132:23 135:21
138:10,22 139:3
142:21 143:3 173:9,
10 175:20 176:7
231:2,9 254:21
255:1 259:19
260:17,19 265:5
medication
11:8 260:11 261:1,3,
17 262:7
medications
11:21 13:5
medicine
61:19 63:14,16
116:6 156:5 261:19
295:17
meds
62:7 64:7 260:2
261:5,8,16
meet
37:11 167:5 169:8
185:21 193:18 200:9
210:24 295:9
meeting
41:19 151:4 166:13,
22 188:6 189:1
190:1 207:20 283:19
295:9,10
meetings
41:8 85:16 220:14,
16

member
169:21 219:13
members
282:7
memo
283:20
memory
10:21 11:9 12:6,23
13:16 44:21 111:6
men
233:14,15
men's
24:15,17 25:1
mental
141:3
mention
286:19
mentioned
17:19 40:23 85:15
107:5 151:9 219:18
239:24 265:10
271:22 281:4 297:1
mentioning
282:14
mentions
62:4 111:11
Mercier
156:7,9,10,11 157:1,
2,4,12,18
Mercier's
157:10
mess
115:3
messages
98:16 211:9
met
98:22 163:8 164:17
172:7 190:6 296:22
metal
10:6 112:4
Metz
103:5 111:2 124:7
125:11,12,13 126:16
127:21 128:3 135:22
136:8,15,17 138:1,4
139:10 174:12,14
Metz's
128:15
Michael
77:10 117:6 186:5
261:20
mid
249:20 255:2
middle
42:9 58:6,7 71:5
83:13 234:9 236:4
263:13
midway
280:2
Midwest
103:6
midyear
223:24 224:13,16
Mike
158:23 209:18
252:12 294:6
mind
229:5 278:21
282:14,24 292:23
mine
24:16 104:12 118:24
119:6 153:7 192:2
196:21 227:3
minor
41:24
minute
104:21 131:19
minutes
63:5 79:21 103:20
110:14 117:14
129:23 133:19

134:4,13 139:15
141:10 142:15 143:1
153:21 173:17,23
176:1 179:4 181:7,9,
12,22 183:4 186:18
187:13 193:3 194:14
197:13,14 216:24
224:3 226:18 234:6
273:3,22,23 274:1
275:4,5,6,10
mirror
84:6,20,21
missing
116:6 227:5 261:18
295:17
mistake
128:23 129:1 168:24
169:1
mistaken
298:18
misunderstood
107:1
Mm-hmm
11:22 12:19 14:23
22:20,24 28:19
32:17 55:21 59:8
77:19 94:2 107:13
114:1,15,23 115:19
120:2 121:4 128:18
130:13 135:13,23
136:10 137:12 145:4
149:23 158:2 160:16
167:16 175:3 191:23
196:13 197:4 198:14
208:7 241:12 255:10
257:22 270:23 279:1
290:19
Mohammed
165:11,12
mom
16:12,16,24 42:12
296:24
mom's
16:13
moment
113:21
momentum
106:23
Monday
51:16 61:17 117:19,
20,24
money
26:15
monitor
49:16,17 58:18
62:23 71:17 74:1
94:16 99:11 103:19
151:13 181:23
212:13
monitored
180:2
monitoring
39:14 43:9,10 49:21
73:20 74:4 81:4,12
89:22 99:13,14
153:16,18
monitors
71:9 73:24 74:5,7,10
181:21
month
42:21 51:19 59:9,23
61:13 67:14 85:9
269:21
months
176:14,15,16 295:8
Morgan
14:16
morning
7:2 8:13 11:1,4
51:16 60:7,11 67:6
85:16 89:12 134:13

167:3
Morris
75:21,22 77:10 88:9
117:7,12,15,22
146:15 154:17
159:14 186:2,4,5,7,
10,19,22,24 187:2,
17,19,23 188:7
189:3 190:2,7
192:11,19 193:17,20
200:9,12 209:18
211:2,10 226:1,11,
20 252:12 262:10
285:21 293:17
motivation
25:3,5 267:24
move
38:15 39:7 46:5
61:22 64:6 87:6
96:22 97:3 120:22
122:7 154:2 158:24
245:3 268:3 293:17
296:4
moved
59:11,16,18 60:5
61:24 96:20 228:17
236:14,15 237:13,22
245:1,2,4 295:18
movement
197:21
moves
116:24
moving
104:14 105:6 120:14
153:14 254:12 277:4
286:16 290:14
multiple
277:20 283:7 287:17
music
36:7
mystery
111:19

**N**

named
88:10 180:4 244:20
249:15
names
15:17 52:9 165:9,17
235:14 297:7
narrow
265:22
nasty
75:20
national
264:11
nationals
20:4
nature
9:6 114:3 166:22
233:8 267:16 270:14
nauseated
168:17
nearby
46:7
needed
12:2 72:21 91:15
98:5 100:14 132:17
133:12 146:14 154:2
181:7 187:18 188:4
191:3 197:13 214:15
224:4,12 226:21
231:14,21
negative
201:15,19 202:18,22
nephew
25:3
network
228:21 283:5,6

news
34:17
newspapers
79:15
nice
34:3 45:19 46:13
201:4
night
46:5 242:20 248:22
nodding
9:12
non-uniformed
73:24
nondiscrimination
264:2,22
nonpaying
206:19
nonsense
209:10
normal
60:15 164:6
north
282:11 297:2 300:8
Northern
300:11
northwest
192:3,5,10,12,16,23
193:1,5 245:5,7,24
246:3,9,10 295:17
notary
300:4
note
131:7 158:16 173:11
215:3,4,16 235:16
285:17
notes
112:18 115:1 142:12
154:4 214:12,14
217:15,18
notice
106:9 151:22 293:3,
7,22
noticeable
103:22 106:10
noticed
117:5,11 226:4
245:17 261:19 294:1
notices
235:4,10
November
92:2 155:19 160:10,
20 161:24 162:3
163:4,9 167:12
169:16 170:23 195:3
222:7 256:21
number
52:9 90:24 91:2
92:12 94:22 132:13,
22 133:7 135:22
136:2,8,9 137:20
138:9,20 139:2
140:14 141:2 156:24
171:15,18,20 173:14
175:7,20 234:12
237:6 238:12
240:23,24 248:4
291:3
numbers
287:24
numbness
103:9
numerous
291:19

**O**

O-L-A-D-I-P-O
166:5
O-L-L-A-R-V-I-A
24:8



oath
9:5.6
objection
225:10 289:10
291:11
objections
8:11
observed
280:14
observing
41:6 276:7 293:7,24
occasion
129:23
occasions
128:12 256:11
291:19
occur
42:17
occurred
104:23 106:8
October
16:1 92:2
odd
10:24
off-duty
87:15 90:6,17
180:18
offer
30:8 187:24 196:1
199:18 257:13
266:16 269:22
offered
20:1 24:1,14 30:5
101:9 182:8 194:1,
18 212:7,18 213:5
284:1,5
offering
267:7
offers
202:10 266:12,14
offhand
184:22
office
7:4 26:24 27:1 37:13
43:4,5,8 46:6 47:13,
14 49:8,11,19 52:20
53:1 56:12 58:10,15,
16 63:6,7,10,21,22
72:1 73:22 74:14
79:6,13 82:4,13,14
83:11 84:4 117:18
118:2,3,9 122:10
145:3 146:22 155:1,
2,10 157:12,19
159:9,18,24 166:11
172:22 186:19 189:7
191:12 194:21 211:9
220:9,13 224:11
226:24 256:18,19
278:5,10 285:15,16
286:1
officer
24:1 31:1,8 58:5
64:13 68:6 70:9,10,
13,19,21 87:17
89:17,19 118:14
150:10 173:22
182:20 200:6 218:14
245:8 259:12
263:11,15,18,22
265:10 277:12
296:11,20
officers
31:4 43:22 72:4,11,
14,15,16 73:3,12,15,
16,19,23 74:13,16,
17,19 87:15 88:12
90:7,18 91:13 92:8,9
179:24 180:15,18
197:23 237:3 238:22
250:22

offload
131:8
Ogurkiewicz
215:5
Oladipo
158:21 159:17
165:16 166:5,10
294:8
older
18:13 281:17
oldest
18:5
Oliver
165:10
Ollarvia
24:6
one-hour
154:6 161:7
ongoing
103:18 292:12
online
8:16
onward
270:21
open
81:8 85:14 222:11
opened
226:7
opening
80:4 211:16
opinion
292:20
opportunities
209:2 219:8 232:16
opportunity
101:19 145:3 161:7
162:22 212:9,18
277:23 278:14
284:9,13 286:13
opposing
273:8
opposite
87:7 294:10
option
33:4 213:5,7
order
181:1 227:8 247:8
250:12
ordered
54:17 124:18 128:9
227:11 228:1 247:14
orientation
219:4 252:2 258:2
origin
264:11
original
130:16
orthopedic
102:17 124:12 130:9
Orthopedics
111:22 156:5
orthotic
130:21
Orthotics
130:19
outcome
33:14 218:17 222:15
224:22 246:16,18
257:10 262:18
outlet
268:19
outlined
183:6 255:20 283:21
outlining
284:9
overcrowded
53:18
overheard
219:5

overtime
242:3,18,19 244:9
248:13,20 252:21
292:22
Owens
15:18

P

p.m.
33:10,11 65:23
82:22 115:10
PA
145:2
packed
95:7
pages
131:18 136:19
139:20 140:3,13
144:16 178:8 196:11
263:3
paid
222:13 270:16
pain
103:4,9,10,12,14,16
104:3,5 105:23
107:19 112:19 113:1
127:22,24 128:4,17
129:3,14 130:3,5,23
137:18,20 140:15
141:3,6,12,16,21
154:19 156:21
185:11 285:20
painful
175:8
pains
123:12
paper
73:7 118:4 120:11,
12 147:9,14 182:18
183:6 184:16 189:15
227:22 235:16 237:9
239:1
papers
249:13
paperwork
82:17 112:16 263:21
Para
116:1,2,13 291:19
paragraph
30:20 122:15 138:11
143:4 149:3 152:14
162:16 176:8 178:21
179:16 180:24 212:8
213:4 240:11 241:21
242:1 243:11
248:10,17 254:3
255:7 256:9
paraphrase
241:2
parent
91:23 92:22 100:6
281:5
parenthesis
289:17 290:9
parenthetical
235:9
parents
37:3 65:13
park
21:14,15,17,21,23
23:5,16,19,22 37:7,
10,13 48:6,9 59:4
171:18 172:1,3,8
176:21 179:19,20
180:1,9,15,23
271:24 272:9 281:2
part
32:22 84:18 99:11
116:17 151:12 157:9
199:15 208:21

213:19 217:18
233:2,13 264:21
288:8
part-time
21:15 72:15 73:3
part-timers
74:24
participate
64:11 232:23
participating
224:16
partner
16:9
pass
268:3
passed
268:6,12
past
17:11 117:11
197:18,22 209:9
228:21 272:13 276:8
patient
111:24 128:17 129:2
130:16 260:19
patient's
137:17 138:13 139:3
140:14 141:2
142:12,21 143:6
156:18 175:1,8,16,
20 176:10
patrol
100:2 150:18 199:4
patrols
68:18,20
patrons
37:3
Paul
188:8 296:16
pay
31:10,11 115:4
209:13 222:19
paying
23:13,14
peace
292:23
peanuts
23:14
peeking
88:2,6 293:17,18,21,
22 294:1,5,8
peeping
293:7
peers
116:6 210:20
249:5,7 252:17,18,
21 253:11,13,16
261:15 294:3
pen
246:2
pendency
146:5
pending
10:17 300:9
Pennington
155:3,5 165:11
209:7 252:23 253:1,
2 256:19
people
19:7 40:7,16 64:22
72:24 81:9 85:13
87:17 90:13,17
103:22 106:10
123:22 169:18
172:9,17,21 211:4
219:13 229:24 230:2
237:10 264:10
279:8,11 280:23
293:7
percent
199:23,24

Perez
88:10 154:20,24
155:10,11 194:19,23
209:18 211:3 230:8
244:12 248:23
256:19 278:6 293:16
Perfect
246:14
perfectly
10:6 144:24
perform
138:14 139:4 142:23
143:7 149:17 175:22
176:11
performance
201:1 202:9
perimeter
35:24 148:24 149:16
period
34:12 35:3 51:11
57:7 59:5 60:6 62:22
67:3 79:3 93:2 94:13
97:15 103:17 114:20
127:23 134:1 140:11
141:7,17,20 146:8
151:18 160:11
177:15 181:24 193:2
195:12 200:16,18
235:22 236:3,4,5,16
273:21 274:11,13,23
periodically
245:18
periods
57:9 137:22 138:23
139:6 142:19
Perkins
230:20 236:11
permanent
48:5,14,15 79:5
138:12 143:4,8
176:9
permit
254:21
Perry
98:13,19 123:4
209:17 227:12,20
231:18 232:6,8,11,
13 234:3,9 293:16
Perry's
228:23 231:19
persistent
230:11
person
19:21 24:13 33:18
65:12 79:14 95:12
99:20 100:1,8
109:22 146:24
151:14,19,24 243:23
244:11 267:4 278:6
297:17,18
person's
230:19
personal
24:16 206:4,10,11,
13 225:17 277:6
personally
211:11 300:7
personnel
58:20 71:11 85:17
157:9
pertaining
76:19
Phillip
234:9
phone
26:18,19,20 228:5
269:10 291:18
298:11
phones
66:14,20

phonetic
115:18 116:1 118:14
photographic
298:16
photographs
298:2,3
photos
298:4
phys
21:7
physical
9:12 10:21 19:23
21:8 68:22 100:18
103:7 105:13,18
113:18,23 123:14
140:23 141:3 175:8
physically
79:2
physician
11:18 126:1
physician's
135:22
pick
84:20 299:5
picked
210:7
picking
281:10 299:7
picture
95:4
pictures
280:21
piece
120:11,12 183:5
237:9
pill
13:7
place
65:18 237:17 285:23
plaintiff
7:11 240:12 242:2
243:12 248:11,19
255:21 300:12
plan
114:18
planta
127:6 130:22
plantar
101:24 102:19
109:19 132:24
137:18 141:14
143:23 173:10 175:4
plastic
97:13
plate
34:10
play
19:22 20:4 282:7
played
20:8 25:3
Playground
68:9
Pleasant
268:9
plush
46:11 79:15 97:6
121:23 281:23
pocket
118:12
poetry
233:7
point
45:13 50:6 54:11
57:20 64:4 65:8
70:24 71:9 90:2
137:4 261:24 281:5
285:15 286:20
291:15
pointed
210:11



**pointing**
95:15 137:6 210:12
**police**
58:2 68:10 71:18,21
72:12,15,16,19 73:2,
6,10 74:16,17 86:17
87:15 91:12 179:22
180:15 197:20
228:11 239:18,20
**policies**
197:19 198:1 264:2
**policing**
198:15,22
**policy**
8:14 46:9 97:23 98:1
198:6,11,13,15,17,
21,24 264:9,20,22
**pool**
101:3,4
**pop**
104:20,24 109:5,10
245:18
**popped**
105:5,7,19
**popping**
141:1
**position**
24:1,13 30:22,24
35:9 44:5 70:16
78:13 101:10 149:4
181:19 199:19
209:15 210:3,22
211:16 212:7
218:13,24 221:12
244:14 248:23
250:22 251:11
252:19,21 253:4,5
257:10,13 263:11,14
266:24 267:3
268:13,22 269:4,9,
18 270:16,17 284:22
**positions**
208:22,24 209:4
253:6 267:2 271:22
272:8 279:10
**positive**
202:13,15 232:24
**possibility**
219:5 272:18 275:9
**Possibly**
35:11 217:20
**post**
45:2,3,10,11,12,16
48:2,6,14,15 49:10,
23 50:2 52:3,19
53:7,20 60:24 61:2,
6,7 69:11 79:1,10
87:10 88:3 93:3,17
94:3 96:21 98:2
100:7 104:12 106:22
116:6,7,14 117:3,13
118:12,13,16,24
120:17 121:14
146:20 148:18 151:6
152:20 158:20
162:17 163:23
164:7,22 166:8
179:18,20,21,23
180:4,13 181:17,18
182:8 186:12 188:10
189:16 191:2 192:3,
23 193:15 195:14,16
199:15,16 214:7
226:10 228:19
245:2,3,12 254:13
256:6 273:16 274:9
275:2,3,6 276:12,13
280:12 281:3 282:9
284:1,6,21 294:11
295:21
**posted**
38:4 43:4,8 78:13,15

**posting**
44:5,9 266:13,15
**postnasal**
12:11
**posts**
72:17,18 120:19
164:20 275:24
**potentially**
209:1
**power**
14:4
**practices**
197:18,22
**Pratt**
219:6 232:10
**pre-disciplinary**
222:9
**precise**
94:24
**precisely**
115:10
**prefer**
212:15
**premarked**
11:13,15
**prepare**
17:12
**preparing**
120:22 270:1
**presence**
300:19
**present**
7:6 45:11 46:12 57:5
63:20 92:24 111:23
146:4 153:15 257:1
258:24 271:22 275:8
**presented**
284:8,12,18 286:17
**presently**
171:20
**presents**
128:17 129:3
**pressure**
61:19 86:19 87:3,4,
20,23 133:1 135:5
**pressuring**
27:2
**presume**
84:9
**pretty**
9:23 34:16 93:12
120:21 137:22 139:7
140:16 141:4 142:15
144:5 149:11 156:22
220:7
**previous**
30:15 110:10 120:23
258:7
**previously**
22:5 30:13 31:17,19
67:21 75:12 78:14
131:17 167:20
168:22 170:17,18
174:5,6 178:12,13
191:20 203:5 204:10
208:3 216:9 220:19
233:24 247:2,3
278:17
**pride**
201:21 202:21
220:10,11
**primary**
11:17 125:24 126:8
128:8
**principal**
33:21,24 34:4,7,13
35:3 40:9 47:8,10,
21,23 54:23 55:1,19

**program**
220:7 232:17,18,21,
22 233:2,3,4,11,17
**programs**
206:18 232:17
**projected**
138:12 143:5 176:9
**prolonged**
141:4 142:19
**promised**
177:23
**promote**
108:17 110:15
250:21 292:13
**promoted**
208:23 244:12
251:22
**promoting**
92:18
**promotional**
209:2
**promotions**
292:21
**pronounced**
241:3
**proof**
280:16,20
**proper**
228:15
**property**
228:12 234:13,14,17
235:5
**protective**
291:10
**protocol**
160:1 168:9 228:15
**proud**
281:19
**provide**
28:5
**provided**
47:18 137:8 146:3
260:17 281:22
**provider**
136:20 137:8
**provider's**
140:8
**psychologist**
49:9
**PT**
111:24 114:5 130:16
131:6
**public**
18:16 25:7 32:24
171:20 234:13
267:13 281:7 283:16
300:4
**Pulaski**
40:14,17,18 44:16,
18,20 59:4,14 60:5,
13 61:1 63:24 85:24
89:19 192:6,17
246:3
**pull**
43:1 46:7 187:10
**pulled**
50:20 118:20 119:7
**pumped**
42:10
**punch**
52:21,22
**punched**
160:1 168:12
**punching**
52:23 167:12
**purpose**
279:18,19
**purposes**
44:3 172:11 203:11
241:1 255:3

**pursuant**
247:13
**pushed**
61:24 62:1,3 147:11
189:15 266:5 295:20
**put**
20:2 26:15 40:10
41:14 46:1,2 52:9,21
84:5 87:20 93:21
96:15 99:19 116:24
117:1 118:9,11,23
133:1 139:13 146:17
167:21 168:23 170:6
235:10,14,17 260:10
266:11 295:21
**putting**
86:19 87:3 176:24

**Q**

**qualified**
209:23
**quality**
206:16,17,20
**quantity**
206:23
**quarter**
196:11
**question**
7:19,23 9:10,18,21
10:1,2,10,11,12,13,
15,17,18,24 50:24
54:9 74:9 82:17
157:6 215:11 234:1
237:22 259:18 263:9
298:1
**questionable**
91:3
**questioned**
279:2
**questions**
9:1,23 13:19,21
69:24 174:1 272:24
283:24 284:3 287:15
293:10 297:11
298:23
**quick**
214:22
**quit**
86:17 90:8,21
**quitting**
87:16
**quote**
30:21 35:11 55:23
58:18 65:8 71:12
111:23 121:2 130:14
131:6 132:13,22
133:7 135:2 137:17,
20 138:10,22 146:1
149:3 152:14 154:4
162:16 171:15
173:8,14 179:16
191:24 199:13 235:4
247:11 254:4 258:8
263:10
**quoting**
234:12

**R**

**R-E-Y-E-S**
88:18
**R-O-C-H-E-L-L-E**
149:9
**race**
264:11
**radio**
26:23 43:14,15
49:18 63:6 67:3
94:19 117:18 146:21
151:16,18,23

**radios**
44:1
**ran**
186:2 206:18 233:11
**rang**
78:22
**rate**
141:6
**reach**
284:20
**reached**
148:10 170:24 207:7
**read**
128:19 158:16 175:9
180:24 190:3,11
227:22 290:21 299:3
**reading**
55:16 111:8 115:1
165:17
**ready**
51:22 278:8
**real**
30:12 106:15 167:13
260:15
**realize**
9:24 294:2
**realized**
61:18
**reask**
9:20 74:8
**reason**
37:12 210:5 225:2
230:10 252:4 278:18
**reasonable**
131:14 135:17 145:8
160:18 161:2 162:12
170:11 190:4 255:8,
13 262:13
**reasons**
37:10 54:7,15 132:5
232:5
**reassign**
181:17
**reassignment**
179:17
**recall**
10:7,22 18:20 19:5
24:21 25:2,6 27:16
28:2,14 30:19 33:8,
23 34:19 41:21
46:16 50:10 51:9,11,
12 53:17,21,22 54:6
55:14 59:18 60:4
61:13 64:12 70:5,12,
21 71:2,3,15 73:13
75:13 76:10 85:22
86:14 91:19 94:6
98:14,17 102:3,11,
23 104:1,2,23
105:10 106:7,12
107:8 110:24 111:4,
7 112:15 114:6
122:17 124:9,16
125:22 126:19
127:2,10,14 128:4
129:14 131:1,13,15,
20 136:16 140:12
143:18 144:23
146:7,9 147:20
155:14 156:3,9,10,
12,13 157:17 159:21
160:23 162:6 165:21
170:3,4,10,12,22
176:20,22 177:7,9
178:11,24 179:2,6,
12 182:14 183:14,
17,18,19,21 184:6,
16 185:11,15 187:2,
5,14 189:10,17



190:1,13,18 192:16
194:24 195:15 196:7
200:19 201:3 203:4,
20 205:18 208:2
211:22 213:1,3,12
216:8,14 217:11,21
218:12 223:9 224:24
225:2,4,7,21 228:8,
14 231:11,12 234:24
235:10,24 242:13,17
243:18 244:11,18,
19,21 245:2,9
247:19,21 249:24
250:20 251:16
253:8,17 254:24
256:17 257:6
258:11,23 261:12,23
262:23 263:5 265:23
268:4,21 272:3
277:18,21 279:2
283:19 284:2,4
285:6,7 286:16
289:23 295:6 298:20
receive
283:14 284:17
received
19:20 63:5 148:12
161:15 201:22 222:7
216:12 268:5 271:13
287:12
receiving
277:21
recent
269:6,19
recently
267:2
reciprocate
27:7
recollection
114:16,20 121:7
125:20 131:10 140:6
187:1 243:16 244:6
recommended
257:24
record
7:3 14:8,11 22:19
30:12 32:5,15 55:2,4
65:22 82:21 83:8
111:1 115:9 128:15
137:5 158:4 210:11
215:22 220:20,21
223:11 233:20,21
237:3 238:21 241:1
258:4,5,13,14 273:4,
5 283:1 287:8 288:3
290:16 299:2
records
111:9 112:18 125:7
126:5 127:20 260:17
recreation
270:13
Recreational
271:24
red
25:19
reduced
300:20
Reefs
218:19
Reeves
169:18,19 207:10,
12,23 208:20 210:21
221:10 222:5 223:2,
12 225:8 227:16
referral
127:21
referred
83:16
referring
123:5

reflect
83:8 137:5
reflective
210:17,18 280:13
refresh
243:16
refuse
168:2
refused
167:23 169:8 189:14
204:13 207:3 255:8,
12,16
refusing
292:22
Regan
82:16
regret
30:21
regular
85:20 90:21 92:18
103:14 117:7 118:24
148:23 164:22
186:12 297:6
regulations
247:14
rehired
25:13
reject
188:7 199:18
rejected
194:11,12
related
57:21 154:10 231:9
relates
247:10
relation
84:12
relations
206:4,10,11,13
relationship
126:1 207:11,13,14,
17,19
relaying
98:16
release
135:21
relief
163:20
religion
264:11
remain
111:19
remainder
39:21
remember
10:4,7 19:18 22:3
23:10,18 24:5 25:9
27:12,20 28:3,11,18
29:11,16,22,24 30:8,
18,24 31:21 33:21
34:7,18,20 37:4,19
41:15,19 47:7,20
48:1 50:9 54:3,7,15,
19 59:6,16,23 60:8
61:12 66:1 74:18
76:7,15 77:1 90:9,22
92:12 98:4,11 102:2,
6 105:8 106:5,17
107:11 109:9 110:2,
17 111:15 112:11,23
113:8,22 114:5
115:13 124:2,11,14
126:15 134:21
139:14 140:20
144:12,22 152:20
157:15 165:4,9
167:19 169:15 177:2
181:8 185:8 187:11
193:9 194:3 198:7
199:9 204:1 211:21
213:7,16,23,24

217:4,9 223:13
225:7,8,16,20
230:19,23 233:18
236:3 239:12 243:19
246:16 248:5,8
249:14 250:16
251:12,15,18 252:22
255:1 256:23 257:10
258:19 259:21,24
262:12,17 263:17
264:22 265:11,20
266:6,8 267:17
268:4,20,22 269:13
271:23 272:2 295:2,
13 296:18 298:5
remind
9:16
reminded
214:15
removable
130:14
removal
110:6 155:16
remove
152:15,17 155:12
166:17 181:5 230:2
235:5 283:11 296:3,
6
removed
34:18 87:24 89:3
107:16 115:13
121:3,6 122:9,12
129:5,17 154:15
161:10,15 182:17
235:8,9 256:6
282:16 283:17
295:16,22
removes
181:3
removing
34:15 116:5
rent
82:11
Reoccurring
140:21
reopen
215:13
rep
63:20 169:9,15,20
207:8,9,13 209:21
217:5 222:3 223:11
228:15
repeat
56:6 162:8
rephrase
9:19
reply
193:23 195:5
report
11:17 108:22 109:6
191:12 192:4,9,11,
23 228:11 239:20
240:20 288:6 290:23
reported
109:9 112:8,11,13
300:18
reporter
9:13 246:12
reporting
192:16
represent
55:13
representative
283:21
representing
207:15
reprimand
170:2,6
reproved
210:15

request
125:9 131:13 135:17
145:9 146:5 147:24
152:19 160:18
161:21 162:12,16
164:9 170:10 172:1
176:20 179:17 181:6
195:10 196:1 199:17
247:12,15,22
250:14,15,16 262:12
requested
88:24 132:14,15,24
171:16,17 173:10
194:19 195:9 278:4
requesting
109:22 222:12
requests
162:14
require
152:17 181:4 199:20
required
197:2,8,15 199:14
254:20 277:8
requirements
68:22
requires
149:10,16 178:23
reread
248:18
reschedule
270:2 295:6
reserve
299:4
reside
14:15 33:20
residence
15:2
resigned
266:4 285:4
resources'
8:16
respect
210:16
respond
9:11 56:8,14,19,22
57:3 62:18 145:12,
16 171:1 201:10,11,
16 202:3,11 207:6
responded
62:18 145:17 201:12
202:4
responding
145:13 275:21
responds
55:23 195:5
response
9:12,14 113:8
126:18,20 133:9
145:23,24 162:11
165:24 166:6,7,24
167:8,9 194:4
202:18,23 209:16
responsibilities
31:12 35:18 55:20
56:7 58:22,23 71:5
responsibility
56:4
responsible
52:6 237:5 249:18
283:6,7
rest
103:19 105:14,22
108:4 132:17 133:12
143:16 217:8
restorative
64:23
restriction
218:1
restrictions
114:19

result
255:18
resume
266:11,13,16 272:16
retain
212:16
retained
28:17
retaliate
292:19
retaliation
59:19 110:12,14
116:9 134:9 151:17
158:19 163:13
201:24 205:13
209:10 210:9 219:3
225:22 239:7 240:14
243:14 252:5 258:7
264:13 287:18
291:9,20 292:13
retaliations
108:16
retired
220:3
retiring
42:13
return
64:18 177:4 178:4
212:17,21 213:2,3
217:24 254:21 275:1
286:2 292:16
returned
29:23 30:4 48:5
63:22 70:15 75:16,
17 114:7 115:5
117:24 143:15
147:19 154:16
163:17 189:21
199:16,18 212:22
223:16 231:7 286:5
returns
270:20
reveal
258:1
reviewed
182:1
Revisiting
63:9
Reyes
88:16 180:11
245:10,14 253:3
294:7
rid
278:12
Rights
27:14,24 28:4 87:1
202:1 205:14 218:8
232:3 240:19 247:9,
24 250:11 257:11
288:5 290:22 292:2
rings
38:13 58:3 79:22
rip
239:3
road
295:8
roam
89:20 99:21
roaming
52:1 212:12 275:21
Rochelle
149:8 291:5,7
rolling
97:6,16
room
7:6 38:5,9,10,12,17
39:1 46:4 47:5 49:13
53:9 71:22 72:12,20
73:20,22 75:24
76:18,20 78:4,7,8,

16,20,21 79:2,7,9,
12,18,22 80:6,7,10,
17,21,23 81:6,13
82:5,8 83:1,3,10,23
84:4,10,18,23 85:11
90:1 100:16,22,23
101:5,10,14,15,17,
18,20 103:4 104:8
125:3 128:9 146:13,
22,23 147:13,17
171:20 172:4,7,20,
23 173:7 176:22,24
177:14 179:19
181:17,20,21,24
182:9,13,20,24
183:1,22 184:10
187:8,24 188:3,8,9
190:17 191:2 192:1
193:19,21 194:2,9
195:9,16,19 199:19,
21 212:7,10,19
227:18 256:8 281:1
284:2,6,10,14,22,23
285:10 286:7
rooms
48:20 71:18 212:14
██████████████
15:18,23 16:5
rotate
35:23
rounds
99:24 147:5 151:23
274:4 275:1
routine
164:6 273:9
rows
83:24 84:2,3
rules
247:13
run
80:1 81:1 142:3
270:14
running
20:13 180:13 239:2
270:5
rushing
80:18 106:21

S

S-H-E-R-L-E-N-A
16:14
safe
286:12 290:11 291:6
safety
55:24 149:6 267:9
Saint
102:7 114:3 124:19
125:3,16,21,23
126:2,3 130:6
Sangamon
270:8
sat
128:24 129:11
153:21 190:3,6
289:20
save
272:13
scale
141:24
scan
40:10 58:9 89:12
172:12
scanner
40:12,13
scantron
58:8
scared
233:16
schedule
118:5,6,11,18 119:4,



8,16,18,21,22 120:3,
4,7 147:12 183:7,11
192:22 254:12
**scheduled**
133:22
**schedules**
119:13,15 164:20
**scholarship**
19:20,22 20:2,18
**scholarships**
20:2
**school**
19:4,15,17 20:8
23:23 24:20 25:12
26:5 30:6,7 31:5,6
32:16 33:4,6,7,8
34:16,23 37:7 42:6,9
43:24 53:8 55:24
58:19,21 64:18 65:5
66:5 68:9 71:9,10,
12,15 72:4,14 73:16
87:18 91:3 93:12,13
97:10,23 112:9
116:12 128:11
129:19 146:6 148:4
161:3 163:16 164:1,
11 169:3,5 178:22
179:22,24 182:11
185:22 195:15
197:19 198:11
200:22 203:8 206:19
212:3,24 219:23
220:15 222:11
230:3,7 231:8
232:19 234:12,17,20
236:3,4,5,9,12
237:21 239:1 242:20
243:22 245:24 246:4
248:23 249:19,21
251:19 255:7,12
261:8,16 262:1
267:15 268:24
281:12,16 282:18
295:24 296:9,15,23
297:4
**school's**
254:6
**schools**
18:16,18 25:7 30:5
32:24 197:20 198:2,
5,7,15,21,23 199:1
234:14 267:13
281:7,24 282:2,4
283:6,7,16 296:13
297:2
**sciatica**
107:6,12,17 108:3,6
124:6 130:10 157:1
259:15
**science**
36:13 49:6,13 95:16,
17
**screen**
83:4,5,11,14
**screwed**
97:2
**season**
24:11,12
**seat**
97:12 197:12
**seated**
195:9
**secret**
166:18
**section**
55:18 68:2
**secure**
35:21 38:15 39:3
45:2 78:21
**secured**
81:7

**securing**
150:21,22,23 151:1
172:6 193:6
**security**
24:1,13,19 25:13
31:1,2,3,7,8,18
35:10,11,15,18
37:10 38:24 40:24
41:2,5,6,8,23 43:22
46:3,10 47:9 50:22
53:9 56:5,12 58:5
62:4 64:13 65:12
66:2,4 68:6,12 69:4
70:9,10,13,19,20,21
73:1,3,6,7,12,16,23,
24 75:21 76:3 77:9,
12,15 79:14 81:24
82:13 84:23 85:17,
23 86:2,7,13,19
87:3,6,17,24 88:12
89:13,18 90:13,19,
21 91:3,13,24 92:5,
9,19 95:12 97:17
99:20 100:1,8
109:15,17 117:7,18
118:1,2,14,22 119:7
122:9,13 129:19
145:14 148:22 149:6,
7 150:10 154:1,17
155:3 163:3 164:3,7
165:10,14 171:19
172:5 173:22
179:22,24 180:22
182:20 184:1,18
197:22,23 198:4,12
199:1,3 200:5
209:19 211:2 218:13
228:5 231:20
235:12,13 237:3,11
238:22 245:8 249:18
250:22 259:12
263:11,15,18,22
274:3 277:12 280:12
281:1,2,14,20 282:8,
10,13,18 283:4
293:24 294:13,18
296:5,10,11
**security's**
282:17
**Sedgwick**
112:17 215:17
**seek**
75:18 76:22 77:1,4,9
145:19 146:9 178:4
**SEIU**
169:23,24 208:10
222:22
**selected**
252:1
**sell**
82:11
**send**
8:7 123:20 125:16
165:15 299:6
**senior**
24:1 31:1,2 35:10
70:9,10,12,18,21
73:5 173:22 250:22
259:11 263:11,15,
17,22
**seniority**
242:21 244:9
**sensations**
141:1
**sense**
129:7 150:22
**sentence**
199:13
**separate**
255:19 256:4
**September**
15:24 30:23 92:2

148:20 163:22
218:12 235:21
250:20 252:7,18
**serve**
195:14
**served**
249:12 289:9
**service**
19:8 150:12
**Services**
134:24
**set**
83:24 96:4 133:22,
24 134:4 272:12,21
**sets**
84:1
**setting**
289:20
**settled**
29:15
**settlement**
29:17,19
**seven-hour**
130:1 133:16
**severe**
103:4,9,10,12
107:15 123:12
128:17 129:3,14
130:3,5 141:12,16
**sex**
26:9 27:3
**sexual**
25:11,15 29:1 43:12
219:4 252:2 258:2
**shaking**
9:12
**shape**
99:12
**share**
209:1
**shared**
180:21 210:13
**shebang**
108:17
**sheet**
118:3 147:8 227:21
**Sherlena**
16:14
**shift**
39:17,22 57:7 60:8
128:23 129:6,11
130:1 133:16
**shirt**
75:2
**shoes**
119:10 228:6
**shoot**
271:19
**Shore**
269:11
**short**
65:21 82:20 115:8
135:4 158:3 214:23
215:21
**short-term**
178:17 185:9
**shortened**
99:21
**shouting**
159:24
**show**
11:15 22:1,4 30:11,
13 31:16 55:5,6 67:20
69:13 70:2 75:4,11
93:7 110:22 111:20
114:9 115:16 127:16
128:14 131:17
139:17 144:15 156:1
158:7 167:13 168:19
170:1,14 174:2
177:5 178:7 191:19

196:10 199:7 202:24
204:6,23 207:22
211:18 213:10
214:21 220:18
221:21 223:5 233:23
242:22 247:1 250:7
251:1 260:14 264:4,
5,17 265:4 272:19
**showcase**
233:7
**showed**
69:17 150:3 160:17
161:1 162:10,15
184:3 186:14 217:15
222:3 223:12 229:10
**shower**
84:9,15,17
**shown**
259:1
**siblings**
17:20,22 18:13,15
**sic**
58:8 133:11 205:3
257:15
**sick**
168:16 267:5 295:4,
5
**side**
33:18 37:10 40:14,
17,18,20,21 43:2
44:20 45:7 48:6,9,10
59:4,14 60:6,13,21
61:1 62:2 83:5,7
84:14 89:19 99:17
117:10 183:2 184:1
216:6 217:13 282:11
296:1 297:2
**sign**
82:17 167:24 168:2
172:17 189:14
204:13 207:3
**signature**
22:15,16 32:10,13
135:11,14 136:14,23
140:7,8 156:15
157:11 158:13
167:23 169:7 171:3
196:18 203:13,16,22
204:13 216:17 221:7
243:7 279:6 300:24
**signatures**
171:3 172:17
**signed**
169:8
**significant**
69:1
**signing**
172:18
**Simeon**
198:8 282:5,6
**similar**
139:22 180:22 233:9
281:2 294:3
**Simmons**
292:4 295:1
**Single**
15:6
**siren**
244:3
**sister**
16:18,19,20 17:3,19
26:14 267:22
**sisters**
18:2
**sit**
8:13 40:1 62:5 79:21
89:18 128:22 129:6,
10,22 131:6 132:17
138:24 139:7
142:14,24 149:14
152:15 153:14,20,23

162:6 163:23 165:3
172:4,5,9 173:17,23
175:24 181:2,6,9,12
187:8,15 190:15
191:21 199:2,3
275:9 276:8 280:23
**sits**
79:14 171:19
**sitting**
14:5 41:10 56:15
57:1,2 74:14 88:1
96:23 117:16 135:4
139:11 141:9 142:5
151:5 153:5,11,19
165:8 172:10,21
181:19 186:24
198:12 226:10
275:16,19 276:5
280:1,11,17,21,24
281:1,3 282:9,11,12
289:23 290:4 298:9
**situation**
65:16 66:2,4 81:5
86:13 91:4
**situations**
86:7 151:5 153:4
**six-and-a-half-
hour**
128:23 129:6,11
**size**
83:21
**skills**
120:19
**skipped**
136:7
**Slight**
205:23
**slip**
58:11
**slip-on**
130:20
**Sloan**
111:2 125:11,12
126:16 127:21
135:22 136:8,15,17
174:11,14
**slush**
227:3
**small**
49:13 80:5
**smaller**
161:8
**smashed**
95:6
**Smith**
88:16 119:3 252:24
253:2
**sneezing**
12:10
**snow**
227:4
**son**
15:14
**Sonnada**
253:2
**sort**
13:1,12 21:16 26:7
28:3 35:15 42:8 44:4
45:1 48:20 51:14
56:11 64:20 68:5
78:19 87:4 92:5,20
97:22 103:7 105:11,
18 108:2 128:6
138:4 150:16 172:9
193:4 200:23 219:23
232:14 254:10
267:12 272:19
**sound**
145:5 258:9
**sounds**
8:19 241:3

162:6 163:23 165:3
172:4,5,9 173:17,23
175:24 181:2,6,9,12
187:8,15 190:15
191:21 199:2,3
275:9 276:8 280:23
**south**
14:16 226:1
**southwest**
60:13 151:11 295:18
**speak**
27:1 63:2 128:10
158:22 159:7,8
160:13 166:10
177:21 186:1 192:21
226:22 229:2 226:21
227:5,20 229:6
279:22 280:8
**speaking**
42:18 68:13 202:5
206:5 209:5
**speaks**
76:2
**special**
45:14 47:13,14
220:4
**specialist**
102:17 103:5 124:13
126:15 128:10 130:8
**specialized**
53:8
**specific**
45:13 49:10 51:1
52:4 70:5 76:8
120:16 183:21
**specifically**
36:16 179:18 253:8
**specificity**
184:13
**speculation**
289:11
**spell**
14:11 24:7 25:21
28:20 41:17 88:17
102:12 204:4 297:13
**spelling**
282:24
**spent**
152:11 222:13
**spine**
156:20,21
**splitting**
216:23 217:7
**spoke**
122:1 177:12 178:3
195:10 211:2 252:23
281:20 291:18
**spoken**
226:12 297:22
**sport**
130:21
**sports**
14:5 20:11 51:19,21
156:5 282:7
**spot**
87:6 96:18 147:11
180:21
**spots**
84:7,21
**spreading**
216:24
**spring**
99:3
**square**
99:12
**SS**
300:2
**staff**
46:5 53:9 56:1 211:2
**stairs**
38:19,23 39:2 80:4,
20 81:24 82:1 96:16
100:22 183:1,3,24
184:17 199:15,20
200:1 212:13
**stairwell**
38:11 43:11 80:8



81:20,23 96:10,13
100:3 150:19
**stairwells**
45:9 94:17 149:1
**stand**
79:10 88:4 141:17
142:18 172:16
173:16 175:23
179:10 197:1
**standing**
64:1 69:1,5 80:3,8,
16 89:12 105:2
112:20 117:16
118:15 127:7 137:22
138:23 141:4,7,20
147:8 154:11 175:12
179:8 186:24 193:6
197:8 230:20 295:24
**staring**
64:1
**start**
10:20 14:7 51:24
92:3 216:4 232:17
234:20 236:4 286:7
**started**
26:12,14 34:23 35:2,
8,15,19,20,22 36:15
38:6 39:15 41:3,22
44:2,24 45:22 52:18
53:4,17 66:11,13
67:10 70:24 71:14,
16 85:20 86:17,19,
20 87:2,5 91:21,22,
23 102:2 107:8,11,
12 110:4 116:23
120:15 121:16
122:4,5 127:11,12
129:17 154:19
155:11 163:13
164:11 166:15
229:23 230:1
236:10,12 237:2
263:19,20 274:16
277:4
**Starting**
129:4 285:5
**starts**
96:24 107:14 115:24
136:19 141:18
273:23
**state**
20:5,19,24 21:2,9,
10,12 262:4 300:1,5
**stated**
74:24 122:10 147:3,
16 150:8 159:2
209:11 211:3,13
221:14
**statement**
122:17,21 123:3,4,6,
8,10 124:1,4,15
132:16 137:14
182:3,4 218:1 255:6
**statements**
123:13,23 139:13
254:21
**States**
300:10
**stating**
131:8 163:6 182:18
**stationary**
274:10
**stationed**
97:1
**stationery**
266:22 267:10,11
268:23
**status**
116:1 266:3
**stay**
39:20 53:6 79:7
96:18

**stayed**
20:22 90:11 167:2,4
239:6
**staying**
79:8
**stays**
164:20 296:24
**stealing**
63:13 81:9
**stenographically**
300:18
**stenosis**
156:20
**Stenosis/spinal**
156:20
**step**
275:22 276:2 294:2
**stepping**
84:16
**steps**
43:5 272:19
**sticky**
235:16
**Stiffness**
141:1
**stipend**
24:4
**stipulated**
241:2,23 242:7
**stipulating**
240:24
**stood**
142:2
**stop**
24:24 51:23 74:7
104:20 153:4 270:11
**stopped**
67:18 151:17,21,22
280:9
**stories**
42:13
**stragglers**
81:2,22
**straggling**
58:4
**straight**
21:22 100:3 233:17
286:1
**strange**
211:15 237:19
**strangest**
134:8
**strapping**
130:15
**Street**
14:16 300:8
**strengthening**
114:2
**stress**
205:11 260:12
268:17
**stressed**
195:8
**strict**
66:9
**stride**
201:19,20
**strike**
7:22 10:1 35:16 74:8
114:17 156:7 174:18
215:7 265:8 276:7
277:13 282:1 289:6,
13 292:8
**struck**
112:2,7
**student**
49:19 65:9,14 94:19
106:14,21 109:2,13
112:3,5 153:15
180:8 197:20

234:15,19,22 235:2
237:7 238:12
265:18,19
**students**
37:3 38:14 40:16
42:1,3,4,5,6 52:7
53:18 55:24 64:22
66:12 78:22 79:17,
19,20,23 106:13
153:12 197:2,8,11,
16 206:19 220:6
232:18,20 238:7,8
289:2,3,5
**studied**
267:21 268:1
**studious**
19:20
**stuff**
14:6 18:12 63:9
125:10 219:20
239:20 254:19
271:18 298:21
**sub-janitor**
23:3
**sub-janitors**
23:12
**subbed**
101:15
**subbing**
91:22
**subject**
17:10
**subjected**
259:13
**submit**
254:20
**submitted**
247:12 250:14
**submitting**
255:1
**subpoena**
125:16
**subs**
91:14,21 92:17
**substantial**
257:23
**successful**
266:24
**sudden**
239:8
**sue**
28:10,12,13 247:7,
22 250:17 257:16
262:24
**suffering**
156:23
**suggested**
40:6,9 128:10 138:6
182:16 187:9 188:12
277:16,20
**suggestion**
202:10
**suit**
28:16 29:1 43:13
**Suite**
300:8
**summer**
148:5,9 208:22
209:4,6 230:5,11
251:20 270:5,10,15
272:1
**summertime**
251:23
**summonsed**
278:5
**supervision**
212:16
**supervisor**
41:9,15 56:5 76:3
77:12,15 113:2,3
154:17,20 160:3

168:12 186:1,5
194:20 209:9,12
216:19 244:13
252:19 257:9 282:17
296:5,10
**supervisors**
73:5,7,8 210:19
212:2 235:13 251:23
262:9
**supposed**
88:11 99:10,15
123:9 146:12 147:2
182:23 183:22
184:14 187:6 188:2
190:9,20 267:5
275:7 279:20 282:16
284:14 286:7
**Supposedly**
54:9,17
**surfaced**
117:15 226:19
**surgery**
105:21
**Surprise**
158:17
**surveillance**
293:4,6,14
**suspensions**
66:22
**sweep**
57:24 58:1,2,11
**sweeps**
57:21
**swell**
133:2
**swelling**
103:12 106:3 112:19
113:2 141:1
**swimming**
101:3,4
**swipe**
65:4
**sworn**
7:1 300:15
**symptoms**
103:7 107:18
**system**
234:14

---

**T**

**T-I-N-G-W-A-L-L**
77:7
**Taalib-din**
208:12,13
**Tabitha**
300:4
**table**
172:14
**takes**
237:17 273:21
**taking**
11:8 12:1 20:6 53:4
64:12 117:5 122:10
214:12,14 217:19
238:11 260:2 261:5,
8,13,16 268:4
**talents**
233:7
**talk**
16:24 17:5,9 51:20
64:20 65:13 78:7
85:12 86:1 101:22
115:12 136:15
150:16 184:7 186:6
195:24 196:2 206:14
225:15 252:17
253:13 258:17
273:19 280:3 288:19
297:6 298:12

**talked**
64:24 110:13 128:6
150:4 162:9 178:24
179:3 186:10
194:13,14 226:20
229:17 238:17
250:24 252:20,22
251:11 254:18 271:6
295:2,13 298:1
299:9
**talking**
10:5 35:14 41:3,9
51:19 72:3 73:23
83:6 94:13 101:13
112:5 116:4 122:14
124:8 147:9 150:11
158:24 161:17 165:4
167:11 179:9 180:19
186:21 190:13
192:14 195:22,23
206:2 209:3 213:20
214:1 217:3 218:6,
14,16 219:22 228:15
229:19 233:24 234:5
240:3,6 245:12
253:8,9 257:8
274:13,16,17 293:14
296:7,9,17 297:22
**talks**
64:10 126:14 127:2
142:17 154:3 156:18
160:13 165:1 178:21
243:11
**tape**
52:9 83:22 235:15,
19 237:9 238:24
**tardy**
58:3,10 274:6
**taught**
42:12
**tax**
270:20 271:1
**taxes**
270:20
**teacher**
97:15 219:6 228:21,
22,24 229:1 275:22
276:1,4
**teachers**
60:18 173:4 193:7,8,
10
**team**
23:23 24:15 25:4
52:11 237:15
**teenage**
239:2,10,11
**Telephone**
290:10
**television**
34:15 83:12
**telling**
26:14 80:16 82:24
86:20 87:5 116:10
147:12 150:9 168:7
170:5 184:13 187:3,
5,11 188:8 190:18,
24 210:4 211:5
262:3
**temporary**
146:3 177:13 181:16
182:8 284:1,5,21
**ten**
17:22 18:1 90:18
117:14 121:12,17
126:11,12 129:23
132:22 139:15 173:8
176:1 181:6,9,12,22
183:10 187:12
230:11 273:3,21
**ten-minute**
187:3

**tendency**
14:4
**tendered**
298:18
**term**
130:16 206:21
**terms**
29:16 31:10,11,12
206:8 266:3
**Terrell**
23:13
**test**
267:21 268:4
**testified**
7:14 127:5 212:6
221:9 231:23 255:23
296:14
**testify**
300:15
**testimony**
28:5 300:17,22
**texted**
62:5,17
**thanked**
47:24
**therapy**
105:13 113:18,24
114:4,7 143:16
144:13
**thing**
8:1 9:5 33:17 40:5
47:4 64:20 65:6
67:16 92:7 99:18
134:8 155:17 164:6
174:2 199:7 219:15
233:12 239:1 250:9
**things**
26:9 33:16 40:11
51:23 52:21,22
56:11 65:10 81:9
82:12 85:1 86:21
114:2 115:5 131:24
196:23 200:23 210:4
224:8 225:15 227:2,
4 230:13 233:8
239:8 267:15 270:13
273:14 292:13
**thinking**
28:8 118:16
**thought**
92:15 159:4 188:11
207:15 211:12
265:15 268:7,8
279:19 287:3
**threat**
169:12
**threaten**
55:24 168:6
**threatened**
63:13 168:3,4 195:1
278:10
**threatening**
63:19 163:6
**threats**
155:13 256:10,17
257:4
**threw**
155:13
**thumb**
259:9
**Thursday**
191:21
**Tilden**
198:9 282:5
**time**
13:20 15:2 20:14
24:19 34:12 35:3
38:2 42:16 51:11
52:22 56:16 57:12
59:19 62:24 64:14,
15 65:17 69:23 73:4



74:22 76:18 79:3,23
80:24 84:24 87:21
89:3,8 90:5 91:2
92:14 93:2 94:10,13
96:18 99:7 102:11
103:18 106:12,13
109:23 113:13
114:20 117:8 120:5
127:23 129:20
131:4,5 133:22,24
134:2,12 135:4
139:6,13,14 140:10,
24 141:7,18,20
142:2 143:18 145:8
146:8 148:7 151:9
152:12,15 153:18,
19,24 155:16 157:21
158:18 159:15
160:11 161:15 163:8
165:16 174:17 178:4
181:2 186:22 189:20
190:6 192:22 193:17
200:5 201:7,23
217:1 222:11,13,24
227:7 229:7 230:24
231:21 233:3 235:22
236:16 237:19
245:16 248:22
249:20 260:8,11
265:20 268:2,3
270:4 272:10
273:12,14,17,23
274:13 275:11
278:13 281:15 283:3
285:7,18 287:10
294:9,15 295:5,7
296:24 297:23 298:8

**timeframe**
121:5 123:18 265:22
274:21

**timely**
221:12

**times**
52:15 57:4 72:17
76:11 79:4 87:7
92:16 95:13 96:22
98:3 116:15 134:6
147:14 153:22
170:13,24 171:1
180:12,21 212:11
268:1

**Tingwall**
77:7,8 98:21 99:4,6
134:11 147:2 153:1
155:4,23 159:3,7,8,
16,19,23 160:14
163:5 164:18 165:16
166:3,17,20 168:5
169:2,13,14 181:16
182:1,12 185:2,24
190:19 194:21
195:11 199:17 217:7
222:8 230:14 246:23
255:17,19 256:1,3,
18 257:2,4 262:5
279:12,22 280:8
283:10 294:8

**Tingwall's**
154:24 155:2 278:5

**tired**
12:12

**title**
35:12 77:16 283:3,4
292:5

**titled**
277:12

**titles**
55:12 263:20

**to-wit**
300:6

**today**
7:17 8:8 9:2,10 10:2

12:3,20 13:8 16:11,
17 17:1,5,10,13
30:16 130:12
143:12,21 144:4,9
151:21 260:4 271:7
284:3,18 286:17

**toe**
107:23

**told**
28:8 35:21 47:5,7
54:19 61:23 62:2
75:18,20,24 76:22
77:4 87:8 92:17
98:4,8 113:2,5 118:8
119:20 122:16,21
123:21 125:2 128:7
134:10 145:18
146:9,10,11,12,13,
18 147:2 148:11,14
149:20,22 152:21
154:16 159:3 160:2,
3,5 161:13 166:16
169:19 177:18,20
178:3 181:8 182:5,6,
11,14,15 183:8
184:2 185:23,24
186:10 187:7,15,17,
20 189:14,16 191:9
192:2,9,11,20
193:18 197:7 209:8,
14 213:18 217:5
219:7 222:23 224:4,
10 227:4,5,21 229:2,
8,11,13,16 230:12,
14 231:18,20 232:10
234:16 235:12
239:16,19 245:10,
13,16 256:1,7
261:19 270:2 275:23
278:7,11 279:21
282:12,15,19 284:13
285:21,23 296:3,5

**tone**
75:20

**top**
22:18 32:15 38:18
77:17 114:13 126:22
128:16 132:1 137:6
145:23 160:10 195:4
215:10 217:22
235:21 260:18
287:24

**Toprol**
12:15,16,22

**tossed**
224:9

**total**
36:3 72:8 90:13

**touch**
52:12 177:15 235:15
271:17 297:21

**town**
177:22

**traffic**
40:17 151:24

**training**
64:11,12,16,19,21
65:1,3 85:15 92:23
150:10 151:8 179:7,
9 197:11,23 267:22
283:20

**trainings**
151:5

**Tramaine**
169:17 207:10,12,23
216:23 217:9 221:10
223:2,11

**transcript**
299:4 300:22

**Transcription**
300:21

**transitioning**
173:5

**transitions**
98:23

**travels**
107:22

**treatment**
105:11 108:2 165:3

**trial**
177:15 195:12

**triangles**
220:11

**triple**
182:19,22

**true**
160:2 180:3 231:22
300:21

**truth**
9:8 300:15,16

**Tuesday**
7:3

**tunnel**
156:11

**turn**
140:2 156:23 165:15
167:22 259:5 278:16
279:5 287:18 294:9

**turned**
229:4 233:14 267:3

**Turner**
104:4,10 119:4
123:21 165:11

**tutoring**
233:2,4

**TV**
83:14

**two-day**
64:19

**two-sided**
216:5

**type**
19:5 40:3 43:3 45:18
56:4 58:17 59:20
97:4,9 102:16
103:14 113:22,23
123:1 140:23 184:2
270:10

**typed**
183:13,15

**types**
130:20

**typewriter**
112:4,8 113:16

**typewriting**
300:20

**typical**
51:15

**typo**
241:21,22

**typographical**
129:8

**U**

**unable**
142:18 173:16
175:23

**unavailable**
157:22

**uncomfortable**
285:20

**underneath**
95:19

**undersigned**
137:7

**understand**
9:6,19,20 29:20
38:16 47:17 72:23
73:14 80:9 157:8
159:2 162:22 198:10

201:17 223:22
251:24 261:4 262:19

**understanding**
19:10 34:11 88:22
98:23 146:2 154:5
179:21 181:20 194:1
198:11,16,18,24
211:14 251:21 286:6

**understood**
36:14

**undetermined**
300:10

**unformed**
89:24

**uniformed**
71:18,21 72:13
73:15,19 74:16,17,
19,20 87:14 89:7
180:14,17

**uniforms**
75:1 82:11

**union**
55:11,16,17 63:20
69:16,22 70:4,7
73:10 120:6 150:4
169:9,15,20,21
201:13 205:15
207:8,9,13 208:9,18,
19 209:21 210:22
217:5 221:4,11
222:3 223:11 227:16
228:15 239:15 252:6
285:23

**United**
300:10

**Unpaid**
270:17

**unprofessionalism**
229:14

**unusual**
273:21

**upkeep**
267:14

**upset**
166:21 189:13
191:6,7 201:18
202:19

**upstairs**
62:21 101:5

**usage**
52:16 235:2

**usual**
164:19

**utilizes**
179:22

**V**

**V-A-U-G-H-N**
283:2

**vague**
273:10

**Vaguely**
244:8

**van**
268:6

**Vargus**
226:12,19 227:9
231:16 289:1,14
290:8,12

**vary**
133:22

**vascular**
124:19

**Vaughn**
282:21,22 295:12

**verbal**
9:11,14

**verification**
243:7

**verify**
131:23 172:16
260:15

**VI**
106:12,14

**vice-president**
208:16

**video**
73:15 73:20 74:1,3
89:22

**videos**
73:22

**violations**
218:9

**violence**
233:6 270:11

**visit**
125:7 128:3 129:13

**visited**
195:15

**visitors**
58:20 71:11

**visualize**
93:6

**visually**
235:6

**voluntarily**
235:9

**Volunteer**
270:18

**W**

**W-A-L-T-O-N**
297:14

**W-A-S-S-E-R-M-A-
N**
28:22

**waiting**
62:17 222:13 268:6

**waive**
299:3

**walk**
35:15,24 45:7 51:14
103:2 133:9 137:21
142:18 172:19
173:16 175:23
179:10 183:1 191:8
197:1,11 273:18
281:16

**walked**
63:4,22 117:11
119:10 158:22
186:23 226:2 227:19
228:21

**walkie-talkie**
43:16,18

**walking**
45:5 68:24 69:4,8
112:20 138:23 139:6
141:11 142:9 148:21
149:10,13 154:11
175:13 178:24 179:8
184:17 185:10
197:7,15 285:19
293:24

**wall**
41:11 81:18 83:13,
17 84:1 96:10,11

**Walton**
297:12,19

**wandering**
57:11

**wanted**
36:19 53:12 116:11
152:9 184:23 185:2
223:24 253:6

**washroom**
13:15 45:8 49:7
51:24 99:16,18
100:4 147:6 228:18

245:9

**washrooms**
45:8 49:18 94:17
197:17

**Wasserman**
28:19,21,22,23 29:3,
4,8

**watch**
150:24

**watched**
74:8,11

**watching**
11:6 74:6 88:2,10,
13,21,22 293:17
294:12,14,16

**water**
11:5,6 13:7

**Watson**
300:4

**wave**
276:2

**waving**
276:4

**weapon**
41:7

**wear**
66:13 123:2

**website**
8:16 264:8,24 265:1
269:1 272:10

**Wednesday**
115:21

**week**
8:18 85:7 116:7,8
117:20 123:19

**weeks**
15:15 138:16 176:13

**welcomed**
33:16

**west**
33:18 48:17 49:1,3,
5,11 50:17 51:14
52:3 53:20 83:12
93:5,23,24 94:12,21
99:10 118:21 148:19
164:21 186:14,16
188:19 192:14,24
193:12,14 229:9

**whichever**
180:12

**white**
25:19,23 91:15,16
92:3,6

**Wild**
66:19

**window**
81:18 83:19

**withdraw**
247:12,15 250:14

**withdrawed**
257:15

**withdrawing**
20:6 247:21

**withdrew**
247:18,19 250:16

**witnessed**
280:23

**witnesses**
288:13,17

**Witz**
102:8

**woman**
102:14 174:17
238:18

**women**
20:3

**Wonderful**
51:17

**wondering**
28:21 75:5 162:1



Case: 1:16-cv-04804 Document #: 187-1 Filed: 03/15/19 Page 319 of 319 PageID #:1905
Case: 1:16-cv-04804 Document #: 93-1 Filed: 03/15/19 Page 319 of 319 PageID #:1905
Kim Ammons 08/29/2017

279:23
**wood**
    8:18
**word**
    145:22 175:9 291:9
**wore**
    227:3
**work**
    18:15,18,19 19:5
    21:13,16 26:24
    27:18 29:23 30:4
    45:1 61:17 62:14
    75:1 76:11 78:19
    86:18 87:8,12 92:17,
    20 99:23 104:21
    105:14 106:4,6
    108:23 112:2,21
    114:7,18,21 115:6
    117:9 118:22
    127:14,17 128:22
    129:5 131:7 143:15,
    19 145:20 146:20
    148:8 153:7 161:18,
    19 178:16 181:7,9,
    10 184:2 185:7
    187:18 189:2,21,22
    193:4 196:8 198:4
    200:11 201:21
    206:16,17,21,24
    209:5,17 212:5,17,
    18,22 217:24 223:16
    225:24 230:9,12
    231:12 253:7 254:4,
    22 266:18,21 270:3
    272:20 273:12,13
    282:10 284:10 286:2
    292:24 295:3 297:20
**worked**
    34:13 37:23 67:1
    72:24 79:5 90:13
    100:11 121:12
    127:17 177:16
    180:20 188:19,20
    230:10
**worker**
    100:6
**workers**
    91:23
**working**
    23:21 40:6 52:16
    70:24 92:23 104:19
    111:16 120:15,21
    123:11 127:14
    129:19 130:1 132:7
    143:17 154:1 159:13
    163:20 174:8 185:10
    202:7 225:24
    275:18,20 285:19
**workmen's**
    108:22
**workplace**
    264:14
**worry**
    165:7
**worse**
    76:12 86:15,16
    106:2 129:3,4 183:9
**worst**
    20:10 141:8 232:18
**worth**
    299:7
**wow**
    16:3 51:17 65:12
    72:8 107:19 160:6
    229:16
**write**
    63:11,12 65:17
    129:4 214:16
**writing**
    118:9 213:12,23
**written**
    77:17 160:6 170:1

183:12 237:2
245:11,14 247:12
250:14
**wrong**
    96:16 136:3 211:4
    257:13
**wrote**
    116:19 160:11 197:1
    198:23 208:20
    213:4,22,24 238:21

---
### X

**X-RAY**
    40:12,13,23 172:15,
    16

---
### Y

**yard**
    39:9
**yards**
    39:4,13
**year**
    19:18 20:23 21:2
    25:2 27:19 44:7
    46:16 52:10 54:3,5
    59:7 60:4 64:17
    73:9,13 76:15 92:1
    94:9 98:17 102:3
    134:21 144:2 146:6
    155:20 163:16
    164:1,11,12 189:20
    195:15 200:22
    209:17 230:3,7
    234:20 236:5,9
    237:15,19,21 249:20
    256:23 266:8 274:15
    297:22,24
**years**
    14:21 20:4,24 21:24
    25:5 34:10 35:13
    37:21 42:12 94:5,6
    121:13,17 126:11
    154:1 183:10 230:11
    236:24 238:15
    239:5,6 281:20
**yelling**
    147:1
**yesterday**
    129:5 299:10
**young**
    180:4 219:6 233:14,
    15
**younger**
    18:9
**youngest**
    18:6,7

---
### Z

**Z-I-Y-A-D**
    208:13
**Ziyad**
    208:13

